UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. ______________

07-61738

CIV-MARRA

MAGISTRATE JUDGE JOHNSON

FILED by INTAKE D.C.
NOV 29 2007
CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - FT. LAUD.

CAROLINA ACQUISITION, LLC., as Owner of a 2005 Twin Screw 66 ½ Foot Fiberglass M/Y "BRYEMERE"

Plaintiff,

vs.

DOUBLE BILLED, LLC., PRICE MARINE SERVICES, INC., HMY YACHT SALES, INC., THOMAS PRICE, JIM BARBONI, RICHARD C. TALBERT, JR.,

Defendants.
_________________________________/

**NOTICE OF REMOVAL**

COMES NOW Defendant, DOUBLE BILLED, LLC (hereinafter "DOUBLE BILLED") by and through undersigned counsel and pursuant to 28 U.S.C. sections 1332, 1441 and 1446, hereby files this Notice of Removal to the United States District Court for the Southern District of Florida, Fort Lauderdale Division, from the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, Florida, where the action is currently pending, and states that:

1. According to the records of the Broward County Clerk of Court, on or about October 29, 2007, the Plaintiff, Carolina Acquisitions, LLC., (hereinafter "Plaintiff") filed a lawsuit in the Circuit Court for the Seventeenth Judicial Circuit in and for Broward County, Florida entitled, "CAROLINA ACQUISITION, LLC., as Owner of a 2005 Twin Screw 66 ½ Foot Fiberglass Motor Yacht "BRYEMERE" v. DOUBLE BILLED, LLC.,



PRICE MARINE SERVICES, INC., HMY YACHT SALES, INC., THOMAS PRICE, JIM BARBONI, RICHARD C. TALBERT, JR.," Case Number CACE07028684(13).

2. The Plaintiff, Carolina Acquisition, LLC., is a limited liability company incorporated in the state of Rhode Island. Based upon information and belief, Carolina Acquisition, LLC., maintains its principal place of business in the state of Rhode Island. The sole member of Carolina Acquisition, LLC., is Brian O'Neill. [Compl. at ¶ 17]. Based upon information and belief Brian O'Neill is a citizen of the state of Pennsylvania. "A limited liability company is a citizen of any state of which a member of the company is a citizen." Rolling Greens MHP, L.P. v. Comcast SCH Holdings, L.L.C., 374 F.3d 1020, 1022 (11th Cir. 2004).

3. Defendant, DOUBLE BILLED, LLC., is a limited liability company incorporated in the state of Delaware which is also the LLC's principal place of business. DOUBLE BILLED has two members: Richard C. Talbert, Jr. and Jack Medlin. Talbert is a citizen of the state of South Carolina. Medlin is a citizen of the state of North Carolina.

4. Defendant, PRICE MARINE SERVICES, INC., is a corporation incorporated in the state of Florida which maintains its principal place of business in the state of Florida. PRICE MARINE SERVICES, INC. is a citizen of the state of Florida.

5. Defendant, HMY YACHT SALES, INC., is a corporation incorporated in the state of Florida which maintains its principal place of business in the state of Florida. HMY YACHT SALES, INC., is a citizen of the state of Florida.

6. Defendant, THOMAS PRICE, based upon information and belief is a citizen of the state of Florida.

7.    Defendant, JIM BARBONI, based upon information and belief is a citizen of the state of Florida.

8.    Defendant, RICHARD C. TALBERT, JR., is a citizen of the state of South Carolina.

9.    Plaintiff alleges damages in excess of $75,000.00 stemming from transaction involving two (2) vessels with a total purchase price of $2,275,000.00. [Compl. at ¶ 54, 63, 69, 75, 81, 92].

10.    Section 1332 provides that where a complaint is founded on diversity of citizenship, a federal court may maintain jurisdiction over the action "where the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between (1) citizens of different States." 28 U.S.C. 1332 (2006).

11.    Given the foregoing there is complete diversity of citizenship pursuant to 28 U.S.C. section 1332, therefore, this case is removable pursuant to 28 U.S.C. sections 1441 and 1446.

12.    This lawsuit was served upon Defendant DOUBLE BILLED on or about November 15, 2007.

13.    This lawsuit was served upon Defendant TALBERT on or about November 23, 2007. Defendant TALBERT consents to removal of this case to Federal Court.

14.    This Notice of Removal is "filed within the thirty days after receipt by the defendant," as required by 28 U.S.C. section 1446(b), and it is therefore timely.

15.    Pursuant to 28 U.S.C. 1446(a) a true and correct copy of all process, pleadings, and orders served upon DOUBLE BILLED is attached hereto as Defendant's Composite Exhibit "1".

16.     Venue is proper in the United States District Court for the Southern District of Florida pursuant to the Purchase and Sale Agreement, attached to Plaintiff's Complaint as Exhibit "A" which is part of Defendant's Composite Exhibit "1" to this Notice of Removal which provides that venue lies in Broward County, Florida.

17.     The movant has examined the Circuit Court docket and there is no evidence in the record for the 17th Judicial Circuit in and for Broward County, Florida as of November 29, 2007, that service has been made on any co-defendants other than TALBERT in this action.  Defendant TALBERT consents to removal of this case to Federal Court.  As such, Defendant has not conferred with the remaining co-defendants as consent to removal from non-served named defendants is not necessary for removal. Robert White v. Bombardier Corporation, et al., 313 F.Supp.2d 1295, 1300 (N.D. Fla. 2004).

18.     Pursuant to 28 U.S.C. section 1446(d), Defendant is serving written notice of the Notice of Removal to all served adverse parties and the Clerk of the State Court.

[CONTINUES ON NEXT PAGE]

WHEREFORE, Defendant prays that this Notice of Removal will be deemed good and sufficient, and that proceedings attached hereto be removed from the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, Florida to this Honorable Court's docket.

Respectfully submitted,

By: ______________________

ANDREW N. MESCOLOTTO (28141)
andrew.mescolotto@fertig.com

CHRISTOPHER R. FERTIG (218421)
chris.fertig@fertig.com

FERTIG AND GRAMLING
200 Southeast 13th Street
Fort Lauderdale, FL 33316
PH: (954) 763-5020
FX: (954) 763-5412
Attorneys for Defendant
Double Billed, LLC. &
Richard C. Talbert, Jr.

IN THE CIRCUIT COURT FOR THE 17TH JUDICIAL CIRCUIT IN AND FOR BROWARD COUNTY, FLORIDA

CAROLINA ACQUISITION, LLC., as Owner of a 2005 Twin Screw 66 ½ Foot Fiberglass Motor Yacht "BRYEMERE"

0728684 13

Plaintiff,

vs.

DOUBLE BILLED, LLC., PRICE MARINE SERVICES, INC., HMY YACHT SALES, INC., THOMAS PRICE, JIM BARBONI, RICHARD C. TALBERT, JR.,

Defendants.

_________________________/

## SUMMONS

THE STATE OF FLORIDA:

To All Singular the Sheriffs of the State:

YOU ARE COMMANDED to serve this Summons and a copy of the Complaint or Petition in this action on Defendant,

**DOUBLE BILLED, LLC.**
**1209 Orange Street**
**Wilmington, DE 19801**

Each Defendant is required to serve written defenses to the Complaint, to Plaintiff's attorney, whose name and address is: **Robert D. McIntosh, Esq., Adorno & Yoss, LLP, 888 S.E. 3rd Avenue, Suite 500, Fort Lauderdale, Florida 33316. Telephone No.: (954) 523-5885,** within 20 days after service of this Summons on that Defendant, exclusive of the date of service, and to file the original of the defenses with the Clerk of this Court either before service on the attorneys or immediately thereafter. If a Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint or petition.

DATED ON: OCT 29 2007

HOWARD C. FORMAN

As Clerk of the Court

By:_________________
Deputy Clerk

A TRUE COPY
Circuit Court Seal

DEFENDANT'S
EXHIBIT
1

## IMPORTANTE

Usted ha sido demandado legalmente. Tiene veinte (20) dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, proescrito, y presentarla ante este tribunal. Una llamada telefonica no lo protegera; si usted desea que el tribunal considere su defensa, debe presenter su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas en dicho caso. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen etros requisitos legales. Si lo desea, puede usted consultar a un abogado immediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda pro su cuenta, al mismi tiempo en que presenta su respuesta ante el tribunal, debere usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney." (Demandate o Abogado del Demanadante).

## IMPORTANT

Des poursuites judiciaries ont ete entreprises contre vous. Vous avez 20 jours consecutifs a partir de la date de l'assignation de cet'te citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce Tribunal. Un simple coup de telephone est insuffisant pour vous proteger; vous etes obliges de deposes votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommes ici, si vous souhaitez que le Tribunal entendre votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la couse ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du Tribunal. Il y a d'autres obligations juridiquez et vous pouvez requerir les services immediatsd'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parveniir ou expedier une copie au carbone ou une photocopie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney: (Plaignant ou a son avocat) nomme ci-dessous.

In accordance with the Americans With Disabilities Act of 1990 (ADA), disabled persons who, because of their disabilities, need special accommodation to participate in this proceeding should contact the ADA Coordinator at 201 S.E. 6th Street, Room 136, Fort Lauderdale, Florida 33301, or telephone voice/TDD (305)357-6364 not later than five business days prior to such proceeding.

IN THE CIRCUIT COURT FOR THE 17TH JUDICIAL CIRCUIT IN AND FOR BROWARD COUNTY, FLORIDA

CAROLINA ACQUISITION, LLC., as Owner of a 2005 Twin Screw 66 ½ Foot Fiberglass Motor Yacht "BRYEMERE"

Plaintiff,

vs.

0728684

DOUBLE BILLED, LLC., PRICE MARINE SERVICES, INC., HMY YACHT SALES, INC., THOMAS PRICE, JIM BARBONI, RICHARD C. TALBERT, JR.,

Defendants.

_______________________________________/

A TRUE COPY
HOWARD C. FORMAN
CLERK OF CIRCUIT COURT
OCT 29 2007

**COMPLAINT**

COMES NOW the Plaintiff, CAROLINA ACQUISITION, LLC., as Owner of a 2005 Twin Screw 66 ½ Foot Fiberglass Motor Yacht *"BRYEMERE"* ("Vessel"), and files its Complaint against Defendants DOUBLE BILLED, LLC., PRICE MARINE SERVICES, INC., HMY YACHT SALES, INC., THOMAS PRICE, JIM BARBONI, and RICHARD C. TALBERT, JR., and alleges as follows:

**PARTIES, JURISDICTION and VENUE**

1. This is an action for damages in excess of fifteen thousand and 00/100 ($15,000.00), and is otherwise within the jurisdiction of this Court.

2. [redacted]LLC., 1209 Orange Street, Wilmington, DE 19801, is a South Carolina Corporation, and [redacted]

3. Defendant RICHARD C. TALBERT, JR., a/k/a "Dickey" Talbert, 1702 Havens Drive, North Myrtle Beach, SC 29582, is a South Carolina resident, holds an unknown interest in DOUBLE BILLED, LLC., and is subject to jurisdiction in the State of Florida where he committed tortious acts in the State of Florida, committed a fraud in the State of Florida, and entered into a contract for the sale of a Vessel in the State of Florida. Defendant RICHARD C. TALBERT, JR. employed the corporate fiction DOUBLE BILLED, LLC. to perpetuate a fraud in the State of Florida.

4. Defendant HMY YACHT SALES, INC., 817 NE 3rd Street #1, Dania FL 33004, is a Florida Corporation, and is subject to the jurisdiction of this Court.

5. Defendant JIM BARBONI, a yacht broker with HMY YACHT SALES, INC., is a Florida resident subject to the jurisdiction of this Court.

6. Defendant PRICE MARINE SERVICES, INC., 9418 SE Sharon Street, Hobe Sound, Florida 33455 is a Florida Corporation which is subject to the jurisdiction of this Court.

7. Defendant THOMAS PRICE, director of PRICE MARINE SERVICES, INC., is a Florida resident who is subject to the jurisdiction of this Court.

8. Venue is proper in Broward County pursuant to the terms of the Purchase and Sale Agreement, attached hereto as **EXHIBIT "A,"** which provides that venue lies in Broward County, Florida. *See Paragraph 15, EXHIBIT "A."* Venue is also proper in Broward County Florida pursuant to Florida Statute 47.021 and 47.051.

## GENERAL ALLEGATIONS

9. The Plaintiff realleges and reavers each and every allegation contained in Paragraphs 1-8 as if fully set forth herein.

10. [illegible]. Specifically, on or about March 7, 2007, Brian O'Neill, sole member of CAROLINA ACQUISITION, LLC, entered into a Conditional Purchase and Sale Agreement for the above-referenced yacht with the "Owner of Record," DOUBLE BILLED, LLC. *See EXHIBIT "A."* The sale was conditioned on a pre-purchase survey, as well as the trade of a 1998 53' Ocean "*Breymore V.*" As will be explained in further detail below, Plaintiff entered into the Conditional Purchase and Sale Agreement as a result of the fraudulent inducement of Defendants DOUBLE BILLED, LLC., HMY YACHT SALES, INC., JIM BARBONI, and RICHARD C. TALBERT, JR.

11. [illegible]

12. The Purchase and Sale Agreement provides for prevailing party attorney's fees. *See EXHIBIT "A," Paragraph 15.*

13. Defendants HMY YACHT SALES, INC. and JIM BARBONI were the yacht broker and central listing agent for the sale of the yacht.

14. Brian O'Neill first became aware of the yacht through an advertisement posted by Defendant HMY YACHT SALES, INC. and prepared and/or authorized by or with the assistance of Defendants DOUBLE BILLED, LLC. and RICHARD C. TALBERT, JR. A copy of said advertisement is attached hereto as **EXHIBIT "B."** Also attached is a soldboat.com advertisement, that represents the yacht had a "hull being solid fiberglass construction and custom built to the highest standard." A copy of the soldboats.com listing is attached hereto as EXHIBIT "C." The listing further provides in the section, "Salesman's Remarks":

> This awesome like "NEW" (only 250 hours with an IN-SERVICE DATE OF MAY 2006) solid fiberglass Custom Carolina Sport Fish has all the attributes you would expect of a high performance custom yacht. The speed, sea handling, and those looks, with the sleek profile and Carolina flare...

Id.

15. The "Salesman's Remarks" in a similar soldboats.com listing for the same vessel states as follows:

> "Double Billed" is an absolutely beautiful example of the best of the "NEW Custom Carolina" boats. She is Hull #3 with #4 and #5 now in production.

A copy of the additional soldboats.com listing is attached hereto as **EXHIBIT "D."**

16. In both listings, JIM BARBONI of HMY YACHT SALES, INC. is listed as the central listing agent and salesperson.

17. Brian O'Neill, sole member of CAROLINA ACQUISITION, LLC, first became interested in purchasing the Vessel based on the above-referenced initial advertisement.

18. On or about March 18, 2007, Brian O'Neill met with Defendants JIM BARBONI and RICHARD C. TALBERT, JR. in North Palm Beach, Florida to first view and test drive the Vessel.

19. Subsequently, on or about March 22, 2007, a sea trial was conducted in Lake Worth with Brian O'Neill, L.J. Gallagher, Timothy Caruso, THOMAS PRICE, JIM BARBONI and RICHARD C. TALBERT, JR. present. [illegible]

20. The sea trial was conducted only in Lake Worth, and not in the Atlantic Ocean on the suggestion of RICHARD C. TALBERT, JR., who stated that it was too rough on the day in question. The marine surveyors, THOMAS PRICE and Timothy Caruso agreed, especially since Mr. Caruso would have to be in the engine room underway.

21.    During the sea trial, RICHARD C. TALBERT, JR. represented to Plaintiff that the Vessel had run approximately 120 miles at roughly 30 knots in six to eight foot seas with no problems.

22.    Upon returning to Harbor Point Marina from the sea trial, RICHARD C. TALBERT, JR. voluntarily and without request showed Plaintiff and surveyors 2" samples of the bottom hull and 1 & ¼" samples of the topsides, and represented these samples to be consistent with the actual width of the hull and topside material. These samples were not from the actual hull of the Vessel.

23.    During negotiations for the purchase of the Vessel, JIM BARBONI repeatedly represented to the Plaintiff that the Vessel was "well put together," "made to fish," and generally "a good boat."

24.    Subsequent to the sea trial, THOMAS PRICE of PRICE MARINE SERVICES, INC. prepared a report based on his survey of the hull of the Vessel. A copy of the report is attached hereto as **EXHIBIT "E."**

25.    As noted on Page 1 of 15 of the report, Mr. PRICE listed the bottom and topsides hull condition as "sound." *See EXHIBIT "E," Page 1 of 15.* Additionally, on Page 4 of 15, Mr. PRICE listed the fuel tanks as appearing good where accessible (but also noted later on that he recommended several fixes for securing the fuel tanks better). *See EXHIBIT "E," Page 11-12 of 15.*

26.    Mr. PRICE's report also states as follows:

> In dry dock, the bottom was sounded with a phenolic hammer and found to be basically sound. No gelcoat blisters were found on the bottom during this inspection... The topsides were metered and sounded with phenolic hammer and found to be basically sound... The decks and superstructure were examined and found to be generally sound with no hard or abusive use... The structural interior of the vessel was inspected where accessible without major removals and found to

> be generally sound. All partitions and bulkheads were inspected where accessible and found to show no signs of weakness due to flexing or separation of their fastenings.

*See EXHIBIT "E," Pages 9 – 10 of 15.*

27. Timothy Caruso of Marine Diesel Analysts, Inc. also prepared a report based on his observations during the sea trial. A copy of this report is attached hereto as **EXHIBIT "F."** As noted in Mr. Caruso's report, the ECM showed only 291 hours for port engine and 292 hours for the starboard. *See EXHIBIT "F."*

28. On or about March 29, 2007, there was an additional sea trial performed by Kevin Calhoun of Calhoun and Company, where Mr. Calhoun observed problems with propeller and drive shaft vibration. A copy of Mr. Calhoun's report is attached hereto as **EXHIBIT "G."**

29. On or about April, 19, 2007, Plaintiff closed on the purchase of the yacht. A copy of the closing documents are attached hereto as **EXHIBIT "H."** As will be explained in further detail below, the Plaintiff closed on the purchase of the yacht as a result of the fraudulent inducement of Defendants DOUBLE BILLED, LLC., HMY YACHT SALES, INC., JIM BARBONI, and RICHARD C. TALBERT, JR.

30. As noted in the three surveys attached to the instant Complaint, there were several items that needed to be addressed on the Vessel, and accordingly, on or about April 23, 2007, the yacht was moved to Eagle Eye Enterprises at Cracker Boy Boatyard to have repairs and some upgrades made. These repairs and upgrades included but were not limited to reworking the propellers, installing a teak transom on the boat, painting the foredeck and adding a bowrail. Notably, none of the repairs involved the structural integrity of the hull, and none of the surveys indicated any problems with the structural integrity of the hull.

31. From April 24, 2007 – June 21, 2007, Eagle Eye Enterprises worked on repairing and upgrading the yacht.

32. On June 21, 2007, the Vessel was placed back in the water and moved to Lake Park Marina in North Palm Beach, Florida, where it was subsequently discovered that the transducer was leaking, and additional repairs had to be made. During work on the starboard generator, bad diesel fuel was also found. The vessel was serviced at Lake Park Marina until approximately June 23, 2007, when it was brought back to Cracker Boy Marine to have the leaking transducer fixed, and the bad fuel removed.

33. Ultimately, after several more days of work (including servicing the engines, generators and transmission) the Vessel was ready to be delivered to New England. On Friday, June 29, 2007, the vessel departed Lake Park Marina in North Palm Beach, Florida.

34. On Saturday, June 30, 2007, during the trip from Fort Pierce, Florida to Charleston, South Carolina, the crew and passengers (including Dan O'Neill, Jeff Thiel, Mark Cox, Nick Falcone and L.J. Gallagher) noticed a lot of movement in the forward fuel tanks, which was a problem that was constantly monitored on the way into Charleston.

35. Upon arrival in Charleston, during the daily checks of the Vessel, sludge was observed coming from under the forward fuel tanks. It is believed that the sludge is some form of epoxy, that when combined with water, does not function as intended.

36. On Monday July 2, 2007, when traveling between Beaufort, North Carolina, and Ocean City, Maryland, Mr. Gallagher noticed considerable flex underneath the cabinets on the starboard side of the hallway. Mr. Gallagher immediately notified the mate, Jeff Thiel, and they both notified the Captain, Dan O'Neill. All were in agreement that the flexing was a serious issue that deserved further attention.

37. Upon arrival in Ocean City, Maryland, the outside of the hull was inspected and there were no visible cracks. Then the carpet was pulled back to observe the wall where the flexing took place. The carpet was difficult to remove as it had been glued down. Once the carpet was removed, it was revealed that there was a hatch on the wall that had been covered by the carpet. While there were no cracks in the wall, there was far more flex in the wall than there should have been.

38. From Ocean City, the short trip was made to Cape May, New Jersey under calm conditions. The vessel proceeded slowly with caution. While flex was observed during this leg of the trip, it was not observed as being too bad in the mind of the Captain, crew and passengers.

39. On Wednesday, July 4, 2007, the Vessel departed Cape May and subsequently arrived in Newport, Rhode Island with little problems (aside from the previously observed flex).

40. Upon arrival in Rhode Island, [illegible] from Hinckley Boats came onboard the Vessel and immediately notified those present that the [illegible] a major issue. Another section of carpet was removed, and an additional hatch (which showed signs of previously having been opened) was discovered.

41. On the same day, a core sample was drilled [illegible] discovered that the interior laminate had delaminated from the outer layer. Additionally, Tony Knowles from Newport Marine Surveyors was called in to perform a survey of the Vessel, and a copy of the original design of the vessel was ordered from Jersey Cape Boats, who had bought the plans from Blount Design.

42. Mr. Knowles recommended a full survey and sea trial, and said survey and sea trial were performed on or about July 10, 2007. After less than 15 minutes of the sea trial, the Vessel was brought back to the dock as all parties aboard had observed major flex in only

minimal waves. A copy of Mr. Knowles report is attached hereto as **EXHIBIT "I."** Mr. Knowles observed the following:

> From the galley to the forward cabin, approx 18 ft.
> Starboard side: The core is delaminated above the chine, from the inside laminate of the sandwich construction
> Port side: The core is delaminated above the chine, from the outside laminate
> Also, the core thickness is not as specified
>
> Starboard side:
> The cabin sole supports which are structural are compromised by holes cut to run hoses. An example is at the aft' end of the starboard passageway.
>
> **The hull bottom is flexing alarmingly (at least 2 in. of vertical movement) in the area of the forward fuel tanks, port and starboard.** Stringers have broken and cracks can be seen on the inside surfaces of the hull.
>
> Stress cracks on the outside of the hull, radiate from the chine up the hull sides, port and starboard in the middle of the boat.
>
> The starboard inboard stringer under the forward cabin has been compromised by cutting off the inboard wall to install the black water tank
>
> The port and starboard fuel tank bracket welds are broken.
>
> The aft' main fuel tank is bearing on the stringers and hull bottom.

Id. (emphasis added).

43. After pulling the Vessel out of the water at Hinckley for an additional inspection of the hull, another sea trial was performed on or about July 12, 2007 with the original hull surveyor, THOMAS PRICE, and a hull specialist, Bruce Pfund. A copy of Mr. Pfund's July 25, 2007 report is attached hereto as **EXHIBIT "J."** Mr. Pfund's report reads in part:

> SEA TRIALS:
> A brief inspection was followed by sea trials. **During the sea trials I stood on the hull shell bottom's inner surface in a cutout made by Hinckley personnel prior to my inspection. Sea conditions were calm, boat wakes small, yet the bottom panel moved up and down approximately 2". Broken tank mounts could be seen moving around, with the tanks rising and falling in an alarming amount. The delaminated inner skin of the starboard topside's**

> **foam cored panel in the passageway was observed panting in and out approximately 1/2".**
>
> SUMMARY OF OBERSVATIONS AND CONCLUSIONS:
> **The vessel as built does not correspond in a number of important composite construction respects to the plans provided by Donald Blount and Associates, Incorporated. Significant deviations were noted in material selections and the size and location of the hull's stringers and bulkheads.**

Id. (emphasis added).

44. Mr. Pfund's report goes on to find numerous problems with the construction of the hull, as well as a great deal of damage, including but not limited to core delamination, core thickness too small, and stringers too short. Id.

45. Matthew Smith, a naval architect from Barrington, Rhode Island, also performed a survey on the Vessel. A copy of his report is attached hereto as **EXHIBIT "K."** Mr. Smith's findings are best summarized by the following language found within his report:

> **... the yacht was not built to the designer's structural specifications and as a result is unsafe to operate and not structurally sound...**
>
> ***
>
> **Sea Trials**
>
> ***
>
> When motoring out of the marina at approximately 8 knots, I observed flexing in the forward bottom panels between the outboard stringer and chine of approximately ½"/ When crossing our (sic) own wake at 22 to 28 knots, these bottom panels flexed approximately 2" to 3" which is extreme. The magnitude of typical bottom panel deflection for a yacht of this size and speed would be approximately 1/8".
>
> The bottom panel flexing has caused the forward ends of the outboard hull stringers to break free from the bottom panel. The outboard fuel tanks are attached to these stringers and as a result the mounting brackets on the fuel tanks have cracked and both tanks are effectively floating between the stringer...
>
> ***

> **The conditions which we subjected the hull to during our sea trials are very minor when compared to sea conditions that would be encountered during the normal use of the yacht when fishing 100 miles or so offshore. I would predict that if the yacht were to encounter 6 to 8 ft seas offshore when running at 28 to 30 knots, the structural failure would be catastrophic and potentially result in loss of vessel and life.**

Id. (emphasis added).

46. A preliminary estimate of the cost to repair the Vessel ranges between $600,000 and $1,000,000 U.S. Dollars, presuming the structures under the tanks are intact. A copy of an e-mail from Hinckley is attached hereto as **EXHIBIT "L."**

**COUNT I: FRAUDULENT INDUCEMENT AGAINST DOUBLE BILLED, LLC**

48. The Plaintiff reavers each and every allegation stated in Paragraphs 1 – 47 above as if fully stated herein.

49. [redacted]

50. Despite said knowledge, Defendant DOUBLE BILLED, LLC., through its agents and members, knowing made the following misrepresentations and omissions of material fact with the intent of inducing Plaintiff into purchasing the yacht, including but not limited to:

a) Advertising and/or permitting the Vessel to be advertised as "solid fiberglass construction and custom built to the highest standard";

b) Advertising and/or permitting the Vessel to be advertised as like "NEW";

c) Advertising and/or permitting the Vessel to be advertised as having "all the attributes of a true Carolina Custom Sportfish from her great speed and bow flare to the excellent sea keeping in all conditions."

d) Misrepresenting that the Vessel had performed well in 6-8 foot seas, traveling at up to 30 knots for approximately 120 miles;

e) Knowingly providing core samples of the bottom and topsides of the hull that were not from the actual vessel, and were not representative of the actual thickness;

f) Advertising or permitting the Vessel to be advertised as hull number 3, and that two more were in progress, when in fact the builder either went out of business and/or committed suicide, and two more vessels were not built.

g) Failing to disclose serious hidden defects with the structural integrity of the Vessel.

51. Plaintiff also believes that Defendants DOUBLE BILLED, LLC. and RICHARD C. TALBERT, JR. were not selling the Vessel to pay for a real estate transaction in St. Thomas (as claimed by RICHARD C. TALBERT, JR.), but rather, were selling the boat because of the above-referenced problems with the hull.

52. DOUBLE BILLED, LLC. knew that the above-referenced misrepresentations were false, and made them for the purpose of inducing Plaintiff to purchase the Vessel.

53. Plaintiff relied on the above-referenced misrepresentations to its own detriment, and purchased the Vessel, which is completely unseaworthy and unsafe.

54. As a result of Defendant's misrepresentations, Plaintiff has suffered damages, including but not limited to the cost of the Vessel ($1,575,000.00 cash, plus traded a 1998 53'

Ocean "*Breymore V*," valued at $700,000.00, for a total amount of $2,275,000.00),

▓▓▓▓▓▓ $250,000.00 spent in ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ the costs of various

marine surveyors and naval architects, attorney's fees in prosecuting this action, and any other

damages recoverable by law.

### COUNT II: FRAUDULENT INDUCEMENT AGAINST RICHARD C. TALBERT, JR.

55.    The Plaintiff reavers each and every allegation stated in Paragraphs 1 – 47 above

as if fully stated herein.

56.    Defendant RICHARD C. TALBERT, JR. owned an unknown interest in

Defendant DOUBLE BILLED, LLC.

57.    Defendant RICHARD C. TALBERT, JR. used the corporate fiction DOUBLE

BILLED, LLC., title owner of the Vessel, to perpetuate a fraud against Plaintiff, and otherwise

disregarded the corporate form of DOUBLE BILLED, LLC. sufficient to pierce the corporate

veil. Additionally, Defendant RICHARD C. TALBERT, JR. made fraudulent statements in his

individual capacity for the purpose of inducing the Plaintiff to purchase the 2005 Twin Screw 66

½ Foot Fiberglass Motor Yacht "*BRYEMERE.*"

58.    ▓▓▓▓▓▓▓▓▓▓▓▓ OF TALBERT, JR. knew ▓▓▓▓▓▓▓▓▓▓▓▓ 2005 Twin

S▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ the Plaintiff

th▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ structural

;▓▓▓▓▓▓

59.    Despite said knowledge, Defendant RICHARD C. TALBERT, JR. knowingly

made the following misrepresentations and omissions of material fact with the intent to induce

Plaintiff into purchasing the Vessel, including but not limited to:

13

a) Advertising and/or permitting the Vessel to be advertised as "solid fiberglass construction and custom built to the highest standard";

b) Advertising and/or permitting the Vessel to be advertised as like "NEW";

c) Advertising and/or permitting the Vessel to be advertised as having "all the attributes of a true Carolina Custom Sportfish from her great speed and bow flare to the excellent sea keeping in all conditions."

d) Misrepresenting that the Vessel had performed well in 6-8 foot seas, traveling at up to 30 knots for approximately 120 miles;

e) Knowingly providing core samples of the bottom and topsides of the hull that were not from the actual vessel, and were not representative of the actual thickness;

f) Advertising or permitting the Vessel to be advertised as hull number 3, and that two more were in progress, when in fact the builder either went out of business and/or committed suicide, and two more vessels were not built.

g) Failing to disclose serious hidden defects with the structural integrity of the Vessel.

60. Plaintiff also believes that RICHARD C. TALBERT, JR. was not selling the Vessel to pay for a real estate transaction in St. Thomas (as claimed by RICHARD C. TALBERT, JR.), but rather, was selling the boat because of the above-referenced problems with the hull.

61. RICHARD C. TALBERT, JR. knew that the above-referenced misrepresentations were false, and made them for the purpose of inducing Plaintiff to purchase the Vessel.



[redacted]

63. As a result of Defendant's misrepresentations, Plaintiff has suffered damages, including but not limited to the cost of the Vessel ($1,575,000.00 cash, plus traded a 1998 53' Ocean "*Breymore V*," valued at $700,000.00, for a total amount of $2,275,000.00), [redacted] the costs of various marine surveyors and naval architects, attorney's fees in prosecuting this action, and any other damages recoverable by law.

**COUNT III: FRAUDULENT INDUCEMENT AGAINST HMY YACHT SALES, INC.**

64. The Plaintiff reavers each and every allegation stated in Paragraphs 1 – 47 above as if fully stated herein.

65. Defendant HMY YACHT SALES, INC., as broker and central listing agent for the sale of the 2005 Twin Screw 66 ½ Foot Fiberglass Motor Yacht "*BRYEMERE*" (f/k/a "*M/V Double Billed*") [redacted]

66. Despite said knowledge, Defendant HMY YACHT SALES, INC., through its agents and brokers, knowingly made the following misrepresentations and omissions of material fact with the intent to induce Plaintiff into purchasing the Vessel, including but not limited to:

a) Advertising the Vessel as "solid fiberglass construction and custom built to the highest standard";

b) Advertising the Vessel as like "NEW";

c) Advertising the Vessel as having "all the attributes of a true Carolina Custom Sportfish from her great speed and bow flare to the excellent sea keeping in all conditions";

d) Repeatedly misrepresenting during negotiations to Plaintiff that the Vessel was "a good boat," "well put together," and was "made to fish";

e) Advertising and/or misrepresenting that the Vessel was hull number 3, and that two more were in progress, when in fact the builder either went out of business and/or committed suicide;

f) Failing to disclose serious hidden defects with the structural integrity of the Vessel.

67. HMY YACHT SALES, INC. knew that the above-referenced misrepresentations were false, and made them for the purpose of inducing Plaintiff to purchase the Vessel.

68. Plaintiff relied on the [illegible]

[illegible]

69. As a result of Defendant's misrepresentations, Plaintiff has suffered damages, including but not limited to the cost of the Vessel ($1,575,000.00 cash, plus traded a 1998 53' Ocean "*Breymore V*," valued at $700,000.00, for a total amount of $2,275,000.00), [illegible] $250,000.00 spent in upgrades to an unseaworthy vessel, the costs of various marine surveyors and naval architects, attorney's fees in prosecuting this action, and any other damages recoverable by law.

**COUNT IV: FRAUDULENT INDUCEMENT AGAINST JIM BARBONI**

70. The Plaintiff reavers each and every allegation stated in Paragraphs 1 – 47 above as if fully stated herein.

71. Defendant JIM BARBONI, as broker and central listing agent for the sale of the 2005 Twin Screw 66 ½ Foot Fiberglass Motor Yacht "*BRYEMERE*" (f/k/a "*M/V Double Billed*") knew prior to [illegible] the sale of the [illegible] seaworthy, and/or [illegible] problems with its [illegible]

72. Despite said knowledge, Defendant JIM BARBONI, knowingly made the following misrepresentations and omissions of material fact with the intent to induce Plaintiff into purchasing the Vessel, including but not limited to:

a) Advertising the Vessel as "solid fiberglass construction and custom built to the highest standard";

b) Advertising the Vessel as like "NEW";

c) Advertising the Vessel as having "all the attributes of a true Carolina Custom Sportfish from her great speed and bow flare to the excellent sea keeping in all conditions";

d) Repeatedly misrepresenting during negotiations to Plaintiff that the Vessel was "a good boat," "well put together," and was "made to fish";

e) Advertising and/or misrepresenting that the Vessel was hull number 3, and that two more were in progress, when in fact the builder either went out of business and/or committed suicide, and two more vessels were not built;

f) Failing to disclose serious hidden defects with the structural integrity of the Vessel.

73. JIM BARBONI knew that the above-referenced misrepresentations were false, and made them for the purpose of inducing Plaintiff to purchase the Vessel.

74. [illegible]

75. As a result of Defendant's misrepresentations, Plaintiff has suffered damages, including but not limited to the cost of the Vessel ($1,575,000.00 cash, plus traded a 1998 53' Ocean "*Breymore V*," valued at $700,000.00, for a total amount of $2,275,000.00), [illegible] the costs of various marine surveyors and naval architects, attorney's fees in prosecuting this action, and any other damages recoverable by law.

**<u>COUNT V: NEGLIGENCE AGAINST PRICE MARINE SERVICES, INC.</u>**

76. The Plaintiff reavers each and every allegation stated in Paragraphs 1 – 47 above as if fully stated herein.

77. PRICE MARINE SERVICES, INC. was retained by Plaintiff to perform a hull survey on the Vessel which took place on or about March 22, 2007. The hull survey was incidental to the purchase and sale of the Vessel.

78. Plaintiff relied on PRICE MARINE SERVICES, INC. to perform a hull survey to determine if the Vessel was structurally sound.

79. PRICE MARINE SERVICES, INC., as a professional surveyor, owed a duty to the Plaintiff to exercise reasonable care in accordance with the standard of care used by similar professionals in the community under similar circumstances in performing its hull survey.

80. PRICE MARINE SERVICES, INC. breached its duty of care owed to Plaintiff, by among other things, failing to recognize that the hull of the Vessel was structurally unsound, and that the Vessel was not built to manufacturer's specification.

81. As a result of PRICE MARINE SERVICES, INC.'s negligence, Plaintiff has suffered damages, including but not limited to the cost of the Vessel ($1,575,000.00 cash, plus traded a 1998 53' Ocean "*Breymore V*," valued at $700,000.00, for a total amount of $2,275,000.00) [redacted] the costs of various marine surveyors and naval architects, and any other damages recoverable by law.

## COUNT VI: NEGLIGENCE AGAINST THOMAS PRICE

82. The Plaintiff reavers each and every allegation stated in Paragraphs 1 – 47 above as if fully stated herein.

83. THOMAS PRICE, a professional surveyor, was retained by Plaintiff to perform a hull survey on the Vessel which took place on or about March 22, 2007. The hull survey was incident to the purchase and sale of the Vessel.

84. THOMAS PRICE, as a professional, can be held individually liable for the negligent performance of his work under the common law.

85. Plaintiff relied on THOMAS PRICE to perform a hull survey to determine if the Vessel was structurally sound.

86. THOMAS PRICE, as a professional surveyor, owed a duty to the Plaintiff to exercise reasonable care in accordance with the standard of care used by similar professionals in the community under similar circumstances in performing his hull survey.

87. [redacted]

88. As a result of THOMAS PRICE's negligence, Plaintiff has suffered damages, including but not limited to the cost of the Vessel ($1,575,000.00 cash, plus traded a 1998 53' Ocean "*Breymore V*," valued at $700,000.00, for a total amount of $2,275,000.00), [redacted], the costs of various marine surveyors and naval architects, and any other damages recoverable by law.

**<u>COUNT VII: VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICE ACT BY DEFENDANTS DOUBLE BILLED, LLC., JIM BARBONI, HMY YACHT SALES, INC., and RICHARD C. TALBERT, JR.</u>**

89. The Plaintiff reavers each and every allegation stated in Paragraphs 1 – 47 above as if fully stated herein.

90. Defendants DOUBLE BILLED, LLC., RICHARD C. TALBERT, JR., HMY YACHT SALES, INC., and JIM BARBONI, advertised the above-referenced Vessel as being structurally sound and fit for the purpose intended in an effort to induce the Plaintiff into purchasing the yacht. Among other things, the following misrepresentations or omissions of material fact were made by Defendants:

a) Advertising the Vessel as "solid fiberglass construction and custom built to the highest standard";

b) Advertising the Vessel as like "NEW";

c) Advertising the Vessel as having "all the attributes of a true Carolina Custom Sportfish from her great speed and bow flare to the excellent sea keeping in all conditions";

d) Repeatedly misrepresenting during negotiations to Plaintiff that the Vessel was "a good boat," "well put together," and was "made to fish";

e) Advertising and/or misrepresenting that the Vessel was hull number 3, and that two more were in progress, when in fact the builder either went out of business and/or committed suicide;

f) Failing to disclose serious hidden defects with the structural integrity of the Vessel.

91. The above-referenced misrepresentations and omissions constituted unfair sales and deceptive trade practices pursuant to Florida Statute §§ 501.201- 501.213.

92. Plaintiff relied to its detriment on the above-referenced misrepresentations and omissions in entering into the Purchase and Sale Agreement for the Vessel, and has suffered damages as a result, including but not limited to the cost of the Vessel ($1,575,000.00 cash, plus traded a 1998 53' Ocean "*Breymore V*," valued at $700,000.00, for a total amount of $2,275,000.00), a[illegible]mately $250,000.00 spent in [illegible] vessel, the costs of various marine surveyors and naval architects, attorney's fees in prosecuting this action, and any other damages recoverable by law.

93. Plaintiff demands its "actual damages" as well as attorney's fees, costs and interest.

**COUNT VIII: RESCISSION BY FRAUD**

94. The Plaintiff reavers each and every allegation stated in Paragraphs 1 – 47 above as if fully stated herein.

95. Plaintiff alleges that the Purchase and Sale Agreement for the Vessel was procured by fraud as a result of the misrepresentations, omissions, and/or misstatements of material fact by Defendants DOUBLE BILLED, LLC., HMY YACHT SALES, INC., JIM

BARBONI, and RICHARD C. TALBERT, JR., which are outlined in detail above. These material misrepresentations include:

a) Advertising and/or permitting the Vessel to be advertised as "solid fiberglass construction and custom built to the highest standard";

b) Advertising and/or permitting the Vessel to be advertised as like "NEW";

c) Advertising and/or permitting the Vessel to be advertised as having "all the attributes of a true Carolina Custom Sportfish from her great speed and bow flare to the excellent sea keeping in all conditions."

d) Misrepresenting that the Vessel had performed well in 6-8 foot seas, traveling at up to 30 knots for approximately 120 miles;

e) Knowingly providing core samples of the bottom and topsides of the hull that were not from the actual vessel, and were not representative of the actual thickness;

f) Advertising or permitting the Vessel to be advertised as hull number 3, and that two more were in progress, when in fact the builder either went out of business and/or committed suicide, and two more vessels were not built.

g) Failing to disclose serious hidden defects with the structural integrity of the Vessel.

96. [illegible] result of Defendants [illegible] [illegible] and had serious [illegible]. If Plaintiff had known of the structural defects in the Vessel, it would not have entered into the Purchase and Sale Agreement for the Vessel.

97. Accordingly, Plaintiff demands that the Purchase and Sale Agreement be rescinded and is therefore *void ab initio*, that the monies paid for the purchase of the Vessel be returned with interest, that the 1998 53' Ocean "*Breymore V*" be returned to Plaintiff, and the Plaintiff be awarded the costs of this action, its reasonable attorney's fees, interest, and any other damages recoverable by law, including but not limited to the monies spent repairing and upgrading said Vessel after its purchase.

**COUNT IX: RESCISSION BY MUTUAL MISTAKE OF FACT**

98. The Plaintiff reavers each and every allegation stated in Paragraphs 1 – 47 above as if fully stated herein.

99. In the alternative, Plaintiff alleges that the Purchase and Sale Agreement for the Vessel was entered into by Plaintiff and Defendant DOUBLE BILLED, LLC., based on both parties mistakenly believing that the Vessel was structurally sound and fit for the purpose intended. The structural condition of the Vessel was of the essence in the Purchase and Sale Agreement, and the foregoing constituted a mutual mistake of fact sufficient to rescind the Purchase and Sale Agreement.

100. Accordingly, Plaintiff demands that the Purchase and Sale Agreement be rescinded and is therefo[illegible]he monies paid for the purchase of the Vessel be returned with interest, that the 1998 53' Ocean "*Breymore V*" be returned to Plaintiff, and the Plaintiff be awarded the costs of this action, its reasonable attorney's fees, interest, and any other damages recoverable by law, including but not limited to the monies spent repairing and upgrading said Vessel after its purchase.

***WHEREFORE***, the premises considered, Plaintiff, CAROLINA ACQUISITION, LLC., demands judgment against Defendants for rescission, damages in excess of $75,000.00, costs, interest, attorney's fees and any other damages recoverable by law.

**DEMAND FOR JURY TRIAL**

Plaintiff, CAROLINA ACQUISITION, LLC. hereby demands trial by jury on all issues so triable.

Dated: October 29, 2007

Respectfully submitted,

By:________________________________

Robert D. McIntosh (FBN: 115490)
Email: rdm@adorno.com
Adam B. Cooke (FBN: 0634182)
Email: acooke@adorno.com
**ADORNO & YOSS LLP**
888 S.E. 3rd Avenue, Suite 500
Fort Lauderdale, Florida 33316-1159
Phone: (954) 523-5885
Fax: (954) 760-9531
Attorneys for Plaintiff

# EXHIBIT A



HMY
Yacht Sales Inc.

At Harbour Point Marina
2221 Monet Road
North Palm Beach, FL 33410
TEL. (561) 799-9590
FAX. (561) 799-5722

# PURCHASE & SALE AGREEMENT

Agreement made this 7th day of March 2007, between:

Brian O'Neill (Hereinafter referred to as Purchaser)  Owner of Record (Hereinafter referred to as Seller)

1. The Purchaser agrees to purchase and the Seller agrees to sell all rights, title and interest to the Vessel described as:

Name: "Double Billed" Hull No.: IBT66002A505

Model Year: 2005 Length: 66 Make: Legacy Type: Convertible

Registration No.: ______ Documentation No.: 116812

2. The purchase price is ~~O~~ One Million Five Hundred Fifty Thousand Dollars ($ 1,550,000.00 )

**Plus trade of 1999 53' Ocean SS with clear title.** KO

Sum of ~~One Hundred Fifty~~ 15,000 KO Thousand Dollars ($ ~~150,000.00~~ 15,000.00 KO )
is hereby paid to the escrow account of the Broker, acknowledged below, as a deposit toward the purchase price, and subject to the terms of this Agreement; said funds to be cleared into said account following acceptance by Seller. 135,000 additional deposit shall be paid at completion of survey + seatrial KO

3. This offer to purchase shall be accepted by Seller, and written evidence thereof delivered to the selling Broker on or before March 8, 2007, or this offer shall be deemed revoked and the deposit shall be returned to Purchaser.

4. Written or telegraph acceptance or rejection of the Vessel must be made by the Purchaser by March 30, 2007 Purchaser's failure to exercise his right of acceptance or rejection as specified shall be construed as rejection. In the event of rejection the deposit shall be returned to Purchaser after all expenses incurred by Purchaser against Vessel have been paid.
   (a) The sale of the Vessel is subject to:
      1) Marine Survey at the option and expense of the Purchaser.
      2) Sea Trial at the option of the Purchaser and at the expense of the Owner, to be conducted as soon as practicable after the signing of the Agreement, permission for which is hereby granted by Owner.
      3) Delivery of Vessel and Equipment per the attached listing.

   (b) In the event this sale is subject to survey, the Purchaser acknowledges and agrees:
      (1) He has selected a surveyor who is in his employ and is responsible solely to Purchaser for any errors or omissions, notwithstanding the fact that the Broker may have provided information and assisted the Purchaser with hiring said surveyor.
      (2) He shall instruct his agent or surveyors to examine and/or sea trial the Vessel to ensure the Vessel meets his requirements;

EXHIBIT A

(3) All costs of the survey shall be at the expense of the Purchaser, including but not limited to all associated costs such as haul out, dry dock charges and/or subcontractors, if applicable.

(c) In the event that the sale of the Vessel is subject to sea trial or trial run, the Seller agrees that any sea trial in which he authorizes shall be made at Seller's sole risk and expense.

5. If Vessel is destroyed prior to closing by an Act of God, or other cause, this contract shall become null and void and the deposit, less all expenses incurred on behalf of Purchaser, shall be paid to Purchaser.

6. In the event the closing is not consummated due to non-performance of Purchaser, including but not limited to a failure of Purchaser to pay monies due or execute all documents necessary to be executed by Purchaser for completion of the purchase by the closing date, all deposit funds paid prior to closing shall be retained by the Seller and Broker as liquidated and agreed damages, and the parties shall be relieved of all obligations under this Agreement. Purchaser and Seller agree that the forfeited deposit shall be divided fifty percent (50%) to Seller and fifty percent (50%) to the Broker or Brokers after all expenses incurred on behalf of Purchaser against the Vessel have been paid from the deposit. The Brokers shall divide the brokers portion of the deposit in the same proportions as the commission would have been divided if a sale had been consummated.

7. In the event the closing is not consummated due to non-performance of Seller regarding any of the covenants in this Agreement, all money paid or deposited pursuant to this Agreement by the Purchaser shall be returned to the Purchaser upon demand, less all expenses incurred on behalf of Purchaser; or the Purchaser shall have the right of specific performance. Upon Seller's default, the Seller shall forthwith pay to broker(s) the full commission provided for under the terms of any listing contract.

8. The said Vessel is being purchased free and clear of all debts, claims, liens and encumbrances of any kind whatsoever, except as noted hereinafter, and the Seller warrants and will defend that he has good and marketable title thereto and will deliver to the broker all necessary documents for transfer of title to the Purchaser on or before the closing date, which is agreed to be April 6, 2007. Final payment due at time of closing shall be in the form of cleared or negotiable funds acceptable to Seller. By the date of closing the Vessel shall be delivered at Present Location, together with all gear, machinery, equipment, furnishings and all other articles and appurtenances thereto agreed upon. (In the event the parties do not agree upon a specific inventory, Seller agrees to deliver the Vessel with all the items disclosed in the listing broker's specification sheet or, if none, the selling brochure attached hereto and marked "Exhibit A".)

9. It is agreed by the parties that the risk of loss, damage or destruction of said Vessel and equipment shall be borne by the Seller until the transaction is closed.

10. Sale or use taxes, if applicable on this purchase, are the responsibility of Purchaser and will be collected by the selling broker at time of closing. Duties, taxes, and/or fees on the Vessel of any state, country, city, regulatory and/or taxing authority incurred prior to the date of closing of this transaction shall be the responsibility of the Seller and shall be paid by closing date. Seller shall further pay any cost associated with and shall cooperate fully to obtain any authorization for sale required from any governing authority.

11. Information on the Vessel is believed to be good and correct and the Broker offers such information in good faith, but does not and cannot guarantee the accuracy of the information. After the provisions herein have been complied with and this transaction has been consummated, it is understood and agreed that the Purchaser has accepted the Vessel in its "as is" condition, and no warranty, either expressed or implied, and no representation as to the condition of said Vessel has been made or is binding upon Broker or Seller.

12. The Purchaser is at least 18 years of age and is a citizen of USA.

13. This Agreement shall be binding on all parties herein, their heirs, personal representatives and/or assigns when this Agreement shall have been signed by all parties or their duly authorized agents. Seller agrees not to sell the Vessel or enter into any contract for the sale of same while this Agreement is in effect. If a sale is not consummated per the terms of this Agreement, and the Purchaser and Seller make direct arrangements

between themselves within two years after this Agreement is terminated for the transfer of ownership of the Vessel, the Seller agrees to pay the Broker an amount identical to the commission the Broker would receive under the terms of any listing contract.

14. This Agreement constitutes the entire agreement between the parties hereto and it is agreed and understood that there are no other duties, obligations, liabilities or warranties, implied or otherwise, except as referred to in an addendum if attached.

15. Any legal action brought by or against either party under the terms of this Agreement shall be determined by the laws of the State of Florida, and venue and jurisdiction for said action shall be within the county of Broward and the State of Florida, respectively. Parties further agree that in the event Broker(s) become party to any litigation involving this Agreement between Purchaser and Seller, the non-prevailing party shall pay any costs and legal fees incurred by Broker(s).

16. Seller agrees to sell the above-described Vessel on the terms and conditions stated herein. The Seller and Purchaser recognize and acknowledge HMY as the authorized selling Broker and HMY as the listing Broker.

17. Any funds due the Broker for storage, insurance, repairs and/or any other items accrued to the Seller's account shall be deducted from the Seller's net proceeds prior to disbursement of funds to the Seller.

18. It is further agreed by the parties hereto: This agreement is also subject to buyers personal inspection.

IN WITNESS WHEREOF, the undersigned Purchaser has executed this Purchase & Sale Agreement on the date indicated below and acknowledges receipt of a copy hereof.

Purchaser: [signature] Witnesses: [signature] March 7, 2007
Date

## SELLER ACCEPTANCE

The undersigned Seller accepts and agrees to sell the Vessel on the above terms and conditions. Seller acknowledges receipt of a copy of this

Agreement and authorizes ______________________ to deliver a signed copy hereof to Purchaser.

Seller: Witnesses:

Date

## DEPOSIT RECEIPT

Receipt of $ 15,000.00 per paragraph 2 above is hereby acknowledged, in the form of ____ (check #, bank, etc.)

By: ______________________
(Signature of Broker or Authorized Agent)



UPDated
3/8/07

HARBOUR POINT MARINA
2221 MONET ROAD – NORTH PALM BEACH, FL 33410
Office (561) 799-9590 Fax (561) 799-5722 Cell (561) 252-5220
E-mail: jbarboni@hmy.com

**FACSIMILE TRANSMITTAL SHEET**

| TO: Brian | FROM: JIM BARBONI |
|---|---|
| FAX NUMBER: 401-841-0061 | DATE: |
| RE | TOTAL NO. OF PAGES INCLUDING COVER: |

☐ URGENT ☐ FOR REVIEW ☐ PLEASE COMMENT ☐ PLEASE REPLY ☐ HAVE A GREAT DAY!

Please initial changes
P 2
P 18
And FAX back.

Thanks
Jim

03/07/2007 17:56 5617995722 HMY YACHT SALES INC PAGE 02/04
03/07/2007 05:46 0400000056 ABSCO STORAGE PAGE 01/03
HMY YACHT SALES INC PAGE 02/05
03/07/2007 11:10 5617995722 HMY YACHT SALES INC PAGE 02/04

At Harbour Point Marina
2201 Monet Road
North Palm Beach, FL 33410
TEL. (561) 775-8500
FAX. (561) 799-6722

# PURCHASE & SALE AGREEMENT

Agreement made this 7th day of March 2007, between:

Brian O'Neill (Hereinafter referred to as Purchaser) Owner of Record (Hereinafter referred to as Seller)

1. The Purchaser agrees to purchase and the Seller agrees to sell all rights, title and interest to the Vessel described as:

Name: "Double Billed" Hull No.: IBT66002A505

Model Year: 2005 Length: 66 Make: Legacy Type: Convertible

Registration No.: Documentation No.: 116812

2. The purchase price is One Million Five Hundred Fifty Thousand Dollars ($ 1,550,000.00) [handwritten: 75 Hundred ... 1,575,000]

Plus trade of 1985 55' Ocean SS with clear title.

Sum of One Hundred Fifty Thousand [handwritten: 15,000 BO] Dollars ($ 150,000.00) [handwritten: 15,000.00 BO]

is hereby paid to the escrow account of the Broker, acknowledged below, as a deposit toward the purchase price, and subject to the terms of this Agreement; said funds to be cleared into said account following acceptance by Seller. [handwritten: 135,000 additional deposit shall be paid at completion of survey & sea trial]

3. This offer to purchase shall be accepted by Seller, and written evidence thereof delivered to the selling Broker on or before March 8, 2007, or this offer shall be deemed revoked and the deposit shall be returned to Purchaser.

4. Written or telegraph acceptance or rejection of the Vessel must be made by the Purchaser by March 30, 2007. Purchaser's failure to exercise his right of acceptance or rejection as specified shall be construed as rejection. In the event of rejection the deposit shall be returned to Purchaser after all expenses incurred by Purchaser against Vessel have been paid.

(a) The sale of the Vessel is subject to:
  1) Marine Survey at the option and expense of the Purchaser.
  2) Sea Trial at the option of the Purchaser and at the expense of the Owner, to be conducted as soon as practicable after the signing of the Agreement, permission for which is hereby granted by Owner.
  3) Delivery of Vessel and Equipment per the attached listing.

(b) In the event this sale is subject to survey, the Purchaser acknowledges and agrees:
  (1) He has selected a surveyor who is in his employ and is responsible solely to Purchaser for any errors or omissions, notwithstanding the fact that the Broker may have provided information and assisted the Purchaser with hiring said surveyor.
  (2) He shall instruct his agent or surveyors to examine and/or sea trial the Vessel to ensure the Vessel meets his requirements;

(3) All costs of the survey shall be at the expense of the Purchaser, including but not limited to all associated costs such as haul out, dry dock charges and/or subcontractors, if applicable.

(c) In the event that the sale of the Vessel is subject to sea trial or trial run, the Seller agrees that any sea trial in which he authorizes shall be made at Seller's sole risk and expense.

5. If Vessel is destroyed prior to closing by an Act of God, or other cause, this contract shall become null and void and the deposit, less all expenses incurred on behalf of Purchaser, shall be paid to Purchaser.

6. In the event the closing is not consummated due to non-performance of Purchaser, including but not limited to a failure of Purchaser to pay monies due or execute all documents necessary to be executed by Purchaser for completion of the purchase by the closing date, all deposit funds paid prior to closing shall be retained by the Seller and Broker as liquidated and agreed damages, and the parties shall be relieved of all obligations under this Agreement. Purchaser and Seller agree that the forfeited deposit shall be divided fifty percent (50%) to Seller and fifty percent (50%) to the Broker or Brokers after all expenses incurred on behalf of Purchaser against the Vessel have been paid from the deposit. The Brokers shall divide the brokers portion of the deposit in the same proportions as the commission would have been divided if a sale had been consummated.

7. In the event the closing is not consummated due to non-performance of Seller regarding any of the covenants in this Agreement, all money paid or deposited pursuant to this Agreement by the Purchaser shall be returned to the Purchaser upon demand, less all expenses incurred on behalf of Purchaser, or the Purchaser shall have the right of specific performance. Upon Seller's default, the Seller shall forthwith pay to broker(s) the full commission provided for under the terms of any listing contract.

8. The said Vessel is being purchased free and clear of all debts, claims, liens and encumbrances of any kind whatsoever, except as noted hereinafter, and the Seller warrants and will defend that he has good and marketable title thereto and will deliver to the broker all necessary documents for transfer of title to the Purchaser on or before the closing date, which is agreed to be April 5, 2007. Final payment due at time of closing shall be in the form of cleared or negotiable funds acceptable to Seller. By the date of closing the Vessel shall be delivered at Present Location together with all gear, machinery, equipment, furnishings and all other articles and appurtenances thereto agreed upon. (In the event the parties do not agree upon a specific inventory, Seller agrees to deliver the Vessel with all the items disclosed in the listing broker's specification sheet or, if none, the selling brochure attached hereto and marked "Exhibit A".)

9. It is agreed by the parties that the risk of loss, damage or destruction of said Vessel and equipment shall be borne by the Seller until the transaction is closed.

10. Sale or use taxes, if applicable on this purchase, are the responsibility of Purchaser and will be collected by the selling broker at time of closing. Duties, taxes, and/or fees on the Vessel of any state, country, city, regulatory and/or taxing authority incurred prior to the date of closing of this transaction, shall be the responsibility of the Seller and shall be paid by closing date. Seller shall further pay any cost associated with and shall cooperate fully to obtain any authorization for sale required from any governing authority.

11. Information on the Vessel is believed to be good and correct and the Broker offers such information in good faith, but does not and cannot guarantee the accuracy of the information. After the provisions herein have been complied with and this transaction has been consummated, it is understood and agreed that the Purchaser has accepted the Vessel in its "as is" condition, and no warranty, either expressed or implied, and no representation as to the condition of said Vessel has been made or is binding upon Broker or Seller.

12. The Purchaser is at least 18 years of age and is a citizen of USA

13. This Agreement shall be binding on all parties herein, their heirs, personal representatives and/or assigns when this Agreement shall have been signed by all parties or their duly authorized agents. Seller agrees not to sell the Vessel or enter into any contract for the sale of same while this Agreement is in effect. If a sale is not consummated per the terms of this Agreement, and the Purchaser and Seller make direct arrangements

between themselves within two years after this Agreement is terminated for the transfer of ownership of the Vessel, the Seller agrees to pay the Broker an amount identical to the commission the Broker would receive under the terms of any listing contract.

14. This Agreement constitutes the entire agreement between the parties hereto and it is agreed and understood that there are no other duties, obligations, liabilities or warranties, implied or otherwise, except as referred to in an addendum if attached.

15. Any legal action brought by or against either party under the terms of this Agreement shall be determined by the laws of the State of Florida, and venue and jurisdiction for said action shall be within the county of Broward and the State of Florida, respectively. Parties further agree that in the event Broker(s) become party to any litigation involving this Agreement between Purchaser and Seller, the non-prevailing party shall pay any costs and legal fees incurred by Broker(s).

16. Seller agrees to sell the above-described Vessel on the terms and conditions stated herein. The Seller and Purchaser recognize and acknowledge HMY as the authorized selling Broker and HMY as the listing Broker.

17. Any funds due the Broker for storage, insurance, repairs and/or any other items accrued to the Seller's account shall be deducted from the Seller's net proceeds prior to disbursement of funds to the Seller.

~~18. It is further agreed by the parties hereto:~~ This agreement is also subject to buyers personal inspection.

The seller has same right to cont[illegible] [illegible]

IN WITNESS WHEREOF, the undersigned Purchaser has executed this Purchase & Sale Agreement on the date indicated below and acknowledges receipt of a copy hereof.

Purchaser: [signature] Witnesses: [signature] March 7, 2007
Date

## SELLER ACCEPTANCE

The undersigned Seller accepts and agrees to sell the Vessel on the above terms and conditions. Seller acknowledges receipt of a copy of this Agreement and authorizes HMY to deliver a signed copy hereof to Purchaser.

Seller: [signature] Witnesses: 3-7-2007
Date

## DEPOSIT RECEIPT

Receipt of $ 15,000.00 per paragraph 2 above is hereby acknowledged, in the form of ____ (check #, bank, etc.)

By: ______________________
(Signature of Broker or Authorized Agent)

HARBOUR POINT MARINA
2221 MONET ROAD – NORTH PALM BEACH, FL 33410
Office (561) 799-9590 Fax (561) 799-5722 Cell (561) 252-5220
E-mail: jbarboni@hmy.com

**FACSIMILE TRANSMITTAL SHEET**

| TO: Brian O'Neill | FROM: JIM BARBONI |
|---|---|
| FAX NUMBER: 305-367-8864 | DATE: |
| RE: | TOTAL NO. OF PAGES INCLUDING COVER: |

☐ URGENT ☐ FOR REVIEW ☐ PLEASE COMMENT ☐ PLEASE REPLY ☐ HAVE A GREAT DAY!

PLEASE:

1. INITTIAL THE CHANGE IN PARAGRAPH # 2
2. SIGN THE ACCEPANCE

I AM IN SOUTH MIAMI THIS AFTERNOON AND IF IT IS CONVIENIENT FOR YOU, I CAN EASILY COME TO OCEAN REEF TO RETRIEVE THE REST OF THE DEPOSIT.

DICKIE AND I NEED TO MAKE AIRLINE RESERVATIONS TO VISIT THE 53 OCEAN. CALL SO WE CAN PICK A CONVIENTINT DATE.

CATERPILLAR IS DUE ON "DOUBLE BILLED" IN THE MORNING, TO DO THE SURVEYS WARRENTY WORK.

THANKS

JIM BARBONI
CELL # 561-252-5220

HMY

HARBOUR POINT MARINA
2221 MONET ROAD - NORTH PALM BEACH, FL 33410
Office (561) 799-9590 - Fax (561) 799-6722

**FACSIMILE TRANSMITTAL SHEET**

| TO: | FROM: |
|---|---|
| Desiree | Christy |
| FAX NUMBER: | DATE: |
| 610-471-0782 | 4/13/2007 |
| RE: | TOTAL NO. OF PAGES INCLUDING COVER: |
| | ~~8~~ 7 |

☐ URGENT ☐ FOR REVIEW ☐ PLEASE COMMENT ☐ PLEASE REPLY ☐ HAVE A GREAT DAY!

Desiree,

I am sending the following:

1. Acceptance of vessel for both vessels. (Brian needs to sign and I need back right away.)
2. Agreement of Sale ( Sign and send back with above)

I will fax surveys separately

Thanks

Christy/ Broker's Assistant

SENDING ORIGINAL 1ST PAGE TO READ
IT'S LEGIBLE



HMY

*At Harbour Point Marina + 2221 Monet Road + North Palm Beach, FL 33410*
*Phone: 561-799-9590 + Fax: 561-799-5722 + www.hmy.com*

## CONDITIONAL ACCEPTANCE OF VESSEL

I, Brian O'Neill, Purchaser of the Vessel 2005 86' Custom "Double Billed" do hereby accept said Vessel and hereby agree to perform all other conditions of the purchase and sale agreement dated March 7, 2007 heretofore entered into by the undersigned for the purchase of said Vessel and agree to close this transaction in accordance with the terms therein.

Said Acceptance of Vessel is contingent upon a survey adjustment of $150,000.00 on the original purchase price.

I confirm that the marine surveyors used in this purchase were chosen by me to insure that the Vessel meets all of my requirements and to ascertain that all speeds, measurements, tank capacity, consumption figures, and other data provided, but not guaranteed by owners or brokers, are satisfactory to me.

In the event Purchaser fails to close this transaction as specified, the person holding deposited funds is directed to forthwith pay the escrowed deposit funds to the Seller and Broker in accordance with the Agreement, and upon such payment the person holding the deposited funds is released from any further liability as escrow agent.

APR 19 2007

| Reviewed & Accepted, Purchaser Date | Reviewed & Accepted, Seller Date |
|---|---|
| Brian O'Neill | Richard Talbert |

R. 9/03

04/19/2007 12:29 6189378541 ONEILL COMPANIES PAGE 05/05

04/13/2007 09:31 5617995722 HMY YACHT SALES INC PAGE 02/02

At Harbour Point Marina + 2221 Monet Road + North Palm Beach, FL 33410
Phone: 561-799-9590 + Fax: 561-799-5722 + www.hmy.com

## CONDITIONAL ACCEPTANCE OF VESSEL

I, Richard Talbert, accept as trade the Vessel 1998 53' Ocean "the Bryemere V" do hereby accept said Vessel and hereby agree to perform all other conditions of the purchase and sale agreement dated March 7, 2007 heretofore entered into by the undersigned for the purchase of said Vessel and agree to close this transaction in accordance with the terms therein.

Said Acceptance of Vessel is contingent upon a survey adjustment of only $150,000.00 on the original purchase price of 2005 66' Custom "Double Billed".

I confirm that the marine surveyors used in this purchase were chosen by me to insure that the Vessel meets all of my requirements and to ascertain that all speeds, measurements, tank capacity, consumption figures, and other data provided, but not guaranteed by owners or brokers, are satisfactory to me.

In the event Purchaser fails to close this transaction as specified, the person holding deposited funds is directed to forthwith pay the escrowed deposit funds to the Seller and Broker in accordance with the Agreement, and upon such payment the person holding the deposited funds is released from any further liability as escrow agent.

APR 19 2007

| Reviewed & Accept Trade, Date | Reviewed & Accept, Current Date |
|---|---|
| Richard Talbert | trade Owner<br>Brian O'Neill |

R. 9/03

03/07/2007 17:35 561?995722 HMY YACHT S[illegible] INC PAGE 02/04
03/07/2007 05:45 [illegible] PAGE 01/03
PAGE 02/05
03/07/2007 11:18 5617995722 HMY YACHT SALES INC PAGE 02/04

At Harbour [illegible]
[illegible] Road
North Palm Beach, FL 33408
TEL. (561) [illegible]
FAX. (561) [illegible]

# PURCHASE & SALE AGREEMENT

Agreement made this 7th day of March, 2007, between:

Brian O'Neill (Hereinafter referred to as Purchaser) Owner of Record (Hereinafter referred to as Seller)

1. The Purchaser agrees to purchase and the Seller agrees to sell all rights, title and interest to the Vessel described as:

Name: "Double Billed" Hull No.: [illegible]
Model Year: 2005 Length: 55 Make: Legacy Type: Convertible
Registration No.: Documentation No.: 116813

2. The purchase price [illegible] One Million Five Hundred [illegible] Dollars ($ [illegible])
Plus trade [illegible] Ocean 53 with clear title. [handwritten: illegible]

Sum of [illegible] Dollars ($ [illegible])
is hereby paid to the escrow account of the Broker, acknowledged below, as a deposit toward the purchase price, and subject to the terms of this Agreement, said funds to be placed into said escrow following acceptance by Seller. [handwritten: illegible]

3. This offer to purchase shall be accepted by Seller, and written evidence thereof delivered to the selling Broker on or before March 8, 2007 or this offer shall be deemed revoked and the deposit shall be returned to Purchaser.

4. Written or telegraph acceptance or rejection of the Vessel must be made by the Purchaser by March 30, 2007. Purchaser's failure to exercise his right of acceptance or rejection as specified shall be construed as rejection. In the event of rejection the deposit shall be returned to Purchaser after all expenses incurred by Purchaser against Vessel have been paid.

(a) The sale of the Vessel is subject to:
1) Marine Survey at the option and expense of the Purchaser.
2) Sea Trial at the option of the Purchaser and at the expense of the Owner, to be conducted as soon as practicable after the signing of the Agreement, permission for which is hereby granted by Owner.
3) Delivery of Vessel and Equipment per the attached listing.

(b) In the event this sale is subject to survey, the Purchaser acknowledges and agrees:
(1) He has selected a surveyor who is in his employ and is responsible solely to Purchaser for any errors or omissions, notwithstanding the fact that the Broker may have provided information and assisted the Purchaser with hiring said surveyor.
(2) He shall instruct his agent or surveyors to ascertain and/or sea trial the Vessel to ensure the Vessel meets his requirements.

(f) All costs of the survey shall be at the expense of the Purchaser, including but not limited to all associated costs such as haul out, dry dock charges and/or subcontractors, if applicable.

(g) In the event that the sale of the Vessel is subject to sea trial or trial run, the Seller agrees that any sea trial to which he authorizes shall be made at Seller's sole risk and expense.

5. If Vessel is destroyed prior to closing by an Act of God, or other cause, this contract shall become null and void and the deposit, less all expenses incurred on behalf of Purchaser, shall be paid to Purchaser.

6. In the event the closing is not consummated due to non-performance of Purchaser, including but not limited to a failure of Purchaser to pay surplus [illegible] or execute all documents necessary to be executed by Purchaser for completion of the purchase by the closing date, all deposit funds paid prior to closing shall be retained by the Seller and Broker as liquidated and agreed damages, and the parties shall be relieved of all obligations under this Agreement. Purchaser and Seller agree that the forfeited deposit shall be divided fifty percent (50%) to Seller and fifty percent (50%) to the Broker or Brokers after all expenses incurred on behalf of Purchaser against the Vessel have been paid from the deposit. The Brokers shall divide the broker portion of the deposit in the same proportion as the commission would have been divided if a sale had been consummated.

7. In the event the closing is not consummated due to non-performance of Seller regarding any of the covenants in this Agreement, all money paid or deposited pursuant to this Agreement by the Purchaser shall be returned to the Purchaser upon demand, less all expenses incurred on behalf of Purchaser, or the Purchaser shall have the right of specific performance. Upon Seller's default, the Seller shall forthwith pay to broker(s) the full commission provided for under the terms of any listing contract.

8. The said Vessel is being purchased free and clear of all debts, claims, liens and encumbrances of any kind whatsoever, except as noted hereinafter, and the Seller warrants and will defend that he has good and marketable title thereto and will deliver to the broker all necessary documents for transfer of title to the Purchaser on or before the closing date, which is agreed to be ___April 6, 2007_______. Final payment due at time of closing shall be in the form of cleared or negotiable funds acceptable to Seller. By the time of closing the Vessel shall be delivered at ___Present Location__________, together with all gear, machinery, equipment, furnishings and all other articles and appurtenances thereto agreed upon. (In the event the parties do not agree upon a specific inventory, Seller agrees to deliver the Vessel with all the items disclosed in the listing broker's specification sheet or, if none, the selling brochure attached hereto and marked "Exhibit A".)

9. It is agreed by the parties that the risk of loss, damage or destruction of said Vessel and equipment shall be borne by the Seller until the transaction is closed.

10. Sale or use taxes, if applicable on this purchase, are the responsibility of Purchaser and will be collected by the selling broker at time of closing. Duties, taxes, and/or fines on the Vessel of any state, country, city, regulatory and/or taxing authority incurred prior to the date of closing of this transaction shall be the responsibility of the Seller and shall be paid by closing date. Seller shall further pay any cost associated with and shall cooperate fully to obtain any authorization for sale required from any governing authority.

11. Information on the Vessel is believed to be good and correct and the Broker offers such information in good faith, but does not and cannot guarantee the accuracy of the information. After the provisions herein have been complied with and this transaction has been consummated, it is understood and agreed that the Purchaser has accepted the Vessel in its "as is" condition, and no warranty, either expressed or implied, and no representation as to the condition of said Vessel has been made or is binding upon Broker or Seller.

12. The Purchaser is at least 18 years of age and is a citizen of ______USA______________

13. This Agreement shall be binding on all parties hereto, their heirs, personal representatives and/or assigns when this Agreement shall have been signed by all parties or their duly authorized agents. Seller agrees not to sell the Vessel or enter into any contract for the sale of same while this Agreement is in effect. If a sale is not consummated per the terms of this Agreement, and the Purchaser and Seller make direct arrangements

between themselves within two years after this Agreement is terminated for the transfer of ownership of the Vessel, the Seller agrees to pay the Broker an amount identical to the commission the Broker would receive under the terms of any listing contract.

14. This Agreement constitutes the entire agreement between the parties hereto and it is agreed and understood that there are no other duties, obligations, liabilities or warranties, implied or otherwise, except as referred to in an addendum if attached.

15. Any legal action brought by or against either party under the terms of this Agreement shall be determined by the laws of the State of Florida, and venue and jurisdiction for said action shall be within the county of Broward and the State of Florida, respectively. Parties further agree that in the event Broker(s) become party to any litigation involving this Agreement between Purchaser and Seller, the nonprevailing party shall pay any costs and legal fees incurred by Broker(s).

16. Seller agrees to sell the above-described Vessel on the terms and conditions stated herein. The Seller and Purchaser recognize and acknowledge HMY as the authorized selling Broker and HMY as the Listing Broker.

17. Any funds due the Broker for storage, insurance, repairs and/or any other items incurred to the Seller's account shall be deducted from the Seller's net proceeds prior to disbursement of funds to the Seller.

18. It is further agreed by the parties hereto: This agreement is also subject to buyers personal inspection. The seller has same right to ... [illegible]

IN WITNESS WHEREOF, the undersigned Purchaser has executed this Purchase & Sale Agreement on the date indicated below and acknowledges receipt of a copy hereof.

Purchaser: [signature] Witnesses: [signature] March 7, 2007
Date

## SELLER ACCEPTANCE

The undersigned Seller accepts and agrees to sell the Vessel on the above terms and conditions. Seller acknowledges receipt of a copy of this Agreement and authorizes HMY to deliver a signed copy hereof to Purchaser.

Seller: [signature] Witnesses: 3-7-2007
Date

## DEPOSIT RECEIPT

Receipt of $ 15,000.00 per paragraph 2 above is hereby acknowledged, in the form of ____ (check #, bank, etc.)

By: ______________________
(Signature of Broker or Authorized Agent)

HMY
Yacht Sales Inc.

At Harbour Point Marina
2221 Monet Road
North Palm Beach, FL 33410
TEL. (561) 799-9590
FAX. (561) 799-5722

# PURCHASE & SALE AGREEMENT

Agreement made this 7th day of March 2007, between:

Brian O'Neill (Hereinafter referred to as Purchaser)

Owner of Record (Hereinafter referred to as Seller)

1. The Purchaser agrees to purchase and the Seller agrees to sell all rights, title and interest to the Vessel described as:

Name: "Double Billed" Hull No.: IBT66002A505

Model Year: 2005 Length: 66 Make: Legacy Type: Convertible

Registration No.: ______ Documentation No.: 116812

2. The purchase price is ~~One Million Five Hundred Fifty Thousand~~ Dollars ($ ~~1,550,000.00~~ 1,575,000)

Plus trade of 1998 53' Ocean SS with clear title.

Sum of One Hundred Fifty Thousand Dollars ($ ~~150,000.00~~ 15,000.00) is hereby paid to the escrow account of the Broker, acknowledged below, as a deposit toward the purchase price, and subject to the terms of this Agreement; said funds to be cleared into said account following acceptance by Seller. $135000.00 ADDITIONAL DEPOSIT TO BE PAID AFTER SURVEY & SEA TRIAL.

3. This offer to purchase shall be accepted by Seller, and written evidence thereof delivered to the selling Broker on or before March 8, 2007, or this offer shall be deemed revoked and the deposit shall be returned to Purchaser.

4. Written or telegraph acceptance or rejection of the Vessel must be made by the Purchaser by March 30, 2007. Purchaser's failure to exercise his right of acceptance or rejection as specified shall be construed as rejection. In the event of rejection the deposit shall be returned to Purchaser after all expenses incurred by Purchaser against Vessel have been paid.

(a) The sale of the Vessel is subject to:

1) Marine Survey at the option and expense of the Purchaser.
2) Sea Trial at the option of the Purchaser and at the expense of the Owner, to be conducted as soon as practicable after the signing of the Agreement, permission for which is hereby granted by Owner.
3) Delivery of Vessel and Equipment per the attached listing.

(b) In the event this sale is subject to survey, the Purchaser acknowledges and agrees:

(1) He has selected a surveyor who is in his employ and is responsible solely to Purchaser for any errors or omissions, notwithstanding the fact that the Broker may have provided information and assisted the Purchaser with hiring said surveyor.

(2) He shall instruct his agent or surveyors to examine and/or sea trial the Vessel to ensure the Vessel meets his requirements;



HMY

## CONDITIONAL ACCEPTANCE OF VESSEL

I, Brian O'Neill, Buyer of the 2005 66' Custom, do hereby accept said vessel under the terms set forth in the purchase contract dated, March 7, 2007 heretofore entered into by me for the purchase of said vessel. I (we) hereby acknowledge that all conditions, including but not limited to those set forth in Paragraph 3 of said contract have either been performed or are hereby waived and I agree to accept delivery of said vessel and pay the balance due thereon and close this transaction in accordance with the terms therein.

$200,000

Said Acceptance of Vessel is contingent upon a survey adjustment of ~~$175,000~~ on the original purchase price.

~~In the event the Buyer fails to close this transaction as specified, the Escrow Agent~~ is directed to pay the deposit in escrow to the Seller and Broker in accordance with their agreement. Upon such payment, the Escrow Agent is released from any further liability as Escrow Agent.

Witness: BUYER(S):

________________ ________________ Date: ________

Witness: [signature] SELLER(S): x [signature] Date: 1 April 07

**Palm Beach Gardens Office @ Soverel Harbour Marina**
**2401 PGA Blvd., Suite 182, Palm Beach Gardens, FL 33410**
**Phone: (561) 799-9590 Fax (561) 799-5722**

1.) Buyer shall have free dockage + total access to boat until it goes North approx 5-1-15

2.) Buyers mechanics may install new props + muffler + reverse system prior to closing (Buyer will pay for)

3.) Buyer shall complete name change prior to closing. Settlement shall be May 1

4.) Deposit shall be