# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 09-60551-CIV-ZLOCH/ROSENBAUM

AIG CENTENNIAL INSURANCE
COMPANY,

                    Plaintiff,

v.

J. BRIAN O'NEILL,
CAROLINA ACQUISITION, LLC, and
BANK OF AMERICA, N.A.,

                    Defendants.

_____/

## <u>ORDER</u>

This matter comes before the Court upon Defendants J. Brian O'Neill and Carolina

Acquisition, LLC's Motion to Compel Production of Documents Responsive to Their First Request

for Production [D.E. 48], and Plaintiff AIG Centennial Insurance Company's Motion to Compel

Defendants J. Brian O'Neill and Carolina Acquisition, LLC, to File Better Responses to Centennial's

First Request for Production [D.E. 61], Motion to Compel Better Answers to Interrogatories [D.E.

64], and Motion for Leave to Depose in Excess of Ten Individuals [D.E. 67], upon referral

disposition by the Honorable William J. Zloch. *See* D.E. 77. The Court has carefully considered

the pending Motions, all filings in support thereof and in opposition thereto, and the entire record,

has held oral argument, on October 4, 2010,[1] and is otherwise duly advised in the premises. During

_____

[1]During the October 4, 2010, hearing, the Court also heard argument on Defendants J.
Brian O'Neill and Carolina Acquisition, LLC's Motion to Compel and for Sanctions Based on
AIG's Discovery Misconduct [D.E. 62]. The Court will issue its ruling on this Motion by
separate Order.

the hearing, the Court ruled on many of the issues raised by the Motions but reserved ruling on certain matters. This Order memorializes the Court's rulings during the hearing and sets forth the Court's rulings on the remaining issues. For the reasons that follow, the Court grants in part and denies in part Defendants J. Brian O'Neill and Carolina Acquisition, LLC's Motion to Compel Production of Documents Responsive to Their First Request for Production [D.E. 48]; denies Plaintiff AIG Centennial Insurance Company's Motion to Compel Defendants J. Brian O'Neill and Carolina Acquisition, LLC, to File Better Responses to Centennial's First Request for Production [D.E. 61]; denies Plaintiff AIG Centennial Insurance Company's Motion to Compel Better Answers to Interrogatories [D.E. 64]; and grants in part and denies in part Plaintiff AIG Centennial Insurance Company's Motion for Leave to Depose in Excess of Ten Individuals [D.E. 67].

## Background

This matter arises out of an insurance dispute over a luxury yacht. According to the Amended Complaint, Defendant J. Brian O'Neill ("O'Neill") entered into a contract with Double Billed, LLC, for the purchase of *Bryemere*, a 2005 66-foot legacy Sportfish Motor Yacht. D.E. 31 at ¶ 17. Price Marine Services, Inc. ("Price"), conducted sea trials and a pre-purchase survey of the vessel. *Id.* at ¶ 18. Subsequently, the Amended Complaint asserts, Price prepared a survey report that recommended a series of repairs "to keep [the yacht] in good usable condition." *Id.* at ¶ 19.

In addition, the Amended Complaint continues, Price issued a survey report dated March 22, 2007, opining that the vessel had a market value of "approximately $1,875,000 as equipped." *Id.* at ¶20. A representative of O'Neill, however, allegedly contacted Price and requested that he increase the appraisal value of the *Bryemere* for loan and insurance purposes. *Id.* at ¶ 21. Accordingly, the Amended Complaint avers, Price issued a second survey report also dated March

22, 2007, that "was identical in all aspects to the original survey report [except for] an increase of $475,000.00 in the market value of the vessel to $2,350,000." *Id.* at ¶ 22.

Subsequently, the parties allegedly negotiated a "survey adjustment" of $150,000 on the vessel, which effectively lowered the original purchase price of the yacht by that amount. *Id.* at ¶ 24. On April 18, 2007, Carolina Acquisition, LLC ("Carolina"), obtained title to the *Bryemere*, with the Seller's Closing Statement reflecting that O'Neill served as Carolina's "managing member." *Id.* at ¶ 25. The Closing Statement further shows a "contract sale price" of $1,575,000, plus the value of a traded-in 1998 53-foot Ocean yacht, valued at $700,000, minus the "survey adjustment" of $150,000, for a total price of $2,125,000. *Id.* at ¶ 26.

AIG Centennial Insurance Company, Inc. ("Centennial"), issued a policy of marine insurance for the *Bryemere*, which provided property damage coverage for the period from April 19, 2007, through April 19, 2008 (the "Policy"). *Id.* at ¶¶ 27, 28. Under the Policy, O'Neill is the sole insured, although Defendant Bank of America, N.A. ("BOA"), is listed as the loss payee of the policy. *Id.* at ¶¶ 29, 30. The Policy insured the *Bryemere* for an agreed value of $2,350,000.00, with a deductible of $47,000.00 for hull damage claims. *Id.* at ¶ 31.

The Policy promises to pay "the reasonable costs of repair, with materials of like kind and quality without deduction for depreciation" if the yacht is partially damaged by a covered loss. *See* D.E. 35-1 at 10.[2] In addition, the Policy specifies that it "do[es] not cover any loss, damage, claim or expense for the repair or replacement of any latent defect in the yacht; however, any physical loss

---

[2] Some docket entries, including this one, have two page-numbering systems resulting in different page numbers on the same page: the page number of the original document and the page number imprinted across the top of the page by the Court's CM/ECF system. This Order refers to the page numbers left by the Court's CM/ECF system.

or damage to the yacht resulting or caused by the latent defect will be covered." *Id.* at 14. "Latent defect," in turn, "means a hidden flaw in the material or construction existing at the time of original building of the yacht or any additional or replacement parts, components or systems of the yacht which is not discoverable by ordinary observation or known methods of testing." *Id.* at 8. Similarly, the Policy "do[es] not cover any loss, damage, claim or expense caused directly or indirectly, in whole or in part by any defect in design or manufacture of the yacht or any additional or replacement part, component or system of the yacht." *Id.*

Defendant O'Neill asserted a property damage claim under the Policy, alleging that on June 29, 2007, while on her first post-purchase ocean voyage, the *Bryemere* almost immediately suffered significant movement in the forward fuel tanks as the result of a lack of structural integrity in the hull of the vessel, which was later discovered to have also caused considerable flexing of the hull underneath the cabinets on the starboard side of the yacht. D.E. 31 at ¶ 35. After the *Bryemere*'s arrival in Newport, Rhode Island, O'Neill retained several experts to investigate the condition of the *Bryemere*. *Id.* at ¶ 36; D.E. 35 at ¶ 17.

According to the Amended Complaint, these experts arrived at the following conclusions: (1) Anthony Knowles of Newport Marine Surveyors found that the boat was not built at as designed and was unseaworthy; (2) Naval architect Matthew Smith determined that the vessel was not built to the designer's structural specifications and was therefore unseaworthy, unsafe to operate, and not structurally sound; (3) Mark Ashton of Independent Marine Systems conducted a thermal infra-red imaging survey of the *Bryemere*, which confirmed the existence of significant delamination on both the port and starboard sides of the hull in a number of different locations; (4) Bruce Pfund of Special Projects, LLC, who specialized in fiberglass materials, opined that the yacht, as built, did not

correspond to the design specifications of the *Bryemere*; and (5) Pedrick Yacht Designs, who further inspected the *Bryemere* at the request of Anthony Knowles, concluded that the longitudinal stringers were undersized from the design in both their depth and length along the hull and that the vessel, as constructed failed to meet structural standards and was unseaworthy.  D.E. 31 at ¶ 36; D.E. 35 at ¶¶ 18-20.

Following these inspections, Pedrick Yacht Designs allegedly developed a repair strategy and recommended that the *Bryemere* could be re-constructed to its original design specifications by installing outboard longitudinals in the forward area of the hull to make the vessel sufficiently strong to be fit for her intended service.  D.E. 31 at ¶ 37.  Hinckley Yacht Services subsequently completed the repairs at a cost exceeding $1,255,384.79.  *Id.*

On December 23, 2008, O'Neill filed an insurance claim with Centennial stating a loss date of July 27, 2007, and seeking to recover the cost of repairs completed by Hinckley.  *Id.* at ¶ 39.  The claim attributes the damage to a "latent defect."  *Id.*

On March 19, 2009, Centennial issued a reservation-of-rights letter to O'Neill as the named insured.  *Id.* at ¶ 40.  About a month later, on April 14, 2009, Centennial filed the pending case, seeking a declaration stating that Centennial owes no coverage for O'Neill's December 28, 2008, claim under the Policy.  Centennial filed its Amended Complaint on November 25, 2009.  *See id.*

O'Neill filed his Answer, Affirmative Defenses, and Counterclaim on January 8, 2010.  *See* D.E. 35.  In his Counterclaim, O'Neill asserts a single count against Centennial for breach of contract.  *See id.* at 18-19.

During the course of discovery in this case, the parties served their various discovery requests.  Unsatisfied with some of the responses, the parties filed the catalogue of discovery

Motions presently pending before the Court.  The Court addresses each Motion in turn below.

## Analysis

A.       General Principles Governing Discovery Requests

Rule 26(b), Fed. R. Civ. P., governs the scope of discovery.  That rule provides, in relevant part, that "[p]arties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense . . . .  Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."  R. 26(b)(1), Fed. R. Civ. P.  The Advisory Committee Notes to Rule 26 indicate that "[t]he purpose of discovery is to allow a broad search for facts, the names of witnesses, or any other matters which may aid a party in the preparation or presentation of his case."  Adv. Com. Notes, 1946 Amendment, R. 26, Fed. R. Civ. P. (citations omitted).  Indeed, the Advisory Committee Notes approvingly cite language from a case stating that "the Rules . . . permit 'fishing for evidence as they should.'"  *Id.* (citation omitted); *see also Hickman v. Taylor*, 329 U.S. 495, 507 (1947) ("No longer can the time-honored cry of 'fishing expedition' serve to preclude a party from inquiring into the facts underlying his opponent's case.").

The courts have long recognized the wide scope of discovery allowed under the Federal Rules of Civil Procedure.  As the Eleventh Circuit's predecessor court noted,

> The discovery provisions of the Federal Rules of Civil Procedure allow the parties to develop fully and crystalize concise factual issues for trial. Properly used, they prevent prejudicial surprises and conserve precious judicial energies.  The United States Supreme Court has said that they are to be broadly and liberally construed.

*Burns v. Thiokol Chem. Corp.*, 483 F.2d 300, 304 (5th Cir. 1973)[3] (citing *Hickman v. Taylor*, 329 U.S. 495, 507 (1947); *Schlagenhauf v. Holder*, 379 U.S. 104, 114-115 (1964)).

Of course, the scope of permissible discovery is not unbounded.  Requested discovery must be relevant, and it must not impose an undue burden or be unreasonably cumulative, under the standards described in Rule 26(b)(2)(C).  Finally, even if the discovery sought satisfies all of these requirements, an opposing party generally may not be compelled to respond to it where the opposing party invokes and demonstrates the applicability of an appropriate privilege or protection.  Keeping this framework in mind, the Court considers each of the discovery requests at issue.

B.     Defendants' Motion to Compel [D.E. 48]

In Defendants[4] O'Neill and Carolina's Motion to Compel Production of Documents Responsive to Their First Request for Production [D.E. 48], as of the time of the October 4, 2010, hearing, Defendants sought better responses to the following requests for production:

> **Request No. 1**: Complete certified copies of all insurance policies issued by you to us, including any amendments or endorsements thereto.

> **Request No. 2**: The complete underwriting file pertaining to the Policy, and any renewal insurance policies issued by you to us, including but not limited to the file folder or file folders themselves, all papers, documents, and investigative reports directly pertaining to the Policy, inter- and intra-office memoranda or notes pertaining to the Policy, and any and all written communications which directly or indirectly pertain to the issuance of the Policy to us.  Please include any documents relating or referring in whole or in part to loss control or underwriting inspection(s) pertaining to the property.

---

[3]Pursuant to *Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), opinions of the Fifth Circuit issued prior to October 1, 1981, are binding precedent in the Eleventh Circuit.

[4]This Order refers to O'Neill and Carolina collectively as "Defendants."

**Request No. 3**: The underwriting manual or manuals which pertain to the underwriting of the Policy, including any premium calculation. We agree to keep this information confidential.

**Request No. 4**: The complete claim file pertaining to the Claim. All attorney-client privileged documents and documents created in anticipation of litigation may be withheld provided they are identified on a privilege log.

**Request No. 7**: All documents explicating the relationships between you and any third party involved with the Claim, including, but not limited to, administration agreements, correspondence, contracts, evidence of payment, and invoices, reflecting, in whole or in part, adjustment of the Claim, the basis for compensation, and the duties and/or responsibilities in relation to the Claim.

**Request No. 10**: All documents generated or received by you that define, construe, interpret, comment on the interpretation of, or discuss the meaning or application of Policy terms or provisions relating to "latent defect," "market value," "manufacturing and design defects," and "inherent vice." Such documents might include, without limitation, claims manuals, training materials, memoranda, underwriting documents, sales and marketing materials, actuarial documents, articles published in trade or legal periodicals, articles written for claims professionals or seminars, and home office directives and bulletins.

D.E. 48.

*Request No. 1*

With regard to Request No. 1, Defendants argue that the documents sought pertain to the materiality of Defendants' alleged misstatement regarding the stated value of the yacht on the insurance Policy.[5]   To put Defendants' position in context, the Court notes that Count III of the Amended Complaint, a count charging misrepresentation, asserts that the Policy is void under the

---

[5]As their primary position, Defendants assert that O'Neill did not make misrepresentations on the Policy application. The relevancy of the materials sought, however, depends on Defendants' alternative position that even if O'Neill did make misrepresentations, such misrepresentations were not material.

doctrine of *uberrimae fidei* because Defendant O'Neill allegedly misrepresented the actual purchase

price and actual appraised market value of the *Bryemere*. *See* D.E. 31 at 19-22. According to Count

III of the Amended Complaint, these alleged misrepresentations were material, thereby voiding the

Policy *ab initio*. *Id.*

Defendants contest Centennial's position, contending that the alleged misrepresentation could

not have been material to Centennial's decision to insure the *Bryemere* because Centennial had a pre-

existing, "extensive, lucrative and longstanding relationship" with O'Neill. D.E. l48 at 5. In this

regard, Defendants explain that Centennial annually collects approximately $600,000 in premiums

from O'Neill and his businesses. *Id.* Centennial responds by arguing that misrepresentations

regarding the purchase price of the insured item are always material as a matter of law. If Centennial

is correct, the information pursued by Request No. 1 would not be relevant because even if

Centennial and Defendants had a billion-dollar relationship, such a fact could have no effect on the

issue of materiality. On the other hand, if materiality with respect to purchase price is not always

necessarily a matter of law, the information that Defendants request would fall within the scope of

relevancy under the Federal Rules of Civil Procedure.

The Court therefore considers whether purchase price constitutes a material fact as a matter

of law. "It is well-settled that the marine insurance doctrine of *uberrimae fidei* is the controlling law

of this circuit." *HIH Marine Servs., Inc. v. Fraser*, 211 F.3d 1359, 1362 (11th Cir. 2000) ("*HIH

Marine*") (citation omitted). Under this doctrine, an insured must fully and voluntarily disclose to

the insurer all facts material to a calculation of the insurance risk. *Id.* (citation omitted). As quoted

by the Eleventh Circuit, *The Law of Admiralty*[6] explains, "[T]he highest degree of good faith is

---

[6]G. Gilmore & C. Black, *The Law of Admiralty* 62 (2d ed. 1975).

exacted of those entering [a marine insurance contract], for the underwriter often has no practicable means of checking on either the accuracy or the sufficiency of the facts furnished him by the assured before the risk is accepted and the premium and conditions set." *HIH Marine*, 211 F.3d at 1363 (citation omitted).

Pursuant to *uberrimae fidei*, a material misrepresentation on an application for marine insurance constitutes grounds for voiding the policy. *Id.* (citation omitted). If a misrepresentation "might have a bearing on the risk to be assumed by the insurer," it qualifies as material. *Id.* (citation omitted). Nor do the insured's intentions bear on the determination of materiality. *Id.* (citation omitted). Instead, "a [material] misrepresentation, even if it is a result of 'mistake, accident, or forgetfulness, is attended with the rigorous consequences that the policy never attaches and is void.'" *Id.* (quoting *Steelmet, Inc. v. Caribe Towing Corp.*, 747 F.2d 689, 695 (11th Cir. 1984) (quoting *Fireman's Fund Ins. Co. v. Wilburn Boat Co.*, 300 F.2d 631, 646 (5th Cir. 1962)).

Centennial suggests that a misrepresentation regarding purchase price is material as a matter of law under the doctrine of *uberrimae fidei*. And, in fact, the Ninth Circuit has reached this conclusion. *See New Hampshire Ins. Co. v. C'est Moi, Inc.*, 519 F.3d 937, 939 (9th Cir. 2008). Similarly, the Third Circuit appears to have arrived at the same determination. *See AGF Marine Aviation & Transport v. Cassin*, 544 F.3d 255, 265 (3d Cir. 2008).

But we are not in the Third or Ninth Circuits. Although the Eleventh Circuit does not appear to have spoken directly on the matter of whether purchase price constitutes a material issue as a matter of law, the manner in which the court has resolved cases before it demonstrates that the Eleventh Circuit does not take a categorical approach, but rather, considers the facts on a case-by-case basis. In *Kilpatrick Marine Piling v. Fireman's Fund Ins. Co.*, 795 F.2d 940 (11th Cir. 1986),

for example, the insured had submitted a survey showing the value of his vessel to be $77,609, without disclosing that the purchase price had been $25,000. In explanation of the variance, the insured stated that he had made considerable improvements to the boat since he had purchased it. Nevertheless, the insurer's underwriter attested that he would not have insured the barge had he known of the discrepancy between the survey value and the purchase price. *Id.* at 942-43. The trial court denied the insurer's motion for directed verdict and allowed the issue of materiality to proceed to the jury, with the jury returning a verdict in favor of the insured. *Id.* at 943. On appeal the Eleventh Circuit upheld the jury verdict, stating, "[W]e cannot say, as a matter of law, in light of [the insured's] explanation for the omission[], that reasonable persons would not differ on the question whether the omitted facts were material . . . ." *Id.* Thus, *Kilpatrick* counsels that a misrepresentation regarding purchase price does not necessarily constitute a material misrepresentation under the doctrine of *uberrimae fidei.*

Nor does this Circuit "follow a bright[-]line rule . . . establishing every misrepresentation to a specifically inquired question on the application to be material as a matter of law." *Great Lakes Reinsurance (UK) PLC v. Roca*, 2009 WL 200252, *4 (S.D. Fla. Jan. 27, 2009) ("*Great Lakes*"). Instead, "[m]ateriality . . . is one of those 'mixed' questions that, like 'negligence,' is ordinarily left to the trier of fact unless the outcome is so clear that a reasonable jury could decide it only one way. '[C]ourts and commentators have long recognized that materiality is primarily a question of fact, the resolution of which is necessarily a function of context and circumstances.'" *Grande v. St. Paul Fire & Marine Ins. Co.*, 436 F.3d 277, 283 (1st Cir. 2006) (citing *Dopp v. Pritzker*, 38 F.3d 1239, 1244 (1st Cir. 1994), *cert. denied*, 514 U.S. 1108 (1995); *Howard Fire Ins. Co. v. Chase*, 72 U.S. 509, 515 (1866)); *see also Great Lakes*, 2009 WL 200252, *4 ("Materiality of misrepresentation is a mixed

question of law and fact that can be decided as a matter of law if reasonable minds could not differ on the question") (citing *Woods v. Indep. Fire. Ins. Co.*, 749 F.2d 1493, 1496 (11th Cir. 1985).

Under this framework, a misrepresentation regarding the purchase price of the vessel does not necessarily constitute a material misrepresentation as a matter of law.[7]   Consequently, the materials Defendants seek in Request No. 1 fall within the bounds of relevancy under the Federal Rules of Civil Procedure and must be produced.

*Request No. 2*

As for Request No. 2, Defendants contend that the underwriting file bears on the issue of materiality because it can be expected to show what Centennial considered and viewed as important to its determination of whether to accept or decline the risk of providing insurance for the *Breyemere* on the extended terms.   Centennial responds that it has already provided Defendants with certain documents that generally are a part of the underwriting file but documents not turned over are not relevant.   More specifically, Centennial argues that at this stage of the litigation, all that matters is whether the claim enjoys coverage under the Policy.   Because Defendants have already taken the position in parallel litigation that defects in the *Bryemere* were sufficiently detectable by ordinary observation and customary testing that the previous owners and brokers knew or should have known of them and negligently misrepresented the structural condition of the vessel to Defendants, however,

_____

[7]This Order does not purport to make a finding that any misrepresentation regarding price that Defendants may have made cannot, as a matter of law, be material.   As discussed above, where no reasonable jury could conclude that such a misrepresentation, under the facts of the case, was not material, a misrepresentation regarding price could, as a matter of law, be material. At this time, however, the Court decides only whether this area fairly falls within the parameters of permissible discovery.   As the record is not developed yet regarding the materiality of the alleged misrepresentation, the Court finds that discovery on this issue does not exceed the bounds of relevancy.

Centennial asserts, the Policy precludes coverage, as Centennial contends that the Policy does not cover damage caused by manufacturing or design defects, nor does it cover the cost of repairing latent defects themselves.  *See* D.E. 49 at 9.

Moreover, Centennial urges, the underwriting file contains materials that are confidential and trade secrets, and, thus, are privileged under Fla. Stat. § 90.506.  *Id.* at 13.  According to Centennial, O'Neill represents a threat of disclosure of Centennial's confidential materials to Centennial's competitors.  *Id.*  In addition, Centennial complains that disclosure of the materials to O'Neill "could put Centennial at a competitive disadvantage in future insurance transactions" and that release of the documents to O'Neill's counsel risks giving them an unfair advantage in future, unrelated litigation since O'Neill's counsel "are preeminent practitioners in the field of first-party insurance coverage." *Id.* at 13-14.

First, the Court addresses the relevancy issue because if the documents Defendants seek lack relevancy, the Court need not consider privilege.  For the reasons stated in the discussion of Request No. 1, the Court finds the documents in question to be relevant to the materiality issue, which, in turn, relates to the misrepresentation count in the Amended Complaint.  While Centennial effectively posits that the Court need not address the materiality issue because even if *uberrimae fidei* does not preclude recovery, the Policy exclusions do, this matter is not before the Court at this time on the merits, and the Court cannot ignore the fact that Centennial has chosen to charge misrepresentation as a cause of action in its Amended Complaint.  *See* D.E. 31 at Count III.  Having decided to advance a claim for misrepresentation, Centennial cannot now be heard to object to discovery relating to that count as not relevant.

Consequently, the Court turns to Centennial's claim of privilege.  Centennial's assertion of

privilege cannot bar production.  Centennial invokes a Florida state privilege.  Yet Centennial relies

for jurisdiction in this Court on the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, and the

Admiralty and Maritime Jurisdiction of the United States District Court, 28 U.S.C. § 1333, not on

diversity jurisdiction.   As a result, federal common law, including that surrounding privilege,

governs this proceeding since the Policy does not contain a choice-of-law provision.  *See Am.

Steamship Owners Mut. Prot. & Indem. Ass'n, Inc. v. Alcoa Steamship Co., Inc.*, 232 F.R.D. 191,

196 (S.D.N.Y. 2005) (citing *Hartford Fire Ins. Co. v. Garvey*, 109 F.R.D. 323, 327 (N.D. Cal.

1985)).   Indeed, Rule 501, Fed. R. Evid., requires the Court to apply the federal common law of

privilege because state law does not supply the rule of decision with respect to an element of the

claim for which the documents are sought – materiality as it relates to the claim of misrepresentation.

        Thus, the Florida privilege upon which Centennial relies does not apply in this case.[8]  Rule

26(c)(1)(G), Fed. R. Civ. P., however, endows the court with discretion to impose a protective order

"requiring that a trade secret or other confidential research, development, or commercial information

not be revealed or be revealed only in a specified way" where the court finds good cause justifying

the entry of such an order.   Here, a protective order can address Centennial's concerns while still

allowing Defendants to obtain relevant discovery.   Accordingly, the Court finds good cause for the

entry of such an order.   Centennial shall produce any documents it may have that are responsive to

Request No. 2.   Only counsel for Defendants, however, may review such materials, and such

materials may be used only for purposes of this litigation.  The responsive materials and all copies

---

[8]Furthermore, even if Centennial could successfully invoke Fla. Stat. § 90.506, that provision authorizes courts to "direct[] disclosure" but to "take the protective measures that the interest of the holder of the privilege, the interests of the parties, and the furtherance of justice require."  These considerations effectively echo those that federal courts evaluate under Rule 26(c)(1)(G), Fed. R. Civ. P., as discussed below.

made of them shall be destroyed or returned to Centennial at the conclusion of this litigation.

*Request No. 3*

Defendants seek the underwriting manual that pertains to the underwriting of the policy, including any premium calculation, in relation to the materiality issue.  In this regard, Defendants contend that the underwriting manual will help them to understand the other documents obtained in response to Requests No. 1 and 2.  In addition, Defendants argue that the underwriting manual may describe how the premium is calculated and provide information regarding whether the purchase price of a yacht has any bearing on the price charged for coverage.  Moreover, Defendants reason, the absence of any such guidelines would suggest that Centennial did not find such information to be material to the decision to provide coverage or to the determination of the premium.

Centennial objects to providing the underwriting manual on the grounds of privilege and lack of relevance.[9]  For the reasons previously discussed in relation to Request No. 1, the Court respectfully disagrees with Centennial and finds that the documents sought are relevant to the materiality aspect of the misrepresentation claim charged by Centennial in its Amended Complaint.

As for privilege, once again, Centennial relies on the trade secret privilege.  Once again, the Court accommodates Centennial's concerns by subjecting the responsive materials to the same protections as those imposed for materials responsive to Request No. 2.

---

[9]Centennial also raises an objection on the basis of undue burden but provides no evidence or showing of how or why the production imposes an undue burden.  Consequently, the Court does not consider Centennial's objection in this regard.  *See Benfatto v. Wachovia Bank, N.A.*, 2008 WL 4938418, *4 (S.D. Fla. Nov. 19, 2008) (quoting *Convertino v. U.S. Dep't of Justice*, 565 F. Supp. 2d 10, 14 (D.D.C. 2008), for the proposition, "This court 'only entertains an unduly burdensome objection when the responding party demonstrates how [discovery of] the document is overly broad, burdensome, or oppressive, by submitting affidavits or offering evidence which reveals the nature of the burden'").

_Request No. 4_

With regard to the complete claim file, Centennial avers that "the complete claim file has been produced in this litigation save any privileged documents identified in Centennial's First Amended Privilege Log. All documents identified therein are protected by either the work product (fact or opinion) and/or attorney-client privilege." D.E. 49 at 15. During the October 4, 2010, hearing, the Court directed Centennial to file _in camera_ the documents for which it claimed privilege, which Centennial did. The Court has now reviewed those documents and finds that all of them enjoy either or both work-product protection and attorney-client privilege. As a result, the Court denies Defendants' Motion to Compel as it relates to these documents, as each document is either protected by the work-product doctrine or privileged (or both).

More specifically, the Court finds all documents except one to enjoy the work-product protection. With respect to the one document that does not qualify for work-product protection, this document is an e-mail from Tony Knowles to Matthew Roethke, an adjuster for Centennial, dated December 22, 2008, and Bates-numbered 276.

The work-product protection traces its recognition in American courts to _Hickman v. Taylor_, 329 U.S. 495 (1947). In _Hickman_, the Supreme Court explained the rationale for the protection:

> Historically, a lawyer is an officer of the court and is bound to work for the advancement of justice while faithfully protecting the rightful interests of his clients. In performing his various duties, however, it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. That is the historical and the necessary way in which lawyers act within the framework of our system of jurisprudence to promote justice and to protect their clients'

-16-

> interests.  This work is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways – aptly though roughly termed by the Circuit Court of Appeals in this case (153 F.2d 212, 223) as the 'Work product of the lawyer.'  Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten.  An attorney's thoughts, heretofore inviolate, would not be his own.  Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial.  The effect on the legal profession would be demoralizing.  And the interests of the clients and the cause of justice would be poorly served.

329 U.S. at 510-11.

Rule 26(b)(3), Fed. R. Civ. P., codifies the work-product doctrine originally recognized by the United States Supreme Court in *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947), as it pertains to "documents and tangible things" sought in discovery.  *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1421 (11th Cir. 1994); *see also* Advisory Committee Notes to 1970 Adoption of Rule 26(b)(3), Fed. R. Civ. P. (discussing the Rule's adoption of the *Hickman* work-product doctrine principles).  That rule provides, in relevant part,

> (A)  *Documents and Tangible Things*.  Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But, subject to Rule 26(b)(4), those materials may be discovered if:
>
> > (i)  they are otherwise discoverable under Rule 26(b)(1); and
> >
> > (ii)  the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.
>
> (B)  *Protection Against Disclosure.*  If the court orders discovery

> of those materials, it must protect against disclosure of the
> mental impressions, conclusions, opinions, or legal theories
> of a party's attorney or other representative concerning the
> litigation.

By the terms of Rule 26(b)(3), the Rule applies only to "documents and tangible things" and only

at the discovery stage.  Therefore, where a party invokes work-product protection as it involves non-

tangible things, such as testimony, or it relates to a different stage of the litigation than discovery,

courts must look to *Hickman v. Taylor*.  Regardless of the item or information sought or the stage

of the litigation at which it is requested, however, federal law governs application of the work-

product protection.  *See United Coal Companies v. Powell Const. Co.*, 839 F.2d 958, 966 (3d Cir.

1988); *see also Harper v. Auto-Owners Ins. Co.*, 138 F.R.D. 655, 658-59 (S.D. Ind. 1991) (citing

*Hickman v. Taylor, supra*; *Pete Rinaldi's Fast Foods v. Great Amer. Ins. Cos.*, 123 F.R.D. 198, 201

(M.D.N.C. 1988); Fed. R. Evid. 501); *Abbott Labs. v. Alpha Therapeutic Corp.*, 200 F.R.D. 401, 405

(N.D. Ill. 2001).

The burden to demonstrate the applicability of the work-product doctrine falls on the

shoulders of the party claiming the protection.  *U.S. v. Moore*, 485 F.2d 1165, 1166 (5th Cir. 1973);

*Place St. Michel, Inc. v. Travelers Prop. Cas. Co. of America*, 2007 WL 1059561, *3 (S.D. Fla. Apr.

4, 2007) (citing *Guidry v. Jen Marine LLC*, 2003 WL 22038377, *3 (E.D. La. Aug. 22, 2003)); *Auto

Owners Ins. Co. v. Totaltape, Inc.*, 135 F.R.D. 199, 201 (M.D. Fla. 1990).  To be successful, a party

must show that the document in question was created in anticipation of litigation or for trial.

In the context of a case involving an insurance claim, courts in this district have adopted a

rebuttable presumption that documents prepared before the final decision on an insured's claim do

not constitute work product, but that documents produced after a claims denial do.  *See, e.g.,*

-18-

*Milinazzo v. State Farm Ins. Co.*, 247 F.R.D. 691, 701 (S.D. Fla. 2007); *Royal Bahamian Ass'n, Inc.*

*v. QBE Ins. Corp.*, ___ F.R.D. ___, 2010 WL 3452368, *1 (S.D. Fla. Sept. 3, 2010). "[S]pecific

evidentiary proof of objective facts" can rebut the presumption. *Milinazzo*, 247 F.R.D. at 701

(quoting *Harper v. Auto-Owners Ins. Co.*, 138 F.R.D. 655, 662 (S.D. Ind. 1991)).

In the pending matter, the record is not entirely clear as to when Centennial actually denied

O'Neill's claim. On the one hand, a March 21, 2008, letter from Centennial's representative to

O'Neill states,

> Since repairs to *Bryemere* have not started and no formal claim has
> been presented to AIG, we believe it is [in] the best interest of all
> parties to have this issue resolved now rather than later. As such,
> AIG Private Client Group believes that there is no coverage for this
> matter and any claim which the insured may contemplate submitting
> to underwriters as a claim should be re-considered. . . . AIG is
> available to conference with you and/or who[m]ever else in order to
> bring some resolution to this matter.

D.E. 49 at 34. This letter recognizes that as of March 21, 2008, Centennial did not consider O'Neill

to have filed a formal claim. Thus, no denial of a claim could have, in fact, occurred. And, although

the letter further declares Centennial's "belie[f]" that the Policy does not provide coverage for

O'Neill's loss, it expressly acknowledges that the matter is not resolved. Under these circumstances,

the Court declines to find that this March 21, 2008, letter constituted a denial of O'Neill's claim,

triggering the in-anticipation-of-litigation rebuttable presumption.

Defendants suggest that the claim was not denied officially until January 16, 2009. *See* D.E.

35 at ¶ 26. Centennial argued at the October 4, 2010, hearing, and this Court's review of the

privileged documents submitted by Centennial reveals, however, that on December 23, 2008,

representatives of Centennial met with O'Neill. These documents make clear that, at least in

Centennial's view, it advised O'Neill at the December 23, 2008, meeting that it was likely denying coverage, and in response, O'Neill allegedly expressed his intention to sue Centennial. Clearly, as of that time, regardless of whether Centennial had made a final decision to deny coverage, Centennial anticipated litigation.

Each of the documents submitted for *in camera* review is dated December 23, 2008, or later, with the exception of the Tony Knowles e-mail, which is dated December 22, 2008. Thus, all of these documents except for the Knowles e-mail were created in anticipation of litigation. A review of the documents further reveals that they were created by an attorney or the attorney's agent, or for an attorney's consideration by a client representative in connection with the anticipated litigation. As such, they are protected by the work-product protection (and also by the attorney-client privilege).

As for the Knowles e-mail, this document does not qualify for work-product protection because it was created prior to the anticipation of litigation. Moreover, the document itself does not appear to suggest that Knowles, the author of the e-mail, prepared it in furtherance of or in anticipation of litigation between Centennial and Defendants. Because the work-product protection does not shield this e-mail, the Court considers whether the attorney-client privilege can protect it.

The attorney-client privilege protects communications between an attorney and that attorney's client. *See United States v. Schaltenbrand*, 930 F.2d 1554, 1562 (11th Cir. 1991). It attaches only to communications made in confidence to an attorney by that attorney's client for the purposes of securing legal advice or assistance. *In re Grand Jury Investigation*, 842 F.2d 1223, 1224 (11th Cir. 1987). The party invoking the attorney-client privilege bears the burden of proving that an attorney-client relationship existed and that particular communications were confidential in nature. *In re Grand Jury Proceedings in Matter of Freeman*, 708 F.2d 1571, 1575 (11th Cir. 1983).

More specifically, the client must demonstrate that the communication sought to be protected was "(1) intended to remain confidential and (2) under the circumstances was reasonably expected and understood to be confidential." *Bogle v. McClure*, 332 F.3d 1347, 1358 (11th Cir. 2003) (quoting *Untied States v. Bell*, 776 F.2d 965, 971 (11th Cir. 1985) (quotation marks and emphasis omitted)).

The Knowles e-mail is between Knowles, who was contracted by Centennial at the time that he wrote the e-mail, and Matthew Roethke, the adjuster for Centennial. The contents of the e-mail respond to an apparent question from Roethke regarding the *HMY* Litigation and any role in it that Knowles might play. Because Knowles was acting as an agent of Centennial at the time and appears to have been providing Roethke with information for the purpose of allowing Centennial to seek legal advice, the Court finds this e-mail to be protected by the attorney-client privilege. Consequently, the Court denies Defendants' Motion to Compel as it regards Request No. 3.

*Request No. 7*

During the October 4, 2010, hearing, Defendants limited Request No. 7 to seek information only as it regards Knowles. Counsel for Centennial agreed during the hearing to produce all invoices relating to Knowles and further clarified that it has withheld nothing else. Under these circumstances, the Court denies as moot Defendants's Motion to Compel as it regards Request No. 7.

*Request No. 10*

Seeking documents that Centennial has generated or received that construe or comment upon the meaning or application of the terms "latent defect," "market value," "manufacturing and design defects," and "inherent vice," Defendants assert that the requested information pertains directly to Centennial's stated reasons for denying coverage and suggest that these materials will provide some

enlightenment regarding alleged ambiguities in the meaning of these phrases.  Centennial objects to Request No. 10 as irrelevant to the interpretation of the Policy.  It further complains that the request is overbroad and burdensome.

The Court overrules Centennial's objections.  First, with respect to overbreadth and burdensomeness, Centennial has provided no support for these assertions.  Accordingly, the Court does not consider them.  *See Benfatto v. Wachovia Bank, N.A.*, 2008 WL 4938418, *4 (S.D. Fla. Nov. 19, 2008) (quoting *Convertino v. U.S. Dep't of Justice*, 565 F. Supp. 2d 10, 14 (D.D.C. 2008), for the proposition, "This court 'only entertains an unduly burdensome objection when the responding party demonstrates how [discovery of] the document is overly broad, burdensome, or oppressive, by submitting affidavits or offering evidence which reveals the nature of the burden'").

As for relevancy, Centennial placed the meaning of these terms in controversy when it sought a declaration from this Court denying coverage on the basis of these terms contained within the Policy.  To the extent that Centennial has materials construing these terms, such information is plainly relevant, whether they support or contradict Centennial's current position on the meaning of these phrases.

Nevertheless, Centennial submits that it has already provided everything of which it is aware that responds to this discovery request.  Defendants challenge Centennial's suggestion in this regard, based on their recovery of an internal memorandum between AIG adjusters that allegedly mentioned the *French Cuff* case.  According to Centennial, however, the document at issue consisted of a newsletter that an attorney for Centennial sent, which contained summaries of a number of different cases, including *French Cuff*.  Centennial further explained that it does not have a way to search for other potentially responsive materials.

Consequently, the Court directed counsel for Centennial to check with its client again for all responsive materials, to provide a brief description of the search that was performed, and to have a representative of Centennial certify that despite such a search, no additional materials were found. In the alternative, if materials were recovered, Centennial was directed to make them available to Defendants.

C.      Centennial's Motion to Compel [D.E. 61]

In Centennial's Motion to Compel Defendants J. Brian O'Neill and Carolina Acquisition, LLC, to File Better Responses to Centennial's First Request for Production [D.E. 61], Centennial complains that Defendants O'Neill and Carolina have specified that "'responsive documents in O'Neill's possession are available for inspection and copying at [counsel's offices],' without specific references to bates stamps numbers identifying the selected, responsive documents for counsel's review." D.E. 61 at 2. Centennial further objects that the production includes "multiple copies of the same documents." *Id.*

Defendants counter that under the Federal Rules of Civil Procedure, they have the option of either "produc[ing] documents as they are kept in the usual course of business or . . . organiz[ing] and label[ing] them to correspond to the categories in the request." *See* Fed. R. Civ. P. 34(b)(2)(E)(i). In this case, Defendants state, they produced the records as they are maintained in the ordinary course of business, and that production comprised approximately 6,800 pages. Moreover, Defendants explain, the duplicates are maintained in the files in the ordinary course of business, as they constitute documents received from different sources or documents that may have been attached to other materials. According to Defendants, culling any documents that happen to appear more than once would compromise the integrity of the production.

-23-

The Court agrees with Defendants that their production complied with the Federal Rules of Civil Procedure.  Although a party responding to a discovery request cannot use the production mechanism of providing documents as they are kept in the usual course of business to hide responsive documents in a mountain of non-responsive documents, where the documents produced are responsive to the production requests, a responding party that produces documents as they are usually maintained in the ordinary course of business bears no duty to label or otherwise organize the documents.  *See Hagemeyer N. Am., Inc. v. Gateway Data Sciences Corp.*, 222 F.R.D. 594, 598 (E.D. Wis. 2004).  Here, Centennial does not suggest that Defendants produced non-responsive documents.  As for the repeated documents, to the extent that such duplicate documents are actually maintained in the ordinary course of business and are responsive, Defendants did not have discretion not to produce them, particularly in view of the fact that, according to Defendants' proffer, they derived from different original sources or constituted attachments to other documents.  Nor was the amount of documents that Defendants produced overwhelming; rather, they totaled approximately 6,800 pages.  In short, Centennial's objections to Defendants' responses to Centennial's First Request for Production are overruled in these regards.

Centennial also asserts that O'Neill's objection to Request No. 27 is insufficient.  Request No. 27 sought "[a]ny and all documents relied upon to file the [civil remedy notice] against HMY Yachts' insurer."  D.E. 61 at 4.  Originally, O'Neill objected on the basis of relevancy and further invoked the attorney-client privilege and the work-product protection.  *Id.*  During the hearing, however, counsel for O'Neill clarified that he did not describe documents responsive to Request No. 27 on O'Neill's privilege log because he viewed them as being irrelevant.  The Court directed O'Neill to submit the documents at issue for *in camera* review, which O'Neill did.  The

-24-

Supplemental Privilege Log supplied with the documents does not indicate that Defendants seek to withhold the documents on the basis of either work-product doctrine or attorney-client privilege. Rather, Defendants rely upon relevancy objections for all responsive documents, mediation privilege for one responsive document, and settlement communication privilege for two others.

First, the Court evaluates the relevancy of the materials that Defendants submitted for *in camera* review. To do this, a review of Centennial's stated purpose in serving Request No. 27 is necessary. The Court begins by briefly discussing the civil remedy notice that Defendants filed against ACE, HMY Yachts's insurer.

Prior to Centennial's filing of the pending litigation, Carolina had filed a case against HMY Yacht Sales, Inc. ("HMY") (the firm where the listing agent and salesperson who sold the *Bryemere* was affiliated), and others. *See Carolina Acquisition, LLC v. HMY Yacht Sales, Inc.*, Case No. 07-61738-CIV-ZLOCH (S.D. Fla.) (the "*HMY* Litigation"). In the *HMY* Litigation, Carolina asserted causes of action against HMY for fraudulent inducement, violation of Florida's Deceptive and Unfair Trade Practice laws, and rescission. The alleged violations of Florida's Deceptive and Unfair Trade Practice laws involved claims of misrepresentation and omission of materials facts. Following a trial, on April 28, 2010, the jury entered its verdict for Carolina and against HMY on the claim of negligent misrepresentation and awarded $2 million. *See* D.E. 66-1 at 5-10.

Before the *HMY* Litigation trial and verdict, however, Carolina filed a Florida Civil Remedy Notice of Insurer Violations ("CRN") against ACE. In this CRN Carolina complained that ACE had not attempted in good faith to settle claims that it should have. *See* D.E. 66-1 at 3. More specifically, Carolina asserted that ACE had provided liability coverage to HMY, among others, to protect HMY and the others from third-party actions claiming damages. *Id.* at 4. Subsequently,

-25-

HMY had sold the *Bryemere* to Carolina, even though it "actually suffered from myriad latent defects, causing the hull and other components of the vessel to fail within moments after its purchase . . . ." *Id.* Consequently, Carolina had filed the *HMY* Litigation. *Id.* Although ACE defended HMY under a reservation-of-rights letter, it refused to settle Carolina's claims. Thus, Carolina filed the CRN, alleging that ACE's counsel did not objectively investigate the facts supporting Carolina's negligent misrepresentation and other claims. *Id.*

Centennial argues that in winning its case against HMY in the *HMY* Litigation, Defendants "relied upon facts and documents 'to describe the vessel, its construction and history' in supporting the existence of 'myriad "latent" defects' in *M/Y Bryemere*, as alleged in the CRN." D.E. 70 at 3. Based on Centennial's belief that "[t]hese documents undoubtedly refer to the same set of defects in design or manufacture found within *M/Y Bryemere* that are the basis for Centennial's position . . . that it is not responsible for the condition to or loss incurred," *id.*, Centennial contends that Request No. 27 seeks relevant information.

Defendants counter that in response to Request No. 27, they have provided all relevant, responsive documents and have withheld only those materials that are not relevant to this action. More specifically, Defendants explain that, among other issues they have addressed concerning the CRN, Defendants have argued that ACE violated the Florida statute, in part by failing to pay the judgment against HMY in the *HMY* Litigation and that ACE failed to adopt and implement standards to ensure that independent defense counsel was appointed and vested with the authority to investigate facts objectively and settle cases where warranted. D.E. 66 at 5. According to Defendants, "[t]he limited facts contained in [the] CRN concerning the *M/V Bryemere* are included for contextual purposes only and are derived from the numerous reports by marine professionals already produced

by O'Neill and which have long been in AIG's possession." *Id.* at 6.

The Court has carefully reviewed the documents submitted *in camera*. Based on this review, the Court finds that none of the documents submitted by Defendants are relevant to the claims in this case or bear on the description of the vessel, its construction, or its history, or provide any information regarding the alleged existence of "latent" defects in the *Bryemere*. Accordingly, the Court denies Centennial's Motion to Compel [D.E. 61] in its entirety.

D.      Centennial's Motion to Compel Better Answers to Interrogatories [D.E. 64]

As of the October 4, 2010, hearing, controversies over Interrogatories No. 3, 6, 7, 10, and 13 through 15 remained. Although Defendants had provided responses to these interrogatories, they had, nonetheless, objected on the basis of work-product protection and attorney-client privilege. Unsure of whether Defendants had withheld any materials on those bases, Centennial filed this Motion to Compel Better Answers to Interrogatories [D.E. 64].

With regard to all of the interrogatories in question, however, during the hearing, counsel for Defendants represented that they had not withheld any information on grounds of privilege. Moreover, the Court directed counsel to file and counsel did, in fact, file a Notice of Compliance stating that Defendants had withheld no privileged information in response to these interrogatories.[10] *See* D.E. 94. In addition, a review of Defendants' answers to these interrogatories reveals that the answers to them, for the most part, are detailed and appear to be complete. Under these

---

[10]The Notice states that Defendants have withheld no privileged information or documents responsive to any of Centennial's discovery requests at issue in these various Motions, except for materials listed on Defendants' privilege log and documents submitted to the Court for *in camera* inspection. Defendants' counsel's statements at the October 4, 2010, hearing clarified that none of the withheld documents on the privilege log were responsive to these interrogatories.

circumstances, the Court finds nothing to compel and therefore denies Centennial's Motion to Compel [D.E. 64].

E.      Centennial's Motion for Leave to Depose in Excess of Ten Individuals

In this Motion Centennial seeks leave of court to exceed the ten-deposition limit. Rule 30(a)(2)(A)(i), Fed. R. Civ. P., requires a party to obtain court authorization to depose an individual where the parties have not stipulated to the deposition and the deposition would result in more than ten depositions being taken by that party. Under the rule, the court "must grant leave [to take the excess depositions] to the extent consistent with Rule 26(b)(2)." Fed. R. Civ. P. 30(a)(2)(A)(i). Rule 26(b)(2)(C), Fed. R. Civ. P., in turn, requires the court to

> limit the frequency or extent of discovery otherwise allowed by [the Federal Rules of Civil Procedure] or by local rule if it determines that:
>
> (i)     the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;
>
> (ii)    the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or
>
> (iii)   the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

The Advisory Committee's Notes to the 1993 Amendments to Rule 30, Fed. R. Civ. P., explain two goals of the revised rule: (1) "to assure judicial review under the standards stated in Rule 26(b)(2) before any side will be allowed to take more than ten depositions in a case without agreement of the other parties," and (2) "to emphasize that counsel have a professional obligation

-28-

to develop a mutual cost-effective plan for discovery in the case." Fed. R. Civ. P. 30(a)(2)(A),

Advisory Committee's Notes to the 1993 Amendments.

Courts have construed Rule 30(a)(2)(A), Fed. R. Civ. P., to require a party seeking leave of

court to exceed the 10-deposition limitation to justify the necessity of each deposition *previously*

*taken* without leave of court. *Mazur v. Lampert*, 2007 WL 676096 (S.D. Fla. Feb. 28, 2007); *Barrow*

*v. Greenville Indep. School Dist.*, 202 F.R.D. 480 (N.D. Tex. 2001).  Requiring the party to justify

prior depositions precludes the possibility that "a party could circumvent the cap on depositions by

exhausting the maximum allotted number to take those that she could not justify under Rule 26(b)(2)

standards, and then seeking leave to exceed the limit in order to take depositions that she could

substantiate." *Barrow*, 202 F.R.D. at 483.

In this case Centennial has already taken or noticed the depositions of Thomas Price,

Matthew Smith, Mark Ashton, David Pedrick, Mark Cox, Nick Falcone, Defendant O'Neill, L.J.

Gallagher, and Eric Leslie.  D.E. 67 at 6.  Besides these depositions, Centennial seeks leave to

depose Dan O'Neill, Jeff Thiel, David Jones, Bruce Pfund, Denniz Denzin, Art Meshner, Ed

Hernandez, a representative of Eagle Eye Enterprises, and Defendants' two expert witnesses.  *Id.* at

6-7.  Defendants, however, declined to agree to any of these depositions other than the two expert

witnesses.  *Id.* at 7.

The Court therefore reviews the justification for taking the depositions of each of these

individuals.  Obviously, sufficient justification exists for Defendant O'Neill's deposition.

Turning to the other deponents and proposed deponents, as discussed in the Background

section of this Order, before Defendants purchased the *Bryemere*, O'Neill retained Price, a marine

surveyor, to survey the vessel on March 22, 2007.  Price issued two reports, both dated March 22,

2007, but valuing the boat differently.  The difference in valuation pertains to the materiality of any misrepresentations Centennial alleges that Defendants made in applying for insurance coverage for the *Bryemere* with Centennial.  The Court finds the taking of the Price deposition to have been justified under the principles of Rule 26(b)(2).

As alleged in the Amended Complaint and admitted in O'Neil's Answer, Knowles, Smith, Ashton, Pfund, and Pedrick all examined the *Bryemere* after the June 29, 2007, incident, conducted separate tests, and prepared reports.  *See also* D.E. 64 at 9-11.  Likewise, David Jones inspected the *Bryemere* following the June 29, 2007, events and is an expert in a different area than the others.  Since the cause of the damage at issue represents the heart of this matter, this Court finds justification for deposing each of these individuals.

Captain Dan O'Neill,[11] mate Thiel, and passengers Cox and Falcone were onboard the *Bryemere* during the June 29, 2007, voyage where the damage was noticed.  As the two men operating and in charge of the vessel when the flexing of the hull occurred, Dan O'Neill and Thiel are in a unique position to testify as to what specifically happened.  Presumably, as the captain and mate, Dan O'Neill and Thiel have experience (and possibly, training) in properly operating a yacht such as the *Bryemere* and are familiar with the vessel's structure and equipment.  As a result of their experience and the fact that the boat was under their operation at the time of the hull-flexing, O'Neill and Thiel are in a distinct factual position.  Moreover, because the two men were operating the large vessel jointly, they each are likely to have had different vantage points and to have observed and experienced unique circumstances.  Accordingly, the Court finds that taking both of these

---

[11]Dan O'Neill is not the same person as Defendant Bryan O'Neill.  This Order refers to Bryan O'Neill as "O'Neill" and Dan O'Neill as "Dan O'Neill."

depositions is justified.

As for Cox and Falcone, Centennial has already taken their depositions, and neither had any real knowledge. Their depositions cannot be justified based on the content of them. Nor was it reasonable for Centennial to have expected that either would possess unique knowledge, particularly in view of the fact that they were passengers on the *Bryemere* when Dan O'Neill and Thiel were actually operating the vessel. Had Centennial first deposed Dan O'Neill and Thiel and had these individuals given Centennial reason to believe that Cox and Falcone might possess important information, such a situation may have justified the depositions. But that did not occur here, and nothing else that Centennial has brought to this Court's attention provides justification for why Centennial may have thought these depositions were necessary.

Nevertheless, the Court will not count these depositions against Centennial's limit because, based on correspondence between counsel for the parties, Centennial was justified in believing that Defendants had implicitly agreed to exceed the ten-deposition limit at the time that they took the depositions of Cox and Falcone. In an April 16, 2010, letter from Defendants' counsel to counsel for Centennial, Defendants' counsel confirmed that they were authorized to accept service on behalf of four individuals, recognized that they were "awaiting responses from the others [Centennial's] counsel listed and may be able to accept service for those five, and discussed providing information regarding the availability of all nine for deposition. In addition, defense counsel directed Centennial to contact three others itself. D.E. 67-1 at 51. Although the letter discussed at least twelve depositions, counsel for Defendants mentioned no objection to depositions in excess of the ten-deposition limit.

On April 28, 2010, counsel for Centennial wrote to counsel for Defendants, stating, "On

April 9, 2010, we wrote listing 16 witnesses whose depositions we sought to schedule. . . ." D.E. 67-1 at 53. The remainder of the letter is devoted to suggesting times and places to conduct those depositions. *See id.*

Counsel for Defendants responded on May 5, 2010. *See* D.E. 67-1 at 56. In this communication, defense counsel discussed the scheduling of at least thirteen witnesses for depositions by Centennial. *See id.* Conspicuously absent from this letter is any objection to those depositions exceeding the limit. *See id.* E-mails dated May 25 and 26, 2010, between counsel for the opposing parties similarly reflects discussions regarding the scheduling of depositions without raising any objections to the number of depositions that Centennial sought to take. *See* D.E. 74-2 at 2-5.

Instead, after appearing to agree tacitly to Centennial's plan to take more than ten depositions, Defendants seem to have first raised their objections on June 22, 2010, after the depositions of Falcone and Cox had already been taken. *See* D.E. 67 at 6. While the Court does not suggest in any way that Defendants engaged in any type of plan to deceive Centennial, the result of the April and May communications between counsel for the parties had the same result: Centennial conducted its earlier depositions under the mistaken belief that Defendants did not object to the depositions of the other individuals Centennial had mentioned in its letters, even though the total number of depositions exceeded ten. Thus, Centennial did not seek leave of court before conducting any of its depositions, assuming that it would be able to conduct all of the ones identified in its communications with Defendants. Under these circumstances, the Court will not count the depositions of Cox and Falcone against Centennial.

As for Gallagher, he is Defendant O'Neill's assistant and an employee of Defendant Carolina.

In this capacity, he was allegedly "intimately involved" in the purchase of the *Bryemere*, and Centennial expects to obtain information from him regarding the purchase price of the vessel. As discussed in relation to the resolution of other Motions to Compel in this Order, purchase price relates to the issue of materiality, and could possibly preclude any recovery by Defendants in this matter. As such, the Court finds the deposition of Gallagher to be justified.

Eric Leslie of Hinckley Yacht Services supervised the beginning of repair work to the *Bryemere* following the June 2007 events. As such, he presumably saw first-hand the inner parts of the vessel while it was being taken apart and fixed. In this regard, Leslie's vantage point was unique, and his deposition was justified.

Denzin, Meshner, and Hernandez are all former Inlet Boatworks employees. Inlet Boatworks manufactured the *Bryemere*. Consequently, to the extent that the manufacturing of the vessel may have been deficient, they could be expected to have information regarding such shortcomings. This information could be expected to pertain to the latent defect and manufacturing defect issues relating to Policy coverage. As a result, deposing someone knowledgeable at Inlet Boatworks is justified. Centennial has failed to explain, however, why it must depose all three individuals. Indeed, Centennial has not differentiated among each former Inlet employee's knowledge, even though Centennial has indicated that these three witnesses have so far been responsive to Centennial's inquiries. Under these circumstances, the Court will not authorize the depositions of all three individuals. Instead, Centennial may choose one representative or former employee of Inlet to depose.

Finally, Eagle Eye Enterprises, through Cracker Boy Boatworks, allegedly made repairs to the *Bryemere* in accordance with the March 22, 2007, pre-purchase survey conducted by Price.

Some of these repairs involved welding of the fuel tank mounting brackets which were found to be cracked after the June 29, 2007, events.  According to Centennial, however, Eagle Eye's invoices do not support Defendants' contention that these repairs were actually made.  Information assisting in resolving this factual matter is important to the resolution of this case, and a deposition of Eagle Eye Enterprises is justified.  Thus, in all, Centennial may depose the following five witnesses beyond the ten-witness limit (in addition to Defendants' two experts, to which the parties have agreed): Pfund, Jones, Defendant O'Neill, a representative of Eagle Eye, and a representative or former employee of Inlet Boatworks.

In reaching this determination, the Court notes that the amount in controversy here exceeds $2 million.  Under these circumstances and in view of the expected universes of knowledge of each of the additional deponents for whom the Court has authorized depositions, five depositions beyond the presumptive limit of ten comports with the spirit and purpose of the Federal Rules of Civil Procedure and is otherwise appropriate.  For the foregoing reasons, the Centennial's Motion for Leave to Depose in Excess of Ten Individuals [D.E. 67] is granted in part and denied in part, consistent with the terms of this Order.

## Conclusion

For the foregoing reasons, it is hereby **ORDERED and ADJUDGED** as follows:

1.   Defendants J. Brian O'Neill and Carolina Acquisition, LLC's Motion to Compel Production of Documents Responsive to Their First Request for Production [D.E. 48] is **GRANTED IN PART and DENIED IN PART**, consistent with the terms of this Order;

2.   Plaintiff AIG Centennial Insurance Company's Motion to Compel Defendants J. Brian O'Neill and Carolina Acquisition, LLC, to File Better Responses to Centennial's First Request for

Production [D.E. 61] is **DENIED**;

    3.  Plaintiff AIG Centennial Insurance Company's Motion to Compel Better Answers to Interrogatories [D.E. 64] is **DENIED**; and

    4.  Plaintiff AIG Centennial Insurance Company's Motion for Leave to Depose in Excess of Ten Individuals [D.E. 67] is **GRANTED IN PART and DENIED IN PART**, consistent with the terms of this Order.

    **DONE AND ORDERED** this 18th day of October 2010.

                                                    ROBIN S. ROSENBAUM
                                                    UNITED STATES MAGISTRATE JUDGE

cc:     Hon. William J. Zloch
        Counsel of Record

-35-