## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 09-60551-CIV-ZLOCH/ROSENBAUM

AIG CENTENNIAL INSURANCE
COMPANY,

                Plaintiff,

v.

J. BRIAN O'NEILL,
CAROLINA ACQUISITION, LLC, and
BANK OF AMERICA, N.A.,

                Defendants.

_____/

### ORDER

This matter comes before the Court upon Defendants J. Brian O'Neill and Carolina Acquisition, LLC's Motion to Compel and for Sanctions Based on AIG's Discovery Misconduct [D.E. 62]. The Court has carefully reviewed Defendants' Motion and all filings in support thereof and in opposition thereto, has heard oral argument on the Motion, and is otherwise duly advised in the premises. For the reasons discussed below, the Court now grants in part and denies in part Defendants' Motion.

### Background

This matter arises out of an insurance dispute over a luxury yacht. According to the Amended Complaint, Defendant J. Brian O'Neill ("O'Neill") entered into a contract with Double Billed, LLC, for the purchase of *Bryemere*, a 2005 66-foot legacy Sportfish Motor Yacht. D.E. 31 at ¶ 17. Price Marine Services, Inc. ("Price"), conducted sea trials and a pre-purchase survey of the

vessel. *Id.* at ¶ 18. Subsequently, the Amended Complaint asserts, Price prepared a survey report that recommended a series of repairs "to keep [the yacht] in good usable condition." *Id.* at ¶ 19.

In addition, the Amended Complaint continues, Price issued a survey report dated March 22, 2007, opining that the vessel had a market value of "approximately $1,875,000 as equipped." *Id.* at ¶20. A representative of O'Neill, however, allegedly contacted Price and requested that he increase the appraisal value of the *Bryemere* for loan and insurance purposes. *Id.* at ¶ 21. Accordingly, the Amended Complaint avers, Price issued a second survey report also dated March 22, 2007, that "was identical in all aspects to the original survey report [except for] an increase of $475,000.00 in the market value of the vessel to $2,350,000." *Id.* at ¶ 22.

Subsequently, the parties allegedly negotiated a "survey adjustment" of $150,000 on the vessel, which effectively lowered the original purchase price of the yacht by that amount. *Id.* at ¶ 24. On April 18, 2007, Carolina Acquisition, LLC ("Carolina"), obtained title to the *Bryemere*, with the Seller's Closing Statement reflecting that O'Neill served as Carolina's "managing member." *Id.* at ¶ 25. The Closing Statement further shows a "contract sale price" of $1,575,000, plus the value of a traded-in 1998 53-foot Ocean yacht, valued at $700,000, minus the "survey adjustment" of $150,000, for a total price of $2,125,000. *Id.* at ¶ 26.

AIG Centennial Insurance Company, Inc. ("Centennial"), issued a policy of marine insurance for the *Bryemere*, which provided property damage coverage for the period from April 19, 2007, through April 19, 2008 (the "Policy"). *Id.* at ¶¶ 27, 28. Under the Policy, O'Neill is the sole insured, although Defendant Bank of America, N.A. ("BOA"), is listed as the loss payee of the policy. *Id.* at ¶¶ 29, 30. The Policy insured the *Bryemere* for an agreed value of $2,350,000.00, with a deductible of $47,000.00 for hull damage claims. *Id.* at ¶ 31.

-2-

The Policy promises to pay "the reasonable costs of repair, with materials of like kind and quality without deduction for depreciation" if the yacht is partially damaged by a covered loss. *See* D.E. 35-1 at 10.[1]  In addition, the Policy specifies that it "do[es] not cover any loss, damage, claim or expense for the repair or replacement of any latent defect in the yacht; however, any physical loss or damage to the yacht resulting or caused by the latent defect will be covered." *Id.* at 14.  "Latent defect," in turn, "means a hidden flaw in the material or construction existing at the time of original building of the yacht or any additional or replacement parts, components or systems of the yacht which is not discoverable by ordinary observation or known methods of testing." *Id.* at 8.  Similarly, the Policy "do[es] not cover any loss, damage, claim or expense caused directly or indirectly, in whole or in part by any defect in design or manufacture of the yacht or any additional or replacement part, component or system of the yacht." *Id.*

Defendant O'Neill asserted a property damage claim under the Policy, alleging that on June 29, 2007, while on her first post-purchase ocean voyage, the *Bryemere* almost immediately suffered significant movement in the forward fuel tanks as the result of a lack of structural integrity in the hull of the vessel, which was later discovered to have also caused considerable flexing of the hull underneath the cabinets on the starboard side of the yacht.  D.E. 31 at ¶ 35.  After the *Bryemere*'s arrival in Newport, Rhode Island, O'Neill retained several experts to investigate the condition of the *Bryemere*.  *Id.* at ¶ 36; D.E. 35 at ¶ 17.

According to the Amended Complaint, these experts arrived at the following conclusions:

---

[1]Some docket entries, including this one, have two page-numbering systems resulting in different page numbers on the same page: the page number of the original document and the page number imprinted across the top of the page by the Court's CM/ECF system.  This Order refers to the page numbers left by the Court's CM/ECF system.

(1) Anthony Knowles of Newport Marine Surveyors found that the boat was not built at as designed and was unseaworthy; (2) Naval architect Matthew Smith determined that the vessel was not built to the designer's structural specifications and was therefore unseaworthy, unsafe to operate, and not structurally sound; (3) Mark Ashton of Independent Marine Systems conducted a thermal infra-red imaging survey of the *Bryemere*, which confirmed the existence of significant delamination on both the port and starboard sides of the hull in a number of different locations; (4) Bruce Pfund of Special Projects, LLC, who specialized in fiberglass materials, opined that the yacht, as built, did not correspond to the design specifications of the *Bryemere*; and (5) Pedrick Yacht Designs, who further inspected the *Bryemere* at the request of Anthony Knowles, concluded that the longitudinal stringers were undersized from the design in both their depth and length along the hull and that the vessel, as constructed failed to meet structural standards and was unseaworthy. D.E. 31 at ¶ 36; D.E. 35 at ¶¶ 18-20.

Following these inspections, Pedrick Yacht Designs allegedly developed a repair strategy and recommended that the *Bryemere* could be re-constructed to its original design specifications by installing outboard longitudinals in the forward area of the hull to make the vessel sufficiently strong to be fit for her intended service. D.E. 31 at ¶ 37. Hinckley Yacht Services subsequently completed the repairs at a cost exceeding $1,255,384.79. *Id.*

On December 23, 2008, O'Neill filed an insurance claim with Centennial stating a loss date of July 27, 2007, and seeking to recover the cost of repairs completed by Hinckley. *Id.* at ¶ 39. The claim attributes the damage to a "latent defect." *Id.*

On March 19, 2009, Centennial issued a reservation-of-rights letter to O'Neill as the named insured. *Id.* at ¶ 40. About a month later, on April 14, 2009, Centennial filed the pending case,

seeking a declaration stating that Centennial owes no coverage for O'Neill's December 28, 2008, claim under the Policy.  Centennial filed its Amended Complaint on November 25, 2009.  *See id.*

O'Neill filed his Answer, Affirmative Defenses, and Counterclaim on January 8, 2010.  *See* D.E. 35.  In his Counterclaim, O'Neill asserts a single count against Centennial for breach of contract.  *See id.* at 18-19.

During the course of discovery in this case, Defendants served Centennial with a Notice of Deposition pursuant to Rule 30(b)(6), Fed. R. Civ. P., seeking to take the deposition of "a representative or representatives" of Centennial "with the most knowledge" regarding 21 categories of information set forth in the Notice.  *See* D.E. 62-3.  Among other areas, the Notice identified three subjects expressly involving underwriting.  *See id.* at 4-5, ¶¶ 3, 4, 17.

On June 18, 2010, Centennial produced Matthew Roethke, the claims adjuster assigned on the *Bryemere* claim, *see* D.E. 63-1 at 9:21:11-13,[2] as its sole corporate representative for deposition. Roethke's deposition lasted for nearly eight hours.  During the deposition, counsel for Defendants asked Roethke questions pertaining to underwriting, but Roethke did not know the answers to many of the questions.  *See*, *e.g.*, *id.* at 14:41:20 - 15:45:10.  Subsequently, Roethke conceded that he was not the "most knowledgeable" concerning underwriting.  *See id.* at 39:144:8 - 40:145:11.  He further testified that he was not "speaking for the underwriters" and that Sean Blue would probably have the most knowledge of the *Bryemere* claim from an underwriting standpoint.  *See, e.g.*, *id.* at 84:321:9 - 84:322:20.

---

[2]In this Order, in citations to the deposition transcript of Matthew Roethke, the first number represents the page number imprinted on the deposition transcript by the Court's CM/ECF filing system, the second number refers to the page number of the deposition transcript, and the third number indicates the lines on the page.

At the end of Roethke's deposition, counsel for Defendants indicated his intention to adjourn the deposition because, among other reasons, he thought Defendants were entitled to the production of a Rule 30(b)(6) witness who was knowledgeable in the area of underwriting. *See id.* at 85:326:11-19. Counsel for Centennial responded by offering to make arrangements to make another witness available for a Rule 30(b)(6) deposition with regard to underwriting issues "without the necessity of court intervention." *Id.* at 85:326:20 - 85:327:3.

After the deposition, Roethke submitted an errata sheet containing approximately fourteen changes or additions to his deposition testimony. *See* D.E. 62-1 at 3-6. In response to their receipt of the errata sheet, counsel for Defendants sought to depose the Centennial underwriter and re-depose Roethke with regard to the changes made to his testimony. *See* D.E. 65-1 at 4-5. In the end, the parties were not able to resolve their differences, although Centennial continued to make an underwriter available for the Rule 30(b)(6) deposition. Because of the parties' dispute, Defendants filed the pending Motion seeking an order re-opening the Roethke deposition at Centennial's expense, allowing the use of both the original June 18, 2010, deposition transcript and the July 12, errata sheet revisions, and deeming the honesty of Defendant O'Neill's application for insurance admitted or alternatively, requiring Centennial to reimburse Defendant O'Neill for its time spent preparing for the underwriting aspect of the June 18, 2010, deposition.[3] *See* D.E. 62 at 12.

## Analysis

Defendants direct their Motion to two primary areas of complaint: (1) Roethke's errata sheet, and (2) Roethke's lack of knowledge concerning underwriting. The Court addresses each issue in

---

[3]In addition, Defendants' Motion sought an order directing the immediate production of certain documents responsive to Defendants' discovery requests. This Court has already addressed these discovery issues in its October 18, 2010, Order. *See* D.E. 99.

turn.

**1.  Roethke's Errata Sheet**

Rule 30(e), Fed. R. Civ. P., governs the making of changes to deposition testimony.  This rule

provides, in relevant part,

> (1)  **Review; Statement of Changes.**  On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:
>
> (A)  to review the transcript or recording; and
>
> (B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

Fed. R. Civ. P. 30(e)(1).  Under the express language of Rule 30(e)(1)(B), a deponent may make

changes in substance (as well as in form) to his deposition testimony.  *See also Cultivos Yadran S.A.*

*v. Rodriguez*, 258 F.R.D. 530, 532 (S.D. Fla. 2009).

Courts, however, have disagreed over the circumstances under which a deponent may make

substantive changes to deposition testimony.  The courts who have construed Rule 30(e)(1)(B)

narrowly have allowed changes in substance only when the transcript evidences "obvious

confusion," *see, e.g., Reynolds v. Int'l Bus. Machines Corp.*, 320 F. Supp. 2d 1290, 1301 (M.D. Fla.

2004); where a credible argument can be made that the court reporter may have missed a word such

as "not" that changed the meaning of the response, *see, e.g., Garcia v. Pueblo Country Club*, 299

F.3d 1233, 1242 n.5 (10th Cir. 2002); or where the change provides clarification but does not

materially alter the deposition testimony as a whole, *see, e.g., Rios v. Bigler*, 847 F. Supp. 1538,

1546-47 (D. Kan. 1994).  These courts have expressed concern that allowing substantive changes

beyond these bounds would open the deposition process for abuse. *See, e.g., Garcia*, 299 F.3d at 1242 n.5 ("A deposition is not a take home examination").

On the other side of the issue, courts interpreting Rule 30(e)(1)(B) broadly have emphasized the absence of any qualifying language in the rule or any requirement that courts examine or pass judgment upon the stated reasons for the changes. *See, e.g., Podell v. Citicorp Diners Club, Inc.*, 112 F.3d 98, 103 (2d Cir. 1997). In addition, these courts have concluded that the broad construction of the rule "furthers the purpose of the discovery process – to allow the parties to elicit the true facts of a case before trial." *Cultivos Yadran S.A.*, 258 F.R.D. at 533 (quoting *Reilly v. TXU Corp.*, 230 F.R.D. 486, 490 (N.D. Tex. 2005) (quotation marks omitted)); *see also Lugtig v. Thomas*, 89 F.R.D. 639, 641 (N.D. Ill. 1981) (describing the process allowing for substantive modifications as an "efficient procedure" because it "reduc[es] surprises at the trial").

To safeguard against abuse and prevent advantage to the deponent when the deponent makes substantive changes to testimony, these courts have developed certain protections. For example, these courts have noted that when a deponent amends testimony substantively, the original testimony remains a part of the record and may be used at trial. *Id.* (quoting *Lugtig v. Thomas*, 89 F.R.D. 639, 641 (N.D. Ill. 1981) (citation omitted)). Furthermore, where an errata sheet so alters the substance of testimony so that the deposing party effectively is denied an opportunity to cross-examine the deponent on a material issue, courts have authorized the re-opening of depositions for the purpose of permitting examination on the changes. *See Lugtig*, 89 F.R.D. at 642.

The Eleventh Circuit has not ruled directly on this issue in a binding decision.[4] This Court,

---

[4]In *Reynolds v. IBM Corp.*, 320 F. Supp. 2d 1290, 1301 (M.D. Fla. 2004), *aff'd* 125 F. App'x 982 (11th Cir. 2004), the district court adopted the narrower reading of the rule, and the Eleventh Circuit affirmed without opinion. Consequently, under 11th Circuit Rule 36-2, the

however, finds itself persuaded by the broader reading of the rule.  Where, as here, the deponent

timely submits changes to his deposition testimony and an opportunity remains for the court to allow

the re-opening of the deposition should the court deem it necessary, this Court agrees that Rule

30(e)(1)(B), Fed. R. Civ. P., allows for the making of substantive alterations to deposition testimony,

even if those changes are material in nature.  Nevertheless, substantive, material changes to

deposition testimony should not be encouraged, or abuse could occur and the purpose of the

deposition device could be eviscerated.  While the Court does not suggest abuse in this particular

case, to discourage future abuse in this case and others, to the extent that this Court finds that a party

deponent materially altered his testimony in a substantive way, this Court will require the deponent

to pay the costs and fees associated with re-opening the deposition.

      The Court now turns to the content of the changes to Roethke's testimony to determine

whether the Court should direct the re-opening of Roethke's deposition.  The first two modifications

pertain to the issue of destructive testing.  During the deposition, Roethke testified as follows:

> Q:    Are you familiar with the term destructive testing?
>
> A:    Yes.
>
> Q:    What do you understand it to be?
>
> A:    My understanding of destructive testing is when what you're testing cannot be reused.  It's destroyed.  It's burned.  It's ground down into particles, chopped up into little pieces.  It cannot be put back where it was taken from in its original form.
>
> Q:    Would you include cutting holes in walls and ripping up carpets as an example of destructive testing?

---

decision is not binding authority.

-9-

* * * * *

> A:   Well, when you say drilling holes, no, I would not say that that's destructive testing to the extent that you can drill different diameter holes.  If you have a one-foot drill bit and you drill in the side of a boat, that's much different than using a 16/32 drill [bit] in order to determine topside or hull thickness.  I don't consider that destructive testing from a drilling standpoint.

> Q:   So it is a matter of degree?

> A:   A matter of degree.

D.E. 63-1 at 17:56:14 - 18:57:14.  The errata sheet changes Roethke's second and third responses quoted above as follows:

> While destructive testing is not a term defined in the policy, one must interpret the term using its plain meaning in the English language plus common sense.  I know for a fact that marine surveyors will stick pins, files or other objects through the hull sides to measure core thickness.  Of course, literally this involves a minute destruction of the vessel's fiber glass.  However, the procedure is insignificant in terms of the harm to the vessel.  Secondly, it can be remedied extremely quickly with the application of additional fiber glass or other epoxies available.  You don't necessarily have to take a two[-]inch diameter core sample to measure thickness.

D.E. 62-1 at 3.

The Court does not find the altered testimony to contradict the original deposition testimony.  To the contrary, the new statements are consistent with the spirit of what Roethke said at his deposition.  As a result, these changes do not warrant the re-opening of the deposition.

The next changes regard the deposition testimony set forth below:

> Q:   How about the outbound stringers?  You know what those are, don't you?

> A:   I do.

-10-

Q:   Oh good.  Were they hidden?

A:   No.

Q:   Were parts of them hidden?

A:   Yes.

Q:   And that would be the part that was behind the fuel tanks, true?

* * * * *

A:   True.

Q:   And also the part forward towards the bow of the boat?

A:   True.

D.E. 63-1 at 24:83:14 - 24:83:4.  The errata sheet seeks to change Roethke's third, fourth, and fifth answers as follows:

> As consistent with my previous answer (p. 83, L 17), no, parts of the outbound stringers were not hidden.  The builder, during the manufacture of the yacht, elected to shorten both the inboard and outboard stringers shorter than the length specified in the Blount building plans.  These defects which [sic] were defects in manufacturing made by the boat builders when they deviated from the design.  All the experts agree that the shortened or defective length of the outboard stringers were discoverable by ordinary and known means of testing.

D.E. 62-1 at 3.  Unlike the prior change, this modification differs substantially from the import of the deposition testimony.  Whereas Roethke agreed during the deposition that parts of the stringers were hidden, in his errata alterations, Roethke gave precisely the opposite response, denying that any parts of the outbound stringers were hidden.  Moreover, because this testimony pertains to the characterization of the defects allegedly contained in the *Bryemere*, it is material to the claims before

-11-

the Court in this case.  For these reasons, Defendants should have an opportunity to cross-examine

Roethke on his new position and how he arrived at it.  Consequently, the Court grants Defendants'

Motion to the extent that it seeks to re-open Roethke's deposition to ask questions concerning this

entry on the errata sheet.

The next changes on the errata sheet regards the testimony repeated below:

> Q:   You would agree that there is an exception to that exclusion
> [for latent defect], assuming that there is coverage in the first
> place, for any physical loss or damage to the yacht resulting
> or caused by the latent defect, correct?
>
> A:   That's what it says, correct.
>
> * * * * *
>
> Q:   There is also a manufacturing and design defects provision.
> Do you see that, sir?
>
> A:   I do.
>
> Q:   How do you read these two together?  In other words, there is
> a provision in the policy assuming basic coverage that damage
> caused by latent defects will be covered, but there is an
> exclusion that sits here that says "manufacturing and design
> defects are not covered."  How does that square in AIG's
> mind?
>
> A:   Well, in this case, I don't think they square.  And the reason
> why they don't square is because there are a multitude of
> experts, very highly respected experts throughout the country,
> some of the best experts in the yachting industry that have all
> said repeatedly that the *Bryemere* was not built as designed,
> and there are a multitude of reports to that effect.  So in the
> case of the *Bryemere*, I can't look at them squarely , because
> there is no latent defect.

D.E. 63-1 at 28:100:4 - 29:101:11.  The errata sheet modifies the last response to say,

> As intended in the Policy, a manufacturing defect concerns a situation

where something goes wrong in the manufacturing process. The elements establishing the existence of a manufacturing defect include that the product deviated from the manufacturer's design, standards or specifications, or that an error occurred in the manufacturing process. A product is defective in manufacture if it deviates in some material way from its intended design or performance standards. The exclusion for manufacturing and design defects is stated directly underneath the exclusion for latent defects, thus confirming the distinction between the two concepts. The exclusion for defect in manufacture is separately and expressly carved out of the Policy coverage. Thus, if the cause of loss qualifies as a defect in manufacture, the underwriter intended, quite clearly, that it was excluded from coverage.

D.E. 62-1 at 3-4.

The Court finds that the newer answer differs substantially from the original answer in that the response that Roethke provided during the deposition stated that the latent defect and manufacturing defect provisions of the Policy could not be "squared" in this case, while the errata sheet entry reaches the opposite conclusion, describing how the exclusions can allegedly be harmonized with each other. This answer directly regards two of the reasons why Centennial asserts that the Policy provides no coverage for the *Bryemere*, and it is only fair for Defendants to have the opportunity to cross-examine Roethke on his new position. Consequently, the Court grants the Motion as it seeks to re-open the deposition to ask questions concerning this issue.

Immediately following the exchange in the deposition quoted above, the discussion set forth below occurred:

Q:      Would you agree that defects in construction can be latent?

* * * * *

A:      I can't answer that question to the extent of our policy.

Q:      Why?

-13-

A:      Because it is not in the policy.

* * * * *

Q:      Can a manufacturing or design defect be a hidden flaw or result in a hidden flaw?

A:      To the extent that it is not defined in our policy, I can't answer that question.

D.E. 63-1 at 29:101:12 - 29:102:22.  In the errata sheet, however, Roethke was able to answer the last question:

> To the extent that you inquire as to whether a manufacturing or design defect can be a "latent defect" by asking if a manufacturing or design defect can be a "hidden flaw," the answer is no.  As defined by the Policy, resulting damage from latent defects is a covered loss; however, the plain language of the Policy sets forth an exclusion for manufacturing and design defects.  Under the terms of the subject Policy, a manufacturing or design defect cannot be a latent defect or a hidden flaw.

D.E. 62-1 at 4.  Once again, this matter pertains to the inter-relationship of two of the Policy provisions that Centennial invokes to deny coverage.  Whereas previously, the claims adjuster on the case, speaking on behalf of Centennial, appears to have conceded that the Policy might be ambiguous as to whether the terms "latent defect" and "manufacturing defect" are mutually exclusive, the errata sheet answer concludes that the terms have no overlap, thereby rendering "latent defects" a smaller universe than it would be if something could be both a "latent defect" and a "manufacturing defect" under the Policy.  Because of the significance of this issue to the litigation, Defendants are entitled to cross-examine Roethke on his new response.  Accordingly, the Court grants Defendants' Motion to the extent that it seeks to re-open the deposition of Roethke for the purposes of cross-examining him on this answer.

-14-

In the next area of changed testimony, the following interaction occurred:

> Q:    Put it this way, you are saying, I think, the opposite of what I
>       am asking you.  You are saying the thickness of the core had
>       nothing to do with the delamination of the top sides?
>
> * * * * *
>
> A:    That's what I'm saying.
>
> Q:    That's AIG's position?
>
> A:    That's our position.

D.E. 63-1 at 49:184:25 - 50:185:9.  In the errata sheet, however, Roethke took the contrary position,

stating, "As the experts have concluded in this case, the lack of core thickness material caused the

flexing which in turn caused the delamination.  Thus, the thickness of the core did contribute to the

delamination."  D.E. 62-1 at 4.  Because the cause of the damage to the *Bryemere* may well

determine whether the claim falls within the Policy's coverage, Roethke's about-face on this issue

is material and substantial, and Defendants are entitled to cross-examine Roethke regarding it.  For

this reason, the Court grants Defendants' Motion to the extent that it seeks to re-open the deposition

of Roethke for the purpose of cross-examining him on this response.

The next errata sheet modification regards this deposition testimony:

> Q:    Tell me what's the difference between manufacturing defect
>       and a latent defect.
>
> A:    A manufacturing defect is a defect that occurs during the
>       manufacture of the vessel.  A latent defect is something that
>       you would never be able to find through ordinary observation
>       and known methods of testing.

D.E. 63-1 at 50:188:21 - 51:189:2.  The changed response follows:

> A manufacturing defect concerns a situation where something goes

wrong in the manufacturing process. The elements establishing the existence of a manufacturing defect include that the product deviated from the manufacturer's design, standards or specifications, or that an error occurred in the manufacturing process. A product is defective in manufacture if it deviates in some material way from its intended design or performance standards. A latent defect, as defined in the Policy, is a hidden flaw in the material of construction existing at the time of original building of the yacht or any additional or replacement parts, components or systems fo the yacht which is not discoverable by ordinary observation or known methods of testing.

D.E. 62-1 at 5. The Court finds that this entry in the errata sheet is consistent with and merely expounds upon on Roethke's original response. Thus, it does not warrant the re-opening of the deposition.

In the next modified area of testimony, counsel for BOA conducted the inquiry:

Q:    . . . What is Bank of America's relationship to the policy at issue in this case?

A:    I believe it is the loss payee on the policy.

Q:    What does that mean, exactly?

A:    That means if there is a loss payable under the terms and conditions of the policy, that we would issue a payment to J. Brian O'Neill and the Bank of America.

Q:    Okay. When you were testifying earlier, you mentioned that you spoke with Tony Knowles about repairs needed to get the boat back into a seaworthy condition; is that correct?

A:    Correct.

Q:    So seaworthiness is a condition, correct?

* * * * *

A:    My understanding is that in order for a policy to be valid, for there to be a meeting of the minds between the insured and the insurer, that the vessel has to be seaworthy.

-16-

Q:      You have not answered the question.  Is seaworthiness a condition?

* * * * *

A:      I can't answer that question.

Q:      Why not?

A:      Because I believe that I have given my answer.

Q:      Have you said yes or no?

A:      No, I have not.

Q:      So you haven't answered the question.  It is a yes or no question.  Is seaworthiness a condition?

* * * * *

A:      Yes, it is.

D.E. 63-1 at 79:302:13 - 79:304:11.  The errata sheet modification of the last answer provides,

Yes.   Seaworthiness is a condition such that it is a condition precedent to coverage.  A yacht must be absolutely seaworthy at the inception of the risk for a policy of marine insurance to attach.  Where a vessel is unseaworthy at the inception of the risk, there is no "meeting of the minds" and no contract of insurance comes into existence.  A breach of the condition precedent does not require any knowledge, action, omission or neglect by either the insured or the mortgagee.  However, this is not the same "condition" as used in the mortgagee's interest clause.  The clause uses the phrase "warranty or condition" which refers to a condition or term set forth in the wording of the Policy.

D.E. 62-1 at 5.  While this response differs from the one that Roethke gave at the deposition, the Court does not authorize re-opening the deposition to inquire further into this answer.  Based on the questions and answers preceding the changed response, this Court concludes that the transcript evidences "obvious confusion" as to which "condition" counsel was referring.  Even under the

-17-

narrower view of Rule 30(e)(1)(B), courts permit clarification of answers in such circumstances. Had counsel desired a response regarding a particular definition or reference to "condition" when he insisted that Roethke respond with a "yes" or "no," he had the opportunity at that time to specify what he meant.  BOA's counsel having chosen not to do so and Defendants' counsel, likewise, deciding to remain silent on the point, Defendants cannot now be heard to complain in view of Roethke's clarification.

Finally, the last changes to the deposition testimony involve the following questions and answers:

> Q:     Can defects in construction be hidden?
>
> * * * * *
>
> A:     Yes.
>
> Q:     They can be.  Okay.  Can defects in construction be latent?
>
> A:     Yes.

D.E. 63-1 at 84:322:21 - 84:323:4.   The errata sheet modifies the first and second answers, respectively, as follows:

> Under the terms of this Policy, no.  To the extent that you inquire as to whether a defect in construction can be a "latent defect" by asking if a defect in construction can be "hidden," the answer is no. The plain language of the Policy sets forth an exclusion for manufacturing and design defects.   Under the terms of the subject Policy, a manufacturing or design defect cannot be a latent defect.
>
> Under the terms of this Policy, no.  The plain language of the Policy sets forth an exclusion for manufacturing and design defects, a manufacturing or design defect cannot be a latent defect.

D.E. 62-1 at 5-6.  As with earlier alterations to testimony involving the same matters, this

modification, which changes the answer from "yes" to "no," represents a material substantive change to the position that Roethke took during the deposition.  For the same reasons why the Court  has already directed the re-opening of the deposition regarding this subject matter, the Court finds that the deposition must be re-opened with regard to these answers.  Consequently, the Court grants Defendants' Motion to the extent that it seeks to re-open the deposition on these changes.  As indicated previously, Centennial shall pay the costs and fees associated with the attendance of <u>one</u> of Defendants' lawyers at the re-opening the deposition and shall pay for one regular-delivery transcript of the deposition to Defendants.

**2.  The Costs and Fees Associated with the Rule 30(b)(6) Deposition on Underwriting**

Rule 30(b)(6), Fed. R. Civ. P., sets forth the procedure for deposing a corporation.  Under this rule, a corporation named in a notice of deposition must "designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf; and it may set out the matters on which each person designated will testify. . . .  The persons designated must testify about information known or reasonably available to the organization."  Fed. R. Civ. P. 30(b)(6).  Courts have construed this rule to impose various duties on a recipient corporation:

> First, the deponent has the duty of being knowledgeable on the subject matter identified as the area of inquiry. . . .  Clearly, a deponent that does not know about the subject matter to be inquired about is useless as a deponent at all.  Second, the designating party is under the duty to designate more than one deponent if it would be necessary to do so in order to respond to the relevant areas of inquiry that are specified with reasonable particularity by the plaintiffs. . . .  Third, the designating party has a duty to prepare the witness to testify on matters not only known by the deponent, but those that should be reasonably known by the designating party. . . .  Obviously, the purpose of a Rule 30(b)(6) deposition is to get answers on the subject matter described with reasonable particularity by the noticing party, not to simply get answers limited to what the deponent happens to

-19-

know.  Fourth, the designating party has a duty to substitute an appropriate deponent when it becomes apparent that the previous deponent is unable to respond to certain relevant areas of inquiry.

*Alexander v. FBI*, 186 F.R.D. 137, 141 (D.D.C. 1998); *see also EEOC v. The Boeing Co.*, 2007 WL 1146446, *1 (D. Ariz. Apr. 18, 2007) (citing *Alexander*, 186 F.R.D. at 141); *Belmont Holdings Corp. v. Unicare Life & Health Ins. Co.*, 2000 WL 1920039, *2 (E.D. Pa. Dec. 1, 2000).

In this case, Defendants complain, and a review of the deposition transcript confirms, that Roethke, the designated corporate representative, was neither knowledgeable nor prepared on the subjects relating to underwriting identified in the notice of deposition.  *See, e.g.,* D.E. 63-1 at 14:41:20 - 15:45:10.  Nor has Centennial provided an acceptable reason for the lack of a corporate representative able to respond to inquiries regarding underwriting when the deposition notice specifically articulated three areas regarding underwriting on which it anticipated asking the corporate deponent questions.  In this regard, Centennial points to its June 15, 2010, letter to defense counsel in which Centennial wrote,

> While we will produce a properly prepared 30(b)[(]6[)] representative to appear on behalf of Centennial, because of the sweeping brea[d]th and scope of the areas of inquiry you have set forth we cannot guarantee that a full and comprehensive reply will be available in the additional areas specified above [underwriting].   Naturally, Centennial's corporate representative will endeavor to answer your inquiries in this area to the best of his ability, despite the enumerated difficulties.

*See* D.E. 65-1 at 1.  This is not a case where the designated deponent was able to answer many of the questions in the three designated areas regarding underwriting; rather, he had little knowledge at all about underwriting and about the three specific areas set forth in the notice.  Production of such a witness does not satisfy the first three responsibilities that a corporation bears under Rule 30(b)(6),

as noted in *Alexander*.

But that does not end the inquiry.  As relevant to the fourth responsibility of a corporate deponent set forth above, the record further shows that at the end of Roethke's deposition, when counsel for Defendants indicated his displeasure with Roethke's lack of underwriting knowledge, counsel for Centennial responded by stating, "I think we can make the arrangement for another witness to appear without the necessity of court intervention."  *Id.* at 85:327:1 - 85:327:3.

Defendants urge this Court to conclude that this offer amounted to too little, too late because, Defendants assert, defense counsel prepared in vain for underwriting questions that could not proceed on June 18, 2010, during the scheduled corporate deposition.  In view of the facts that Roethke's deposition ended at 5:53 p.m. and that Roethke had been in deposition all day on the other areas designated by the Rule 30(b)(6) notice of deposition, however, this Court finds that Defendants could not fairly have expected to depose a second deponent at the time of Roethke's deposition, anyway.

Centennial then followed up on July 9, 2010, offering to make Sean Blue, an underwriter for Centennial, available as a corporate representative to be deposed in Miami "at a mutually agreeable time" on the issues relating to underwriting.  *See* D.E. 65-1 at 3.  Because the parties could not agree over issues raised in Defendants' Motion to Compel Production of Documents [D.E. 48] and over whether Defendants should be permitted to take a second deposition of Roethke, based on the errata sheet changes, and, if so, at whose expense, however, Defendants filed the pending Motion instead of conducting Blue's deposition.

"'[N]ormally the process [associated with depositions under Rule 30(b)(6)] operates extrajudicially.'" *New World Network Ltd. v. M/V Norwegian Sea*, 2007 WL 1068124, *2 (S.D. Fla.

Apr. 6, 2007) (quoting *McKesson Corp. v. Islamic Republic of Iran*, 185 F.R.D. 70, 79 (D.D.C. 1999)); *see also id.* at *4. Courts should intervene in this process only upon a showing of good cause, further described as "a compelling and sufficient demonstration that the procedures specified in the Rule have not been or cannot be followed." *Id.* (citing *McKesson Corp.*, 185 F.R.D. at 79). Here, no good cause exists at this time. While Centennial should have had a representative prepared to address the underwriting topics at the time of the June 18, 2010, deposition, for the reasons noted previously, that deposition could not have fairly been expected to have been conducted on the same day as the deposition of Roethke. Moreover, during Roethke's deposition, Centennial agreed to provide a second deponent, a position Centennial promptly repeated in correspondence following the Roethke deposition. Under these circumstances, Defendants suffered no cognizable harm warranting the imposition of sanctions. Consequently, this Court denies Defendants' Motion as it seeks sanctions against Centennial, with the understanding that Centennial will ensure the immediate availability of Blue or some other suitable corporate representative prepared to testify regarding the underwriting issues.

## Conclusion

For the foregoing reasons, it is hereby **ORDERED and ADJUDGED** that Defendants J. Brian O'Neill and Carolina Acquisition, LLC's Motion to Compel and for Sanctions Based on AIG's Discovery Misconduct [D.E. 62] is hereby **GRANTED IN PART and DENIED IN PART**,

consistent with the terms of this Order

> **DONE AND ORDERED** this 22nd day of October 2010.

ROBIN S. ROSENBAUM
UNITED STATES MAGISTRATE JUDGE

cc:   Hon. William J. Zloch
      Counsel of Record