UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IN ADMIRALTY
CASE NO.: 09-60551- CIV - ZLOCH

AIG CENTENNIAL INSURANCE
COMPANY,

      Plaintiff,

vs.

J. BRIAN O'NEILL, CAROLINA ACQUISITION
LLC, and BANK OF AMERICA N.A.

      Defendants.

_____/

### PLAINTIFF AIG CENTENNIAL INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT J. BRIAN O'NEILL

COMES NOW, the Plaintiff, AIG CENTENNIAL INSURANCE COMPANY (hereinafter "CENTENNIAL" or "Plaintiff") by and through undersigned counsel and, pursuant to Rule 56 of the Federal Rules of Civil Procedure and S. D. Fla. L. R. 7.5, hereby moves this Court to enter Summary Judgment in favor of CENTENNIAL and against Defendant J. BRIAN O'NEILL ("O'NEILL") on CENTENNIAL'S Complaint for Declaratory Judgment inasmuch as, on the material facts set forth herein that are not in dispute, CENTENNIAL is entitled to judgment as a matter of law, and in support hereof would state as follows:

### PLAINTIFF'S STATEMENT OF ENTITLEMENT TO SUMMARY JUDGMENT AGAINST O'NEILL

On or about April 18, 2007, Defendant CAROLINA ACQUISITION, LLC (CAROLINA) purchased the 66' sport fishing yacht "*DOUBLE BILLED*", later re-named "*BRYEMERE*". The vessel purchase was singularly unfortunate, in that it spawned litigation against the corporate and individual yacht sellers; the corporate and individual yacht brokers that brought the parties together; and the marine surveyor who inspected the vessel prior to CAROLINA'S purchase. CAROLINA sued the seller and broker because, contrary to selling a yacht that was "awesome, like new" the vessel was actually, in the new Owner's own words,

"unseaworthy, unsafe and was not built according to the designer's plans" [CAROLINA First Amended Complaint DE – 174-1 ¶ 125].[1]

Repeated examination by numerous experts engaged by CAROLINA and/or its sole shareholder, O'NEILL, beginning approximately two months after CAROLINA'S purchase, confirmed the yacht was not manufactured as designed by naval architect Donald Blount and Associates. Instead, the vessel's construction deviated drastically from her intended design, leaving her with severe structural defects, including a fiberglass topside hull structure with a significantly thinner core than specified; longitudinal girders or "stringers", which provide support and rigidity to the hull, were 10 feet shorter than required; bulkheads and transverse flooring in the forward part of the boat were missing - never installed. It is not just that the manufacture or omission of these components, among others, deviated from intended design; the vessel's safety and seaworthiness *required* that her construction in these crucial areas conform to the naval architect's plan.

Due to these defects, among many others, in *BRYEMERE'S* construction, CAROLINA prosecuted a lawsuit against the sellers, yacht brokers and surveyor in this Court because: "Clearly the vessel was not built to specifications, is not seaworthy, is not structurally sound, and is not safe for its intended use." [DE-174-1 ¶ 61].   CAROLINA subsequently settled with the marine surveyor and the sellers and proceeded with the trial against the brokers.

On April 28, 2010, CAROLINA'S allegation of negligent misrepresentation against the sellers and the broker, including the averments that "The vessel is unseaworthy, unsafe, and not built according to the designer's plans" [*Id*., ¶ 112; 125] against each of the Defendants, respectively, was established as fact by a jury verdict [DE – 257 ¶ 11; 12; 15; 16; 17].

These same facts and circumstances also give rise to O'NEILL'S claim against CENTENNIAL for physical damage to the vessel under the Policy of hull and machinery insurance issued by CENTENNIAL on April 19, 2007.   While O'NEILL would color the circumstances in the two lawsuits as a tale of two cities, the fact of the matter is that the vessel was built only once.   The structural deficiencies and manufacturing defects that gave rise to CAROLINA'S claim against the sellers, the yacht brokers and the surveyor did not change when

---

[1] Unless specified otherwise, all docket entry references herein refer to the lawsuit styled *Carolina Acquisition, LLC vs. Double Billed, LLC, et al.,* USDC, SD FLA 07-61738-CIV-Zloch ("HMY litigation").  Docket entry references pertaining to this litigation are prefaced "Cent".

O'NEILL lodged a claim with his insurance company, seeking coverage for a loss attributable to a vessel that was unseaworthy at the time of CAROLINA'S purchase due to severe defects in her manufacture in 2005. The numerous experts' unanimous conclusions, the HMY pleadings, the deposition testimony, affidavits, motions, trial testimony and jury verdict unequivocally establish:

    (1)    The hull that became *BRYEMERE* was not built as designed;

    (2)    The vessel was manufactured with numerous and significant structural defects;

    (3)    These defects caused her to be dangerous, unsafe and unseaworthy;

    (4)    These structural defects and all the damage caused by them existed prior to the commencement of the CENTENNIAL policy period.

As a result, there is no coverage under the CENTENNIAL Policy. *BRYEMERE* was unreservedly in breach of the warranty of seaworthiness at the inception of the risk implied in every policy of marine insurance. Secondly, *BRYEMERE*'S structural defects were the result of the manner in which she was constructed or manufactured. The Policy expressly and unequivocally excludes loss attributable from defect in design or manufacture of the insured yacht. Thirdly, all the physical damage to the vessel, including the delamination of the hull topsides, as pled by CAROLINA, supported by their uncontroverted expert testimony at trial and established by the jury's verdict, took place and existed prior to CAROLINA'S purchase, and hence, prior to the issuance of the Policy. The Policy only covers loss which occurs during the "Policy Period"; therefore, there is no coverage under CENTENNIAL'S Policy, which commenced on April 19, 2007.

Finally, O'NEILL did not deal with his insurer, CENTENNIAL, in the utmost good faith, ("*uberrimae fidei*") as has been required for centuries[2] when applying for a policy of marine insurance. When his surveyor, Price, initially stated a market value for the yacht of "approx $1,875,000 as equipped" O'NEILL, using his own definition of market value as including both what he paid for the vessel and what he intended to invest in the vessel, instructed Price to issue a second report, identical in all aspects, except increasing the market value by $475,000 to $2,350,000. It was this later survey report, with its inflated value, that was submitted to CENTENNIAL as evidence in support of the "$2,350,000 vessel purchase price" represented in

---

[2]*McLanahan v. Universal Ins. Co.*, 26 U.S. (1 Pet.) 170, 185-6, 7 L.Ed. 98 (1828).

the application for insurance. The earlier report, with the lower value, was apparently presented to the sellers to obtain a $150,000 reduction in CAROLINA'S purchase price.

The Closing Statement for the yacht's purchase reflects a "Contract Sale Price" of $1,575,000, plus the trade in of a 1998, 53' Ocean yacht, valued at $700,000, less the Survey Adjustment of $150,000 for an "Adjusted Sale Price plus trade" of $2,125,000. Thus, the actual purchase price was $225,000 less than the $2,350,000 figure represented by O'NEILL on his application for insurance. Again, apparently O'NEILL also had his own definition of "purchase price" as including not only what was actually paid by the buyer to the seller for title to the vessel but also including the cost of repairs and improvements intended to be made. CENTENNIAL only learned of the existence of the earlier Price report, as well as the information contained in the Closing Statement, months after the Policy was issued.

Additionally, O'NEILL did not inform CENTENNIAL that CAROLINA, and not he, was the actual owner of the insured yacht. In the space provided for the "Owner/Beneficial Owner Name" in the application only O'NEILL'S name and address appears; there is no mention of CAROLINA anywhere in the application. O'NEILL also appears to have had his own definition of "owner." Even assuming, *arguendo*, that O'NEILL honestly considered himself to be the "owner" of the yacht, his failure to disclose the name of the actual, titled owner was a material omission. A material misrepresentation or omission in applying for the policy of marine insurance voids the Policy *ab initio*. Both as a condition of the insurance contract and as a matter of general maritime law, a misrepresentation by the insured of the vessel's true purchase price is *per se* material. Similarly, the identity of the actual owner of the property is material to the risk, and misrepresentation or omission of either one of these material facts voids the Policy.

Moreover, the sole named insured identified on the Policy's Declarations page, J. BRIAN O'NEILL, is not the owner of the yacht. The owner of the yacht, CAROLINA ACQUISITION, LLC, is not named on the Policy. The Policy only covers the "person or any legal entity named on the Declarations Page as the Named Insured *who are the owners of the yacht*." (Emphasis supplied). Accordingly, there is no coverage available to J. BRIAN O'NEILL or CAROLINA ACQUISITION, LLC under the CENTENNIAL Policy.

O'NEILL'S misrepresentations and omissions did not stop with representing himself as owner when he was not, omitting the name of the true owner from the application, misrepresenting the true purchase price and supporting it with an altered survey report. The

application also asked whether O'NEILL had ever suffered any losses. In response to the requirement to disclose prior losses, O'NEILL disclosed a single vessel loss by fire in December 2003. CENTENNIAL has since learned that O'NEILL suffered at least four separate marine losses prior to his application, including a grounding, a machinery failure and dock damage in addition to the fire loss disclosed on the application.

An accurate applicant's loss history is material to an underwriting decision. As set forth in the attached Declaration of Sean Blue, an applicant's loss history is material to an underwriter's decision whether to accept a risk, the deductible and/or premium charged and other terms and conditions of the policy. O'NEILL'S misrepresentation of his loss history and omission of previous losses from the application were a material breach of utmost good faith and voids the policy *ab initio*.

For these reasons, as reviewed in greater detail below, CENTENNIAL respectfully submits that both as a matter of contract and law, it is entitled to a declaratory judgment from this Court releasing it from any liability to Defendants under the Policy of insurance.

## I.  SUMMARY JUDGMENT FOR CENTENNIAL IS AN APPROPRIATE REMEDY IN THIS CASE

Rule 56 of the Federal Rules of Civil Procedure states, in part:

> (a) **By a Claiming Party**.  A party claiming relief may move, with or without supporting affidavits, for summary judgment on all or part of the claim.

CENTENNIAL seeks a ruling from this Court that it is absolved of any liability to Defendants for the damage to *BRYEMERE* as a matter of contract, as well as a matter of law. The interpretation of the provisions of an insurance contract under the general maritime law, as well as the law of the State of Florida, is a matter of law to be decided by the court.  *Fireman's Fund Ins. Co. v. Tropical Shipping & Constr. Co*., 254 F.3d 987, 1003 (11th Cir. 2001).  Therefore, the construction of the CENTENNIAL Policy may be a question of law and suitable for summary judgment.  *Id*.; *International Ship Repair & Marine Services. v. St. Paul Fire and Marine Insurance Co*., 944 F. Supp. 886, 891 (M.D. Fla., 1996); *Stuart Petroleum Co. v. Certain Underwriters at Lloyd's London*, 696 So. 2d 376, 379 (1st DCA 1997).

This Court in *Certain Underwriters at Lloyd's, London v. Giroire*, 27 F. Supp. 2d 1306, 1309 (S.D. Fla. 1998) defined the Court's focus when reviewing a party's motion for summary judgment as follows:

> Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment where the pleadings and supporting materials show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The Court's focus in reviewing a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." (Internal citations omitted).

This case is uniquely suited to disposal through summary judgment in CENTENNIAL'S favor, as: (i) the relevant facts, as established and pled by the Defendants, and verified by a jury verdict, are not in dispute; and (ii) the general maritime law, applicable State law and the Policy language excluding coverage, based upon those facts, is clear and unambiguous.

The HMY jury verdict established that the yacht, as built, was unsafe, structurally unsound and unseaworthy as contended by CAROLINA [DE- 174-1 ¶ 112; 113; 120; 125; 126; 133]. *A priori*, this finding inescapably leads to three conclusions. The first is that because the yacht was built in 2005, the unseaworthy conditions existed prior to the inception of the risk with CENTENNIAL, and thus coverage is void *ab initio*. *The Caledonia*, 157 U.S. 124, 132, 15 S. Ct. 537, 541 (1895).

Second, the cause of loss and damage to the yacht, as also pled and found by the jury verdict in HMY, is attributable, both directly and indirectly, to defects in the vessel's manufacture, which is expressly excluded from cover; Policy, Part III, E. Exclusions [Cent.DE – 31 Ex "B"]. This language, interpreted in its plain, ordinary meaning, is clear, unambiguous and without qualification or exception. It bars recovery for the loss sustained by *BRYEMERE*, which are due to multiple defects in her manufacture.

Third, as pled and proven by CAROLINA in the HMY litigation; testified to by David Pedrick in the HMY litigation on behalf of CAROLINA and as found by the jury in their award of money damages for both the cost of rebuilding the vessel to correct the structural deficiencies created by the builder and for the cost of repairing the damage suffered by the vessel as a result of those structural deficiencies, all of the structural defects and consequent physical damage, including delamination of the hull topsides, occurred prior to the purchase of the vessel and prior to the attachment of the risk under the Policy in April 2007.

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, show that no genuine issue of material fact exists and that the party moving is entitled to judgment as a matter of law. *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  CENTENNIAL respectfully submits that the record developed in this and the HMY litigation squarely meets the criteria announced by the U. S. Supreme Court, and that summary judgment in its favor is warranted in this instance.

II.     ***BRYEMERE'S* IRREFUTABLE UNSEAWORHTINESS AT THE TIME THE RISK ATTACHED VOIDS THE POLICY FROM INCEPTION**

      a.     Defendants are Estopped from Denying the Vessel's Unseaworthy Condition on or before April 19, 2007, or that She Was Not Built According to the Designer's Plan, as Established in the HMY Litigation

The yacht's owner, Defendant CAROLINA, spent hundreds of thousands of dollars in expert and legal fees to demonstrate, successfully, that *BRYEMERE* "is unseaworthy, unsafe, and not built according to the designer's plans" [DE- 174-1 ¶ 125].  In fact, CAROLINA repeated these and similar averments at least 21 separate times in its HMY Complaint.[3]   The expert testimony, pleadings in CAROLINA'S HMY litigation filed in this Court, the Defendants' own testimony and ultimately the jury's verdict establish unequivocally that the vessel, as constructed in 2005, was unsafe because she was missing integral structural components necessary for her seaworthiness. Plaintiff will not catalogue here the overwhelming evidentiary basis confirming the yacht's unseaworthiness; rather, the Court is respectfully referred to the Statement of Material Facts ("Statement") paragraphs numbered 1 through 13 [Cent. DE - 109].

O'NEILL'S expert in this declaratory action, naval architect David Pedrick, testified to this Court on April 14 and 15, 2010 in the HMY litigation. In response to questions posed by CAROLINA'S attorney, Pedrick testified that the vessel "is, in my opinion, not seaworthy" as a result of "serious structural deficiencies".  Mr. Pedrick testified that "the condition she was in at the time she was purchased posed a genuine risk of … flooding and sinking" and that this condition was "in effect as of 2007" [Trial Tr. DE – 276 p. 16 L 20 – p. 17 L 17].  That same day Mr. Pedrick testified that the 5/8ths of an inch fiberglass "sandwich" core comprising the vessel's topside structure was a "very, very serious modification *by the builder*" [*Id*., p. 42 LL 23-24] leaving *BRYEMERE* "only perhaps 25% as strong as it was designed to be by the Blount office" resulting in a "very high risk ... [of allowing] the boat to flood *and sink*" [*Id* p. 43 LL 16-

---

[3]  *Id*., ¶ 57, 58, 59, 61, 64, 69, 70, 74, 78, 79, 81, 84, 87, 90, 96, 112, 113, 120, 125, 126, & 133.

24] (emphasis supplied).  Mr. Pedrick continued, in response to questions from CAROLINA'S
attorney [*Id* p. 46 L 15-p. 47 L 8] (emphasis supplied):

> Q.    In your opinion, was the "Double Billed" seaworthy prior to April of
>       2007?
>
> A.    No.
>
> Q.    Why do you say that?
>
> A.    Well, these problems that I have been describing existed before.  *They
>       weren't sudden.  The deterioration was not sudden.  It happened over a
>       period of time.*  And the flexing that was going on had spread cracks over a
>       period of time.  We found that the foundations, aluminum foundations that
>       hold the fuel tanks – the fuel tanks are welded in aluminum boxes.  They
>       carry these tanks in the area of interest, carry approximately 300 gallons of
>       fuel which weighs more than a ton.  So when these tanks are full, each one
>       of them has a ton of mass that's going up and down in the boat.  The
>       foundations, the forward foundations on these tanks had broken on both
>       sides of the boat.
>
> So these were things that had happened over a long period of time. *They
> weren't just in the relatively few running hours that happened after April
> of 2007.*  (Emphasis added)

Please find copies of the cited transcript excerpts appended hereto as **Ex. "A"**.

*BRYEMERE* was not seaworthy prior to April of 2007.  This was the position advocated
by the yacht's Owner in the HMY litigation; buttressed by the unanimous testimony of numerous
experts, including Mr. Pedrick, and ultimately confirmed by the jury.

As a second affirmative defense to this claim for declaratory relief O'NEILL asserts that
the record amassed in support of the vessel's unseaworthy condition in the HMY litigation is
"irrelevant and do[es] not support the relief AIG seeks".  Respectfully, this position is simply
untenable. *BRYEMERE'S* dangerous and unsafe condition, existing before and at the time of
purchase, painstakingly documented by CAROLINA over the course of three-plus years, did not
transform simply because now O'NEILL seeks to recover money under CENTENNIAL'S
Policy.  Indeed, O'Neill relies on the jury verdict, innumerable record references to the HMY
litigation and the expert reports to establish his position in this action in his response to
Plaintiff's first set of interrogatories (please see a copy of Defendants' response, particularly pp.
6 – 11, attached as **Ex. "B"**).

In ¶ 111 and 124 of its First Amended Compliant CAROLINA pled that the Defendants
"made representations relating to [*BRYEMERE'S*] safety and seaworthiness".  In ¶ 120 and 133

CAROLINA pled that "Plaintiff was harmed by [these] representations ... and would not have *purchased* the Vessel if it *had known* that it *was* unsafe, structurally unsound and unseaworthy" (emphasis supplied).   Obviously, the allegation is that the yacht was unseaworthy before O'NEILL purchased it.   The Court instructed the jury: "To make a misrepresentation simply means to state as a fact something that is false or untrue" [Jury Instructions DE – 253 p. 9].   The jury found that the four Defendants were guilty of negligent misrepresentation [DE – 257 ¶ 11; 12; 15; 16; 17].   Perforce the representations that the vessel was seaworthy before and at the time of CAROLINA'S purchase were "false or untrue" and *MY BREYMERE* was, in fact, unseaworthy before purchase and, of necessity, before CENTENNIAL'S Policy attached.   Accordingly, Defendants are collaterally and/or judicially estopped from denying that "The vessel is unseaworthy, unsafe, and not built according to the designer's plans" at the time CAROLINA bought the boat, as pled in the HMY litigation and found as fact by the HMY jury.   The Eleventh Circuit instructs in *A.J. Taft Coal Co., Inc. v. Connors* 829 F.2d 1577, 1580 (C.A.11 1987):

> There are several prerequisites to the application of collateral estoppel: (1) the issue at stake must be identical to the one alleged in the prior litigation; (2) the issue must have been actually litigated in the prior litigation; and (3) the determination of the issue in the prior litigation must have been a crucial and necessary part of the judgment in that earlier action. In addition, the party against whom the earlier decision is asserted must have had a full and fair opportunity to litigate the issue in the earlier proceeding.

CENTENNIAL respectfully submits that all four criteria are met by the HMY jury verdict.   Moreover, one of the goals underlying the doctrine of collateral estoppel is to preclude re-litigation of identical issues and the resulting waste of judicial resources. *Id*., 829 F.2d p. 1581.   The vessel's unseaworthy condition before and at the time of CAROLINA'S purchase has been fully litigated, and decided, in CAROLINA'S favor.   What purpose is served by trying the issue again, other than to afford the Defendants an opportunity to disprove what they previously proved?

Research does not reveal any entrenched admiralty principle in the Eleventh Circuit governing judicial estoppel; accordingly, Florida law controls in this instance.   *Wilburn Boat Co. v. Fireman's Fund Insurance Co*., 348 U.S. 310, 75 S. Ct. 368 (1955).   To the extent that there is federal jurisprudence regarding estoppel, in this Circuit it mirrors Florida law; see *Chrysler Credit Corp. v. Rebhan* 842 F.2d 1257, 1261 (C.A.11 (Fla.), 1988) where the Panel, in reviewing

a bankruptcy case, stated: "The [federal] doctrine of judicial estoppel 'is directed against those who would attempt to manipulate the court system through the calculated assertion of divergent sworn positions in judicial proceedings.'" This formulation is similar to that announced by Florida's Supreme Court in *Blumberg v. USAA Cas. Ins. Co.* 790 So.2d 1061, 1066 (Fla., 2001): "'Judicial estoppel is an equitable doctrine that is used to prevent litigants from taking totally inconsistent positions in separate judicial, including quasi-judicial, proceedings.'" (Internal citations omitted).

As a general proposition, for an estoppel to work under Florida law in proceedings terminating in a judgment, the position assumed in the former trial must have been successfully maintained; the positions must be clearly inconsistent; the parties must be the same and the same questions must be involved; *Blumberg, supra*.

Florida's Supreme Court's decision in *Blumberg* is dispositive as to Florida law, as well as instructive. Plaintiff sued his homeowner insurer and insurance broker for loss of personal property, alleging the broker was the insurer's agent and responsible for a lapse in coverage. Plaintiff obtained a directed verdict of $25,000 against his insurer, based on the agent's negligence, but dismissed the suit before entry of judgment, as it was less than the insurer's offer of judgment. Plaintiff then sued the broker, claiming that the broker was *his* agent, and asserted a claim for failure to procure insurance. In concluding that Plaintiff's claim against the broker was barred by the equitable doctrine of judicial estoppel the Court observed:

> This case is exactly the type of scenario for which the judicial estoppel doctrine was intended. Blumberg is attempting "to make a mockery out of justice" by asserting inconsistent positions in the St. Paul suit (where he claimed that coverage existed and prevailed) and the Bruner suit (where he claimed that coverage did not exist).

The *Blumberg* Court rejected Plaintiff's argument that judicial estoppel was inappropriate because of a lack of mutuality of parties, noting that Florida courts have on occasion recognized exceptions to the identity of parties requirement under the *res judicata* or collateral estoppel doctrines. The Court found no reason why this exception should not be extended to the doctrine of judicial estoppel "where special fairness or policy considerations appear to compel it." 790 So.2d at 1067.

CENTENNIAL respectfully submits that equity dictates that both Defendants CAROLINA and O'NEILL are estopped from denying *BRYEMERE* was unsafe and

unseaworthy on April 19, 2007, when the risk attached, or that she was not built according to the designer's plans.   In the case of CAROLINA, it was the successful Plaintiff in the HMY litigation, succeeding in proving that *BRYEMERE* was "unseaworthy, unsafe, and not built according to the designer's plans" at the time of purchase, contrary to the representations of the Defendants HMY and J. Barboni.  CAROLINA'S complaint against HMY and Barboni sought an award of money damages to restore the structural integrity of the yacht and repair all the damage found in the yacht based on the Defendants' misrepresentations of the yacht's condition *before and at the time of sale* [DE- 174-1 ¶ 120 and 133].   The jury agreed and awarded CAROLINA $2,000,000 [DE – 257 ¶. 18].  CAROLINA cannot possibly be heard now, in this same Court, no less, to deny that the yacht was unseaworthy on April 17, 2007; or that her flaws consisted of severe structural deficiencies and damage stemming from the manner in which she was constructed.  To permit CAROLINA to maintain such a diametric reversal of position, respectfully, flies in the face of Florida's Supreme Court's admonition that: "The courthouse should not be viewed as an all-you-can-sue buffet".  *Blumberg, supra,* 790 So.2d at 1067.

Similarly, O'NEILL has no legal or equitable basis for seeking to deny the yacht was unseaworthy, or that her flaws and damage derived from severe structural deficiencies occurring during her construction, as established by the HMY jury, in an effort to collect against his insurance carrier for the same loss. True, technically there is not a complete "mutuality of parties" between O'NEILL and CAROLINA; however, the degree of consanguinity is sufficiently close for the purposes of invoking judicial estoppel, an equitable principle. O'NEILL is the only and sole member of CAROLINA and is attempting to recover under the subject Policy as an "owner" on that basis.  Moreover, as stated, Florida recognizes an exception to the requirement "where special fairness or policy considerations appear to compel it."

CENTENNIAL respectfully submits that not to hold O'NEILL bound by the positions he took and by the jury's findings in favor of CAROLINA in the HMY litigation would truly allow O'NEILL to make a "mockery out of justice".

**b**.     The Vessel's Unseaworthiness on April 19, 2007 Voids the Policy from Inception

Every marine insurance policy contains an implied absolute warranty of seaworthiness. *The Caledonia*, *supra*; *Kilpatrick Marine Piling v. Fireman's Fund Ins. Co*., 795 F.2d 940, 945 (11th Cir. 1986); *Employers Insurance Co. v. Occidental Petroleum Corp*., 978 F.2d 1422 (5th

Cir., 1992)[4] *cert. denied* 510 U.S. 813 (1994); *Gulfstream Cargo, Ltd. v. Reliance Ins. Co.,* 409 F.2d 974 (5th Cir. Fla. 1969); *Saskatchewan Government Ins. Office v. Spot Pack, Inc.*, 242 F.2d 385, 388 (5th Cir. 1957); *Conn. Indem. Co. v. Palivoda*, 2005 AMC 2047; (M.D. Fla., 2005).

The warranty attaches at the inception of the risk. *Kilpatrick, supra.; Gulfstream Cargo, supra; Spot Pack, supra; D. J. McDuffie, Inc. v. Old Reliable Fire Ins. Co.,* 608 F.2d 145 (5th Cir., 1979); *Lloyd's United States Corp v. Smallwood,* 719 F. Supp. 1540 (M.D. Fla., 1989).

The nature of the warranty is said to be "absolute" and thus applies without regard to whether the unseaworthy condition was known to the insured. *Employers Ins. Co., supra,* 978 F.2d at 1431; *Palivoda., supra.* The absolute nature of this implied warranty of seaworthiness is grounded in a public policy choice; *Employers Ins. Co., supra,* 978 F.2d at 1433 (citing *The Caledonia, supra).*

The existence of an implied warranty of seaworthiness in a policy for hull insurance is a federal maritime rule, and the interpretation of the respective rights and duties of the insured and insurer under such a policy is governed by federal maritime law. *D. J. McDuffie, Inc., supra*, 608 F.2d at 147.

Breach of the warranty voids the Policy; *Kilpatrick, supra,* 795 F.2d p. 945 and cases cited therein. Once the Court finds that the warranty is breached there is no need to consider argument regarding possible coverage – the contract is void and underwriters are relieved of their responsibility, regardless of whether the breach caused the loss or is cured prior to the loss. *D. J. McDuffie, Inc., supra*, 608 F.2d at 147; *Gulfstream Cargo, Ltd, supra,* 409 F.2d at 983, fn. 28 (citing 45 *C.J.S. Insurance* § 650 at 555).

The uncontroverted fact is that *BRYEMERE* was rendered unseaworthy by numerous, severe structural deficiencies in her very construction in 2005 and remained so on April 19, 2007, when the CENTENNIAL Policy attached. Therefore, the Policy is void *ab initio* as a matter of the general maritime law and Plaintiff respectfully maintains that it is entitled to judgment in its favor accordingly.

### III.   O'NEILL'S MISREPRESENTATION OF THE VESSEL'S PURCHASE PRICE, OWNER'S IDENTITY AND LOSS HISTORY VIOLATES THE DOCTRINE OF *UBERRIMAE FIDIE* AND VOIDS THE POLICY *AB INITIO*

---

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11 Cir. 1981 *en banc*), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

a.    Misrepresenting the Yacht's Purchase Price Violates the Doctrine of *Uberrimae Fidei*

On March 7, 2007, J. Brian O'Neill signed a Purchase and Sale Agreement with the owner of the *M/Y DOUBLE BILLED*.  Around this time he engaged Price Marine Services, Inc. ("Price") to inspect the yacht.  Price did so, and in his report dated March 22, 2007, Price stated his opinion that the yacht had a market value of "approx $1,875,000 as equipped".  Prior to the submission of his application for insurance O'NEILL, through his employee L.J. Gallagher, instructed Price to issue a second survey report, identical in all respects to the earlier report, even as to date, except it now stated that the yacht had a market value of "approx $2,350,000 as equipped".   O'NEILL found a use for each report.  The earlier survey was used to squeeze the seller for a $150,000 reduction in the purchase price.  The second report was submitted with his insurance application, and the mortgage application, to achieve a higher insured value and greater financing for the yacht.  As a result of extracting a reduction in the purchase price, O'NEILL actually paid, in a combination of barter and cash, $2,125,000 for the yacht;  *See* [DE-174-1 ¶ 11 and Exhibit "A" referred therein; ¶ 91];  Statement of Material Facts accompanying this Motion ¶ 16 through 21].  This figure is $225,000 less than the $2,350,000 price stated on the application.

The differing market values were deliberately commissioned by O'NEILL with the intention to deceive all three parties for O'NEILL'S pecuniary gain.  O'NEILL not only obtained a lower purchase price and greater financing for the purchase; had the vessel suffered a total, covered loss, O'NEILL stood to gain an additional $225,000 in insurance proceeds, by the artful but fraudulent tactic of claiming two values simultaneously for the same boat.

Lest there be any doubt regarding O'NEILL'S conduct and intentions, this is not a case where the surveyor independently decided to revise his opinion based on subsequent analysis and decided to withdraw the earlier report and independently issued a revised report increasing the yacht's market value. No. O'NEILL freely admitted during the HMY litigation that it was O'NEILL'S view that the market value of the yacht should have been calculated as $2,350,000 to include both the amount paid and the cost of the work being done.  Accordingly, O'NEILL instructed his employee, L.J. Gallagher, to "…inform Mr. Price of the exact numbers of the transaction so that he could properly reflect the correct market value of the boat" in a revised survey report. [Trial Tr. DE – 264 p. 49 L 19 – p. 50 L 21]. O'NEILL employed both reports in a

calculated maneuver to deceive the seller, the Bank and the Plaintiff.  Indeed, O'NEILL attached the first report rather than the second to CAROLINA'S Complaint in HMY DE – 174-5 Ex. "E"']. Needless to say, when submitting the revised survey report with the greater market value to CENTENNIAL, O"NEILL said nothing to CVENTENNIAL about the revision of the market value from the original survey report.

The stringent requirements owed by the prospective insured to the insurer enveloped in the Latin phrase "*uberrimae fidei*" are reflected in the classic definition as quoted by the District Court in *Thebes Shipping, Inc. v. Assicurazioni Ausonia SPA* 599 F.Supp. 405, 427 (D.C.N.Y., 1984):

> The most abundant good faith; absolute and perfect candor or openness and honesty; the absence of any concealment or deception, however slight. A phrase used to express the perfect good faith, concealing nothing, with which a contract must be made; Black's Law Dictionary 1690 (4th ed. 1951).

The Eleventh Circuit emphasizes that it is well-settled that the marine insurance doctrine of *uberrimae fidei* is the controlling law of this circuit. *HIH Marine Servs. v. Fraser,* 211 F.3d 1359, 1362 (11th Cir. 2000). "*Uberrimae fidei* requires that an insured fully and voluntarily disclose to the insurer all facts material to a calculation of the insurance risk." *Id.*; *Transamerica Leasing, Inc. v. Institute of London Underwriters* 267 F.3d 1303, 1308-1309 (11th Cir. 2001).

Under federal maritime law, materiality is a broad concept. "[M]ateriality" is defined as "that which could possibly influence the mind of a prudent and intelligent insurer in determining whether he would accept the risk." *Northfield Insurance Co. v. Barlow,* 983 F.Supp. 1376, 1379 (N.D.Fla.1997) (quoting *Kilpatrick Marine Piling v. Fireman's Fund Ins. Co.,* 795 F.2d at 942-43) (11th Cir. 1986). In the context of marine insurance, "concealment" is the failure to disclose "any material fact or circumstance in relation to the subject matter of the contract which may increase the liability to loss, or affect the risk assumed, and which is, in fact or law, within or ought to be within, the knowledge of one party, and of which the other party has no actual or presumptive knowledge." *Steelmet v. Caribe Towing Corp.,* 747 F.2d 689, 695 (11th Cir. 1984).

The Eleventh Circuit has confirmed that the purchase price of the vessel is material to the underwriter's consideration of the risk; *Markel American Ins. Co. v. Nodarse,* 297 Fed. Appx. 852, 11th Cir. 2008), affirming the decision of this Court in *Markel American Ins. Co. v. Nodarse*  2008 WL 3007250 (S.D. Fla., 2008).  In the case brought to the District Court, the

insurer sought to void the Policy on the basis that the insured had misrepresented: the purchase price of the vessel on the application; his vessel owning history; and the vessel's maximum speed and horsepower.   After affirming the applicability of the doctrine of *uberrimae fidei* the Court reviewed the relevant legal principles and fact pattern, remarkably analogous to the case at Bar, and found, at p. 5:

> The Court rejects Defendant's argument that the actual purchase price of the Vessel is not material because it is the value of the Vessel that was being insured, and finds that the purchase price is a material fact which could possibly influence the mind of a prudent and intelligent insurer in determining whether the insurer would accept the risk. *See Kilpatrick,* 795 F.2d at 942. As Plaintiff notes, various courts have held that a vessel's purchase price is unquestionably a fact material to the risk. ... The application at issue here specifically asks for the purchase price of the Vessel, as well as its current value; moreover, Defendant concedes that he represented the Vessel's purchase price as $180,000 on the application, even though, according to his own deposition testimony, he only paid $126,000 for the Vessel. Plaintiff has also submitted undisputed evidence that the purchase price of the Vessel was a material factor in Plaintiff's underwriting decision to accept the risk of insuring the Vessel. It is further undisputed that at the time Plaintiff issued the Policy, it did not have the bill of sale, and thus relied on Defendant's representation that the Vessel's purchase price was $180,000, as stated on the application. (Internal citation omitted).

Because only one misrepresentation need violate the requirement of *uberrimae fidei* to void the Policy, the Court did not address the remaining material misrepresentations as alleged by Plaintiff; *Id.*, p. 6 (citing, *inter alia*, *Kilpatrick Marine Piling v. Fireman's Fund Ins. Co*. 795 F.2d 940, (11th Cir. 1986)).

As in *Nodarse,* CENTENNIAL specifically requested the vessel's purchase price in the application.   CENTENNIAL did not have possession of the closing documents revealing the actual price, nor the earlier Price survey, until well after agreeing to the risk.   CENTENNIAL relied on the information supplied by O'NEILL in the application in making its decision to offer the insurance and at what price.

It is significant to note that the *Nodarse* Court rejected as irrelevant the insured's argument that it is the yacht's *value* that is being insured, and purchase price therefore is immaterial. To justify his inflated figure O'NEILL testified at trial and at his September 28, 2010 deposition that he calculated the yacht's "purchase price" by including the amount paid in cash and trade in, or $2,125,000 and the $225,000 he intended to spend in repair shortly after purchase; thus, he argues, there was no misrepresentation made on the application.   Not only is

15

the argument factually flawed (CENTENNIAL'S review of invoices for the work reveals that a significant portion was required repair, not necessarily increasing the yacht's value) it is legally irrelevant.  The insurer is entitled to know the actual purchase price of the vessel proposed for insurance – that is why the question is asked on the application.

This latter point is accentuated in *Great Lakes Reinsurance (UK) PLC v. Atlantic Yacht & Marine Services, Inc*. 2008 WL 2277509, 2-3 (S.D. Fla., 2008) where this Court summarily voided the insurance policy because of the Defendant's misrepresentation of the purchase price on the application.  After observing that "The legal principle of *uberimmae fidei,* utmost good faith, is the settled and recognized law binding all district courts within the Eleventh Circuit" the Court continued:

> Where, as in the instant case, the application form directly and explicitly inquires into a particular subject, that being the purchase price, a presumption arises as to the materiality of that particular question. *Pacific Insurance Co. v. Kent,* 120 F.Supp.2d 1205 (C.D.Cal.2000). Moreover, it has been held that purchase price is by definition "material" and that even an innocent misrepresentation as to purchase price will void coverage. *Underwriters at Lloyd's v. Montford,* 52 F.3d 219, 1995 A.M.C. 1201 (9th Cir.1995). The case law is equally clear that an insurer may void the policy even if the failure to disclose material facts was the result of actions by a person acting on behalf of the actual insured. *Underwriters at Lloyd's v. Giroire,* 1998 A.M.C. 2153 (S.D.Fla.1998); *Royal Insurance Co. Of America v. Cathy Daniels, Ltd.,* 684 F.Supp. 786 (S.D.N.Y.1986).

Clearly, O'NEILL'S misrepresentation on the insurance application of the amount paid in the actual purchase for *BRYEMERE* is material*,* and voids the Policy; *Nodarse, supra*.  Any assertion to the contrary by O'NEILL makes a mockery of the principle of utmost good faith and, respectfully, should not be allowed to stand by this Court.

**b**.     Misrepresenting the Owner's Identity Violates the Doctrine of *Uberrimae Fidei*

CAROLINA is the registered owner of the yacht; Statement ¶ 25.  The identity of the true owner, CAROLINA, is nowhere to be found in the application; nor was it disclosed to CENTENNIAL until after the Policy was issued; please see the Declaration S. Blue, attached hereto as **Ex**. "**C**".  Only O'NEILL'S name appears in the space in the Application requesting the identity of the "Owner/Beneficial Owner Name" of the vessel proposed for insurance.  O'NEILL thus simultaneously misrepresented himself as the owner of *BRYEMERE* on the application of insurance and failed to disclose the identity of the true owner.

The identity of the owner of the insured property is material to the risk; *HIH Marine Services, Inc., supra.* 211 F.3d at 1364 ("As the insurer, HIH had the right to assess the risk using accurate information on the identity of its insured and the use of the vessel.")  Similarly, the identity of the owner of *BRYEMERE* is material to CENTENNIAL; see Declaration S. Blue

Under the terms of the contract of insurance, only the person or legal entity named on the Declarations Page as the Named Insured who are the owners of the yacht can be insured; *see* Policy, Part II, Definitions.  The application specifically asks for the identity of the "Owner/Beneficial Owner Name".  A presumption of materiality arises when the application directly and explicitly inquires into a particular subject; *Great Lakes Reinsurance, supra,* 2008 WL 2277509 p. 2.  There is nothing more fundamental to the assessment of the risk of insurance than the true identity of the insured.

    **c**.    Misrepresenting the Applicant's Loss History Violates the Doctrine of *Uberrimae Fidei*

It has only very recently come to light that contrary to the one prior loss reported on the application, O'Neill and/or companies he controlled had at least three other losses; *see* Statement ¶ 30.  O'Neill's misrepresentation of his loss history and omission of previous losses from the application were a material breach of utmost good faith as a matter of law and voids the policy *ab initio*. *Great Lakes Reinsurance (UK) PLC v. Arbos* 2009 A.M.C. 334, 341 (S.D.Fla.2009); *All Underwriters at Lloyd's (London) Subscribing to Policy No. 200-451-7275 v. Kenney*, 986 F. Supp. 1384 (S.D. Fla. 1997); *Great Lakes Reinsurance (UK) PLC v. Yellow Fin 36 LLC* 2010 WL 3394716, 7 (M.D.Fla., 2010).

While CENTENNIAL acknowledges that there is contrary authority in the Southern District regarding the materiality of loss history as a matter of law (see *AXA Global Risks (UK) Ltd. v. Pierre* 2001 WL 1825853, 9 (S.D.Fla.2001)) Plaintiff respectfully submits that the Declaration of Sean Blue, the presumption created by the requested information in the Application and the Policy wording (please see discussion, *infra*.) remove any doubts as to its materiality in this instance.

*Uberrimae fidei* encompasses not only the obligation to refrain from furnishing inaccurate material information to the insurer, whether by design or neglect, but also the duty to provide full disclosure of all information specifically requested.  This duty has not devolved on the insured from the void or, worse yet, from the insurer besting the insured in a battle for

commercial supremacy but rather, as stated by the Eleventh Circuit, in quoting the preeminent treatise of American maritime law, G. Gilmore & C. Black, *The Law of Admiralty* 62 (2d ed. 1975) :

> [T]he highest degree of good faith is exacted of those entering [a marine insurance contract], for the underwriter often has no practicable means of checking on either the accuracy or the sufficiency of the facts furnished him by the assured before the risk is accepted and the premium and conditions set."). The duty to disclose extends to those material facts not directly inquired into by the insurer.

> *HIH Marine Services, supra*, 211 F.3d at 1362 (citations omitted).

The Defendants' violation of the obligation of utmost good faith is a question of federal maritime law. *Steelmet, Inc. v. Caribe Towing Corp.,* 747 F.2d 689, 695 (11th Cir.1984). In the absence of any material disputed fact relating to the misrepresentation this Court is empowered to decide the issue by summary judgment. *Certain Underwriters at Lloyd's, London v. Giroire, supra,* 27 F.Supp.2d at 1314. Only one misrepresentation is necessary under the good faith doctrine of *uberrimae fidei* to void the policy. *Nordarse, supra,* 297 Fed.Appx. p. 853. In this case, there are at least four breaches of the duty of utmost good faith; misrepresentation of O'Neill as the owner, failure to disclose CAROLINA as the true owner, misrepresentation of the true purchase price of the yacht and misrepresentation/omission of O'NEILL'S prior losses, any one of which voids the Policy.

**d**.   Misrepresenting the Yacht's Purchase Price, Owner's Identity and Loss History Voids the Contract

The Policy Part I, the Yacht Insurance Contract, reads in relevant part as follows (emphasis supplied):

> We have relied on the information given to us by you or on your behalf (including the information in any submission and any documents and survey reports) in deciding to agree to this insurance contract. All information provided to us by you or on your behalf must be completed and accurate. This insurance contract *is void if any information provided to us is incomplete, inaccurate* or if any material information has been withheld or misrepresented.

The Policy Part IV, General Exclusions and Conditions, section B General Conditions, Misrepresentation and Fraud, reads (emphasis supplied):

This contract of insurance *is void if any information provided to us is incomplete or inaccurate* or if any material information has been withheld either at the time of applying for this policy, during the Policy Period, before or after a loss.

These contract provisions and O'NEILL'S contractual obligation to provide accurate information are separate and distinct from *uberrimae fidei*. O'NEILL breached the contract when he provide an inaccurate yacht purchase price, an inaccurate identity of the Owner of the insured property and an inaccurate loss history, all of which were specifically requested in the Application. Materiality is not an issue with regard to providing inaccurate information under the contract. O'NEILL also, as detailed *supra*, misrepresented and withheld material information when applying for the insurance, in contravention of his undertaking above, which was relied upon by CENTENNIAL in taking the decision to issue the Policy. Accordingly, the Policy is void as a matter of contract.

WHEREFORE, Plaintiff submits that O'NEILL'S material misrepresentation in applying for the Policy by misstating the Vessel's true purchase price, misrepresenting himself as owner, omitting the identity of the actual vessel owner and misrepresenting his loss history entitles CENTENNIAL to void the Policy *ab initio* both as a matter of law and of contract and respectfully requests an Order from this Court entering judgment in its favor.

## IV     *BRYEMERE'S* **LOSS WAS NOT AN OCURRENCE WITHIN THE POLICY PERIOD**

The Policy, Definitions, contains the following relevant definitions:

**Occurrence**: means a sudden and unexpected event or an accident to which this insurance applies that happens within the **Policy Period**.

**Policy Period**: means the period commencing on the effective date shown on the Declarations Page. This period ends on the earlier of the expiration date or the effective date of cancellation of this **policy**. All **physical loss or damage**, **property damage**, **bodily injury** and all **occurrences** giving rise to any claim under this **policy** must occur during the **policy period**. (Emphasis in the original.)

The Policy Period, as established on the Declarations Page, began on April 19, 2007 and expired on April19, 2008 at 12:01, Eastern Standard Time.

As argued *supra*, Defendants CAROLINA and O'NEILL are judicially estopped to deny the truth of the expert testimony that formed the core of the claim against HMY; the testimony of

David Pedrick that all the damage and deficiencies found in the vessel, including the delamination of the hull topsides and fuel tank bracket failures, occurred prior to CAROLINA'S purchase of the yacht and the attachment of the risk under the subject Policy in April 2007. During the HMY Trial, David Pedrick testified at length over two days as to both the extensive structural deficiencies in the vessel, which he attributed directly to the failure of the manufacturer to follow design specification, and to the physical damage to the yacht he observed in September 2007 in Rhode Island that was caused by those structural defects. See, Statement ¶ 12 through 15.  Pedrick repeatedly testified that the physical damage he observed on the vessel as having been caused by the numerous structural defects was a gradual process, not sudden, happening over a long period of time, over many days, and, as he repeated several times, all that damage occurred prior to the purchase of the yacht by O"NEILL in April 2007.  [Trial Tr. DE – 264 p. 43 L 3 – p. 44 L 12; p. 46 L 15-p. 47 L 8; p. 53 L16-p. 56 L14; p. 59 L1-p. 61 L 19] [Trial Tr. DE-265 p. 27 L 6-p. 31 L9; p. 31 L 18-p. 33 L 11;  p. 33 L 21-p. 36 L 21; p. 38 LL 12-16; p. 55 L 23 - p. 56 L 2; p.58 L 21- p.59 L 2].  Neither CAROLINA nor O'NEILL should be able to argue to this Court that physical damage to the vessel which so definitively occurred prior to the purchase of the vessel in April 2007 during the HMY litigation suddenly all occurred after O"NEILL purchased a policy of insurance and the risk attached.

The Policy simply does not cover loss that occurred prior to the Policy period.  O'NEILL does not dispute that there is no coverage under the Policy for any loss attributable to a manufacturing defect nor does he seek coverage for the cost of repairing or replacing the any allegedly latent structural defects. O'NEILL has only sought coverage for what he claims is physical damage to the vessel during the Policy Period caused by alleged latent structural defects.  However, Pedrick's HMY testimony make it indisputably clear that all the physical damage to the vessel catalogued by Pedrick and the other experts in Rhode Island occurred prior to O'NEILL'S purchase of the vessel and the attachment of the risk under the Policy.  Therefore, respectfully, as a matter of simple, but indisputable logic, any claim for physical damage to the yacht is not covered and Plaintiff is entitled to summary judgment in its favor absolving it of liability for *BRYEMERE'S* loss.

Respectfully submitted,


*Lawrence Jacobson*_____
ANDREW W. ANDERSON, ESQ.
Florida Bar No.: 213144
Anderson@houckanderson.com
LAWRENCE JACOBSON, ESQ.
Florida Bar No.: 0846201
ljacobson@houckanderson.com
CHARLES S. DAVANT
Florida Bar No.: 15178
cdavant@houckanderson.com
HOUCK ANDERSON P.A.
Attorneys for Plaintiff
1500 Cordova Road., Suite 300
Ft. Lauderdale, Florida 33316
Telephone:  (305) 372-9044
Facsimile:   (954) 463-8752

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of November, 2010, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.


_*Lawrence Jacobson*_____
LAWRENCE JACOBSON

## <u>SERVICE LIST</u>

**<u>Attorneys for Bank of America, N.A.</u>**

J. RANDOLPH LIEBLER, ESQUIRE
CHRISTOPHER M. DRURY, ESQUIRE
Liebler, Gonzalez & Portuondo, P.A.
Courthouse Tower – 25th Floor
44 West Flagler Street
Miami, Florida  33130
Telephone:  305-379-0400
Telefax:  305-379-9626
Email:  jrl@lgplaw.com
   cmd@lpglaw.com

**<u>Attorneys for J. Brian O'Neill</u>**
Meghan C. Moore, Esq.
Jeffrey L. Greyber, Esq.
Ver Ploeg & Lumpkin, P.A.
100 SE 2nd Street, 30th Floor
Miami, Florida 33131
Telephone:  305-577-3996
Telefax:  305-577-3550
Email: mmoore@vpl-law.com
   jgreyber@vpl-law.com

HOUCK ANDERSON, ATTORNEYS AT LAW