UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
IN ADMIRALTY
CASE NO.: 09-60551- CIV - ZLOCH

AIG CENTENNIAL INSURANCE
COMPANY,

      Plaintiff,

vs.

J. BRIAN O'NEILL, CAROLINA ACQUISITION
LLC, and BANK OF AMERICA N.A.,

_____Defendants._____/

## MOTION TO STRIKE AND/OR LIMIT REPORT, REBUTTAL REPORT AND
## TESTIMONY OF DEFENSE EXPERT DAVID PEDRICK

COMES NOW, the Plaintiff, AIG CENTENNIAL INSURANCE COMPANY("CENTENNIAL"), by and through undersigned counsel and pursuant to the applicable Federal Rules of Civil Procedure and files its Motion to Strike and/or Limit the Report, Rebuttal Report and Testimony of Defense Expert David Pedrick on behalf of Defendants, J. Brian O'Neill and Carolina Acquisition LLC based upon (1) the doctrine of judicial estoppel; and (2) the unreliability of certain opinions under the standards adopted in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), and in support of thereof states as follows:

## I.  INTRODUCTION

Defendants' expert David Pedrick has rendered written and verbal opinions in this case which are, in every way, diametrically opposite to the opinions he rendered in sworn testimony in a matter formerly pending before this Court: *Carolina Acquisition, LLC v. HMY Yacht Sales, Inc. et al*, Case No. 07-61738-CIV-ZLOCH (hereinafter "HMY Litigation"). In the HMY Litigation, Carolina Acquisitions LLC successfully sued the selling broker of BRYEMERE, then known as DOUBLE BILLED, for negligently misrepresenting the condition of the vessel which was found to have serious structural deficiencies.

In support of its position in the HMY Litigation, Carolina Acquisitions LLC presented two (2) days of testimony from David Pedrick, a Naval Architect and Marine Engineer, who identified the numerous structural deficiencies in the vessel and damage to the vessel these

deficiencies caused. Most importantly, Mr. Pedrick testified, at great length, that **all** of these defects and damages existed **prior** to the purchase of the vessel in April 2007.

Now, Carolina Acquisitions LLC presents Mr. Pedrick as an expert witness in this case and seeks to have Mr. Pedrick render opinions that all of the structural deficiencies were hidden, could not have been detected by a reasonably careful and thorough inspection of the vessel and that all of the damages caused by the deficiencies occurred **after** the purchase of the vessel and, conveniently, during the policy period for the policy of marine insurance which is the subject of this litigation. Such conduct by Carolina Acquisitions LLC and David Pedrick should not and must not be tolerated by this Court.

Moreover, the factual and technical basis upon which Mr. Pedrick is offering his new opinions and/or changes in his previous opinions lack a sufficient scientific basis under *Daubert* and as such, his testimony must be stricken.

## II. ARGUMENT

CENTENNIAL issued a policy of marine insurance for a vessel known as BRYEMERE for a policy period beginning April 19, 2007 and continuing through April 19, 2008 at 12:01 a.m. Eastern Standard Time (hereinafter the "Policy"). (Policy, Exhibit "A"; Declarations Page, Exhibit "B"). The Policy provides insurance coverage for physical loss or damage to a yacht owned by the named insured on the declarations page. (Policy, Ex. "A"). The Policy further excludes coverage for manufacturing and latent defects, but does provide limited coverage for damage caused by latent defects. *Id.* The Policy further requires that any physical loss or damage giving rise to a claim under the Policy must occur during the Policy Period. *Id.*

### a. The doctrine of judicial estoppel prevents Mr. Pedrick from changing his testimony as to his expert opinions

Contrary to their position taken in the HMY Litigation, Defendants, J. Brian O'Neill and Carolina Acquisition LLC, now contend that the brackets on the port (left) and starboard (right) outboard (outer) sides of the port and starboard forward fuel tanks on BRYEMERE fractured in July 2007 and the hull topsides delaminated (separation of inner fiberglass skin from foam core material) in July 2007 sometime **after** Mr. O'Neill purchased the vessel through HMY. *See* David Pedrick's December 5, 2010 report attached hereto as Exhibit "C". Defendants further contend these damages were caused by hidden defects in the vessel for which the Policy provides coverage. *Id.*

CASE NO.: 09-60551-CIV-ZLOCH

Their sole support for these allegations is their expert Naval Architect and Marine Engineer, David Pedrick. Mr. Pedrick was deposed on December 8, 2010. This Court heard testimony from Mr. Pedrick in the HMY Litigation just eight (8) months ago – on April 14 and 15, 2010 – regarding the numerous structural deficiencies in the vessel and resulting damages. Mr. Pedrick's testimony in this case and testimony in the HMY Litigation are completely at odds and cannot be reconciled.

"[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *Davis v. Wakelee*, 156 U.S. 680, 689 (1895). This rule, known as judicial estoppel, "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Pegram v. Herdrich*, 530 U.S. 211, 227, (2000); *see also New Hampshire v. Maine*, 532 U.S. 742, 744 (U.S. 2001).

In the HMY Litigation, J. Brian O'Neill and Carolina Acquisitions LLC used the testimony of David Pedrick to establish that at the time Mr. O'Neill purchased the vessel, it was in an advanced state of deterioration, unseaworthy, structurally unsound and had been damaged as a result of that lack of structural integrity such that HMY knew or should have known of the true condition of the vessel and negligently misrepresented the condition of the vessel to Mr. O'Neill. In the instant case, J. Brian O'Neill and Carolina Acquisitions LLC are using the testimony of the same witness, who has done no new investigation or analysis and discovered no new facts, to establish there was no reason to believe there were any problems with the vessel because a reasonably careful and thorough inspection would not have revealed the condition of the vessel and the damage caused by the structural deficiencies all occurred after Mr. O'Neill purchased the vessel. Their respective position in the two cases is the classic definition of trying to have it both ways.

Here, the presentation of Mr. Pedrick as an expert witness in the HMY Litigation to support the breadth of the defects and damages existing **prior** to Carolina's purchase of the vessel and the presentation of Mr. Pedrick as an expert witness in this case to support the allegation damages occurred **after** Carolina's purchase is simply untenable and quintessential

judicial estoppel.  Mr. Pedrick's testimony cannot be relied upon under *Daubert* or any standard and his testimony must be stricken accordingly.

In the HMY Litigation, Pedrick testified, without qualification, that the broken fuel tank foundations occurred prior to April 2007 and not after April 2007:

> Q:   In your opinion, was the "Double Billed" seaworthy prior to April 2007?
>
> A:   No.
>
> Q:   Why do you say that?
>
> A:   Well, these problems that I have been describing **existed before. They weren't sudden.** It happened over a period of time. And the flexing had spread cracks over a period of time. We found that the foundations, aluminum foundations that hold the fuel tanks—the fuel tanks are welded in aluminum boxes. They carry these tanks in the area of interest, vary approximately 300 gallons of fuel which weighs more than a ton. So when tanks are full, each of them has a ton of mass that's going up and down in the boat. **The foundations, the forward foundations on these tanks had broken on both sides of the boat. So these were things that happened over a long period of time. They weren't just in the relatively few running hours that happened after April 2007.**

HMY Trial Testimony of David Pedrick, April 14, 2010, pp. 46:15 – 47:8, Ex. "D" (emphasis added).

Mr. Pedrick continued to discuss and describe the problems with the fractured fuel tank brackets during his HMY Trial Testimony on April 15, 2010.  In his testimony of April 15, 2010, beginning at Page 27, Line 6 and continuing to Page 29, Line 13, Ex. "D", Mr. Pedrick uses a photograph of a fractured fuel tank bracket to describe the fracture of the bracket and the tremendous forces that caused tank movement and the fracture of the fuel tank brackets. He then testifies:

> Q:   **Do you have an opinion as to whether this condition that you have now described existed before April 2007 when Carolina Acquisition bought the boat?**
>
> A:   Yes.
>
> Q:   And what is your opinion?
>
> A:   Well, this something that happened over a period of time. Any this is repetitive type of phenomenon that brings this level of destruction. So, this is something that had been going on for a period of time in the boat.

HMY Trial Testimony of David Pedrick, April 15, 2010, pp. 29:14-22, Ex. "E" (emphasis added).

In a continuing response to the question of whether the condition of the fractured fuel tank brackets he described existed before April 2007, Mr. Pedrick then testifies, at length, from Page 29, Line 22 of his HMY trial testimony to Page 31, Line 3, as to other observations he made that indicated the problem with excessive tank movement had been going on for some time. Mr. Pedrick then concludes his response to the question as to when the condition of the fuel tank brackets he described existed by testifying:

> So, this was really, this photograph is an example of part of what was going on. There was other evidence in the boat of **this movement that had been going on for a significant length of time and that would have included prior to the sale.**

HMY Trial Testimony of David Pedrick, April 15, 2010, pp. 31:6-9, Ex. "E" (emphasis added).

In the HMY Litigation, although Pedrick testified that the fracture had occurred before April 2007, Pedrick also testified that he was unable to tell precisely when the fracture occurred but that the fuel tank brackets fractured as a result of a long term condition in the vessel:

> Q:   Now, looking at that bracket, you can't tell when exactly that fracture, that long fracture that you described, and you drew a line down, you can't tell when that occurred, can you?
>
> A:   Precisely, no. But over a period of-- a long period of time. **This was something that would have taken many, many days and at least tens if not more than that of hours of running.  This was a very long term thing.**

HMY Trial Testimony of David Pedrick, April 15, 2010, pp. 58:21 – 59:2, Ex. "E" (emphasis added).

In the instant case, Pedrick has now stated on page three of his report of June 18, 2010 that, rather than something that was not sudden that he could not tell precisely when it occurred other than it was before April 2007, the fuel tank brackets fracture was a "…sudden, catastrophic fracture.." that occurred off Ocean City, Maryland in July 2007 and confirmed that changed opinion in his deposition testimony:

> A:   The catastrophic failure of those brackets, I think without question, occurred just a very short time before they were noticed aboard [in June 2007].

*See* June 18, 2010 report attached hereto as Exhibit "G"; Deposition Testimony of David Pedrick, December 8, 2010, p. 198:13-17, Ex. "F".

CASE NO.: 09-60551-CIV-ZLOCH

In the HMY Litigation Pedrick also testified, at length, from Page 33, Line 18 to Page 36, Line 1, regarding what delamination is and the process of the slow delamination of the inner skin from the foam core material on the hull's topsides of BRYEMERE. He then testified:

> Q:   And the delamination, is this a problem?
> A:   Yes.  The consequences of this is that what you have is a delaminated structure, as I was describing yesterday.  It no longer works as an integral stiff unit, it works as a series of flexible individual plies that aren't getting support from one another.  And it basically just means it is weaker, it will break more easily.  And in this case, as wave action, both directly applied from the outside of the boat and also just the forces of this 50-ton boat has a lot of intertial forces within itself and works on that.  **And once the peeling action starts, it's something that just keeps spreading and getting worse and it can lead to a fracture or a rupture of the topsides** and, again, exposes the boat to sinking and the consequences of that.
> Q:   And **the condition that you have described and we see on this photograph, as with the other defects and deficiencies in the structure of the boat, is this also something that had taken place prior to April 2007** when Carolina Acquisition bought the boat?
> A:   **Yes.**

Trial Testimony of David Pedrick, April 15, 2010, p. 36:2-21, Ex. "E" (emphasis added).

In his deposition on December 8, 2010, Mr. Pedrick reversed his sworn testimony at trial, offering for the first time new opinions as to when and why the hull topsides delaminated. He first testified, starting at Page 121, Line 13 , of his deposition:

> ....But what I think happened here, and it's certainly curious, that the problems with the bottom became catastrophic at apparently the same time as the problems that became apparent in the topsides. So because both of them were deficient and that the catastrophic failure of both of them occurred within such a narrow time frame, it seems me that there were issues with the--probably the bottom framing first causing the tank brackets to rupture. That once the tank brackets ruptured and that allowed the bottom to flex more than it had ever been permitted before, that could have been the trigger that then caused the topsides to let go.
>
> Q:   Is that something that you can state within a reasonable degree of engineering probability or is that just sort of an untested theory?
>
> MR DRURY: Objection to the form of the question.

A:      That's my best estimate as an engineer trying to understand how these occurrences happened to appear so close together.

Deposition Testimony of David Pedrick, December 8, 2010, p. 121:13-122:8, Ex. "F". He then later stated that the delamination was a catastrophic and sudden event:

Q:      Just for clarity, I'm talking the delamination in the way of the master stateroom port and starboard that we have been talking about. That was not a sudden event, was it?

MS. MOORE:  Object to the form.
MR. DRURY:  Object to the form of the question.

A:      **It appears that the catastrophic failure was a sudden event.** There's no way of knowing the degree to which there may or may not have been voids beforehand.

Deposition Testimony of David Pedrick, December 8, 2010, p. 146:21-147:6, Ex. "F".

Pedrick's reversal of opinions continues and extends beyond just the damages Carolina and O'Neill seek in this litigation. In the HMY Litigation Pedrick testified before this very Court as to the advanced state of deterioration the vessel was in:

Q:      Assume that the boat had not been pulled out of water and that the boat was actually being used going out 100 miles offshore. Do you have an opinion as to what would have happened with the "Double Billed"?

A:      Well, **this boat was in a state of deterioration that was pretty well advanced.** And the greatest risk that I see in it is the bottom panel, that is the watertight barrier between there and the deep blue sea, is in the process of breaking. The cracks on the outside. **There where was the breaking away of this partial longitudinal girder on the inside. There were things moving around the girder and the tanks were moving around.** There was a lot of force and flexion going on in that area.

Trial Testimony of David Pedrick, April 15, 2010, p. 38:19 – 39:6; 40:14-41:7, Ex. "E" (emphasis added).

In deposition he states just the opposite:

HOUCK ANDERSON, ATTORNEYS AT LAW

> Q:  Was BRYEMERE in a state of deterioration that was pretty well advanced at the time she was purchased by Mr. O'Neill?
>
> MR. DRURY:  Object to the form of the question. Asked and answered.
>
> MS. MOORE:  Same.
>
> THE WITNESS:  It's been established by Mr. Price that **that was not the case.**

Deposition Testimony of David Pedrick, December 8, 2010, p. 206:1-8, Ex. "F".

Mr. Pedrick has clearly reversed his prior testimony in deposition and will perjure himself should he testify as set forth in his reports and depositions given in this case. Carolina's presentation of him as an expert in the HMY litigation and in this case on the same issue but with different opinions rises to the level of a fraud on this Court. Such conduct cannot be tolerated and Mr. Pedrick's testimony must be stricken.

**b.  Mr. Pedrick's testimony also fails to meet *Daubert* requirements**

In a complete about-face from the position he advocated in the HMY litigation prosecuted successfully by Defendant Carolina against, *inter alia*, the yacht broker who sold the boat, David Pedrick now proposes to opine that no one, presumably including HMY, had any reason to think BRYEMERE was not structurally sound and seaworthy until the alleged catastrophic failures of the tank brackets and hull topsides during the first voyage under Carolina's ownership, somewhere in the vicinity of Ocean City, Maryland. Mr. Pedrick now is of the opinion that not only did the tank bracket failure and hull topside delamination occur **after** April 2007 but that a reasonably careful and thorough inspection of the yacht prior to Carolina's purchase would *not* have revealed any reason to be concerned about the seaworthiness or structural integrity of *M/Y BRYEMERE*. (Deposition Testimony of David Pedrick, December 8, 2010, p. 65:21-p. 67:1, Ex. "F").

Significantly, Mr. Pedrick did not offer any new facts or any new research, new engineering studies, new analysis, new investigation that he has undertaken between his testimony in the HMY trial and his deposition to provide any explanation or justification for his radical changes in opinion. Indeed, the entire basis for his new opinions rests completely on information that he knew at the time he testified to the contrary in the HMY Litigation.

CASE NO.: 09-60551-CIV-ZLOCH

Mr. Pedrick's departure from his opinions in the HMY Litigation begins with his June 18, 2010 Report of Principal Observations, Analysis and Repair Processes. (Please find attached a copy of Defendants' expert disclosure document and Mr. Pedrick's report attached hereto as Ex. "G"). On Page sixteen of his report Mr. Pedrick states, in part (emphasis supplied):

### General Conclusions

The motor yacht "Bryemere" appeared to be a sound and satisfactory sportfishing yacht *as of the time of purchase by Mr. O'Neill in March 2007. It was not until the vessel made its open-ocean delivery voyage from Florida to Rhode Island* – a distance of more than 1000 nautical miles – *that sudden, catastrophic damage occurred*, revealing numerous flaws in the materials of the vessel's construction. "Bryemere" had substantial defects *that could not have been reasonably foreseen by normal means of observation, even by experienced marine professionals. ...*

In my opinion as an experienced naval architect and marine engineer of recreational marine craft, the motor yacht "Bryemere" had unforeseen and unforeseeable defects that *revealed themselves only by the occurrence of catastrophic structural failure when under way in the open ocean. Only then* was it apparent that the vessel lacked structural seaworthiness and should be condemned from use until damaged areas are repaired corrective measures are incorporated.

On December 8, 2010, his most recent deposition in this case, Mr. Pedrick for the first time, revealed a truly remarkable basis for his new conclusion that *M/Y BRYEMERE* had undergone a sudden, catastrophic failure of her fuel tank brackets apparently near Ocean City, Maryland. Although his report attributes the information to the Captain, in his deposition, his source becomes L.J. Gallagher who, in reporting his observation of the yacht's fuel tanks' movement two months after the voyage, displayed an "emotional seriousness".

Q. (BY MR. ANDERSON) Let me get this straight.  Did you or did you not just say that there was a catastrophic failure of those brackets sometime just prior to somebody noticing the tank movement?
A. That's what I said.
Q. Okay.  So tell me what the factual basis of that opinion is.
A. The factual basis of the opinion was the description that I was given when I was called in on the project back in September, early September of 2007 ... and I was asking questions about

9

what happened here, principally L.J. Gallagher described the failure at the time.

Q.   And tell me what Mr. Gallagher described to you as specifically as you can recall.

A.   That they were running the boat up in the vicinity of Ocean City, Maryland, and that very suddenly there was -- that the tanks and he -- as I recall and what he was telling me at the time, were that the tanks were moving violently, and that the topsides inner skin was -- what they could see was panting inboard.

Q.   Now, you used the term "violently." Is that this his word or is that your word?

A.   That is my word, recalling the emotional seriousness that he had at the time.

Q.   Emotional seriousness?

MR. DRURY: Objection no question pending.

A:   This was a pretty disturbing situation to be on a boat where that was happening. So, yes, he had been deeply concerned, let me say, he and his shipmates, when that happened. ... So it was my understanding from the way the situation was described to me, that this was a very sudden and very disturbing experience for them.

Deposition Testimony of David Pedrick, December 8, 2010, p. 199:6-p. 200:24, Ex. "F".

Q:   And you're basing this opinion as to whether this catastrophic failure occurred on the emotional intensity with which L. J. Gallagher described the experience?

MS MOORE: Objection to the form.

MR. DRURY: Objection to the form.

A:   No. That's not what I'm basing it on. I'm basing it on his -- the facts that he stated to me, and they were stated with a level of obvious distress experiencing it.

Q.   Again, tell me what those facts are, because I'm still trying to get them.

A.   The facts are ---

Q.   The facts.

A.   The facts that he described to me, were that they were near Ocean City, Maryland, and there was something going on below that drew their attention, and then they were alarmed by a sense that -- the tanks moving and the topsides inner skin being visibly
panting inboard.

MS MOORE: Objet to the form.

Q.   Any other facts?

A:   That is the essence of what I recall being told by L.J. as we started the job.

(Deposition Testimony of David Pedrick, December 8, 2010, p. 1202:17 to p. 203:16.)

> **i.**  **Mr. Pedrick's testimony is based on insufficient data
> and does not assist the trier of fact**

Rule 702 of the Federal Rules of Evidence provides (emphasis supplied):

> *If* scientific, *technical,* or other specialized knowledge will assist
> the trier of fact to understand the evidence or to determine a fact in
> issue, a witness *qualified as an expert by knowledge, skill,
> experience, training, or education,* may testify thereto in the form
> of an opinion or otherwise, *if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable
> principles and methods,* and (3) the witness has applied the
> principles and methods reliably to the facts of the case.

The party that proffers expert testimony bears the burden of establishing admissibility by
a preponderance of the evidence. *Allison v. McGhan Med. Corp.*, 184 F.3d 1300 (11th Cir.
1999). The testimony must be based upon sufficient *facts or data*; Federal Rule of Evidence 702
(emphasis supplied); see also *McDowell v. Brown* 392 F.3d 1283, 1298 (11th Cir. 2004).

In his deposition, Mr. Pedrick attributes his revised opinion that M/Y BRYEMERE
experienced a "catastrophic failure" of the fuel tank brackets on the voyage just outside Ocean
City, Maryland to L.J. Gallagher. Mr. Pedrick's new opinion as to when the fuel tank brackets
fractured is based completely on the naval architect's subjective impression of the "emotional
seriousness" of the individual who allegedly reported his observations, L.J. Gallagher.
Information he knew at the time he testified in HMY. However, when questioned about whether
he observed, or anyone reported to him having observed, any type of unusual movement in the
forward fuel tanks of M/Y BRYEMERE during the trip from Florida to Rhode Island, the
Captain was unable to recall any such movement. (Deposition of Captain Dan O'Neill, October
19, 2010, Page 62, line 12 to Line 19, Ex. "H") Further, when L. J. Gallagher was asked in his
deposition about fuel tank movement, he wholly failed to reflect the alarm and concern allegedly
perceived by Mr. Pedrick:

> Q:  In the legs of the voyage, I know you described the flexing, did you
> observe any  movement of the fuel tanks during the voyage up to Rhode
> Island?
> A:  You know, that port tank might have had a little movement but I can't say
> that I remember anything that was concerning at that time.
> Q:  There was no concerning movement of the starboard fuel tank?

CASE NO.: 09-60551-CIV-ZLOCH

A:      No, I mean the tank wasn't jumping around damaging anything. It wasn't moving really, I mean, I think it was just more vibration through the boat.

Q:      Normal movement?

A:      Correct.

Q:      Okay. And the same with the port side?

A:      Yes sir.

Deposition of L. J. Gallagher, August 25, 2010, Page 121, Lines 10 to 24, Ex. "I".

Respectfully, Mr. Pedrick's speculative impression is not only contrary to the testimony of the witnesses upon whose factual recollection he allegedly relies, but falls so far short of the requirement that his "testimony is based upon sufficient facts or data" as to make its submission contumacious, if not downright contemptuous, of the rules of this Court. The degree of emotion, or the lack thereof, which Mr. Gallagher allegedly may have employed in his description of the movement in the yacht's fuel tanks, or his reaction to it, is utterly insufficient "facts or data" upon which Mr. Pedrick can "scientifically" conclude that M/Y BRYEMERE underwent a "catastrophic failure ... in the vicinity near Ocean City, Maryland."

There is no technical or scientific analysis or report of the yacht's condition as she approached Ocean City, or at any other time during the voyage, upon which Mr. Pedrick could possibly base his changed testimony as to when the brackets failed. Mr. Pedrick admitted that he did not have any scientific data upon which he based his conclusion when he testified but that the entire so-called "factual basis" of his opinion was the "emotional seriousness" with which tank movement was described by a witness who has testified under oath that there was no concerning movement of the fuel tanks on the voyage from Florida to Rhode Island. However, it is now clear that any concern that either the captain or L. J. Gallagher may have expressed to Mr. Pedrick was limited to the flexing of the hull topsides that they observed off Ocean City and had nothing whatsoever to do with any tank movement.

Thus, Mr. Pedrick has no factual basis on which to justify his new opinion that the tank brackets fractured in July 2007 off Ocean City, Maryland rather than prior to April 2007 as he testified in the HMY Litigation.

Not surprisingly, given that L.J. Gallagher denied any concerning tank movement, Mr. Pedrick admitted that Gallagher provided him with no specific description of the manner or degree of movement of the tanks. On this basis alone, even setting aside L. J. Gallagher's testimony denying any concern about tank movement, Mr. Pedrick's testimony should be

CASE NO.: 09-60551-CIV-ZLOCH

excluded by the Court, as lacking any hint of a sufficient factual basis to support or sustain the highly speculative opinion offered.

The trial judge is a gatekeeper and must ensure that any and all expert testimony rests on a reliable foundation and is relevant to issues before the court. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993); *Corwin v. Walt Disney World Co.*, 475 F. 3d 1239, 1250 (11th Cir. 2007). When determining relevance and reliability, a trial judge should assess whether the reasoning and methodology of the proffered expert witness is scientifically valid and can be properly applied to the facts at issue. *Id.* at 592-93. A trial court in the Eleventh Circuit must:

> . . . [c]onduct "a rigorous" three-part inquiry" considering whether: (1) the expert is qualified to testify competently regarding the matters intended to be addressed; (2) the methodology used to reach conclusions is sufficiently reliable, as determined by the sort of inquiry mandated in *Daubert;* and (3) the testimony assists the trier of fact, *through the application of scientific, technical, or specialized expertise*, to understand the evidence or to determine a fact in issue.

*Powell v. Carey Int'l*, 2007 U.S. Dist. LEXIS 26074 (S.D. Fla. 2007) citing City *of Tuscaloosa v. Harcros Chems.*, 158 F.3d 548 (11th Cir. 1998). (emphasis supplied).

As recently explained by the Eleventh Circuit, in this instance the Defendants bear the burden of demonstrating their proffered witness is qualified to render an expert opinion, the opinion is reliable, and the opinion would assist the trier of fact in resolving a disputed issue of material fact--here, whether or not the port and starboard outboard tank bracket aboard M/Y BRYEMERE failed prior to Mr. O'Neill's purchase of the vessel in April 2007, as Mr. Pedrick testified in the HMY Litigation, or in July 2007 when the yacht reached the vicinity of Ocean City Maryland. *McDowell v. Brown* 392 F.3d 1283, 1298-99 (11th Cir.2004)   Accepting that Mr. Pedrick is a well-qualified naval architect does not in any manner sanction an opinion, even on a subject within his expertise that is not based on a scientific analysis of "facts" but instead is based on a faulty and subjective review of the reporter's alleged "emotional intensity". The conclusion that M/Y BRYEMERE suffered a "catastrophic failure" is a naval engineering judgment; a scientific opinion. To be valid it must be premised on sufficient facts or data to allow the expert to reasonably reach that opinion or conclusion.

Similarly, the opinion that M/Y BRYEMERE suffered a "catastrophic failure" at a specific point in time is also a scientific conclusion, requiring sufficient facts or data which would provide the expert with a rational basis for making his judgment. Mr. Pedrick's basis for his two-fold conclusion, that is, his subjective assessment of Mr. Gallagher's "level of distress", is not only contrary to Gallagher's actual testimony, it is simply insufficient "facts or data" – it is impermissible because it is neither fact or data, it is impression. Rule 702 of the Federal Rules of Evidence and the case law enunciating its interpretation make clear that its purpose is to guard against a naval architect's scientific conclusion premised on his subjective evaluation of a witnesses' "emotional intensity". Mr. Pedrick's testimony on this issue should be refused by the Court.

### ii. Mr. Pedrick's opinions lack scientific foundation

Rule 702 of the Federal Rules of Evidence requires that the proffered expert's "testimony is the product of reliable principles and methods". In this case, the basis for Mr. Pedrick's revised testimony regarding both the cause and timing of a specific engineering event is a decidedly unscientific and completely subjective evaluation of L.J. Gallagher's emotional state.

Mr. Pedrick's new opinion that the structural failures of M/Y BRYEMERE occurred during a June/July 2007 voyage from Florida to Rhode Island lacks a scientific foundation and should be stricken on that basis. An expert's testimony and opinions should be excluded if the reasoning or methodology which forms the basis of the opinion is scientifically invalid, or if the methodology cannot be applied to the facts of the case. *Club Car, Inc. v. Club Car (Quebec) Imp., Inc.*, 362 F.3d 775 (11th Cir. 2004). As recently observed by the Eleventh Circuit, the proponent of expert testimony "must demonstrate that the witness is qualified to testify competently, that his opinions are based on sound methodology, and that his testimony will be helpful to the trier of fact. *Cook exrel. Estate of Tessier v. Sheriff of Monroe County*, 402 F.3d 1092, 1107 (11th Cir. 2005).

Mr. Pedrick's deposition testimony reveals the complete lack of any scientific procedure underpinning his conclusion. His subjective impression of L.J. Gallagher's "emotional seriousness"; and/or his apparently flawed recollection that Gallagher was "deeply concerned"; and/or his "level of obvious distress" as expressed to Mr. Pedrick about two months after the yacht arrived in Rhode Island, does not qualify as "the product of reliable principles and methods" under the most generous, rational interpretation of language in the Rule. It cannot, by

definition. The rigor of scientific methodology is intended precisely to exclude one's subjective impressions in reaching an expert conclusion.

Mr. Pedrick's revised testimony is proffered by the Defendants to establish, through the expert testimony of a naval architect and engineer, that that there was a catastrophic failure of the fuel tank brackets after the vessel was purchased by Mr. O'Neill sometime just prior to the time the tank movement was allegedly noticed by those onboard, outside of Ocean City, Maryland.

However, once the "emotional seriousness" as the factual basis as to when the fuel tank brackets failed is discarded, as it should be, a more reasoned and scientific analysis of the facts makes it even more clear that Mr. Pedrick's opinions as to when the fuel tank brackets failed is seriously flawed and unreliable. Mr. Pedrick concedes no one ever visualized the failed port and starboard outboard longitudinal girders, the broken tabbing connecting those girders to the hull bottom or the broken port and starboard outboard fuel tank brackets prior to the arrival of M/Y BRYEMERE in Rhode Island in July 2007. (Deposition Testimony of David Pedrick, December 8, 2010, p. 45:17-25; p. 52:3-11; p. 61:10-17, Ex. "F"). He also testified that excessive flexing of the hull bottom and the problems that ultimately resulted in the fracture of the tank brackets were conditions that existed from very early on in the service life of M/Y BRYEMERE and prior to the purchase of the vessel by Mr. O'Neill. (Deposition Testimony of David Pedrick, December 8, 2010, p. 48:6 to p. 49:7; p. 75:9-21, Ex. "F").

Mr. Pedrick also described the eventual fracture of the tank brackets was caused by the failure of the tabbing at the end of the port and starboard outboard longitudinal girders which, in turn, allowed excessive movement in the hull bottom panels. The excessive movement of the hull bottom panel then caused movement of the port and starboard outboard girders which caused movement in the outboard side of the port and starboard fuel tanks. It was this movement of the fuel tanks which eventually caused the outboard port and starboard fuel tank brackets to fracture. (Deposition Testimony of David Pedrick, December 8, 2010, p. 63:11-25, Ex. "F"). Mr. Pedrick further testified that the excessive movement of the hull bottom panels, the failed tabbing, the movement of the port and starboard outboard girders and the fractured tank brackets were on the outboard side of the fuel tanks and could only be observed through access holes cut in the decks on the port and starboard side in Rhode Island above the areas of the failed girders and broken brackets. (Deposition Testimony of David Pedrick, December 8, 2010, p. 79:8 to p. 83:13, Ex. "F").

CASE NO.: 09-60551-CIV-ZLOCH

Most significantly, Mr. Pedrick conceded that even when he observed the excessive movement of the port and starboard hull bottom panels, the movement of the failed port and starboard outboard girders and the fractured port and starboard outboard tank brackets, **there was no detectable or observable movement at the forward end of the port and starboard fuel tanks.** (Deposition Testimony of David Pedrick, December 8, 2010, p. 64:1 to p. 65:1; p. 85:13 to p. 86:2, Ex. "F"). Mr. Pedrick also conceded that someone positioned in the hatch at the foot of the master stateroom, between the port and starboard fuel tanks, the only area accessible at the time of the March 2007 sea trial, would have been unable to observe the excessive movement of the hull bottom panels or the movement of the failed port and starboard outboard girders occurring on the port and starboard outboard sides of the fuel tanks. (Deposition Testimony of David Pedrick, December 8, 2010, p. 80:21 to p. 81:15; p. 83:8-13, Ex. "F"). Thus, given Mr. Pedrick's testimony that (1) the broken fuel tank brackets were not and could not have been observed until the vessel arrived in Rhode Island; (2) the excessive movement of the hull bottom panels and failed outboard girders could only be observed through access holes cut in the deck and could not be observed from the only area accessible during the March 2007 sea trial, and (3) **even after the tabbing failed, the outboard girders started to move and the fuel tank brackets were fractured, there was no visibly discernible movement at the forward end of the fuel tanks**: thus, there is no evidence that the fuel tank brackets were not already broken during the sea trial of March 2007. When the testimony of Captain O'Neill and L. J. Gallagher, that there was no unusual movement of the fuel tanks observed during the voyage from Florida to Rhode Island and no concern about unusual movement about fuel tank movement during that trip, is added to the other facts, it becomes quite clear that not only did Mr. Pedrick have no justifiable scientific or technical basis to change his HMY testimony as to when the fuel tank brackets occurred but his opinion that there was a sudden and catastrophic failure of the fuel tank brackets off Ocean City Maryland lacks any credible, reasonable scientific basis at all. It is equally possible, if not more probable, that, as Mr. Pedrick testified in the HMY trial, the fuel tank brackets were, in fact, already fractured when Mr. O'Neill purchased M/Y BRYERMERE.

Mr. Pedrick's changed testimony as to when the hull topsides delaminated is similarly flawed and lacks any justifiable scientific or technical basis for his changed opinion. As in the case of the fractured fuel tank brackets, he offers no new facts, no new analysis, calculations,

investigation or research. He simply takes facts he already knew when he testified to the contrary in the HMY trial and offers a new and contrary interpretation. Under Mr. Pedrick's new and revised opinions, rather than the delamination having occurred gradually over a long period of time and having been complete when Mr. O'Neill purchased the vessel as he testified in HMY, now the delamination was a sudden and catastrophic event that occurred months later off Ocean City, Maryland.

Mr. Pedrick's efforts to justify his new opinions are contradictory. When asked if he could testify with any degree of certainty as to whether there was delamination in the hull topsides at the time Mr. O'Neill purchased the vessel, Mr. Pedrick first attempted to opine that the hull topsides were sound at the time of purchase because the outside of the hull topsides had been sounded during the pre-purchase survey and there was no detectable delamination. However, when pressed on the issue, he reversed himself and admitted that sounding the outside of the hull would not have revealed whether the delamination between the inner skin of the hull topside core laminate and the core itself, the delaminated condition which he now opines suddenly occurred off Ocean City, was present at the time of the pre-purchase survey. (Deposition Testimony of David Pedrick, December 8, 2010, p. 191:6-p. 192:9, Ex. "F").

When further pressed for facts on which his new opinion as to when the delamination of the hull topsides "suddenly" occurred off Ocean City, Mr. Pedrick did not refer to any technical analysis or scientific principles. He opined that the hull delamination, as evidenced by observable flexing, was not present during the pre-purchase sea trial because "...there was no degree of movement that was going on there that drew attention." (Deposition Testimony of David Pedrick, December 8, 2010, p. 192:10 – p. 193:6, Ex. "F"). His opinion as to why the delamination "suddenly" occurred off Ocean City is then revealed to also be based on no one having "...noticed anything significant occurring in the passageway..." until the vessel was off Ocean City (Deposition Testimony of David Pedrick, December 8, 2010, p. 193:7-2194:13, Ex. "F") rather than any technical or scientific analysis. Accordingly, Mr. Pedrick's "expert opinion" as to when the delamination occurred is entirely premised on the assumption that the hull flexing symptomatic of "sudden" delamination had not occurred before it was actually noticed by someone.

However, in relying on this rather large assumption, Mr. Pedrick wholly ignores the scientific method of analysis which would require him to consider, evaluate and discard other

explanations as to why the hull flexing was first noticed off Ocean City. The fact that people can overlook and not notice the presence or absence of something for a significant period of time, even in familiar surroundings let alone on a strange vessel, is something that we all know from every day common human experience. Sometimes things are there or not there and we simply do not notice their presence or absence for some time. It is a concept with which we are all familiar and a phenomenon which Mr. Pedrick wholly ignores in assuming that if the hull flexing had been present it would have been notice immediately; hardly a scientific analysis.

Mr. Pedrick testified the stresses on the hull topsides that caused flexing and eventual delamination were a combination of vertical acceleration as the vessel moves through the water, interacting with the water, and the external hydrodynamic forces of the water on the hull panels themselves. (Deposition Testimony of David Pedrick, December 8, 2010, p. 131:13-25, Ex. "F"). However, in opining as to why the hull flexing was not noticed during the pre-purchase sea trial and first noticed off Ocean City he made no effort to analyze the hydrodynamic forces exerted on the hull topsides during the sea trial conducted in the sheltered waters of Lake Worth and compare them to the forces exerted on the hull topsides when the vessel was being operated in the open ocean for the first time since purchased by Mr. O'Neill. (Deposition Testimony of David Pedrick, December 8, 2010, p. 194:14-p. 195:3, Ex. "F").

In arriving at his new and revised opinions as to when the delamination "suddenly" occurred and why hull flexing had not been previously noticed by those aboard M/Y BRYEMERE, Mr. Pedrick made no effort to scientifically evaluate whether there had been any change in the speed of the vessel, the force and direction of the wind, the height and direction of the sea waves or the course steered by the vessel in relation to wind and waves, all of which would have affected the manner in which would have how the vessel interacted with the waves and the hydrodynamic forces which could have caused hull flexing.

After being so certain that the slow delamination process had occurred prior to April 2007 just five (5) months ago in the HMY Litigation, Mr. Pedrick repeatedly states he cannot be certain as to when the delamination began or how advanced it was when the vessel was purchased by Mr. O'Neill:

> Q:     Now, this delamination that you have described in the port and starboard side of the vessel and the hull topsides happened over a period of time; correct?
> MS MOORE: Object to form.

CASE NO.: 09-60551-CIV-ZLOCH

MR. DRURY: Object to the form of the question.

A:    I Think it was over some period of time, But I have no idea what length of time.

(Deposition Testimony of David Pedrick, December 8, 2010, p. 145:7-16, Ex. "F").

Q:    That's not my question. My question is, is it your testimony that the delamination of the hull topsides in the way of the master stateroom started to delaminate in the relatively few operating hours after Mr. O'Neill bought this vessel?

MS MOORE: Objection to the form.

A:    I don't know when it started.

(Deposition Testimony of David Pedrick, December 8, 2010, p. 147:17-24, Ex. "F").

Q:    (BY MR. ANDERSON) Can you tell me whether, in your opinion, the delamination in the hull topsides existed at the time Mr. O'Neill bought the vessel in April of 2007?

A:    **I can't say with any certainty.**

Q:    So if I understand you, you can't tell me with any certainty that it did not exist when Mr. O'Neill bought the vessel in April 2007?

A:    That would be fair.

Deposition Testimony of David Pedrick, December 8, 2010, p. 148:14-148:22, Ex. "F".

He again confirms his lack of certainty as to when the delamination occurred later in his deposition:

Q;    Is it accurate to say, therefore, that you can't state with any degree of certainty the extent to which the delamination had already taken place at the time Mr. O'Neill purchased the vessel?

MS MOORE: Object to the form.

MR. DRURY: Object to the form.

A:    It would be anybody's complete guess so anything I say would be a guess.

Deposition Testimony of David Pedrick, December 8, 2010, p. 197:20 to p.198:4, Ex. "F".

Thus, Mr. Pedrick's own testimony clearly establishes that his new and revised opinion as to the "sudden and catastrophic" delamination of the hull topsides off Ocean City is not based on new facts or new any scientific or technical analysis but on a flawed assumption as to whether it had been noticed previously. His testimony concerning his uncertainty as to when the delamination process actually began or how advanced it was at the time the vessel was purchased further confirms that his new opinion is little more than unscientific speculation.

In *Daubert* the U.S. Supreme Court instructs:

HOUCK ANDERSON, ATTORNEYS AT LAW

CASE NO.: 09-60551-CIV-ZLOCH

> The subject of an expert's testimony must be "scientific ... knowledge." The adjective "scientific" implies a grounding in the methods and procedures of science. Similarly,    the    word "knowledge" connotes *more than subjective belief or unsupported speculation*.

509 U.S. 590 (emphasis supplied).

In *McDowell v. Brown, supra,* 392 F.3d at 1298, the Eleventh Circuit expounded on the

Supreme Court's requirements, stating):

> *Daubert's* reliability prong sets out four guideposts that a district court may consider in assessing the reliability of the expert testimony, which include, but are not limited to: (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the technique has been subjected to peer review and publication; (3) the known and potential error rate of the methodology; and (4) whether the technique has been generally accepted in the proper scientific community. In addition, other factors that a court may consider in the *Daubert* analysis are "reliance on anecdotal evidence (as in case reports), temporal proximity, and improper extrapolation (as in animal studies)." Finally, *a court should meticulously focus on the expert's principles and methodology*, and not on the conclusions that they generate.

392 F.3d at 1298 (11th Cir. 2004)(internal citation omitted)(emphasis supplied).

With respect, it is beyond argument that Mr. Pedrick's "methodology" in this instance stands naked and embarrassed when viewed through any one of the guideposts established in this Circuit for assessing the reliability of expert opinion, let alone all four.   Mr. Pedrick's testimony presents a paradigm of precisely the undisciplined, idiomatic opinion "evidence" that the U.S. Supreme Court has stated must be banished from the courtroom by the trial judge, charged as gatekeeper.

Accordingly, Mr. Pedrick's testimony should be excluded on the basis that it is utterly lacking in scientific foundation.

WHEREFORE, the Plaintiff, AIG CENTENNIAL INSURANCE COMPANY, respectfully request this Honorable Court to enter an Order granting this, its Motion to Strike the Report and Testimony of David Pedrick and for such other and further relief as this Honorable Court deems just and appropriate under the circumstances.

## LOCAL RULE 7.1.A CERTIFICATION

I hereby certify that counsel for the movant has conferred with all parties or non-parties who may be affected by the relief sought in this motion in a good faith effort to resolve the issues but has been unable to do so.


Respectfully submitted,


_/s/ Charles S. Davant_
ANDREW W. ANDERSON
aanderson@houckanderson.com
Florida Bar No.: 213144
LAWRENCE JACOBSON
ljacobson@houckanderson.com
Florida Bar No.: 0846201
CHARLES S. DAVANT
cdavant@houckanderson.com
Florida Bar No.: 15178
HOUCK ANDERSON P.A.
Attorneys for Plaintiff
200 South Biscayne Blvd., Suite 300
Miami, Florida 33131
Telephone:  (305) 372-9044
Facsimile:   (305) 372-5044

CASE NO.: 09-60551-CIV-ZLOCH

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of December, 2010, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

_/s/ Charles S. Davant_
CHARLES S. DAVANT, ESQ.

## SERVICE LIST

**Attorneys for Bank of America, N.A.**

J. Randolph Liebler, Esquire
Christopher M. Drury, Esquire
Liebler, Gonzalez & Portuondo, P.A.
Courthouse Tower – 25th Floor
44 West Flagler Street
Miami, Florida  33130
Email:  jrl@lgplaw.com
         cmd@lpglaw.com
Telephone:  305-379-0400
Telefax:  305-379-9626

**Attorneys for J. Brian O'Neill & Carolina Acquisition**

Meghan C. Moore, Esquire
Jeffrey L. Greyber, Esquire
Ver Ploeg & Lumpkin, P.A.
100 SE 2nd Street, 30th Floor
Miami, Florida 33131
Email: mmoore@vpl-law.com
        jgreyber@vpl-law.com
Telephone:  (305) 577-3996
Telefax:  (305) 577-3550

HOUCK ANDERSON, ATTORNEYS AT LAW