UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 09-60551 CIV-ZLOCH
Magistrate Judge: Rosenbaum

AIG CENTENNIAL INSURANCE
COMPANY,

   *Plaintiff,*

vs.

J. BRIAN O'NEILL,
CAROLINA ACQUISITION, LLC, and
BANK OF AMERICA, N.A.,

   *Defendants.*
_____/

## O'NEILL AND CAROLINA ACQUISITION LLC'S RESPONSE IN OPPOSITION TO AIG'S MOTION TO STRIKE AND/OR LIMIT REPORT, REBUTTAL REPORT AND TESTIMONY OF DEFENSE EXPERT DAVID PEDRICK

Defendants, J. Brian O'Neill and Carolina Acquisition LLC ("O'Neill"), pursuant to S.

D. Fla. L.R. 7.1 submit the following response in opposition to the Motion of Plaintiff, AIG

Centennial Insurance Company ("AIG") to Strike and/or Limit Report, Rebuttal Report and

Testimony of Defense Expert David Pedrick:

### I.   INTRODUCTION

On December 23, 2010 this Court denied AIG's Motion to Amend its Answers and

Affirmative Defenses. [D.E. 139]. This Court rejected AIG's newfound affirmative defenses

including, (among others), that "O'Neill and Carolina are judicially estopped from denying that

the M/Y *Bryemere*'s loss is attributable to an inherent lack of structural integrity in the

construction of the vessel; and that O'Neill and Carolina are judicially estopped from denying

that M/Y *Bryemere*'s loss is attributable to unseaworthiness" as untimely pled.   [Id].

Dissatisfied, AIG re-asserts its judicial estoppel arguments through a motion to strike/and or limit testimony, as well as prematurely challenging and seeking to impeach the credibility (albeit with great futility) of AIG's former expert.  The grounds for relief asserted in AIG's motion bear a marked similarity to the grounds asserted in its previous motion to amend.  Consistent with its prior ruling, the Court should deny AIG's motion entirely. [D.E. 139].   Alternatively, even if the Court were to consider the subject matter of AIG's motion, this Court should find that AIG's motion is groundless.

## II.   ARGUMENT AND AUTHORITIES

### A. AIG Grossly Mischaracterizes David Pedrick's Expert Testimony in the HMY Case and in this Case. [1]

Judicial estoppel is an equitable doctrine invoked at the court's discretion.  *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001).   The doctrine is designed to prevent parties from making a mockery of justice by inconsistent pleadings.  *American Nat'l Bank of Jacksonville v. Federal Dep. Ins. Corp.* 710 F.2d 1528, 1536 (11th Cir. 1983) (internal citation omitted).  The factors that inform application of the doctrine include (1) "whether the present position is 'clearly inconsistent' with the earlier position; (2) whether the party succeeded in persuading a tribunal to accept the earlier position, so that the judicial acceptance of the inconsistent position in a later proceeding creates the perception that either court was misled; and (3) whether the party advancing the inconsistent position would derive an unfair advantage on the opposing party." *New Hampshire*, 532 U.S. at 750-751.

---

[1] AIG's argument that David Pedrick's deposition testimony in the present action conflicts with his prior testimony in the HMY case was also raised in its Motion for Summary Judgment against Bank of America [D.E. 112] and in its Motion to Strike or Dismiss for Fraud on the Court [D.E. 146].  Accordingly, as AIG's arguments overlap O'Neill incorporates by reference Defendants' Omnibus Response to AIG's Motion for Summary Judgment, and O'Neill's Response to AIG's Motion to Strike and/or Dismiss for Fraud on the Court.

97282_1

AIG cannot satisfy the first element.  AIG's cutting, pasting, and juxtaposing of various excerpts of Pedrick's expert testimony rendered in *Carolina Acquisition, LLC v. HMY Yacht Sales Inc. et al.* Case no. 07-61738-CIV-Zloch (the "HMY case") and during his December 8, 2010 expert witness deposition in this case, followed by significantly mischaracterized representations of this testimony in no way establishes inconsistency.  Rather, Pedrick's testimony, augmented by additional information as applied to disparate issues proves the opposite.

### i.    Pedrick's Testimony in the HMY Case And In the Present Action Are Consistent

AIG claims that Pedrick testified in the HMY case that *all* defects and damages found in *Bryemere* existed prior to April 2007 and in this case reversed his opinion, concluding that *all* damages and defects suddenly occurred on July 2, 2007 during the vessel's delivery voyage from Florida to Rhode Island. This is simply untrue.[2]  The sum and substance of Pedrick's testimony throughout the scope of his retention in both cases has been and continues to be that latent defects discovered on *Bryemere*, (particularly, hull thinness and length of outboard girders) existed since the vessel's construction. [*see generally*, D.E. 140-3, 114-8, 153-1, D.E. 114-7]; the thinness of *Bryemere*'s hull bottom provided inadequate support to the vessel's hull bottom [D.E. 140-3]; while the vessel was in operation, the insufficiently supported hull bottom gradually fatigued and weakened over a long period of time, David Pedrick HMY Case Trial Testimony, April 15, 2010 pp. 29-14-22; p. 36:2-21; [153-1 ¶¶6-12, ¶20]; cyclic and excessive hydrodynamic loading bearing upon unusual stress points in the hull bottom caused gradual fatigue and weakening of *Bryemere*'s inadequately supported hull bottom and topsides which,

---

[2] AIG both in questioning of witnesses and in its papers purposely confabulates defect with resulting damage.  The two are both legally and factually distinct as its own Policy confirms.

when coupled with the shortness of the girders, eventually caused cracks, delamination, rupture

of the fuel tank brackets, and sudden catastrophic failure of the hull during the vessel's delivery

voyage from Florida to Rhode Island [D.E. 153-1 ¶¶6-12];  (Pedrick Dep. 61:18-66:19, 198:5-16,

Dec. 8, 2010. )

  The consistency in Pedrick's testimony is clear in the very excerpts AIG quotes.  For

example, AIG cites the following testimony from the HMY case:

> Q. Do you have an opinion as to whether this condition that you have now
> described existed before April 2007 when Carolina Acquisition bought the
> boat?
>
> A. Yes.
>
> Q. And what is your opinion?
>
> A. Well, this something that happened over a period of time.  And this is repetitive
> type of phenomenon that brings this level of destruction.  So, this is something
> that had been going on for a period of time in the boat.
>
>         * * *
>
> Q. And the delamination, is this a problem?
>
> A. Yes.  The consequence of this is that what you have is a delaminated structure as
> I was describing yesterday.  It no longer works as an integral stiff unit, it works
> as a series of flexible individual plies that aren't getting support from one
> another.  And it basically just means it is weaker, it will break more easily.  And
> in this case, as wave action, both directly applied from the outside of the boat and
> also just the forces of this 50-ton boat has a lot of intertial forces within itself and
> works on that.  And once the peeling action starts, it's something that just keeps
> spreading and getting worse *and it can lead to a fracture or a rupture of the*
> *topsides*, and, again, exposes the boat to sinking and the consequences of that.

[David Pedrick HMY Case Trial Testimony, April 15, 2010 pp. 29-14-22; p. 36:2-21, D.E. 140

Ex. E]. [emphasis supplied]    Pedrick testified that the damages witnessed in *July* 2007 by the

delivery crew and by him in September, 2007 must have "happened over a period of time." [*Id.*]

He specifically describes the  delamination of the hull bottom as a "peeling action" that "just

keeps spreading and getting worse" over time caused by "wave action" and other "intertial forces" applied from the outside and within the vessel –a process he estimates began "taking place prior to April 2007." [Id.]  He presages his testimony here by stating "and it can lead to a fracture or rupture of the topsides," which is what happened after O'Neill purchased *Bryemere*. During his expert deposition in this case, Pedrick's testimony focused more specifically on the timing and structural point of *catastrophic failure* of the vessel's hull, stating:

> [Present action]
>
> Q. Just for clarity, I'm talking about the delamination in the way of the master stateroom port and starboard that we have been talking about.  That was not a sudden event was it?
>
> MS. MOORE: Object to the form.
> MR. DRURY:  Object to the form of the question
>
> A. It appears that the catastrophic failure was a sudden event.  There's no way of knowing the degree to which there may or may not have been voids beforehand.  All we know is that it was –there was nothing that was observably wrong with that skin through all the – through the [pre-purchase sea] trial, and that also when the crew took the boat –again, I think L.J. said that they were all over it looking at things.  This passageway was the place where they were frequently going in and out.  So there was nothing happening in that area that caught anybody's eye, including those who were looking for things.
>
> * * *
>
> Q. Can you tell me, is it your opinion as we sit here today, that the delamination in the hull topsides of this vessel started, began after Mr. O'Neill purchased the vessel?
>
> MR. DRURY:  Object to the form of the question.
> MS. MOORE:  Same objection.
> THE WITNESS:  I can't say when the smallest sign of it would have started.  What I can say is it went from an unobserverable level, whatever amount of delamination may or may not have been there, that it was not observable until there was catastrophic failure en route.
>
> * * *

CASE NO.: 09-60551 CIV-ZLOCH

Q. You used the term "catastrophic failure." What does that mean?
A. That means a rupture that causes substantial loss of structural integrity.

Q. So would it be accurate to say that the delamination had at that point advanced to the point where it became substantial and observable?

MR. DRURY: Object to the form of the question.

MS. MOORE: Object to the form

A: The delamination had reached a point where the inner skin had fractured away from the core [over] such a large area that the sandwich panel was no longer acting as a sandwich panel. It was acting as two independent skins. So that catastrophic failure occurred when the two skins no longer could function effectively together.

(Pedrick Dep. 147:3-16; 196:15 – 197:7). Pedrick simply opined that the hydrodynamic loading or "wave action" caused fatigue and gradual weakening of the vessel's hull bottom and topsides and eventually resulted in its catastrophic failure -- meaning observable structural failure of the hull bottom to the point where the inner skin had fractured away from the core over such a large area that the sandwich panel was no longer acting as a sandwich panel. *Id.*

When describing events causing the *Bryemere*'s fuel tank brackets to fracture, Pedrick's collective testimony reflects a similar process to that of the deterioration of the hull bottom— namely, gradual fatigue followed by catastrophic release or failure. For instance, in both cases, Pedrick confirms that the weakening of the fuel tank brackets occurred over a long period of time:

[HMY case testimony]

Q. Now, looking at the bracket, you can't tell when exactly that fracture, that long fracture that you described, and you drew a line down, you can't tell when that occurred, can you?

A. Precisely, no. *But over a period of – a long period of time*, this was something that would have taken many, many days and at least tens if not more than that of hours of running. This was a very long term thing.

6

* * *

[Present Action]

Q.   (BY MR. ANDERSON) Do you have any opinions as to whether the motion of those tanks and flexibility of the bottom was something that had been going on for some time?

A.   I think that the magnitude of whatever was going on, that I believe these retaining brackets were installed to cure, was something that evidently had been going on during the prior ownership.

Q.   (BY MR. ANDERSON)  The type of problems that you're talking about here that ultimately resulted in the damage to the girder and the fracture of the bracket, those conditions are something that takes a long time to develop? . . . .

THE WITNESS:  In the particular matter of this boat and these brackets, there's evidence that it was going on at least prior to the purchase by Mr. O'Neill.  And by what amount of time, I don't know

[Pedrick HMY Case Trial Testimony pp. 58:21 59:21, D.E 140 Ex. E]; (Pedrick Dep. 73:19 –

74:21) (emphasis added).  However, when estimating the point in time in which the catastrophic

failure of the fuel tank brackets occurred, Pedrick opined during his expert deposition:

Q.   As I understand your testimony, it's your opinion at this point that the failure of the forward brackets on either the port and starboard tanks occurred sometime after the vessel left Florida?

MR. DRURY:  Object to the form of the question.

MS. MOORE:  Join in the objection

A.   The catastrophic failure of those brackets, I think without question, occurred just a very short time before they were noticed aboard [in July 2007].

(Pedrick Dep., 12/18/10, 198:5-16.)  Again, there is no inconsistency in Pedrick's testimony

concerning the structural failure of the *Bryemere*'s fuel tank brackets.  The aluminum brackets

welded to the sides of the fuel tanks on the *Bryemere* were attached to the outboard longitudinal

girders. (Pedrick Dep. 68: 15-18). These short outboard girders, coupled with *Bryemere*'s thin

topsides, caused excessive cyclic hydrodynamic loads to be thrust on the fuel tanks, via the

outboard fuel tank brackets port and starboard. [D.E. 153-1 ¶9]. "Over a long period of time" the welds attaching the fuel tank brackets to the girders gradually weakened, and finally ruptured suddenly during *Bryemere*'s voyage to Rhode Island. [Pedrick HMY Case Trial Testimony pp. 58:21 59:21]; [D.E. 153-1 ¶10]. The effect of their rupture was an immediate loss of structural support in the *Byremere's* topsides with the force of hydrodynamic rotational deflections at the chine increasingly substantially, which in turn caused substantial flexing and cracking in the hull and significantly increased the rate of delamination. [D.E. 153-1 ¶¶11-12]. Pedrick's testimony in the HMY case and here contemplates a sequence of events explaining the process underlying the progressive deterioration of the vessel's hull structure to the point a failure occurred causing it to manifest. In no way does his prior testimony suggest that all delamination found in the hull or the complete fracture of the fuel tank brackets existed prior to April 2007; that incipient delamination and fracturing suddenly occurred in July 2007; or, that the defects causing the damage did not pre-exist the April, 2007 purchase.

      ii.     **AIG Mischaracterizes Pedrick's Testimony Concerning The Overall State of Deterioration of the *Bryemere*.**

AIG's interpretation of Pedrick's testimony concerning the overall state of deterioration of the *Bryemere* set forth in the HMY case and in the present action is also inaccurate. AIG cites the following testimony from the HMY case and expert witness deposition to show that Pedrick's views concerning the state of deterioration of the vessel are inconsistent:

      [HMY Case Testimony]

Q. *Assume that the boat had not been pulled out of the water [once it reached Rhode Island] and that the boat was actually being used going out 100 miles offshore.* Do you have an opinion as to what would have happened with the "Double Billed"?

A. Well, this boat was in a state of deterioration that was pretty well advanced. And the greatest risk that I see in it is the bottom panel, that is the watertight barrier

CASE NO.: 09-60551 CIV-ZLOCH

between there and the deep blue sea, is in the process of breaking. The cracks on the outside. There where was the breaking away of his partial longitudinal girder on the inside. There were things moving around the girder and the tanks were moving around. There was a lot of force and flexion going on in that area.

\* \* \*

[This Case]

Q.   Was BRYEMERE in a state of deterioration that was pretty well advanced at the time she was purchased by Mr. O'Neill?

MR. DRURY:  Object to the form of the question.  Asked and answered.

MS. MOORE:  Same

THE WITNESS:  It's been established by Mr. Price that was not the case.

Q. At the time BRYEMERE was purchased, did she pose a genuine risk of breaking in the bottom and flooding and sinking at the time she was purchased?

MR. DRURY:  Object to the form of the question

MS. MOORE:  Same objection

A. To the same way as I answered previously, there was no knowledge that there was a condition posing unseaworthiness, but that in her original construction, she did have these elements that were a disaster waiting to happen.

[Pedrick HMY Case Trial Testimony p. 38:19 – 39:6; D.E. 140 Ex. 3]; (Pedrick Dep. 206:1-20.)

Neither Pedrick's HMY case testimony nor his expert witness deposition testimony stand for the proposition AIG proposes.  Pedrick's testimony in the HMY case indicating that the state of deterioration of the *Bryemere* was "pretty well advanced" as of September, 2007 when he saw her in no way indicates that this state of deterioration existed since the time O'Neill purchased the vessel in April 2007.[3]  Pedrick's expert witness deposition testimony merely conveys his

---

[3]  To suggest otherwise is to infer that O'Neill voluntarily spent over two million dollars purchasing a vessel, while noticing substantial flexing in the hull bottom with water-bed like movement appearing in the starboard passageway: which none of the myriad people aboard *Bryemere* prior to April, 2007 saw either.

9

97282_1

acknowledgement that Tom Price and *Bryemere*'s crew found the vessel to be structurally sound, and therefore were unaware of the vessel's structural defects or state of deterioration until the catastrophic failure occurred.  Accordingly, Pedrick's testimony does not constitute a change of opinion, and AIG's judicial estoppel claim must be denied.

### B.   Pedrick's Anticipated Expert Testimony Meets *Daubert* Requirements

The admissibility of expert testimony is governed by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 (1993) and Rule 702 of the Federal Rules of Evidence. Federal Rule of Evidence 702 provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact
> to understand the evidence or to determine a fact in issue, a witness qualified as
> an expert by knowledge, skill, experience, training, or education may testify
> thereto in the form of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and methods reliably to
> the facts of the case.

Fed. R. Evid. 702.  In *Daubert,* the Supreme Court interpreted Rule 702 to require federal judges to perform a "gatekeeper" role to ensure "that any and all scientific testimony or evidence admitted is not only relevant but reliable." *Daubert,* 509 U.S. at 594-95.  In the Eleventh Circuit, the proponent of expert testimony must show that: (1) the expert is qualified to testify about the matters he intends to address; (2) the methodology used by the expert to reach his conclusions is sufficiently reliable; and (3) the expert's testimony will assist the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or determine a fact in issue. *See U.S. v. Frazier,* 387 F.3d 1244, 1260 (11th Cir. 2004).  AIG's motion does not challenge Pedrick's expertise or qualifications.   Instead, AIG claims Pedrick's expert opinions are based on insufficient data and lack scientific foundation.

### i.        Pedrick's Opinions are based upon Sufficient Facts and Data

AIG mischaracterizes Pedrick's opinion as to when the *Bryemere*'s fuel tank brackets fractured and the ample facts and data underlying his opinion.  The Eleventh Circuit states that proposed expert testimony must be supported by "appropriate validation- *i.e.,* 'good grounds,' based on what is known."  *United States v. Frazier,* 387 F.3d 1244, 1261 (11th Cir.2004).  In reviewing the sufficiency of the facts, the court's role is to determine whether sufficient facts exist to support the witness's conclusion, not whether one party's version of the facts should be credited.  The advisory committee notes state, "[t]he emphasis in the amendment on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." Fed. R. Evid. 702, (advisory committee notes, 2000 proposed amendment).  "As expert evidence, the testimony need only assist the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Allstate Insurance Co. v. Hugh Cole Builder, Inc.,* 137 F.Supp.2d 1283 (M.D. Ala. 2001) (quoting *City of Tuscaloosa v. Harcros Chems., Inc.,* 158 F.3d 548, 564-65 (11th Cir.1998)).

Contrary to AIG's allegations, Pedrick's opinion as to when the fuel tanks brackets finally failed is not solely based on his subjective impression of L.J. Gallagher's "emotional seriousness" or "emotional intensity" displayed when communicating his recollection of the vessel's structural failure on July 2, 2007.[4]  While Pedrick was asked in depth about this

---

[4] Pedrick has since corrected this accounting.

conversation, he was not asked[5] to name all sources he relied upon to form his expert opinion concerning what caused the fuel tank brackets to fail.  These sources, facts and data were all fairly disclosed in Pedrick's expert reports; they are voluminous and include recently-stipulated meteorological data supportive of a change in the stress loads encountered by *Bryemere* on her delivery voyage.[6]  Although Pedrick may have made a mistake recounting a single conversation, which he admits, that does not render all of his opinions inadmissible, especially where as here, "he has modified his opinion to take into account the actual facts. The original reliance on the incorrect facts goes to the weight of his testimony not the admissibility of the testimony itself." *Voth v. State Farm Fire and Cas. Ins. Co.*, 07-4393, 2009 WL 411459 (E.D. La. 2009).

Moreover, Pedrick's examination of *Bryemere*, including its fuel tank brackets, occurred first-hand after its interior parts were largely disassembled. The extensive and competent data Pedrick used to form his expert opinion as to when the fuel tank brackets fractured includes (but is not limited to) the following:  scantling drawings of the vessel; prior notes, calculations,

---

My recollection of how Mr. Gallagher described the discovery of problems near Ocean City Maryland to me appears to have been colored by the later priority on bottom flexing and tank bracket failure to which I was introduced by the various project parties in September 2007.  The impression on me at the time was reinforced by the actual high level of alarm among all of us aboard the vessel upon observing the extreme flexing of the hull bottom during the September 7 sea trial.  Only since reviewing the depositions of four of the delivery crew following this subject deposition, together with a subsequent conversation with L.J. Gallagher, do I know now that the high level of alarm that I observed about bottom flexing, rather than tank movement, as of 6-7 September 2007 was not present among the delivery crew at the time that they discovered the topsides delamination on July 2, 2007 near Ocean City, MD. Therefore my answers within these cited lines of my deposition are inaccurate and should be struck.

[5] Or, given the wording and context of the questions, the question was not apparent.

[6] The three-page listing of "Documentation used in Forming Expert Opinions" is attached hereto as Exhibit 1.

photographs; John Reeve and Tom Price's pre-purchase surveys; direct communications with *Bryemere* crew and Price; his personal review and analysis of numerous deposition transcripts of *Bryemere* crew's and other engineers who observed the vessel first hand including Matthew Smith and Eric Leslie of Hinckley Yacht Services in Rhode Island; AIG's expert witness reports and other reports completed by Bruce Pfund (July 25, 2007 Vessel Inspection Report), Matthew Smith (July 13, 2007 Report), and Kevin Calhoun (March 30, 2007 letter report, Double Billed Sea Trail Results) ; and a Compuweather report detailing wind speed, wind direction and sea states during *Bryemere*'s voyage to Rhode Island. See [D.E. 114-7 pp. 17-26; 140-3 pp. 4, 11-13, 19-24; D.E. 153-1 ¶ 13]. AIG did not inquire as to what facts within these sources were material to Pedrick's analysis and opinions; it chose instead to focus on a single conversation between Pedrick and Gallagher. This deficiency is AIG's and not grounds for excluding Pedrick's expert testimony.

### ii.     Pedrick's Opinions Have Scientific Foundation

*Daubert* delineated four non-exhaustive factors courts should consider in determining reliability under Fed. R. Evid. 702 including (1) whether the theory or technique can be tested; (2) whether it has been subjected to peer review; (3) whether the technique has a high known or potential rate of error; and (4) whether the theory has attained general acceptance within the scientific community. *Daubert*, 509 U.S. at 593-94. These factors are non-exhaustive, and the proponent of the expert testimony does not have the burden of proving that the proffered testimony is scientifically correct, but that by a preponderance of the evidence, it is reliable. *Allison v. McGhan Medical Corp.,* 184 F.3d 1300, 1312 (11th Cir. 1999).

> As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination. Only if the expert's

opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded.

*Bonner v. ISP Technologies, Inc.*, 259 F.3d 924, 929-930 (8th Cir. 2001)[7] (quoting *Hose v. Chicago Northwestern Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1996). Challenges to the weight and sufficiency of expert testimony are not properly raised under *Daubert. See Quiet Technology DC-8. Inc. v. Huerl-Dubois, UK Ltd,* 362 F.3d 1333, 1341 (11th Cir. 2003); *Walters v. Altec Industris, Inc.* 01-cv-371-J-12TEM, 2003 WL 25686829 *3 (M.D. Fla. 2003). As a result, the exclusion of expert testimony under *Daubert* should be the exception rather than the rule. *Lord v. Fairway Elec. Corp.,* 223 F.Supp.2d 1270, 1279 (M.D.Fla. 2002). Ultimately, the factors to be considered in assessing reliability will depend on the "particular circumstances of the particular case at issue." *Kumho Tire Co., Ltd. V. Carmichael,* 526 U.S. 137, 150 (1999).[8]

AIG does not challenge Pedrick's qualifications as a naval architect and marine engineer nor his ability to perform the engineering calculations and analysis necessary to opine on matters bearing on a vessel's structural integrity and damage caused when that structural integrity is compromised. Indeed, AIG initially hired him for his purpose. See Pedrick Yacht Design, Oct. 4, 2007 Report, p. 1 (Pedrick was hired "to inspect and evaluate the as-built and as-designed construction engineering of the 66' Sport-fishing boat "Bryemere" on behalf of the yacht's

---

[7] AIG's challenge to the scientific foundation of Pedrick's testimony nevertheless regurgitates its attack on the facts considered by Pedrick in reaching his conclusions, as opposed to his methodology. For instance, AIG repeats its misconception that the fulcrum of Pedrick's opinion was the emotional intensity of a single conversation he had with L.J. Gallagher. This attack (focused on one portion of Pedrick's testimony, now clarified by errata, to the exclusion of all others) ignores engineering altogether. It may be fodder for cross examination, but it is not grounds for challenging Pedrick's engineering foundation.

[8] Neither "Rule 702 of the Federal Rules of Evidence nor *Daubert* require specific actions to be taken to validate the investigation done by an expert witness." *Voth v. State Farm Fire and Cas. Inc.* Co. 2009 WL 411459 *5. Accordingly, AIG's criticism of Pedrick's testimony goes to the weight to be accorded to Pedrick's testimony, not its admissibility. Therefore its motion to limit or strike Pedrick's testimony under *Daubert* should be denied. *Quiet Technologies DC-8, Inc. v. Hurel-Dubois UK LTD,* 326 F.3d 1333, 1345 (11th Cir. 2003).

insurance company, AIG").[9] But when AIG learned of Pedrick's conclusion that the complete failure of the fuel tank brackets[10] and catastrophic delamination of the topsides occurred suddenly during the vessel's voyage from Florida to Rhode Island, AIG challenged these conclusions as lacking scientific foundation. AIG's assertions are baseless.

At trial, Pedrick will set forth the scientific principles and methods of study he employed to formulate his opinions. As a marine engineer and naval architect significantly credentialed in the arena of fiberglass motor yacht design and having had the opportunity to examine *Bryemere* first hand (unlike Messrs. Gimpel, Learned and McCrory – AIG's recently-hired team of overlapping experts), Pedrick will testify as to the materials used in the physical composition of the vessel; the theory and technique underlying his opinions concerning the behavior of stress concentrations and fatigue on those materials when subjected to hydrodynamic loading and vertical acceleration; and the deductive reasoning, drawn from years of experience and engineering practice, employed by him in determining how and when the catastrophic failure of the *Bryemere* occurred. This methodology was not the subject of AIG's inquiry at deposition, though it had reason to inquire.

During his December 2010 deposition in this case, Pedrick confirmed that he relied upon the engineering analysis and calculations performed by him while employed by AIG. Pedrick Dep., 12/8/10, p. 10:5-18. Pedrick also informed AIG of this at his first deposition in this case:

---

[9] The October 4, 2007 report is attached hereto as Exhibit 2.

[10] Pedrick formulated his opinions after observing and examining the fuel tank brackets post-loss first-hand; and by communicating with Price; reviewing pre-purchase survey findings of the vessel completed by other accomplished marine surveyors; observing photographs of the fuel tank brackets taken by Bruce Pfund, and analyzing deposition testimony of *Bryemere*'s captain, Dan O'Neill who has a decade of experience piloting yachts in *Bryemere's* class; Brian O'Neill a longtime boater; and, L.J. Gallagher, an experienced mate. He also notes that the mechanical engineer and engine expert reports completed by Timothy Caruso, and Kevin Calhoun after inspecting the vessel prior to its delivery voyage did not detect any rupture of the fuel tank brackets prior to the date of loss. (Pedrick Dep. 71:1 – 72:15).

> A.   What we observed were structural circumstances that on our observation
> looked like they would be inadequate and then subject – you know, following our
> subsequent calculations, indeed showed that they were inadequate.  And that's all
> based on hydrodynamic loading, ocean loading.

Pedrick Dep., June 8, 2010, p. 134:6-14.

Pedrick's October 4, 2007 Report, commissioned by AIG, provides an in-depth explanation of the engineering analysis and calculations performed by Pedrick in reaching his conclusion that the outboard longitudinals and core thickness were inadequate to withstand normal hydraulic loads and vertical accelerations in rough water.[11]  Pedrick evaluated the design engineering and as-built engineering deficiency through a series of engineering calculations based upon formulas derived from America Bureau of Shipping ("ABS") Guides and those of its Norwegian equivalent, Det Norske Veritas ("DNV").  These ABS and DNV Guides and equations are published and readily available to naval architects and marine engineers, such that the calculations performed by Pedrick may be tested.  Moreover, the Guides have been subjected to peer review, are accurate and reliable (lives depend on them), and are generally accepted within the community of naval architects and marine engineers.  *See* 46 C.F.R. § 70.35-1.  Accordingly, they satisfy *Daubert's* scientific foundation (reliability) requirement.

The engineering principles underlying these calculations are generally relied upon by engineering professionals in determining both causation and timing of structural failures.  And

---

[11] *See e.g.,* Ex. 2 at p. 6 ("DNV run is based on scale measurements and statistical analysis . . . For a yacht such as *Bryemere*, an "RO" designation would allow the vessel to be used as intended . . . DNV guide . . . gives design pressures based on several factors, and then calculates a required thickness based upon the maximum design load.  The first design pressure is due to slamming and is based on estimating the vertical accelerations that the yacht may experience . . . The second design pressure is due to slamming in the bow sections from pitching, or punching through waves.  A wave coefficient is assigned based on length and service rating . . . The third pressure is hydrostatic pressure and is based on the depth of the panel and wave coefficient . . .").

Pedrick applied these principles in reaching his opinions.[12]  For instance, as acknowledged by AIG, Pedrick testified that "the stressers on the hull topsides that caused flexing and eventual delamination were a combination of vertical acceleration as the vessel moves through the water, interacting with the water, and the external hydrodynamic forces of the water on the hull panels themselves," Motion p. 18.  AIG then briefly followed up.

> Q.     Okay.  So aside from the hydrodynamic forces, what other forces would have caused this delamination?
>
> A.     One of them is the vertical forces from accelerations.  The way to try to quantify what goes on with impact pressures in naval architecture is how many times the force of gravity, the forces on the boat causing it to basically decelerate.  So boats coming down on a wave, the wave is pushing up against it.  And if it's a gentle wave, then it will be a gentle motion, and the accelerations won't be very high.  If it's a very severe, large, steep wave, then it can be a very abrupt stopping of the boat as it tries to go into it and consequently higher acceleration.  So if that's happening in the bottom, the bottom panel goes out to the chine.  And then the chine area transmits that into vertical force of the topsides.  So you can get some significant loading in the lower part of the topsides that's actually coming from the hull bottom.

Pedrick Dep., 12/8/10, 129:13 – 130:7.  While it is precisely this type of engineering knowledge that qualifies Pedrick to ascertain the timing of structural failure, AIG discards his scientific testimony and, having failed to probe Pedrick's methodology, attacks the facts and data relied upon him in reaching his expert opinions.

For instance, AIG focuses again on Pedrick's comments concerning his mistaken belief that the crew was concerned with excessive movement of the fuel tanks while on the voyage to Rhode Island, a factor immaterial to Pedrick's determination of causation and the timing of tank bracket failure.  *See* Pedrick Errata Sheet, Ex. 3, 121:18-19.  Though later clarified in his

---

[12] In the affidavit being contemporaneously filed, Pedrick explains how he applied these principles as he continued to interpret and analyze the his original engineering analysis, the apparent load paths and modes of failure, and the more extensive information from others that has been furnished to him in this case.

97282_1

CASE NO.: 09-60551 CIV-ZLOCH

deposition[13] and errata sheet, AIG ignores this testimony in the hopes it can parlay this innocent and irrelevant error to its benefit. Further, AIG's suggestion that Pedrick's testimony should be stricken because he did not observe the hidden fuel tank brackets prior to their failure both disregards engineering principles and the purpose of expert testimony – here, to assist the trier of fact in determining when the catastrophic failure occurred from an engineering (not a lay observer's) standpoint. Pedrick reached his opinions within a reasonable degree of engineering certainty, and that is all that is required.

The same holds true for Pedrick's conclusion concerning the timing of delamination in the vessel's topsides. Notwithstanding considerable testimony by Pedrick that a substantial observable portion of the hull topsides "let go" from the core while on route to Rhode Island, AIG quotes on page 19 of its Motion a single excerpt to suggest that Pedrick could not tell when any delamination occurred. Pedrick's comment that he could not say with certainty that "the delamination" existed in April of 2007 was plainly referring to incipient delamination. AIG's own Motion acknowledges Pedrick's opinion that "the hull topsides had been sounded during the pre-purchase survey and there was no detectable delamination." Motion, p. 17. Pedrick considered this fact, as well as others (including undisputed evidence[14] that outside of Ocean City, Maryland, the topsides were panting like a dog run hard), when applying his engineering knowledge and experience. AIG's allegation that Pedrick's expert opinion as to when delamination occurred is based on a nonscientific assumption that hull flexing and sudden

_____

[13] At page 16 of its Motion, AIG quotes the portion of Pedrick's deposition in which he notes there was "no detectable or observable movement at the forward end of the port and starboard fuel tanks."

[14] AIG suggests that this factual underpinning is unreliable because "[s]ometimes things are there or not there and we simply do not notice their presence or absence for some time." [D.E. 140 at 17-18]. It is axiomatic that the forgoing rationale cannot possibly be sufficient to strike the reliable expert testimony rendered by Pedrick.

97282_1

delamination had not occurred before it was actually noticed by someone is groundless. Pedrick will testify at trial that his opinion is based on his engineering knowledge, examination of his prior calculations and analysis, and consideration of numerous facts, including that both marine professionals and experienced boaters made conscientious inspections of the vessel and saw nothing unusual for a substantial number of days (plainly the basis of a reasonably controlled experiment) prior to witnessing the hull's inner skin waving like a waterbed.

Last, AIG's contention that Pedrick "made no effort to scientifically evaluate whether there had been any change in speed, the force and direction of the wind, the height and direction of the sea waves, or the course steered by the vessel in relation to wind and waves" is simply false. Though not asked about the weather and sea conditions at his deposition, we need not guess concerning the materiality of these factors to Pedrick. He testified via affidavit dated January 10, 2011, that:

> The weather data from Compuweather, Inc. shows that there was a significant change in sea conditions between the first two days of the delivery voyage and the third and fourth days, from Charleston to Beaufort and then Beaufort to Ocean City.
>
> During these third and fourth days, the vessel experienced a significant change in the magnitude and frequency of wave-induced loading on the hull bottom.

D.E. 153-1, ¶ 13-14. This data supports Pedrick's conclusions.[15]

In summary, Pedrick's prior engineering calculations/analysis, supplemented by additional scientific data in the form of a Compuweather report, stipulated as accurate by AIG, along with the facts and data gleaned from the materials listed on Exhibit 1, provide a more than sufficient scientific foundation for Pedrick's expert opinions concerning the timing of catastrophic failure.

---

[15] See also Pedrick's January 24, 2011 affidavit which will be filed contemporaneously.

97282_1

## III.    CONCLUSION

The relevance of Pedrick's testimony and its benefit to the trier of fact is self-evident. The instant case involves a dispute concerning whether hidden structural deficiencies, detected and realized after a catastrophic event, are covered under the latent defect coverage provision of the Policy. Expert opinion as to the extent of the latent defects, whether they were observable, whether they caused damage, and the point in time that the damage was first observed are all relevant considerations for resolution in this breach of contract case.   Pedrick has both the necessary academic training as a naval architect and marine engineer and 40 years of practical experience, neither of which AIG disputes.   His testimony is here based upon reliable engineering principles and sufficient facts and data.  AIG's Motion must be denied

Respectfully submitted,

**VER PLOEG & LUMPKIN, P.A.**
100 S.E. Second Street, Thirtieth Floor
Miami, FL 33131-2158
(305) 577-3996
(305) 577-3558 *facsimile*

By:     /s/ Meghan C. Moore
**Meghan C. Moore**
Florida Bar No. 0668958
mmoore@vpl-law.com
**R. Hugh Lumpkin**
Florida Bar No. 308196
hlumpkin@vpl-law.com
*Counsel for J. Brian O'Neill and*
*Carolina Acquisition LLC*

97282_1

CASE NO.: 09-60551 CIV-ZLOCH

## CERTIFICATE OF SERVICE

I hereby certify that on January 24, 2011, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified on the below Service List *via* transmission of Notice of Electronic Filing generated by CM/ECF.

/s/ Meghan C. Moore
**Meghan C. Moore**

97282_1

## SERVICE LIST
## CASE NO: 09-60551-CIV-ZLOCH

Andrew W. Anderson, Esq.
aanderson@houckanderson.com
Lawrence Jacobson, Esq.
ljacobson@houckanderson.com
Charles S. Davant, Esq.
cdavant@houckanderson.com
**HOUCK ANDERSON, P.A.**
200 South Biscayne Blvd., Suite 300
Miami, FL 33131-2332
Phone: (305) 372-9044
Fax: (305) 372-5044
*Counsel for AIG Centennial*
*Insurance Company*


J. Randolph Liebler, Esq.
jrl@lgplaw.com
Christopher M. Drury, Esq.
cmd@lgplaw.com
**LIEBLER, GONZALEZ & PORTUONDO, P.A.**
Courthouse Tower – 25th Floor
44 West Flagler Street
Miami, FL 33130
Phone: (305) 379-0400
Fax: (305) 379-9626
*Counsel for Bank of America, N.A.*

97282_1