UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**IN ADMIRALTY**

CASE NO.: 09-60551- CIV - ZLOCH

AIG CENTENNIAL INSURANCE
COMPANY,

       Plaintiff,

vs.

J. BRIAN O'NEILL, CAROLINA ACQUISITION
LLC, and BANK OF AMERICA N.A.

       Defendants.                /

**<u>PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

      Plaintiff, AIG CENTENNIAL INSURANCE COMPANY (hereinafter "Centennial"), hereby files the following Proposed Findings of Fact and Conclusions of Law:

**ORDER**

WILLIAM J. ZLOCH, District Judge.

      THIS MATTER is before the Court upon Plaintiff's Complaint (DE 1) filed herein. A [  ] day bench trial was held commencing [    ] 2012. The Court has carefully reviewed the entire court file herein and is otherwise fully advised in the premises.

**I.**    *Findings of Fact*

      Pursuant to Federal Rule of Civil Procedure 52, after a full presentation of the evidence at trial by both sides, including the live testimony, physical evidence, and all reasonable inferences drawn therefrom, the Court finds the following facts by a preponderance of the evidence:

A.    <u>The Vessel, Pre-Purchase Survey, Purchase, and Mortgage</u>

      1. The Motor Yacht "*BRYEMERE*", formerly known as "*DOUBLE BILLED*" is a 66 foot, composite fiberglass hull motor yacht, with two Caterpillar C-12 engines, built by Inlet Boat Works Inc. and completed in 2005. She was designed as a "sport fish" vessel, intended to travel at high speed, up to 100 miles or more offshore, in pursuit of deep sea fishing.

CASE NO.: 09-60551-CIV-ZLOCH

2.     The design drawings, structural specifications, and structural plans for the construction of *M/Y BRYEMERE* were prepared by naval architect Donald L. Blount and Associates, Inc. of Chesapeake, Virginia ("Blount").

3.  In September of 2005 the hull that was to become *M/Y BRYEMERE* was acquired by Double Billed, LLC, in settlement of a lawsuit against Inlet Boat Works by investors, who alleged fraud and misappropriation by the builder of funds designated for construction of the vessel.  After completion of additional work its owner placed it for sale through Palm Beach, Florida, yacht broker HMY Yacht Sales Inc.

4.  On March 7, 2007, Defendant J. Brian O'Neill ("O'Neill") entered into a purchase and sale agreement with Double Billed, LLC to purchase *MY DOUBLE BILLED*, subject to O'Neill's right to conduct a survey and sea trial of the yacht prior to purchase, with the option to cancel the sale if the vessel was not in satisfactory condition.  The agreement stated the purchase price was $1,575,000 plus the trade-in of one 1998 built 53 foot Ocean yacht.  Although no value was stated for the 53 foot Ocean yacht, the closing statement specified a value of $700,000, yielding a total price of $2,275,000.

5.  Pursuant to his option O'Neill retained Thomas Price of Price Marine Services Inc., ("Price") to survey the vessel.  Price conducted a pre-purchase survey of the yacht on March 22, 2007 and issued a pre-purchase survey report ("first Price report") bearing that date.  Price forwarded this survey to L.J. Gallagher ("Gallagher"), O'Neill's project manager for the vessel's purchase, on March 23, 2007.

6.  Price's first pre-purchase survey stated a market value for *MY DOUBLE BILLED* of "approx. $1,875,000 as equipped".  Price's report listed 30 items under the heading "recommended repairs: (primary recommendations)".  Item No. 2 read: "The top brackets of the forward fuel tanks beneath the master stateroom sole are not welded to the tops and are chaffing into the tanks – weld top brackets to tanks."   Item No. 10 read: "The aft fuel tank is chafing on the underside of the cockpit sole - separate tank and deck."

7.     Peter Gimpel testified that this tank movement was indicative of structural problems with the vessel. Gimpel also testified the open and obvious loose brackets were also an indication and manifestation of structural issues.

CASE NO.:  09-60551-CIV-ZLOCH

8.     Several days after he issued his first report Price received a request from Gallagher to increase the yacht's market value.  Price sent a second report ("second Price report") to Gallagher on April 3, 2007, identical in every respect to the first, except the market value for the vessel now read "approx. $2,350,000 as equipped".

9.    On or about April 11, 2007, O'Neill incorporated Carolina Acquisition LLC ("Carolina") in Rhode Island, as a limited liability company, to act as the registered title owner for the vessel after purchase.  O'Neill is the sole member and shareholder of Carolina.

10.   Following the pre-purchase survey O'Neill sought a reduction in the in the agreed price from the seller, as compensation for the recommended repairs.  O'Neill initially sought $200,000, and ultimately agreed to $150,000.  On April 19, 2007, O'Neill executed a "Conditional Acceptance of Vessel", which stated in part that: "Said acceptance of Vessel is contingent upon a survey adjustment of $150,000".  The agreement lowered the vessel purchase price by that amount.

11.   The parties also executed the closing statement for the sale on that date, with the purchaser of *MY BRYEMERE* now identified as Carolina Acquisition LLC, with O'Neill as its "managing member."  The closing statement reflected a contract sale price of $1,575,000, plus the trade in of a 1998, 53' Ocean yacht, valued at $700,000, less a survey adjustment of $150,000, for an adjusted sale price of $2,125,000.   O'Neill used the first Price report, with the lower market valuation, when negotiating a reduction in the purchase price with Double Billed, LLC.

12.   During the first week in April, 2007, Carolina applied for a purchase mortgage with Defendant Bank of America N.A. ("Bank").  Carolina utilized the services of a mortgage broker, Beacon Marine Credit ("Beacon") in making the application. The Beacon credit application lists the vessel's purchase price as $2,275,000 with a $445,000 cash down payment, yielding a finance request of $1,830,000.  The loan request was approved by the Bank by April 11, 2007.

13.   Shortly thereafter Carolina, through Beacon, asked the Bank to increase the loan amount to include $278,329.69 for items recommended "by the surveyor".  In support of its loan application Carolina submitted the second Price report, stating a market value for the vessel of $2,350,000.  Carolina did not provide the Bank with a copy of the original Price survey, with market value of $1,875,000.  The Bank subsequently agreed to the increased loan request.

CASE NO.:  09-60551-CIV-ZLOCH

14.  On April 18, 2007 the Bank issued a first preferred ship's mortgage in the amount of $1,976,000 to Carolina, as "100% sole owner" of *MY BRYEMERE*.  On the same day O'NEILL signed the Bank's mortgage contract as Carolina's "guarantor".

B.      The Insurance Application

15.  On April 13, 2007, O'Neill, through his insurance broker Willis of Pennsylvania, Inc. ("Willis") located in Radnor, Pennsylvania, approached AIG Private Client Group ("PCG"), seeking a quotation for insurance for the vessel.  At all times material, Willis acted as the agent of O'Neill, not Centennial.

16.      O'Neill, through Willis, submitted only the second Price report with the quotation request.    PCG acted as underwriter for several different insurance companies, at the time including Plaintiff AIG Centennial Insurance Company of Fort Washington, Pennsylvania ("Centennial"). PCG responded to the request by asking that O'Neill complete its application for insurance form to obtain a quotation.

17.  The application that PCG sent to O'Neill, through Willis, consisted of two forms, one titled "Luxury Yacht Insurance Application Form" and the second simply "Watercraft Application Form".  O'Neill completed both forms and returned the application to Centennial on April 17, 2007.

18.    In the space on the application asking for "owner/beneficial owner" O'Neill identified himself, "J. Brian O'Neill", with an address in Villanova, Pennsylvania, and in the space designated for a corporate owner, listed himself again. He also listed the corporate address in care of O'Neill Properties Group in King of Prussia, Pennsylvania.  Carolina, the titled vessel owner, was not identified by O'Neill on the application or in any of the accompanying correspondence exchanged among O'Neil, Willis and/or PCG.

19.      Centennial had no knowledge of the existence of Carolina at the time it bound the risk on BRYEMERE because Willis of Pennsylvania was not its agent nor did Willis of Pennsylvania ever communicate Carolina's existence to PCG at the time of or before the Application.

HOUCK ANDERSON, ATTORNEYS AT LAW

20.     The Policy provides Property Coverage to "**you** against all risks of physical loss or damage to **your yacht**".  The Policy also provides the words "you, your, and yours refer to the person or any legal entity named on the Declarations Page as the **Named Insured** who are the owners of the yacht."

21.     Sean Blue testified PCG wants to know the actual titled owner's identity to verify prior vessel ownership, loss history, and insurability, which are all material to the decision as to whether to underwrite the risk, the terms and conditions under which a policy might be issued, and the calculation of premium.

22.     In section 2 of the Luxury Yacht Insurance Application Form, Owners Experience and Loss History, the insurer asked:   "Has the owner or captains ever suffered any losses?" O'Neill responded by stating "Yes, 12/11/03, loss due to fire at Crosby Yacht, Osterville, MA (vessel was in storage for offseason)".   In his last deposition in this case taken on September 28, 2010, O'Neill testified that prior to April of 2007 he had incurred three additional losses to vessels in which he had an ownership interest. The three prior, undisclosed losses included damage to Mr. O'Neill's 53' Ocean when he grounded it on a sand bar causing damage to the shafts and propellers; a loss to his 103' sailing vessel WHITEHAWK when it suffered a machinery failure; and, damage to the railing, woodwork and seats of a 1969 Boston Whaler when it became caught under the dock at Hyannisport, Massachusetts.

23.     Sean Blue and Susan Bonner testified at trial that the full disclosure to underwriters of prior losses was material because loss history affects both the decision to insure, premium calculation, and may affect the deductible as well as other terms and conditions in the policy.   Such conditions include potentially requiring a named operator's warranty; a captain's warranty and/or impose navigational restrictions. Underwriters may also use that information to conduct a financial and occasionally a criminal review of the applicant.

24.     In the box on the Watercraft Application Form requesting the "vessel purchase price" O'Neill stated "$2,350,000".  In fact, O'Neill paid $2,125,000 in a combination of cash and trade in value for the vessel.

25.     Susan Bonner testified at trial that full disclosure of purchase price was material to underwriters because price is critical element in deciding whether to accept a risk; if accepted, the hull value limit; the terms and conditions of coverage, as well as the premium and/or deductible

CASE NO.:  09-60551-CIV-ZLOCH

to charge.  Bonner testified the purchase price generally is used as the agreed value hull limit and therefore is critical to determining the extent of PCG'S financial exposure and the amount it will charge to accept that risk.

26.  PCG responded to O'Neill's application with a quotation for insurance the same day. During the communication of information relating to the Policy between Willis, O'Neill's agent, and Centennial, at least three (3) binders, with different named insureds were issued. To wit: (1) the binder issued at 5:11 p.m. from Sharon King to Desiree Foulds with the cover sheet stating "See revised Binder with the LLC name. Sorry for the error."; (2) an unknown binder presumably bearing the named insured "J. Brian O'Neill" which would have logically preceded the 5:11 p.m. binder given the statement by King "revised Binder with the LLC name". This is confirmed by review of King's customer activity listing which reflects the initial binder was sent to Desiree Foulds at 5:07 p.m.; and finally, (3) a third revised binder sent at 5:41 p.m comprised of a Willis coversheet stating "Attached is corrected binder.  I have faxed copy to Peta-Ann Blair.", which includes special conditions and the proper hull number (not previously included) as requested by Peta-Ann Blair in an e-mail to Sharon King.

27.  Thereafter, Centennial Policy No. PY 758 66 66 was issued to J. Brian O'Neill, with an effective date of April 19, 2007.  The Policy Declarations Page states the name of insured as "J. Brian O'Neill".  The Policy Period is stated as "4/19/2007 – 4/19/2008 at 12:01 a.m. Eastern Standard Time".  The limit of property coverage for the yacht's hull was specified as "$2,350,000" exclusive of deductible.  The deductible under the Policy was $47,000.00.

28.  The Bank was identified as a loss payee under the Policy.  A mortgagee's interest clause stated the extent of the Bank's financial interest was $1,976,000 and read as follows:

> It is understood and agreed that in the interest of the Mortgagee(s) $1,976,000, shall not be impaired or invalidated by any act or omission, or neglect of the mortgagor, owner, master, agent or crew of the vessel(s) insured by this policy, or by failure to comply with any warranty or condition over what (*sic*) the Mortgagee has no control.

> All other terms, conditions and valuations remain unchanged.

**C.**   The Voyage and Discovery of the Vessel's Construction Defects

29.  On June 29, 2007 *M/Y BRYEMERE*, refurbished and making her first significant voyage under her new ownership, departed Palm Beach, Florida, headed for Newport, Rhode

Island, with two crew and three passengers onboard. On the first day out with benign weather conditions, the passengers and crew noticed considerable movement in the forward fuel tanks. When traveling between Beaufort, North Carolina and Ocean City, Maryland, on July 2, 2007, the crew and passengers noticed considerable flexing in the vessel's fiberglass hull. The crew inspected the hull at Ocean City and observed excessive flexation in the vessel walls. The passengers and crew proceeded with caution, monitoring these conditions for the duration of the voyage.

30.    The yacht arrived at Rhode Island on July 4, 2007 and proceeded to the Hinckley boat yard in Portsmouth. Several days later *M/Y BRYEMERE* began a series of inspections and tests by, among others, naval architect Matthew Smith; surveyor and infrared thermographer, Mark Ashton; fiberglass expert Bruce Pfund; naval architect and marine engineer, David Jones; naval architect, David Pedrick and surveyor, Anthony Knowles. Each of these experts issued written reports and most, if not all, were deposed and/or testified at trial. Their reports and testimony collectively establish the following facts regarding the vessel's physical condition and construction:

a.     The Blount construction plans for *MY BREYMERE* specified a fiberglass laminate core with a thickness of 1 and $3/8^{th}$ inch for the hull topsides; the yacht was manufactured with an approximately 5/8ths inch fiberglass core in the hull topsides.

b.     The Blount construction plans specified that the vessel's inboard longitudinal girder or "stringer" beneath the master stateroom was to extend to station 29 at a height of eight (8) inches and the outboard longitudinal stringer beneath the master stateroom was to extend to station 20; the yacht was manufactured with both longitudinal stringers approximately ten (10) feet shorter in length and with the inboard longitudinal stringer ending 3 inches shorter in height than as designed.

c.     As manufactured, the strength of the starboard outboard longitudinal stringer beneath the master stateroom onboard *MY BREYMERE* was compromised by several "cut-outs".

d.     As manufactured, *MY BREYMERE'S* starboard topside framing did not extend to the height specified in the Blount architectural plans.

e.     As manufactured, *MY BREYMERE* was missing several forward transverse bulkheads specified in the Blount building plans.

f.      As manufactured, *MY BREYMERE* was missing transverse flooring or webbing at stations 19 and 23.5, as specified in the Blount architectural plans.

g.      As manufactured, *MY BREYMERE* was missing 4" wide by 2" trapezoidal shaped foam pads or "fillets" between the bulkheads and hull, as specified in the Blount building plans.

h.      The fiberglass structure of the port and starboard hull topside core laminates of *MY BREYMERE* was delaminated.

i.      Structurally, *MY BREYMERE* was not built as designed and specified by naval architect Donald Blount.

j.      These conditions reflect manufacturing defects in the construction of *MY BRYEMERE.*

k.      These structural defects of *MY BRYEMERE* existed before O'Neill purchased the vessel.

31.   The unanimous opinion of the naval experts who examined the vessel, as stated in their contemporaneous reports and subsequent testimony, was that *M/Y BRYEMERE* was structurally unsafe for her intended use as constructed because she was not built according to her design specifications.

32.   The structural deficiencies and the damage found upon the inspection and testing of *MY BRYEMERE* in Rhode Island in 2007 was wholly caused, directly or indirectly, by the failure of Inlet Boat Works to follow the Blount design specifications when building the vessel.

E.      The Policy Terms and Conditions

33.   Centennial's Policy No. PY 758 66 66, provides insurance coverage for *M/Y BRYEMERE* subject to the following relevant terms and conditions:

**PART I – THE YACHT INSURANCE CONTRACT**

> We have relied on the information given to us by you or on your behalf (including the information in any submission and any documents and survey reports) in deciding to agree to this insurance contract. All information provided to us by you or on your behalf must be complete and accurate. This insurance contract is void if any information provided to us is incomplete, inaccurate or if any material information has been withheld.

**PART III – PROPERTY COVERAGE**

8

## A.  Insuring Agreement

This **policy** covers you against all risk of **physical loss or damage** to your **yacht** and its **contents, fine arts** and **personal effects** while on board your **yacht**. This coverage is subject to the **Navigational Limits**, and all **policy** terms, conditions and exclusions.

## C. Payment of a Loss

For a covered loss, we will pay as follows:

### • Partial Damage to the Yacht

…We will not pay for any improvement or betterment to the yacht.

## F. Loss Payee

If a loss payee is named in this **policy**, any claim payable will be paid to the loss payee and you, as interests appear. If more than one loss payee is named, the order of payment will be the same as the order of precedence of the loss payees.

## E.  Property Exclusions

These exclusions apply to Part III – Property Coverage. There shall be no insurance under Part III – Property Coverage for any loss, damage, claim or expense resulting directly or indirectly, in whole or in part from:

### • Latent Defect

We do not cover any loss, damage, claim or expense for the repair or replacement of any **latent defect** in the **yacht**, however, any **physical loss or damage** to the **yacht** resulting or caused by the **latent defect** will be covered.

### • Manufacturing and Design Defects

We do not cover any loss, damage, claim or expense caused directly or indirectly, in whole or in part by any defect in design or manufacture of the **yacht** or any additional replacement part, component or system of the **yacht**.

## PART VI- GENERAL EXCLUSIONS AND CONDITIONS

HOUCK ANDERSON, ATTORNEYS AT LAW

CASE NO.:  09-60551-CIV-ZLOCH

**B.  General Conditions**

We will not be liable to pay any claim under this insurance unless you and any **insured person** comply with all the requirements in the following conditions.

**• Misrepresentation and Fraud**

This contract of insurance is void if any information provided to us is incomplete or inaccurate or if any material information has been withheld either at the time of applying for this

The policy defines the following pertinent terms:

**PART II – DEFINITIONS**

In this **policy**, the words "you", "your", and "yours" refer to the person or any legal entity named on the Declarations Page as the Named insured who are the owners of the yacht.

**Insured Person:** means:
**a.** You or a **family member;**
**b.** An additional insured named in the **policy…**

**Latent Defect:** means a hidden flaw in the material of construction existing at the time of original building of the **yacht** or any additional or replacement parts, components or systems of the **yacht** which is not discoverable by ordinary observation or known methods of testing.

**Physical Loss or Damage:** means the actual physical harm to or destruction of tangible property insured under this policy.

**Policy Period:** means the period commencing on the effective date shown on the Declarations Page.  This period ends on the earlier of the expiration date or the effective date of cancellation of this **policy**.  All **physical loss or damage, property damage, bodily injury** and all **occurrences** giving rise to any claim under this **policy** must occur during the **policy period**.  If anyone becomes an **insured person** under this **policy** after the effective date, the **policy period** begins as of the date such person becomes an **insured person** and ends on the earlier of the expiration date or the effective date of cancellation of this **policy**.

10

D.     The Lawsuit Against the Seller and HMY

34.   On October 29, 2007, Carolina filed suit in Florida state court in Broward County against the seller, Double Billed LLC and one of its principals, Richard C. Talbert, Jr.; the yacht broker, HMY Yacht Sales, Inc. and the individual broker, Jim Barboni; and Price Marine Services Inc. and Tom Price, personally.  The case was removed to the United States District Court for the Southern District of Florida in November of 2007 and tried to a jury in this Court, *Carolina Acquisition, LLC vs. Double Billed, LLC, et al.,* Case No. 07-61738-CIV-ZLOCH.

35.   In its Complaint Carolina stated that the "total purchase price" of the vessel was $2,275,000.

36.   Plaintiff Carolina alleged a combined five counts of fraudulent inducement; unfair sales and deceptive trade practices under Florida Statutes 501.201 through 501.213 and negligent misrepresentation against the sellers and the brokers.  In its Complaint Carolina took the position that *MY BRYEMERE* was unsafe, unseaworthy and structurally unsound at the time the vessel was purchased.  Each and every count against the sellers and the brokers alleged, in so many words, that the yacht that as sold to Carolina was unsafe and dangerous because of a lack of structural integrity.   During the course of the litigation Carolina proffered testimony and reports from numerous marine experts, including naval architect Mr. David Pedrick, in support of its allegation that the yacht was unseaworthy at the time Carolina purchased it from the seller.

37.    In particular, Pedrick testified that the fracturing of the yacht's forward fuel tank brackets; the delamination of the fiberglass topsides of the hull and the general deterioration of the yacht occurred over a long period of time, not just in the relatively few running hours that happened after April 2007. Pedrick further testified that the state of structural deterioration cause by these defects was pretty well advanced at the time of Carolina's purchase, and that in his opinion the vessel was not seaworthy prior to April 2007.

38.    At trial Carolina argued that the structural defects  and deteriorated condition of *BRYEMERE* at the time of sale to O'Neill was such that HMY and Jim Barboni knew or should have known of the structural defects; that such defects would have been detected by a reasonably thorough inspection of the vessel; that they failed to conduct such an inspection and negligent represented to O'Neill that the vessel was in sound structural condition and reasonably fit for the use intended for the vessel.

HOUCK ANDERSON, ATTORNEYS AT LAW

39.     On April 28, 2010, the jury found that Defendants HMY and Jim Barboni negligently misrepresented the yachts structural condition and awarded Carolina $2,000,000. Carolina settled or dismissed the remaining Defendants prior to the jury's verdict.

E.     The Declaratory Action

40.     Following the notice of claim from O'Neill, Centennial filed suit asking this Court to declare that there is no coverage for the loss complained of under the terms and conditions of the insurance Policy.  In addition to O'Neill, Centennial sued Carolina Acquisition, LLC, as owner of the vessel, and Bank of America N.A. as the Policy's agreed loss payee.

41.     Specifically, Centennial asserts that neither O'Neill nor Carolina can recover under the Policy because O'Neill's statements on the application for insurance regarding the yacht's actual owner; the purchase price of the vessel and O'Neill's marine loss history, were all false and material to the risk, thereby voiding the Policy *ab initio.*  Further, Centennial alleges Carolina cannot recover because it is not a named insured under the Policy.

42.     O'Neill and Carolina deny Centennial's assertion and argue that Plaintiff's objections are outside the scope of the issues raised by the pleadings. Moreover, Defendants maintain that none of the responses on the application were false or material to Centennial's decision to accept the risk.

43.     Regarding the owner's identity, Defendants allege that the insurer knew or should have known that Carolina was the vessel owner and intended insured, and point to an insurance binder issued by Willis showing Carolina as the named insured. Defendants also assert that the omission of Carolina's name on the Policy is irrelevant, given that O'Neill is the sole shareholder and Centennial would have issued the Policy to Carolina.

44.     Concerning the sales price, O'Neill states that $2,350,000 "purchase price" figure submitted to the insurer includes the approximately $250,000 he intended to spend on repairing and upgrading the vessel in compliance with Price's recommendations and therefore the amount he ultimately paid; secondly, any difference in the two figures is inconsequential, relative to the yacht's value.

45.     With respect to the unreported prior losses Defendants maintain that this information was readily available to Centennial, as a subsidiary of AIG; further, that the

HOUCK ANDERSON, ATTORNEYS AT LAW

application is ambiguous, in that it does not specify a request for all losses.  Finally, Defendants state that Centennial would have insured the vessel if the three additional losses had been identified on the form.

46.    Centennial also argues that even if the Policy were in effect, the claimed loss is excluded under the exception to cover for loss caused "by any defect in design or manufacture of the yacht".   The insurer asserts that the structural defects and resulting damages discovered in the vessel in Rhode Island stem from defects in its manufacture in 2005.

47.    O'Neill claims that regardless of whether there are manufacturing defects, certain of the defects were latent and consequential damages from the latent defects are covered under the Policy.  That the defects were latent according to Defendants is established by the fact that they allegedly remained undetected until the yacht was subjected to "destructive" testing and inspection at Hinckley's yard beginning in July of 2007.  In particular, Defendants argue that a forward hatch, allowing clear visibility of the foreshortened girders and other deficiencies, was covered over by carpeting glued to the deck, which had to be ripped up to open the hatch. Carolina and O'Neill contend that their damages, as calculated, represent the cost of repairing only physical loss or damage to the yacht "resulting or caused by the latent defect".

48.    Centennial denies that the defects were latent, underlining the language in the Policy defining latent as a defect "which is not discoverable by ordinary observation or known methods of testing".  The insurer argues that the vessel's structural defects were discoverable by a number of recognized inspection methods or tests, including the use of mirrors, moisture meters and digital camera.  Plaintiff also notes that surveyor Price had not only noted the fuel tank movement during the sea trial which was symptomatic of bracket failure but also highlighted the problem with the movement of forward fuel tank brackets in his report, which should have led to a more in-depth inspection of the tanks and the inevitable discovery of the structural deficiencies in the forward part of the vessel.

49.    Additionally, Centennial argues that without regard to whether the defects were or were not latent and the resulting consequential damage might have been covered under the Policy, none of the defects (latent or otherwise) or the ensuing physical loss occurred during the Policy Period, that is, after April 19, 2007, and consequently there is no coverage for O'Neill, Carolina, and/or Bank of America.   This chronology of loss is also cited in support of

Centennial's argument that *MY BREYMERE* was unseaworthy at the inception of the risk, and this fact therefore voids the insurance contract under the general maritime law.

50.      Defendants state that the "Policy Period" argument cannot fairly be drawn from the Plaintiff's operative pleadings and thus should not be considered by the Court.  However, the occurrence of a loss while a Policy in effect is fundamental to coverage and is a necessary implication of any coverage determination. Furthermore, Defendants claim that the argument is factually incorrect, and point to the testimony of their expert, naval architect Mr. David Pedrick, who testified that the delamination in the vessel's fiberglass topsides resulted from a catastrophic event onboard during the voyage to Rhode Island in 2007, while under Carolina's ownership. Specifically, in Mr. Pedrick's opinion, while the vessel was en route from Beaufort, North Carolina, the tabbing for the shortened longitudinal girders failed, resulting in additional bottom flexion that ultimately fractured the forward fuel tank brackets, triggering the delamination in the topsides as the yacht neared Ocean City, Maryland.

51.      Centennial points out that this opinion completely contradicts Mr. Pedrick's prior testimony, in this courtroom, in Carolina's lawsuit against the seller, that the defects and damage to *MY BREYMERE* existed prior to Carolina's purchase of the vessel.  In addition, Centennial's expert in naval architecture, Peter Gimpel testified that the observations of O'Neill's surveyor Price during the sea trial and his inspection of the vessel with regard to the movement of the fuel tanks were consistent with his findings that the fuel tank brackets and longitudinal girders had already failed when the pre-purchase seat trial took place in March 2007.

52.      Defendant Bank of America joins in all of the arguments in favor of coverage under the Policy raised by O'Neill and Carolina.  Additionally, the Bank claims that none of Centennial's arguments and/or defenses to cover apply to it, as under the mortgagee's interest clause the Bank is the beneficiary of a separate and distinct contract of insurance and it is completely immune from the consequences of O'Neill's and/or Carolina's "act or omission, or neglect" with respect to Centennial.  The Bank states that it is entitled to insurance no matter the case, as the wording of the mortgagee's interest clause does not directly preclude recovery by the Bank despite the terms and conditions of the Policy.

53.      Centennial argues in rebuttal that under the general maritime law the insured vessel must be seaworthy at the commencement of the Policy and, if not, the insurance contract

never comes into force.  To put matters another way, the insurer argues that the Bank has no greater right to insure an unseaworthy vessel than does the owner. Similarly, the damage must occur within the Policy period. Centennial also argues however, there was not valid contract of insurance formed in favor of the back as there was no meeting of the minds or privity of contract with regard to Centennial and Bank of America's understanding of the Policy and accompanying mortgagee's interest clause. Specifically, Centennial points out that the intended mortgagor under their Policy was O'Neill while the Bank's mortgagor was Carolina.

47.    The parties raise a number of additional facts in support of arguments not necessary to be summarized here, given the Court's Conclusions of Law below.


## II.    *Conclusions of Law*

The Court has jurisdiction over the Parties hereto and the subject matter herein pursuant to its admiralty and maritime jurisdiction granted by 28 U.S.C. § 1333.

The Policy of insurance at issue in this action is a maritime contract and accordingly its interpretation is governed by the general maritime law of the United States.  To the extent that there is no controlling federal maritime law precedent, the law of the State of Pennsylvania applies [Order DE-150].

### A.   The Application for Insurance and the Doctrine of *Uberrimae Fidei*

It is well-settled law in the Eleventh Circuit that the doctrine of *uberimmae fidei* applies to a marine insurance contract.  *HIH Marine Servs. v. Fraser,* 211 F.3d 1359 (11th Cir. 2000).  As also observed by the Third Circuit in *AGF Marine Aviation & Transport v. Cassin,* 544 F.3d 255 (3d Cir. 2008) every circuit except the Fifth has held this doctrine is well-entrenched federal precedent; 544 F.3d at 263.  Thus, the doctrine of *uberrimae fidei* is "controlling federal authority".  Thus, *uberimae fidei* applies to this marine insurance contract.

As noted by the Eleventh Circuit, the obligation imposed on the prospective insured under the doctrine of *uberrimae fidei* requires him to "fully and voluntarily disclose to the insurer all facts material to the calculation of the insurance risk." A material misrepresentation on an application for marine insurance is ground for voiding the policy "even if the

misrepresentation is a result of mistake, accident, or forgetfulness." *HIH Marine Servs. supra,* 211 F.3d at 1362 -1363 (internal citation and quotation marks omitted).

Accordingly, the Court will look to the general maritime law as found by the Third Circuit, which includes Pennsylvania, in determining the merits of Centennial's claim that O'Neill breached the requirement of the utmost good faith when applying for the Policy.

*i.*      **Purchase Price**

a. Misrepresentation

The insurance application submitted on behalf of J. Brian O'Neill unquestionably states that the purchase price of *M/Y BRYEMERE* was $2,350,000.00.  Centennial asserts the closing statement for the purchase and sale confirms that O'Neill did not actually pay $2,350,000 for the vessel.  As found above, the closing statement listed the purchase price as $1,575,000 plus $700,000 for the trade-in vessel, equating to a total purchase price of $2,275,000.   O'Neill subsequently negotiated a $150,000 "survey adjustment" with the seller, resulting in an adjusted, final sales price of $2,125,000.00.

O'Neill stated in his pleadings that the actual purchase price in the sale contract was $2,125,000.00.  Nonetheless, he contends there was no misrepresentation because the $2,350,000.00 figure stated on the insurance application included the cost of the surveyor's recommendations, which he complied with immediately after purchase.  O'Neill states that his calculation was reasonable, objective and mathematically accurate and argues that Centennial bears the burden of proving otherwise.  He also maintains that he was required by Centennial to submit a letter of compliance with the surveyor's recommendations as part of his obligation in binding the insurance.

This argument fails for several reasons.  First, both Blue and Bonner testified that the placement of insurance coverage for the vessel was not contingent upon the letter of compliance. Rather, the letter was to be completed after the survey recommendations were completed, in order to verify the safety items identified by the surveyor were corrected.  It was not considered by the insurer to affect the purchase price requested on the application.

The actual monetary value exchanged between Carolina and Double Billed, LLC for the purchase of *MY BRYEMERE* was $2,125,000.  The representation that the purchase price was $2,350,000 was false.  Purchase price is defined as the "[p]rice agreed upon as consideration for

which property or good are sold and purchased." *Black's Law Dictionary* (6th Ed.). O'Neill contends that it is the value of the yacht being insured which is the paramount consideration. But O'Neill's argument that $225,000 in repair/compliance costs must be added to the $2,125,000 paid to the seller does not comport with the definition of "purchase price". The very same argument, where the insured sought to include the added costs for a refitting of the vessel in its calculation of purchase price as stated on the insurance application, was specifically rejected by this Court in *Great Lakes Reinsurance (UK) PLC v. Atlantic Yacht & Marine Serv's Inc.*, 2008 WL 2277509, 5 (S.D. Fla. 2008).

Additionally, O'Neill's position ignores the fact that he already received and negotiated a discount for the same repairs by way of a $150,000 survey adjustment. The Court does not accept the argument that Centennial's reference to the discount confirms that it is an agreed element of the "purchase price". Rather than confirming that Centennial agrees with his position that the repair costs must be factored into the purchase price, the discount confirms that the actual purchase price was less than the figure stated on the application.

Neither does the Court accept the argument that the value tendered and accepted for Carolina's purchase of *MY BRYEMERE* was atypical, given that it consisted of cash, a trade-in and "survey discount", thereby rendering the application's request for the purchase price ambiguous. A similar argument was made by the insured in *Pacific Ins. Co. v. D. Kent*, 120 F. Supp. 2d 1205 (C.D. Cal. 2000) where the Court rejected the contention that the request for "purchase price" on an insurance application is ambiguous and could be interpreted to mean the present market value. The combined value of the property Carolina transferred to the seller on April 19, 2007 was $2,125,000, and the Court finds that is the vessel's "purchase price".

The Court finds that O'Neill's response on Centennial's application that he paid $2,350,000 for *MY BRYEMERE* was false. Under the doctrine of *uberrimae fidei,* it does not matter that O'Neill might have been mistaken in the manner in which he made his calculation; *HIH Marine Servs, supra.* Therefore, the value stated by O'Neill misrepresented the purchase price, as a matter of law.

b. <u>Materiality</u>

To void a policy of marine insurance on the ground of breach of utmost good faith the applicant's misrepresentation must be material to the insurer's decision to accept the risk. A

misrepresentation is material under the doctrine if "it might have a bearing on the risk to be assumed by the insurer." *HIH Marine Servs., supra,* 211 F.3d at 1363; *see also Kilpatrick Marine Piling v. Fireman's Fund Ins. Co.,* 795 F.2d 940, 942-43 (11th Cir.1986) (materiality is "that which could possibly influence the mind of a prudent and intelligent insurer in determining whether he would accept the risk").

A number of courts, including the Third Circuit, have found that the vessel's purchase price is material to the risk as a matter of law; *see e.g., AGF Marine Aviation & Transport v. C. Cassin,* 544 F.3d 255 at 265 (3d Cir. 2008); *N.H. Ins. Co. v. C'Est Moi, Inc.,* F.3d 937 at 939 (9th Cir. 2008).  Other courts, including this one, have found that a presumption of materiality exists when the application form directly and explicitly inquires into a particular subject, such as the purchase price. *Great Lakes Reinsurance (UK) PLC v. Atlantic Yacht & Marine Services, Inc.* 2008 WL 2277509, 3 (S.D.Fla.,2008).

The Eleventh Circuit recently reaffirmed that where the undisputed evidence indicated that the purchase price of the vessel was a material factor in the insurer's underwriting decision to accept the risk of insuring the vessel, and that price was misrepresented, the insurance contract was void *ab initio. Markel American Ins. Co. v. Nordase* 297 Fed.Appx. 852, 853, (C.A.11 (Fla.) 2008).  The Panel in *Nordase* observed that, as here, the insurer did not have a copy of the bill of sale and instead relied on the price stated in the application in deciding to accept the risk.

The record evidence confirms that Centennial did not have a copy of the closing documents for the vessel sale when reviewing O'Neill's application for insurance. Blue testified that Centennial relied on the monetary figure of $2,350,000 as represented in the application when considering whether to accept the risk, and at what rate.  O'Neill does not dispute that the vessel's purchase price was requested on this insurance application submitted to Centennial. O'Neill argues that the insurer has not put forth credible evidence to establish that the lower price would have caused it to refuse the risk, or alter the terms, and contends that Centennial's renewal of the Policy in 2008 and 2009 proves the point.

The Court does not agree that Centennial has failed to prove that the yacht's purchase price was material.  O'Neill ignores the trial testimony and detailed affidavits submitted by the insurer's two underwriters explaining why the purchase price was a significant factor in the decision to write the risk, and at what terms and conditions. The Court finds this testimony

persuasive. Further, the Court finds that as found by the Third Circuit, that the vessel's purchase was material as a matter of law. Regarding the renewal, underwriter Sean Blue testified at trial that Centennial did not know of the second Price survey in 2008, and only learned of it in 2009. Significantly, the yacht was insured on a "port risk" basis as of October, 2007. This effectively limited coverage for the yacht to risks associated with her stay in berth at Hinckley's Yard, awaiting repair. The premium was reduced by about 90% and the coverage severely limited.[1]

O'Neill points to no evidence to support his contention that Centennial would have insured the vessel for the amount of $2,350,000 had they known he intended the repairs, and the record evidence on the subject contradicts him.

The Court concludes that O'Neill's misstatement of the actual purchase price of the vessel constitutes a material misrepresentation, which violates the requirements of *uberrimae fidei* and voids the Policy from inception.

*ii.*   **The Yacht's Ownership**

The closing documents for the sale of the yacht show Carolina Acquisition LLC as the purchaser and owner of the vessel. The insurance application identifies only J. Brian O'Neill as the owner of the vessel. Defendants deny that this constitutes misrepresentation, and argue that O'Neill disclosed Carolina's identity to Willis, who allegedly were acting as the insurer's agent, before for the Policy was issued. That Willis knew of Carolina is confirmed by the fact that Willis issued an Accord form insurance binder identifying Carolina as the named insured on April 19, 2007; see Defendants' Response in Opposition to AIG'S Motion for Leave to Amend the Complaint (DE – 91). Defendants argue that Willis' knowledge binds Centennial as principal as a matter of law regardless of whether Centennial was actually aware of Carolina at the time. Further, O'Neill argues that even if he "misrepresented" the identity of the yacht owner on the application, it was not material to Centennial's decision to issue the Policy because O'Neill is Carolina's only shareholder and if Centennial agreed to insure O'Neil, Centennial would have agreed to insure Carolina.

---

[1] See *Trans-World-Marine, Inc. v. Bouffard Agency* 885 F.2d 332, 334 (C.A.6 (Mich.),1989) where the Sixth Circuit Court of Appeals explains the difference in coverage between "all risk" and "port risk" insurance, the cost of the latter usually being less due to the absence of the hazards of navigation.

a. Misrepresentation

It is beyond argument that the Policy identifies only O'Neill, rather than Carolina, as the yacht owner on the application for insurance.  This representation to Centennial is factually incorrect, because Carolina is the titled, registered owner of *MY BRYEMERE*.  The Court finds that O'Neill misrepresented the vessel's ownership in the application for insurance, both in asserting that O'Neill owned the vessel and in failing to disclose that Carolina was the titled owner.

Defendants assert that Willis acted as Centennial's agent when issuing the insurance binder naming Carolina as the insured, and that O'Neill's disclosure of Carolina's status to Willis precludes any claim of misrepresentation by Centennial. However, Defendants offer little by way of proof of their allegation and, in fact, the record demonstrates just the opposite, commencing with the opening message from Willis to PCG underwriting on April 13, 2007, stating, in part, "Our Client  J. Brian O'Neill is purchasing a new boat today or at latest Monday. He would like to have an estimate TODAY on the cost [of insurance]."  Moreover, the parties' joint pre-trial stipulation states as an uncontested fact that "O'Neill retained Willis of Pennsylvania Inc. to procure marine insurance from Centennial" (DE 152, ¶ 6).

Pennsylvania law also establishes Willis was the agent of O'Neill, not Centennial. The general rule in Pennsylvania regarding insurance broker/agency issues is found in *Taylor v. Crowe,* 444 Pa. 471, 282 A.2d 682 (1971):

> Where a person desiring to have his property insured applies not to any particular company or its known agent, but to an insurance broker, permitting him to choose which company shall become the insurer, a long line of decisions has declared the broker to be the agent of the insured; not the insurer.

*Id.* (quoting *Taylor v. Liverpool & L & G Ins. Co.,* 68 Pa.Super. 302, 304 (1917)); *Regis Ins. Co. v. All Am. Rathskeller, Inc.*, 976 A.2d 1157, 1167 -1169 (Pa.Super.2009).

The Pennsylvania Supreme Court further indicated that a broker may in appropriate cases be considered the agent of the insurer, but there must be some actual evidence to infer such an agency relationship:

> A broker may be found to have acted on behalf of an insurer in negotiations between the latter and the insured so as to be deemed the agent of the insurer and not the insured ... *but there must be some evidence of an authorization, or some*

> *fact from which a fair inference of an authorization by the company might be deduced to make an insurance broker the agent of the company.*

Defendants have provided no credible evidence of authorization, or any facts from which a fair inference of such authorization may be found. Accordingly, the Court finds Willis has solely acted as the agent of O'Neill, not as the agent of Centennial. The only evidence presented by Defendants comes in the form of two (2) emails allegedly standing for the inferred proposition that Bonner, on behalf of Centennial, had actual or constructive knowledge that Willis intended to bind coverage for Centennial due to Bonner's *silence* or lack of response to King's communications stating "we will be binding coverage today" and coverage was "bound effective today". *See* DE 272, p.7. Somehow, O'Neill argues, Bonner's silence in response to King's e-mails allegedly created an apparent agency relationship between PCG and Willis rather than actual authority, apparent authority, or authority by estoppel. These arguments are without merit. The silence or failure to object to an ambiguous statement concerning binding of coverage without any specific reference as to on whose behalf Willis claimed to be acting does not establish any agency relationship between Willis and Centennial.

Without knowledge of the issuance of the changed binder that O'Neill attempts to argue Centennial ratified by silence, there can be no creation of an agency relationship with, or authority on behalf of, Centennial on the part of Willis. *See, e.g., Volunteer Fire Co. of New Buffalo v. Hilltop Oil Co.,* 412 Pa.Super. 140, 602 A.2d 1348, 1353 (1992) (absent knowledge on the part of the principal regarding nature and effect of agent's act, principal could not ratify agent's action through silence). Susan Bonner testified she did not object to Sharon King's statements regarding the binding of coverage because she interpreted them as statements regarding King's intent to agree to the binding of coverage of behalf of her client, O'Neill.

Defendants' argument inviting the Court to infer King had actual agency authority to act on behalf of Centennial based on Bonner's silence is, at best, far-fetched. "Inferences from silence are perilous." *See* Posner, Cardozo: A Study In Reputation, 37 (1990); *Coleman v. Interco, Inc. Division Plans,* 933 F.2d 550, 552 (7th Cir.1991) (same); *United States v. Hale,* 422 U.S. 171, 176 (1975) (silence generally is so ambiguous that it is of little probative force, inviting the jury to speculate as to its meaning); Falknor, *Silence as Hearsay,* 89 Univ. of Pa.L.Rev. 192 (1940); *Tillman v. Indiana Energy Sav. Corp.*, 2010 WL 1729591, 2

(N.D.Ill.,2010); *Philadelphia, W. & B.R. Co. v. Cowell,* 1857 WL 7378, 5 (Pa. 1857)("no case can be found where an agency is not only presumed to be created, but the acts of the agent are *presumed* to be ratified by the silence of the alleged principal. Such a doctrine would be most dangerous."). Therefore, this Court declines to create an actual authority by silence doctrine here as the same would run contrary to Pennsylvania law.

Next, under Pennsylvania law, "apparent authority exists where a principal, by words or conduct, leads people with whom the alleged agent deals to believe that the principal has granted the agent the authority he or she purports to exercise." *Joyner v. Harleysville Ins. Co.,* 393 Pa.Super. 386, 392, 574 A.2d 664, 667 (1990). Therefore, in determining the apparent authority of an agent, the court must look to the actions of the principal, not the agent. *Bolus v. United Penn Bank, supra* at 261, 525 A.2d at 1222. "An agent cannot, simply by his own words, invest himself with apparent authority. Such authority emanates from the action of the principal and not the agent." *Turnway Corp. v. Soffer,* 461 Pa. 447, 458 (1975), quoting *Jennings v. Pittsburgh Mercantile Co.,* 414 Pa. 641, 645 (1964).

As in *Volunteer Fire,* the issue here is whether the Centennial itself held Willis out as having apparent authority, not the actions of Willis. 602 A.2d 1348. Much like actual authority, apparent authority is only established through manifestations by the principal, and a third party's reasonably held belief that the agent is authorized must be "traceable to the manifestation." *Jurimex Kommerz Transit G.M.B.H. v. Case Corp.*, 2007 WL 2153278, 3 (3d Cir. 2007), citing Restatement (Third) of Agency § 3.03. Here, there exists no evidence that a representation was made by Centennial to *O'Neill* or, indeed, any evidence that O'Neill relied on any representation or conduct by Centennial from which it could be reasonably inferred that Willis was Centennial's agent. As such, no apparent authority can exist. Moreover, in the absence of such knowledge on behalf of the principal regarding the contested activity by the agent (i.e. issuing a revised binder with a different named insured); a representation emanating from the agent cannot create apparent authority. *Volunteer Fire,* 602 A.2d 1348, 1353 (agent had no apparent authority to alter the nature of an original conveyance). *Volunteer Fire* held "absent knowledge on the part of the fire company regarding the nature and effect of the corrective deed, it could not effectively ratify the deed." *Id.* The Court relied on the following applicable principal in arriving at its holding:

> [t]he question of ratification could not arise in the absence of proof that the [principal] had full knowledge of all the material facts and circumstances

attending the transaction intended to be ratified, *for the doctrine presupposes knowledge of such facts.* "Ratification implies knowledge of the material facts, and to be effective must be made by persons having the power to perform the act which is the subject of ratification."

*Id*., citing *Schwartz v. Mahoning Valley Country Club,* 382 Pa. 138, 142 (1955) quoting *Sword v. Reformed Congregation Keneseth Israel,* 29 Pa.Super. 626, 630 (1905) (emphasis added); *Solomon v. Cedar Acres East, Inc.,* 455 Pa. 496 (1974); *McRoberts v. Phelps,* 391 Pa. 591 (1958); *DeSilvio v. Restauire,* 264 Pa.Super. 528 (1979). Because Centennial had no knowledge of the Carolina Binder, nor did it have any knowledge of Willis' act of revising the original binder presumably bearing O'Neill's name, Defendants' argument that Centennial ratified Willis' action by silence is unsupportable.

The holding under Pennsylvania law in *Donegal Mut. Ins. Co. v. Grossman*, 195 F.Supp.2d 657 (M.D.Pa.2001) supports this conclusion. The Court granted summary judgment for the insurer, finding no agency relationship existed, where there was no evidence that would support a reasonable belief on the insured's part that the broker—through the issuance of certificates of insurance—had the authority to bind insurer to terms of coverage *different than those expressed in the policy*. *Id.* at 669. In doing so, the Court noted the certificates issued to the insured specifically referenced the relevant insurance policy and expressly stated, in pertinent part: "This certificate does not amend, extend or alter the coverage afforded by the policies below," and "…the insurance afforded by the policies described herein is subject to all the terms, exclusions and conditions of such policies." *Id.*

The *Grossman* Court similarly disposed of "implied authority" arguments where the broker made representations regarding coverage contrary to those expressed in the policy. The Court stated "implied authority" is the right and obligation to do all that is proper and necessary to the exercise of authority actually granted. The argument that the authority to issue certificates of insurance implies the authority to bind the insurer to specific terms of coverage *different than those contained in the insurance policy* was disregarded. *Id.*  Such was the case because the certificates of insurance explicitly informed the recipient that the certificates did not amend policy coverage, and referred to the policy for all applicable terms, conditions, and exclusions.

This rationale can be applied *sub judice* as the Accord Binder states, on the second page: "The insurance is subject to the terms, conditions and limitations of the policy(ies) in current use

by the company…This binder is cancelled when replaced by a policy." *See* DE 109-1, Ex. "C". Therefore, the Policy terms indisputably control, not the erroneous binder. It is undisputed that Willis subsequently sent the Policy to O'Neill, a Policy which named O'Neill as the inusred, thereby cancelling the binder and replacing its unauthorized contradictory terms. *See* May 10, 2007 Willis correspondence to O'Neill/Foulds enclosing BRYEMERE policy, attached hereto as Ex. "C".  This correspondence also shows that Willis instructed O'Neill to review the policies and advise if there were any "errors or discrepancies" *Id.* It is undisputed that neither Willis nor O'Neill objected to the Policy or its subsequent endorsements, all of which named O'Neill and not Carolina as the named insured.  It logically flows then, that the policy, and its terms, and not the erroneous binder, was in effect at time the claim notice was submitted by the insured in July 2007.  On these grounds, the Court declines to find that Willis was an agent of Centennial for purposes of establishing whether Carolina is entitled to coverage under the Policy.

The Accord form binder issued by Willis naming Carolina was sent by the broker to O'Neill; there is no evidence that it was sent to Centennial.  The insurer's underwriters, Sean Blue and Susan Bonner, testified that Willis did not have binding authority on behalf of PCG and/or Centennial and had no authority to issues a binder which changed the named insured from O'Neill to Carolina.  Blue and Bonner also testified that there was no copy of the subject binder in the underwriting file and that he never saw the document until after the commencement of the litigation.  Neither PCG nor Centennial ever authorized Willis to issue the binder, according to both Blue and Bonner.

The Court finds that the testimony and record evidence establishes that Willis was solely acting at all times as O'Neill's and/or Carolina's agent when negotiating the Policy with Centennial and was not acting as the agent of Centennial.  Accordingly, notice from O'Neill to the broker, Willis, is not notice to Centennial, who was unaware of Carolina's ownership of the vessel until after the Policy was issued to O'Neill.

b. Materiality

Under the terms of the contract of insurance, only the person or legal entity named on the Declarations Page as the Named Insured who are the owners of the yacht can be insured; *see* Policy, Part II, Definitions. The PCG application specifically asks for the identity of the "Owner/Beneficial Owner Name".   The Ninth Circuit has concluded that disclosure of the

insured vessel's ownership is material as a matter of law. *SW Traders LLC v. United Specialty Ins. Co*. 409 Fed.Appx. 96, 98 (C.A.9 (Wash.) 2010) ("Ship ownership is indisputably material to an insurance company's *assessment of the risk,* regardless of whether the identity of the owner actually increases the risk of insuring a particular vessel."). A presumption of materiality arises when the application directly and explicitly inquires into a particular subject; *Great Lakes Reinsurance, supra,* 2008 WL 2277509, 2. There is nothing more fundamental to the assessment of the risk of insurance than the true identity of the insured.

The Court finds that the identity of the actual, titled owner of *MY BRYEMERE* was material to Centennial's decision to inure the yacht, and the misrepresentation of the true owner violated O'Neill's obligations under the doctrine of *uberrimae fidei*. Accordingly, the Policy is void from inception.

*iii.*     **Loss History**

The PCG application form asks: "Has the owner or captains ever suffered any losses?" It is undisputed that in response O'Neill identified one loss on the application, which occurred on December 11, 2003, due to a fire. During his September 28, 2010 deposition O'Neill testified that he had experienced at least three other losses prior to the submission of his application. Had PCG'S underwriters known that O'Neill had four prior marine losses, rather than simply one loss, as reported, they testified that they might have declined the risk, or charged a different premium or imposed a higher deductible or other terms or restrictions on the Policy. Defendants maintain that this information was readily available to Centennial, as a subsidiary of AIG; further, that the application is ambiguous, in that it does not specify a request for all losses. Finally, Defendants state that Centennial would have insured the vessel if the three additional losses had been identified on the form.

a. Misrepresentation

There can be little doubt that the failure to list the three prior losses on the application misrepresents the owner's actual loss history. The Court rejects Defendants' argument that the question is ambiguous. The question posed is whether the applicant or his captains *ever* suffered *any* losses (emphasis supplied). The plain meaning of the language is a request that the applicant report all losses, without qualification. The fact that O'Neill reported one marine loss establishes he understood the question and thereafter submitted the application without full disclosure of his

loss history. Responding to an inquiry regarding loss history by listing one of four losses is misrepresentation. *See* New Hampshire Ins. Co. v. Diller, 678 F.Supp.2d 288, 306 (D.N.J.,2009)(an applicant's loss history is often material to an insurer's decision to issue a policy.); *Certain Underwriters at Lloyd's v. Montford,* 52 F.3d 219, 222 (9th Cir.1995) ("An insurance applicant's loss history is a fact material to the risk."); *Pinette v. Assurance Co. of Am.,* 52 F.3d 407, 411 (2d Cir.1995) ("Common sense tells us that an applicant's prior loss history is material to a reasonable insurance company's decision whether to insure that applicant or determination of the premium."); *Great Lakes Reins. PLC v. Arbos,* 2008 U.S. Dist. LEXIS 109472, at **15-16 (S.D.Fla. Dec. 30, 2008) ("[A] prospective insured's loss history is undoubtedly material, as it might have a bearing on the risk to be assumed by the insurer, and no reasonable juror could find otherwise.... [C]ourts have routinely found that an insurance applicant's loss history is a fact material to the risk.").

b. Materiality

The PCG underwriter who handled O'Neill's application, Susan Bonner, testified that she would not have had the authority to issue the Policy without first obtaining approval from a superior on the PCG yacht team, as her underwriting authority was limited to applicants with one loss only, of less than $50,000.  Thus, the Policy that was actually issued was, as a result of O'Neill's misrepresentations, beyond her authority to approve.  Bonner and Sean Blue both testified that had they known of the actual loss history Centennial may not have issued the Policy; or at the very least, the premium, terms and conditions would have been different. Defendants dispute the truthfulness of this testimony, and argue that Centennial would most certainly have issued the Policy to O'Neill, but are unable to point to any specific evidence, apart from O'Neill's desirability as a PCG client.

Defendants assert that PCG and/or Centennial, as part of the AIG group of insurance companies, had access to O'Neill's loss history, as the losses were incurred on policies underwritten by other AIG companies.  Blue testified that Centennial did not have such access and, in fact, was in competition with some of those other AIG companies.

Several of Florida's district courts have held that misrepresentation of the vessel's loss history is material as a matter of law, based primarily on the Ninth Circuit's decision in *Certain Underwriters at Lloyd's v. Montford,* 52 F.3d 219 (9th Cir.1995); see *All Underwriters at Lloyd's*

CASE NO.:  09-60551-CIV-ZLOCH

*v. Kenney,* 986 F.Supp. 1384 (S.D.Fla.1997); *Great Lakes Reinsurance (UK) PLC v. Yellow Fin 36 LLC* 736 F.Supp.2d 1302, (M.D.Fla.,2010).  At least one other Florida court has expressly rejected that view, deciding instead to focus on the particular circumstances of each policy in reaching a conclusion based, in part, on the Eleventh Circuit's decision in *HIH Marine Services, Inc. v. Fraser* 211 F.3d 1359 (C.A.11 (Fla.),2000); see *AXA Global Risks (UK) Ltd. v. Pierre* 2001 WL 1825853, (S.D.Fla.,2001).

    This Court need not take a decision based on one side or another of the debate, as it is clear from the record that Centennial considered O'Neill's loss history as a material element of the risk in underwriting this Policy.   The particular underwriter's authority to accept an application and issue a policy depended, in part, on the number and value of the applicant's (and his captain's) loss history.  This factor alone, in the Court's view, is sufficient to establish the materiality to the insurer of the information sought on the application.  Had O'Neill accurately disclosed his prior losses, the individual underwriter lacked the authority to and could not have issued the Policy; absent specific authority from a superior.   The loss history directly affected the underwriters' authority and level of review required to issue the policy on behalf of the insurer, which establishes its materiality to the underwriting decision.

    The Court also rejects Defendants' position that it is incumbent upon the insurer to independently obtain or verify the responses submitted by a prospective insured on the application form.  The insured is best placed to identify his own losses; not the insurer.  It is well established that, under *uberrimae fidei*, an underwriter is entitled to rely on the information provided by the applicant and need not undertake any independent investigation or confirmation of accuracy of information submitted. Admiralty courts routinely recognize that "[a] marine insurer is under no duty to verify the information provided in an application *prior* to the loss."  *Continental Ins. Co. v. Muradyan*, 2003 WL 22096119, 2003 AMC 1536 (C.D.Cal. 2003); *Cigna Prop. & Cas. Ins. Co. v. Polaris Pictures Corp.*, 1999 AMC 1 (9th Cir. 1998); *C.N.R. Atkin v. Smith*, 1998 AMC 1239 (9th Cir. 1998).

    The Court finds that O'Neill's loss record was misrepresented to Centennial on the application form, in response to a direct request, and that the loss record, as reported, was a material factor in the insurer's decision to write the Policy.

In sum, the Court finds that O'Neill violated the tenets of *uberrimae fidei* and the general maritime law in submitting an application for insurance to Centennial that: (i) stated the purchase price for *MY BRYEMERE* as $2,350,000, when the actual price was $2,125,000; (ii) incorrectly identified J. Brian O'Neill as the owner, and failed to identify Carolina Acquisition LLC as the titled owner; and (iii) identified only one prior marine loss when, if fact, O'Neill had four marine losses prior to the date of the application.

iv.    **Waiver and Estoppel do not Apply**

At trial, Defendants urged this Court to overlook these misrepresentations by invoking the doctrines of wavier and estoppel.  Defendants assert Centennial waived its coverage defenses by continuing to renew the Policy subsequent to the loss.  The Policy was not renewed under the same terms and conditions and, even if it had, the doctrines of wavier and estoppel do not apply to marine insurance risks in the context of *uberrimae fidei*.

Centennial's Policy was originally written with navigation limits confined to the U.S. coastal waters of the Atlantic Ocean and Gulf of Mexico, including the Bahamas, for the policy period beginning April 19, 2007 and ending on April 19, 2008.  The premium charged was $15,747.00; (Declarations Page, Ex. K).  The Policy then underwent two endorsements, the first to change an address.  The second, on October 10, 2007, significantly changed the terms of the original Policy and only provided coverage for "port risk", which does not encompass navigation, while the yacht was in the Hinckley shipyard for repair. ).  (Endorsement No. 2, Ex. L). In addition, the premium was reduced by $2,350.  *Id.*  Thus, the original Policy, which is the subject matter of this litigation, was never renewed and was, in fact, rescinded through endorsement on October 10, 2007.

The Court finds that even if Centennial had renewed the same Policy, the circumstances do not warrant the imposition of a waiver and estoppel argument that, in essence, would result in condoning O'Neill's misrepresentations when applying for the Policy.   In both the Eleventh and Third Circuits it is well-settled that the doctrine of *uberimae fidei* controls a marine insurance contract.  *HIH Marine Servs. v. Fraser*, 211 F.3d 1359 (11th Cir. 2000); *AGF Marine Aviation & Transport v. Cassin*, 544 F.3d 255 (3d Cir. 2008).  As set forth in *Cassin*, every circuit except the Fifth has held this doctrine is well-entrenched federal precedent.  *Id.*, 544 F.3d at 263.  Thus, the doctrine of *uberrimae fidei* is "controlling federal authority".

The doctrines of wavier and estoppel do not apply in the context of *uberrimae fidei* in marine insurance contracts.  *HIH Marine Servs. v. Fraser*, *supra*, 211 F.3d at p. 1362.  Here, the materiality of purchase price, identity of the insured and loss record are at the heart of Centennial's claim of a breach of the long-standing doctrine of *uberrimae fidei*. As observed by the Eleventh Circuit:  "*uberrimae fidei* does not permit the use of the principles of waiver and estoppel to provide coverage where there has been a material misrepresentation on the application." *Id*., 211 F.3d 1369 at 1362.  Similarly, under Pennsylvania law, the doctrine of waiver and estoppel cannot create an insurance contract that never existed. *Pizzini v. Am. Intern. Specialty Wines Co.*, 210 F. Supp. 2d 658 (E.D. Pa. 2002).

Accordingly, the Court rejects Defendants' contention that Centennial's issuance of a port risk only Policy on October 10, 2007, acts a wavier or otherwise estops the insurer from asserting that O'Neill misrepresented the vessel's purchase price, owner and loss history on the insurance application.

B.  The Policy of Insurance

*i.*        **Who is the Named Insured?**

The Declarations Page of the Policy, provided to O'Neill through Willis, states the named insured is J. Brian O'Neill.  The Policy definition of "Insured Person" is "You or a family member" or "an additional insured named in the policy".  The word "you" refers to the person or any legal entity named on the Declarations Page as the Named insured "who are the owners of the yacht."  To qualify as an insured under the Policy definitions, O'Neill would have to be the titled owner of the yacht.  He was not, Carolina was. Carolina is neither "a family member" nor "an additional insured named in the policy" as there are no additional insureds named in the Centennial Policy.

As there is no controlling federal precedent applicable to the interpretation of the Centennial Policy language, Pennsylvania state law governs its interpretation; [Order, *Id*.].

Under Pennsylvania state law, insurance policy interpretation is a matter of law for the Court to decide.  *401 Fourth Street, Inc. v. Investors Ins. Group* 583 Pa. 445, 454, 879 A.2d 166, 171 (Pa., 2005).  When the language of the policy is clear and unambiguous, a court is required to give effect to that language. When a provision in a policy is ambiguous, however, the policy is to be construed in favor of the insured; *Id.*

Pennsylvania's Supreme Court continues its analysis principles of policy interpretation in *401 Fourth Street, Inc* as follows:

> Contractual language is ambiguous 'if it is reasonably susceptible of different constructions and capable of being understood in more than one sense.' " Finally, "[i]n determining what the parties intended by their contract, the law must look to what they clearly expressed. Courts in interpreting a contract, do not assume that its language was chosen carelessly. *Id.*, (internal citations omitted).

Words of 'common usage' in an insurance policy are to be construed in their natural, plain, and ordinary sense, and a court may inform its understanding of these terms by considering their dictionary definitions. *Dale Corp. v. Cumberland Mut. Fire Ins. Co.* 2010 WL 4909600, 4 (E.D.Pa., 2010) (citing *Wall Rose Mut. Ins. Co. v. Manross*, 939 A.2d 958, 962 (Pa.Super.Ct.2007). The term "named insured" is clear and unambiguous under Pennsylvania law and a court should give effect to the ordinary meaning of the language. *Hartford Ins. Co. v. Van Fossen* 1997 WL 136443, 5 (E.D.Pa.,1997).

The Court finds that based on the clear and unequivocal language of the Policy as quoted, O'Neill is not insured under the Centennial Policy because he is not the owner of the yacht. O'Neill's argument that he is the owner of *MY BRYEMERE* because he is the sole shareholder of Carolina Acquisition LLC is not sanctioned under Pennsylvania law, which prohibits the individual members of a limited liability company from holding title to corporate property in their individual names; 15 *Purdon's Pennsylvania Statutes and Consolidated Statutes Annotated* §8923(a) ("General rule -- Property transferred to or otherwise acquired by a limited liability company becomes property of the company. A member has no interest in specific property of a company.") See also *Baird v. Macklin* (Pa.Com.Pl. 2008). The argument of a commonality of title is also in derogation of the law of Rhode Island, the state of Carolina's incorporation; see *Cortellesso v. Town of Smithfield Zoning Bd. of Review* 888 A.2d 979, 981 (R.I. 2005).

Carolina is not entitled to coverage under the Centennial Policy because it is not identified as a named insured or additional insured in the Declarations Page. *Hartford Ins. Co. v. Van Fossen, supra.* The Court finds no ambiguity in the governing provisions of the Policy and is bound to give effect to what is clearly expressed; *401 Fourth Street, Inc., supra.* Defendants argue that because Centennial accepted a premium someone – preferably both – are insured. What this argument ignores, however, is that this anomalous situation arose precisely because

O'Neill went to the trouble of creating Carolina solely to hold title to the yacht and then failed to tell the insurer that it, and not he, was the owner.

The Defendants urge the Court to reject Centennial's position for another reason – they allege that it was not raised in the operative pleadings.  Rather, Defendants maintain, Plaintiff only first raised the issue through its Motion for Leave to File a Second Amended Complaint (DE 75) and Motion for Leave to Amend Answer and Affirmative Defenses (DE 76). Defendants raised this, among other, objections to Centennial's position in their Motion for Leave to Amend Counterclaim (DE 79) and Defendants' joint Motion to Strike AIG'S Motions for Summary Judgment (DE 122).

 On December 23, 2010, the Court entered its Order denying Plaintiff's Motions (DE 139) for undue delay.  In its Order the Court noted that while Plaintiff sought to amend the Complaint to raise, *inter alia*, specifically the issues of O'Neill's lack of ownership interest and Carolina's absence from the Policy Declarations Page, the insurer nevertheless maintained that the "proposed amendments involve legal argument and interpretation that, candidly, have been in the fore of this lawsuit since inception."   The Court agrees with this latter statement.   O'Neill's counterclaim against Centennial for breach of contract avers the insurer reached the policy "by failing to pay benefits to *O'Neil pursuant to the terms of the policy*."  (emphasis supplied").   The counterclaim raises the general issue of O'Neill's entitlement to the proceeds of the Policy.

The Federal Rules of Civil Procedure provide that a complaint contain a short and plain statement of the claim showing that the pleader is entitled to relief, and a respective demand for that relief. *See* FRCP 8(a).  As observed by the Eleventh Circuit in *Hamilton v. Allen-Bradley Co., Inc.* 244 F.3d 819, 823 (C.A.11 (Ga.),2001):  "A complaint need not specify in detail the precise theory giving rise to recovery.  All that is required is that the defendant be on notice as to the claim being asserted against him and the grounds on which it rests."  The "simplified notice pleading standard" of the Federal Rules "relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

The First Amended Complaint in this action states that closing documents identified Carolina as the yacht's purchaser and "O'Neill is listed as the sole insured under the Policy" (First Amended Complaint, DE 31 ¶ 25, 29).  Defendants have admitted that the Centennial

Policy was issued to O'Neill and that Carolina is the titled owner of the yacht (Answer, DE 35 ¶ 2, 4). Moreover, the Court is convinced that Mr. O'Neill is well aware of the difference between himself and his limited liability company, as confirmed by the fact that the Complaint in the HMY litigation was brought solely in Carolina's name, while the counterclaim against Centennial in this action is brought solely in O'Neill's name.

Finally, to accept Defendants' position would compel this Court to turn a blind eye to the plain terms of the Declarations Page and the Policy proforma resulting, in effect, in a judicial re-write of the contract. The Court is obligated under the controlling law of Pennsylvania to adopt the opposite approach, and to give effect to the unambiguous terms of the Policy; *401 Fourth Street, Inc. v. Investors Ins. Group supra*, 583 Pa. p. 454.

Pennsylvania's courts have rejected previous attempts to enlarge the term "named insured"; *Hartford Ins. Co. v. Fossen*, *supra*. See also *Globe Idemnity Co. v. Derevjanik*, 1997 WL 397483 (E.D. Pa. 1997)(declaratory action granting insurer summary judgment for failure of individual to be a named insured on the declarations page); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania*, 1989 WL 153945 (E.D. Pa. 1989)(declaratory action granting insurer summary judgment for failure of individual to be a named insured on the declarations page); *Prudential Property & Casualty Ins. Co. v. Estate of Elias*, 2003 WL 21497543 (E.D. Pa. 2003) (declaratory action granting insurer summary judgment for failure of an individual to be a named insured on the declarations page, even though the individual was named a "licensed operator" on the declarations page).

The Court finds that the distinction between O'Neill as insured and Carolina as owner of *MY BRYEMERE* was raised sufficiently in the operative pleadings and concludes, as a matter of law and contract construction, that the Policy affords neithercoverage under these circumstances.

*ii.*    **Reformation**

Both at the Summary Judgment stage and at trial, Defendants argue that the Policy issued in O'Neill's name should be reformed to include Carolina as an insured. Carolina, however, has not met its burden, and based on Pennsylvania law, is not a worthy candidate for reformation. Reformation is an equitable remedy that is sparingly granted. *Twin City Fire Ins. Co. v. Pittsburgh Corning Corp.*, 813 F.Supp. 1147, 1149 (W.D.Pa.,1992). Pennsylvania courts have consistently held that it is not the province of the Court to alter a contract by construction or to

make a new contract for the parties. *Id.*, citing *Amoco Oil Co. v. Snyder,* 505 Pa. 214, 478 A.2d 795 (1984).  However, reformation is a remedy that is only available to a party that seeks to enforce a contract in which a provision has been incorrectly or imperfectly expressed. *Id.*

A contract may be reformed only where mutual mistaken belief, shared by the parties with respect to a material aspect of the agreement, prevents the contract from conforming to the true intention of the parties. *Navarro v. Ohio Cas. Ins. Co.,*325 Pa.Super. 167, 170, 472 A.2d 701, 702 (Pa.Super.,1984); *Philadelphia Electric Co. v. Borough of Lansdale,* 283 Pa.Super. 378, 424 A.2d 514 (1981). Reformation presupposes that a valid contract between the parties was created but, for some reason, was not properly reflected in the instrument that memorialized the agreement. *H. Prang Trucking Co. v. Local Union No. 469,* 613 F.2d 1235 (3d Cir.1980).

A party seeking reformation of a contract, which includes an insurance policy, has the burden to prove by clear, precise and convincing evidence that, as a result of a mistake, a written instrument does not truly express the intention of the parties. *See General Elec. Credit Corp. v. Aetna Cas. & Surety Co.,* 437 Pa. 463, 263 A.2d 448 (1970). The Pennsylvania Superior Court has defined the term "clear and convincing evidence" to mean: (1) witnesses must be found to be credible; (2) the facts to which they have testified are remembered distinctly and the details thereof narrated exactly and in due order; and (3) their testimony is so clear, direct, weighty, and convincing as to enable either a judge or jury to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. *Jones v. Prudential Property & Cas. Ins. Co.,* 856 A.2d 838, 844 (Pa.Super.2004); *Westchester Fire Ins. Co. v. Treesdale, Inc.,* 2008 WL 1943471, 5 (W.D.Pa.2008).

Defendants cannot point to any concrete evidence of Centennial's intent to make Carolina a named insured on the Policy or that Carolina's omission was brought about by reason of a mutual mistake. All evidence presented by Defendants is wholly without merit and cannot be considered in determining if reformation is warranted.  Sharon King demonstrated her lack of personal knowledge on the witness stand and offered otherwise improper testimony. King's testimony precludes a finding that clear and convincing evidence exists to support reformation. Because the Court has already found that there is no agency relationship between Centennial and Willis, Defendants cannot show Centennial had knowledge of Carolina's existence.

What's more, the Policy, as issued by Centennial, was sent by Willis to O'Neill and he was advised to review the same for any "errors or discrepancies". "It falls stale upon the ear to be told that a formal contract was not read, or was hurriedly prepared, or was signed in haste. Such things are no ground for reforming or invalidating a contract." *Thrasher v. Rothrock*, 105 A.2d 600, 604 (1954). The essence of contract law is the objective intent of the parties and when there has been no allegation of mistake, fraud, overreaching or the like, it is not the function of the court to redraft a contract to be more favorable to a given party than the agreement he chose to enter. *Harris v. Dawson*, 479 Pa. 463, 468, (1978). Pennsylvania courts have consistently held that "[i]t is not the province of the court to alter a contract by construction or to make a new contract for the parties." *Amoco Oil Co. v. Snyder,* 505 Pa. 214, 221 (1984) (citing *Steuart v. McChesney,* 498 Pa. 45, 49–51, (1982)). This Court will not entertain Defendants' arguments presented in an untimely fashion. As such, reformation under Pennsylvania law is inappropriate.

iii.   <u>The Loss Occurred Outside the Policy Period</u>

Centennial asserts that the physical loss to *MY BRYEMERE* – the structural deficiencies in the girders; the missing bulkheads and flooring; the fractured forward fuel tank brackets; the insufficient fiberglass core and delamination in the vessel's topsides - all were present in the yacht prior to the commencement of the Policy Period or April 19, 2007. This fact is legally established, argues Centennial, by the jury's verdict vindicating Carolina's claims against the sellers and brokers in the HMY litigation. The $2,000,000 jury award to the vessel owner and purchaser, Carolina, was intended to compensate Carolina for the Defendants' misrepresentations regarding the vessel's condition, which were in existence prior to the April 19, 2007 purchase of the structurally defective vessel. Accordingly, the insurer argues, in light of the verdict it is tautological that the loss occurred prior to the commencement of the Policy Period and hence there can be no coverage under its Policy.

Plaintiff also argues that the Defendants are estopped from attempting to counter the pleadings and testimony adduced in the HMY litigation to support their case, and thus the jury's

finding.  Centennial reserves particular objection to the testimony of Defendants' expert, naval architect Mr. David Pedrick.

The testimony of Carolina's only expert witness Mr. Pedrick's testimony was instrumental in establishing the existence of *M/Y BREYMERE'S* structural deficiencies and gradual deterioration prior to its purchase by Carolina.  In the HMY litigation Mr. Pedrick testified unequivocally that the vessel was unseaworthy when purchased and specifically, among other defects, the fractures in the forward fuel tanks and delamination in the vessel's fiberglass hull topsides had been in existence prior to April 2007; see HMY Trial Testimony of David Pedrick, April 14, 2010, pp. 46:15 – 47:8, [DE 140 Ex. "D"]; April 15, 2010, pp. 29:14-22; pp. 31:6-9; p. 36:2-21  [DE 140, Ex. "E"].

When testifying in this trial in support of O'Neill's counterclaim for breach of contract, however, Mr. Pedrick stated that, in his opinion, the damage to *M/Y BRYEMERE* occurred on approximately the third day of the vessel's voyage from Florida to Rhode Island, several months after Carolina's purchase.  In particular, Mr. Pedrick opined that the fiberglass tabbing holding the vessel's foreshortened longitudinal girders to the hull bottom weakened, which allowed for excessive vibration in the fiberglass hull.  This, in turn, put additional stress on the forward fuel tank brackets, fracturing them.  The resulting increased stress, according to Mr. Pedrick, caused the fiberglass comprising the vessel's topsides to delaminate.  Rather than a process of gradual deterioration, as told to the jury in the HMY trial, Mr. Pedrick testified in this proceeding that the loss was the result of a sudden, catastrophic event.

Centennial argues that this is in complete derogation of Pedrick's earlier testimony and, they assert, the primary basis of the jury verdict, and maintain the doctrines of judicial and/or collateral estoppel bar Defendants' admission of Mr. Pedrick's contradictory testimony in this action; alternatively, if considered by the Court, deprive it of any weight.

Defendants counter that Pedrick's conclusion are consistent with his prior testimony in the HMY trial. Moreover, Defendants object to Centennial's entire argument regarding the Policy Period on the basis that it was not raised in the operative pleadings and is therefore not properly before the court.  Additionally, Defendants claim that the First Amended Complaint concedes that the damages in fact occurred during the Policy Period.  Finally, Defendants urge

the Court to apply Pennsylvania's "effect test" to determine when the loss occurred onboard *MY BRYEMERE*.

The Court finds that the jury's verdict of negligent misrepresentation against the sellers and yacht brokers in the HMY trial conclusively establishes, as a matter of law, that the vessel conditions complained of in that trial existed prior to Carolina's purchase in April 2007. Further, the Court finds that those vessel conditions are identical to the very same conditions that are the subject of this declaratory action. It must follow, therefore, that the losses complained of occurred prior to the attachment of the risk to Centennial and outside the Policy Period. As a result, there is no cover under the contract of insurance.

The Court finds that any other conclusion would make a mockery of the jury's verdict in the HMY trial. The jury, after a trial in this Court, awarded Carolina $2,000,000, or almost the entire amount of money paid to purchase the yacht, as compensation for the HMY Defendants' negligent misrepresentation of the vessel's condition as it existed at the time Carolina made the purchase. For the Court to now rule that the loss occurred subsequent to Carolina's purchase, on the voyage to Rhode Island, would be tantamount to overturning the jury's verdict; a verdict in favor of one of the very parties now seeking its repeal. Not only does this Court lack the authority to overturn the jury's verdict in the HMY trial at this date, the record does not warrant such a result.

The Court finds Mr. Pedrick's testimony in this trial completely unconvincing. Mr. Pedrick originally testified in his December 8, 2010 deposition that he grounded his conclusion regarding the day in which the loss occurred, July 3, 2007, on the "emotional intensity" of L.J. Gallagher's description of the events of that day. Mr. Pedrick later sought to withdraw this testimony and testified that he concluded that the loss occurred sometime during the Florida to Newport voyage, based primarily on the lack of any reported delamination in the Price survey report. Mr. Pedrick did not refer to any new or additional survey or engineering reports other than those reviewed prior to his testimony in the HMY trial. After Pedrick testimony in this case, the Court has difficulty in understanding how, then, Pedrick can come to the contradictory opinion as to the time of loss proffered most recently, and accordingly discounts it.

Judicial estoppel is a matter of federal law, not state law. *Burnes v. Pemco Aeroplex, Inc.* 291 F.3d 1282, 1285 (C.A.11 (Ala.), 2002); see also *Milhoff v. Benson* 2011 WL 1044663,

2 (W.D.Pa.,2011).  Judicial estoppel is an equitable doctrine invoked by a court at its discretion. *New Hampshire v. Maine* 532 U.S. 742 21 S.Ct. 1808 (U.S., 2001).

The U.S. Supreme Court explains that while the circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle, three considerations predominate. First, a party's later position must be clearly inconsistent with its earlier position. Second, whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled.  A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.  *New Hampshire v. Maine* 532 U.S. 742, 750-751, 121 S.Ct. 1808, 1815 (U.S.,2001) (internal citations and quotation marks omitted).

The timing of the loss is a crucial factor in each lawsuit.  Judicial estoppel prevents parties from "playing 'fast and loose with the courts' and forbids the use of "intentional self-contradiction ... as a means of obtaining unfair advantage".  *New Hampshire v. Maine, supra*, 532 U.S. p. 751.

In a subsequent decision the Eleventh Circuit stated: "Under judicial estoppel, an equitable doctrine, a party is prevented from "asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding.' *Palmer & Cay, Inc. v. Marsh & McLennan Companies, Inc*. 404 F.3d 1297, 1307 (C.A.11 (Ga.),2005).  The Court of Appeals cited two factors that must be present to support a finding of judicial estoppel, namely: "the allegedly inconsistent positions must have been taken under oath in a prior proceeding, and second, they must have been calculated to make a mockery of the judicial system. *Id*., (internal citations and quotation marks omitted).  The Panel in *Palmer & Cay* notes that these factors are not exhaustive, and other pertinent factors include "whether the present position is "clearly inconsistent' with the earlier position" and whether the party successfully persuaded a court to accept the earlier position, "so that judicial acceptance of the inconsistent position in a later proceeding creates the perception that either court was misled." *Id.* at 1285 (citation omitted).

The Court finds all of these factors are present in Defendants' counterclaim for coverage for *MY BRYEMERE'S* losses under the Policy.

Carolina maintained, and its expert testified under oath, that the unseaworthy conditions built into the vessel's structure existed prior to purchase, and that the HMY Defendants negligently misrepresented the vessel's condition to the purchasers. O'Neill's current position, that the vessel's losses occurred after purchase, is clearly inconsistent with the prior proceeding and, if accepted, would make a mockery of the jury's verdict. If O'Neill's current position were to prevail, then the inescapable conclusion is that the either the HMY jury or this Court was misled. The Court concludes that it would be inequitable to allow the Defendants to assert the loss occurred during the Policy Period in the face of the HMY jury verdict ruling that it occurred prior to April 19, 2007.

Therefore, the Court finds that Defendants are judicially estopped from denying that the loss occurred outside the Policy Period.

The Court rejects Defendants' contention that the insurer is estopped from citing the Policy Period clause as a bar to coverage because it was not raised in the operative pleadings. The insured in a suit under an all-risks insurance policy must show a relevant loss in order to invoke the policy, and "proof that the loss occurred within the policy period is part and parcel of that showing of a loss." *Banco Nacional De Nicaragua v. Argonaut Ins. Co.* 681 F.2d 1337, 1340 (C.A.Fla., 1982). By filing their counterclaim for breach of the contract of insurance, asserting that coverage exists for their loss, the Defendants/Counter-Plaintiffs are implicitly alleging that the loss occurred within the Policy Period. As a result they bear the burden of proving the loss occurred when the Policy was in effect, and the insurer is permitted to introduce evidence to the contrary in its defense.

Further, the Court finds that the time of the loss has always been an issue in this case: witness the Counts in the First Amended Complaint concerning unseaworthiness at the inception of the risk and defense based on manufacturer's defect; and corresponding denials in Defendants' Third, Seventh, Eighth and Ninth and Affirmative Defenses.

The Court finds no merit in Defendants' assertion that the insurer conceded, as a judicial admission, in the First Amended Complaint that the damages, in fact, occurred during the Policy Period. Defendants maintain that the averments in paragraph 12, under the heading "Parties, Jurisdiction and Venue" that "the subject of this declaratory action occurred just after "*BRYEMERE*" departed Palm Beach, Florida" and in the "Wherefore" clause that "loss she

sustained on or about June / July 2007" constitute an admission that the damage occurred after the Policy attached.

Judicial admissions must be "deliberate, clear, and unequivocal." *Reynolds v. Roberts* 202 F.3d 1303, 1318 (C.A.11 (Ala.), 2000).  Statements taken out of context do not constitute "judicial admissions".  *Taylor v. Mooney Aircraft Corp*.  265 Fed.Appx. 87, 93, 2008 WL 490597, 4 (C.A.3 (Pa.),2008).  The isolated phrases lifted from the Complaint do not constitute Centennial's "affirmative, unequivocal" statement that the loss occurred at the time alleged by Defendants.

An objective reading of the Complaint supports Centennial's contention that the statements refer to O'Neill's allegations of when the loss occurred – not the insurer's.  Reading the entire document confirms that the insurer took the position that conditions onboard *MY BRYEMERE* barring coverage were in existence prior to the inception of the risk; see paragraphs 36; 38; 39; 41-52; 54; 55; 57; 60; 63; 65; 68; 77-80; 'Wherefore' clause (b – e).  The Defendants have agreed to a substantial portion of this position; see pre-trial stipulation [Joint Pre-Trial Stipulation, DE-152, Agreed Facts, Nos. 9 – 13].  Accordingly, the phrases cited by the Defendants do not meet the criteria specified by the Eleventh Circuit as necessary for a judicial admission.

Moreover, the Federal Rules of Civil Procedure, Rule 8(e), Construing Pleadings**,** enjoins:  **"**Pleadings must be construed so as to do justice".  The Court finds that to construe the allegations in the First Amended Complaint as an admission that the loss did occur during the Policy Period would constitute an injustice to the Plaintiff, and rejects the Defendants' argument.

Finally, the Court concludes that Pennsylvania's "effect test" is inapplicable in determining when the loss occurred under this policy of marine insurance. This test looks to whether there was but one proximate, uninterrupted and continuing 'cause' or whether there were multiple occurrences. In the latter situation, the court fixes the time of the occurrence by reference to the time when the injurious *effects* of the occurrence took place.  *Zimmerman v. Harleysville Mut. Ins. Co*.  860 A.2d 167, 170 -171 (Pa.Super.2004) (citing *Appalachian Ins. Co. v. Liberty Mut. Ins. Co.,* 676 F.2d 56 (3d Cir.1982).

This Court's Order made clear that Pennsylvania law applied to the interpretation of this contract of marine insurance in the absence of a controlling principle of federal law (Order DE

150 p. 4].  Pennsylvania's "effect test" is not applicable, as under settled principles of maritime law the doctrine of proximate cause governs the analysis of the causal connection between the loss and the peril insured against in a policy of marine insurance. *Standard Oil Co. v. United States*, 340 U.S. 54, 58 (U.S. 1950).  By definition, Pennsylvania's "effect test" only applies in the absence of one, proximate cause.   Admiralty courts, however, are admonished by the Supreme Court that "the doctrine of proximate cause is applied strictly in cases of marine insurance."  *Lanasa Fruit Steamship & Importing Co. v. Universal Ins. Co*.  302 U.S. 556, 562, 58 S.Ct. 371, 374 (U.S. 1938).   Accordingly, Pennsylvania's "effect test" is inappropriate in interpreting when the loss occurred for purposes of ascertaining coverage under Centennial's Policy.

### C. Centennial Policy Exclusions / Exceptions to Coverage

*i.*      Defect in the Manufacture of *MY BRYMERE*

The Court concludes that when the vessel eventually named *MY BRYMERE* was completed and launched in the water sometime in 2005 she was burdened with numerous structural defects as a result of her manufacture.  The vessel was not constructed in compliance with her intended design, as exemplified by the Blount drawings.   These defects included outboard longitudinal girders or stringers that were of insufficient height and 10 feet short of their intended length; missing bulkheads and flooring; and a fiberglass core in her hull topsides that was less than half of its designed width.  These missing aspects of the vessel's hull structure were indisputably "defects in manufacture".

The Centennial Policy excludes cover for "any loss, damage, claim or expense caused directly or indirectly, in whole or in part by any defect in design or manufacture of the yacht".  The question then becomes were the yacht's physical damages caused by these defects in manufacture?

Defendants' expert, naval architect David Pedrick, testified that in his opinion the delamination resulted from a sudden, catastrophic event.  In particular, Mr. Pedrick stated he considers that the fiberglass tabbing connecting the shortened girders to the hull bottom failed, resulting in additional bottom flexing that ultimately fractured the forward fuel tank brackets, "triggering" the delamination in the topsides as the yacht neared Ocean City, Maryland in July of

2007. Had the girders extended to the bulkhead, as designed, they would have been much more rigid, Pedrick testified, thereby greatly reducing the bottom flexion.

Accepting Mr. Pedrick's analysis, the vessel's physical damage; *i.e.* delamination of the fiberglass topside structure, begins with the fact that the longitudinal girders ended ten feet short of the forward bulkhead. Given that Mr. Pedrick concedes that the shortened outboard stringers were built into the yacht, the loss, of necessity, arose from a defect in manufacture. The Court agrees that the proximate cause of the loss is attributable to defects in the yacht's construction, specifically the fact that the outboard longitudinal girders were of insufficient length and height to absorb the stress that flowed into the fiberglass hull, ultimately causing the fuel tank brackets to fracture and the vessel's fiberglass topsides to come apart at the core. It therefore follows that coverage is excluded under the exception for defect in design or manufacture stated in the Policy.

The Defendants argue that there is an ambiguity in the Policy terms and definitions. Specifically, the Policy excludes cover for loss resulting from "defect in design or manufacture". It extends cover to damage resulting or caused by the latent defect, but not repair or replacement of the latent defect itself. The Policy defines latent defect, in part, as a hidden flaw in "the material of construction existing at the time of original building of the yacht". Therefore, Defendants submit, the Policy covers the loss in this instance, as *MY BRYEMERE'S* flaws were built into the yacht and hidden from O'Neill and Carolina until the 2007 voyage. At the very least, there is an ambiguous overlap between the exclusion for defect in manufacture and the definition of latent defect sufficient to warrant an interpretation favoring coverage under Pennsylvania law.

The Court finds that the structural imperfections and omissions in *MY BRYEMERE* clearly qualify as defects in "manufacture" as opposed to "the material of construction". The yacht's problems stemmed from the builder's failure to complete the construction properly, as designed, rather than the use of inherently faulty material, as found by the numerous experts who examined the vessel, including Mr. Pedrick. The outboard longitudinal girders were constructed of sufficiently robust material; the problem lay in the fact that there was insufficient length and height, or that cuts had been made in them at the time of construction to accommodate the fuel tanks. It is not that several forward bulkheads and transverse flooring were constructed of flawed material; rather, they were not installed by the builder. The experts did not criticize the

CASE NO.:  09-60551-CIV-ZLOCH

material used to construct the hull topside fiberglass core; they found fault with the amount of material missing.

The parties have agreed that these and other defects existed at the time of the original building of *MY BRYEMERE*; see Joint Pre-Trial Stipulation ¶ 9 -13 (DE 152).

Defendants' expert, Mr. Pedrick, lays the blame for the vessel's losses squarely on the foreshortened longitudinal girders. Their deficiency in length and height clearly exemplifies a defect in the *manufacture* of the yacht and not "a hidden flaw in the *material* of construction" (Court's emphasis).  While it is possible that under a different set of facts an ambiguity in the Policy language might be found, it is manifest that the losses incurred by *MY BRYEMERE* were directly and proximately caused by the defect in her manufacture. As observed by Pennsylvania's Supreme Court in interpreting an exclusion for pollution liability in a commercial general liability insurance policy:

> Contractual language is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. This is not a question to be resolved in a vacuum. Rather, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts.

*Madison Const. Co. v. Harleysville Mut. Ins. Co.* 557 Pa. 595, 606, 735 A.2d 100, 106 (Pa., 1999) (internal citation omitted).

The Court finds that under the particular set of facts of this case the Policy exclusion for loss attributable to defect in manufacturer is clear and unambiguous; accordingly, it must be given its plain meaning and effect.  *401 Fourth Street, Inc. v. Investors Ins. Group* 583 Pa. 445, 454, 879 A.2d 166, 171 (Pa., 2005).  Indeed, it is difficult to conceive of a clearer exemplar of defect in manufacture than *MY BRYEMERE*, whose seeds of eventual collapse were constructed into her very fabric by her builder.  As observed by the Third Circuit Court of Appeals in *Transp. Ins. Co. v. Pa. Manufacturers' Ass'n Ins. Co.*, 2009 U.S. App. LEXIS 21126 (3d Cir. Pa. 2009) quoting from Pennsylvania's Supreme Court in *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 557 Pa. 595, 735 A.2d 100, 106 (Pa. 1999) it is not the Court's role to "distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity".

Defendants argue that the recent decision of the Eleventh Circuit in *French Cuff, Ltd. v. Markel American Insurance Company,* 322 Fed Appx 669 (11th Cir. 2009) ("*French Cuff*")

mandates that the defects in *MY BRYEMERE'S* foam core, outboard stringers and propeller strut laminate are flaws in the material of construction.

The Court does not agree that the *French Cuff* decision is dispositive to its interpretation of the Centennial Policy.  Firstly, the suit in *French Cuff* was heard on the basis of the Court's diversity jurisdiction; admiralty jurisdiction was not invoked under Fed.R.Civ.P. 9(h); *Id.* p. 670 fn. 1.  The parties in *French Cuff* agreed that Florida law applied; *Id.*, p. 671.  The Eleventh Circuit based its interpretation of the Markel policy on Florida law; *Id.*, p. 672.  This Court is applying Pennsylvania law in the absence of controlling federal authority.  Because the ruling in *French Cuff* was based exclusively on the application of Florida state law, it is not "controlling federal authority" and, obviously, it is not Pennsylvania law.

More importantly, the *French Cuff* Court made it abundantly clear that its decision was premised on a detailed analysis of the Markel policy wording, which reads, as quoted by the Panel (this Court's emphasis):

> We will not pay for loss, damage or expense caused by or resulting from:
>
> c. *manufacturer's defects or defects in design*. However, if the loss or damage has not resulted from the negligence of any insured, *this exclusion does not apply to loss, damage or expense directly caused by* explosion, bursting of boilers, breakage of shafts or any *latent defect in the hull or machinery* (excluding the cost and expenses of replacing or renewing the defective part); *Id.*, pp. 670-671.

In reading this language the appeals court found:

> The policy excludes from coverage losses caused by manufacturer's defects or defects in design. Markel contends that the losses at issue here were caused by manufacturer's defects or defects in design, and we agree. But in a paragraph immediately beneath, and indented from that exclusion, the policy provides that, "this exclusion does not apply to loss, damage or expense directly caused by ... any latent defect in the hull...."  *The policy makes clear* that the manufacturer's defects or defects in design exclusion does not apply to a loss caused by a latent defect in the hull.

This finding and other language in the decision confirm that the Panel based its holding squarely on the language of the Markel policy, which provided cover for defect in manufacture if caused by, among other exceptions, a latent defect. The Centennial Policy, conversely, is markedly different in that it contains no exception to its exclusion from cover for loss arising from a defect in manufacture. The two insurance policies treat coverage for defect in

manufacture differently, with Centennial's Policy unambiguously excluding "any loss" so caused.  Accordingly, the Court finds that the decision of the Eleventh Circuit in *French Cuff* is not relevant authority in the interpretation of the Centennial Policy and the claim in this declaratory action.

ii.      *MY BRYEMERE'S* Defects were not Latent

The parties agree that the Policy does not cover repair or replacement of the latent defects themselves, but rather only the damage caused by those defects; see Pre-Trial Stipulation, agreed facts, ¶ 40.  The parties also agree that a latent defect is defined as:  "a hidden flaw in the material of construction existing at the time of original building of the yacht ... which is not discoverable by ordinary observation or known methods of testing" *Id*., ¶ 41.

Both parties rely, initially, on the Price pre-purchase survey conducted on March 22, 2007, to support their respective positions.  During trial Plaintiff's expert, marine surveyor Jim McCrory, testified that in his opinion Mr. Price had observed and reported several structural defects which should have caused him to suggest to Mr. O'Neill that a second, more thorough survey be undertaken, including "removals"; *i.e.* the temporary, limited dismantling of the yacht's  structure for inspection.  In particular, McCrory testified that Price had confirmed in his report that the top "hold down" brackets for the forward fuel tanks under the Master suite were chafing into the tanks; secondly, the after fuel tank under the cockpit deck was chaffing into the underside of the deck.   Price not only observed tank movement, a condition he deemed unseaworthy in deposition testimony, in McCrory's view that movement was symptomatic of structural problems in the vessel requiring further scrutiny.  According to McCrory, the simple use of a mirror or digital camera would have revealed the forward fuel tanks' failed mounting brackets, which would have triggered further inspection.

McCrory also criticized Price's examination of the yacht's topsides and failure to ascertain that something was amiss with the fiberglass construction. The Price report states that the surveyor sounded the vessel's topsides with a phenolic hammer, a common and inexpensive method of testing for imperfections in fiberglass construction. Marked dissimilarities in sounding the vessel's length should lead to more precise testing, such as measuring the thickness by unscrewing "through-hull" fittings or the insertion of a small diameter probe through the hull for measurement. McCrory testified that the subsequent revelation that 10 foot sections on both sides

44

of *MY BRYEMERE'S* 66 foot long hull were delaminated confirms that the testing was incomplete.

McCrory testified the Mr. Price should have observed other significant structural deficiencies during his examination, including large cut-outs made into the starboard inboard stringer and various bulkheads and some transverse frames, all of which seriously weaken the vessel's structure.  These conditions, in McCrory's opinion, could have been established through mere visual observation, or with the use of a mirror or digital camera.  In addition to these items, McCrory also detailed a number of other means of non-destructive testing and inspection, including concededly uncommon tools such as vessel plans, borescopes and ultrasonic gauging.

Centennial also offered the expert testimony of naval architect Mr. Peter Gimpel at trial. Gimpel testified that in his opinion, based upon his review of the record in the HMY litigation and personal inspection of *MY BRYEMERE'S* sister ship in Myrtle Beach, South Carolina, in May of 2010, that the major structural flaws were open and obvious.  In particular, Gimpel testified that the inboard longitudinal stringers did not continue to the adjoining bulkhead, but terminated in a squared ending short of the bulkhead.

These and other vessel defects and missing structural components were detectable through visual inspection and/or through the use of commonly used tools in marine surveying, Centennial insists, and were open and recognizable had the surveyor bothered to look.  As the defects plainly were discoverable by "known means of testing" they cannot be latent under the Policy definition.

The Defendants argue that the phrases "ordinary observation" and "known methods of testing" utilized in Centennial's definition of latent defect ultimately must be understood within the context of accepted practice among marine surveyors. Ordinary observation refers to "routine, usual" which, Defendants maintain, means the type of observation routine among marine surveyors of recreational vessels. Quoting the Merriam-Webster Online Dictionary, Defendants state the word "known" refers to "generally recognized".  Thus, "known methods of testing" means the standards and tests customarily employed by marine surveyors of recreational vessels.  O'Neill avers that this proposition is confirmed in the available judicial definitions of latent defect, which have referred to "customary" tests in the absence of a policy definition

citing, among other cases, *Tropical Marine Products Inc. v. Birmingham Fire Insurance Company of Pennsylvania* 247 F.2d 116 (5th Cir., 1957).

O'Neill argues that Price conducted all the known and customary non-destructive testing generally performed in a pre-purchase survey of a pleasure craft.  Defendants' expert, David Pedrick, testified that it is not customary for a marine yacht surveyor to perform destructive testing, or to engage in physical disassembly in conducting a pre-purchase survey, noting that the surveyor is engaged by the buyer and at the time of the inspection the vessel is the seller's property.  Defendants argued that Price could not have accomplished a more detailed inspection without engaging in either, or both, of these practices. Defendants claim the methods advocated by McCrory are either destructive or would require "an unusual level of observation gymnastics" (Pedrick, December 5, 2010 report) Mr. Pedrick testified that a marine surveyor generally does not acquire the builder's plans prior to a pre-purchase survey of a recreational vessel; further, most marine surveyors are not qualified to review and compare the architectural plans with the physical craft under inspection, as that is left to naval architects and engineers.

Defendants assert Price conducted all the standard and customary tests in his survey, which they argue is verified by the record evidence and the HMY jury verdict; see Defendants' Omnibus Motion for Partial Summary Judgment (DE 113 p. 13).  Given that Price did not find the defects in the yacht's longitudinal stringers, the missing structural pieces and the fiberglass topside panels, they must, perforce, be latent, claim Defendants.

The Court concludes that the major structural defects built in *MY BRYEMERE* were observable by "known methods of testing" and agrees that in the case of the fuel tank movement under the Master stateroom and cockpit, they were perceived by Price.  Prices' report clearly states under the section titled "Recommended Repairs" that the top brackets of the forward fuel tank are not welded properly, allowing the tank to "chafe" or move; and the after fuel tank was chafing against the underside of the deck, again confirming movement. (Price report, pp.  11-12, ¶ 2; 10).   Mr. Pedrick testified in the HMY trial that the condition of the fuel tank brackets rendered the vessel unseaworthy; see HMY Trial Testimony of David Pedrick, April 14, 2010, pp. 46:15 – 47:8, [DE 140 Ex. "D"].  The fact that Mr. Price did not, apparently, recognize the significance of his finding does not bear on the issue at hand; namely, whether the defects themselves were or were not discoverable by "known methods of testing".  If the defects in the

tank brackets were discovered, as confirmed by Prices' written observation and recommendation, then clearly they do not qualify as latent defects.

The Court is also persuaded by Mr. McCrory's testimony that large cut-outs made into the starboard inboard stringer and various bulkheads and some transverse frames were plainly visible is indicative that the vessel's structural inadequacies were within sight.  In particular, McCrory testified that the after ends of the longitudinal girders near the after fuel tank ended short of the transom, which revealed a problem with their length. Again, the issue is not the adequacy of the Price report but rather whether the defects were detectable by known means of testing.  The fact that they were in plain view confirms that they were patent.

Defendants' theory of loss, supported by Pedrick's testimony, is that the longitudinal girder was defective, which allowed the normal running stresses to pass through to the unsecured fuel tank brackets, resulting in their eventual fracture.  Once this occurred, the weight of the poorly secured fuel tanks added to the stress borne by the insufficiently-protected hull bottom, causing additional stress to flow through to the fiberglass topsides, causing delamination.  The Court finds that the record evidence demonstrates that the deficiencies in the tank brackets and longitudinal girder were sufficiently detectable by known means of testing and therefore do not qualify as "latent defects" under the Policy definition.

O'Neill argues the Eleventh Circuit's decision in *French Cuff, supra*, mandates a finding as a matter of law that the flaws in *MY BRYEMERE'S* foam core, outboard stringers and propeller laminate are latent defects. The *French Cuff* decision concerned a 64 foot fiberglass hulled catamaran that suffered delamination and buckling in her bulkheads and extensive flexion in her deck, attributed largely to the manufacturer's use of a fiberglass foam core that was either "too thin or too friable". 322 Fed.Appx. p. 670.  The Markel hull policy excluded damage caused by defect in manufacture, but excepted from the exclusion damage attributable to "latent defect in the hull".  The District Court granted the insurer summary judgment on the basis that a latent defect could not also be a defect in manufacture.  On appeal, the parties agreed that the vessel's failings were defects in manufacture and that they were latent defects, defined in the Markel Policy "a flaw in the material of the Insured Yacht's hull or machinery existing when the Insured Yacht or [its] components were built and not discoverable by common means of testing."  322 Fed Appx p. 673.

The insured argued that material that was "too thin or too friable" fell within the insurer's definition of "a flaw in the material" and therefore covered as a latent defect by Policy definition. Markel maintained that a latent defect could not also be a defect in manufacture,  and cited two cases holding that a latent defect cannot be a material which, although not defective in-and-of-itself, is not suited to the application for which it is used.  The *French Cuff* Panel specifically distinguished the two cases cited by the insurer as controlling authority because the "policies at issue did not define latent defect". *Id*.  The Panel then concluded that as the two parties had each put forth a plausible interpretation of the Markel Policy, the language was ambiguous and, under Florida law, must be interpreted to afford coverage.  322 Fed Appx pp. 673.-674.

The Court does not interpret the ruling in *French Cuff* to mandate that the construction of a yacht's fiberglass hull with insufficient fiberglass means, as a matter of law in the Eleventh Circuit, that such construction is a latent defect.  The Panel made it clear that its ruling was based on the specific wording of the Markel Policy. The Markel Policy contains an exception for damage caused by latent defect, as well as other exceptions, within its overall exclusion for defect in manufacture.   The Centennial Policy's exclusion for loss attributable to defect in manufacture is more broadly worded than Markel's, and is presented as a separate clause, without any exceptions.

The Court has serious doubt that the Eleventh Circuit intended its ruling to stand as controlling federal precedent on the interpretation of all hull and machinery insurance policies, as Defendants argue. The ruling was expressly conditioned on Florida law and the language of the Markel Policy. The Centennial Policy is governed by the general maritime law and, in the absence of controlling precedent, Pennsylvania law.  The Centennial Policy expressly refuses to insure "any loss, damage, claim or expense caused directly or indirectly, in whole or in part by any defect in ... manufacture of the yacht".  Under Pennsylvania state law "Courts in interpreting a contract, do not assume that its language was chosen carelessly." *401 Fourth Street, Inc. v. Investors Ins. Group, supra.*   The Court concludes that the parties clearly intended to exclude loss from defect in manufacture, including that attributable to latent defect.

CASE NO.:  09-60551-CIV-ZLOCH

**D.  Unseaworthiness at the Inception of the Risk**

The Court finds that the jury's verdict of negligent misrepresentation against the sellers and yacht brokers in the HMY trial conclusively establishes, as a matter of law, that *MY BRYEMERE* was unseaworthy at the inception of the Centennial Policy.

Every marine insurance policy contains an implied absolute warranty of seaworthiness. *The Caledonia*, 157 U.S. 124, 132, 15 S. Ct. 537, 541 (1895); *Kilpatrick Marine Piling v. Fireman's Fund Ins. Co*., 795 F.2d 940, 945 (11th Cir. 1986).  The warranty attaches at the inception of the risk. *Kilpatrick, supra.*  The existence of an implied warranty of seaworthiness in a policy for hull insurance is a federal maritime rule, and the interpretation of the respective rights and duties of the insured and insurer under such a policy is governed by federal maritime law. *D. J. McDuffie, Inc. v. Old Reliable Fire Ins. Co.,* 608 F.2d 145 147 (5th Cir. 1979).

Breach of the warranty voids the Policy; *Kilpatrick, supra,* 795 F.2d p. 945 and cases cited therein.  Once the Court finds that the warranty is breached there is no need to consider argument regarding possible coverage – the contract is void and underwriters are relieved of their responsibility, regardless of whether the breach caused the loss or is cured prior to the loss.  *D. J. McDuffie, Inc., supra,* 608 F.2d at 147; *Gulfstream Cargo, Ltd, supra,* 409 F.2d at 983, fn. 28 (citing 45 *C.J.S. Insurance* § 650 at 555).

The uncontroverted fact is that *MY BRYEMERE* was rendered unseaworthy by numerous, severe structural deficiencies in her very construction in 2005 and remained so on April 19, 2007, when the Centennial Policy attached.  Therefore, the Centennial Policy is void *ab initio* as a matter of the general maritime law.

The Court rejects Defendants' proposition that the Policy provision covering damage caused by latent defect negates the absolute warranty of seaworthiness.  The Court finds that the defects that were built into *MY BRYEMERE* were not latent, but rather discoverable by known means of testing.

The Court does not accept Defendants' conclusion that Centennial's "all risks" policy of insurance conveys the insurer's intention to waive the warranty of seaworthiness.  O'Neill cites the Fifth Circuit's decision in *Employers Ins. Of Wausau v. Occidental Petroleum Corp.,* 978 F.2d 1422 (5th Cir. 1992) and argues that by agreeing to cover loss occasioned by latent defect, Centennial has waived the warranty of seaworthiness, at least to the extent that latent defects

49

CASE NO.: 09-60551-CIV-ZLOCH

caused the unseaworthiness.  The Panel in *Employers* reviewed the effect of an expansive liner negligence clause adding cover for the "negligence, error of judgment or incompetence of any person" to the limited cover of a named perils policy to determine if it "unambiguously covers risks which would ordinarily be excluded by a breach of the implied warranty of seaworthiness." The Panel concluded that it did.

Contrary to a named perils policy, an all-risk policy covers all fortuitous losses not resulting from misconduct or fraud, unless the policy contains a specific provision expressly excluding the loss from coverage." *International Ship Repair and Marine Services, Inc. v. St. Paul Fire and Marine Ins. Co.*  944 F.Supp. 886, 892 (M.D.Fla.,1996).  Rather than expressing a far-reaching extension of coverage, Centennial's coverage for damage caused by latent defect is specifically identified as an exception to an exclusion from "all risk" cover.  This fact negates Defendants' argument that the exception memorializes the insurer's intention to augment cover and waive the absolute warranty of seaworthiness at the inception of the risk.  A plain reading of the language denotes Centennial's clear intention to decline to cover an identified "risk" that, unless specifically excepted, would otherwise be covered under an "all risks" policy. *Id*.

The Panel in *Employers* confirmed repeatedly that the warranty was "absolute" and noted that the Fifth Circuit had earlier affirmed that the warranty applied "unless expressly waived"; 978 F.2d pp. 1438-1439.  The Court finds that the exception to the Policy's express exclusion of "repair or replacement of any latent defect" does not constitute an express waiver the insured's absolute warranty of seaworthiness.

The Court does not agree that Defendants' citation to 7 *Couch on Ins*. §99:21 and the statement that "the warranty of seaworthiness under traditional maritime law should not be read into an all-risks yacht policy covering a vessel used only for private pleasure" is the law in the Eleventh Circuit – or, indeed, any other Circuit.  The respected commentator on insurance cites only one case, *Mathis v. Hanoever Ins. Co.,* 127 Ga. App. 89 (1972), for this novel proposition of maritime law.  This singular state court decision is not cited for this principal by any other court in its 39 year history; see 75 A.L.R.3d 410.  It is certainly not controlling authority in the Eleventh Circuit, where the warranty is held to apply without drawing any distinction regarding the vessel's use. *Kilpatrick Marine Piling v. Fireman's Fund Ins. Co*.  795 F.2d 940, 945 (C.A.11 (Ga.), 1986).

Accordingly, the Court finds that Policy is void due to the vessel's unseaworthiness at the Policy inception.

**E. The Losses Incurred by *MY BRYEMERE* were not Fortuitous**

The insured has the initial burden to prove a loss was fortuitous under an all risks policy of insurance. *Morrison Grain Co., Inc. v. Utica Mut. Ins. Co.* 632 F.2d 424, 430 - 431 (C.A.Fla., 1980); see also *Banco Nacional De Nicaragua v. Argonaut Ins. Co.* 681 F.2d 1337, 1343, fn. 9 (C.A.Fla., 1982); (9A *Couch on Insurance* §137:44 (citing *Northwestern Mut. Life Ins. Co. v. Linard*, 498 F.2d 556 ( 2d Cir. N.Y. 1974)).

This principle is one of the general maritime law. *Morrison Grain Co., supra,* 632 F.2d 429. Pennsylvania law is in accord. To recover under an "all risks" policy under Pennsylvania law the insured needs to show in its *prima facie* case for coverage that the covered property suffered some type of fortuitous damage. *Amitie One Condominium Ass'n v. Nationwide Property & Cas. Ins. Co.* 2010 WL 5071190, 3 (M.D.Pa., 2010) (citing *Miller v. Boston Ins. Co.,* 420 Pa. 566, 218 A.2d 275, 279 (Pa.1966)).

Insurance policies, even an "all risks" policy, cover only risks - not certainties. *Commercial Union Ins. Co. v. Daniels*, 343 F. Supp. 674, 677, (S.D. Tex. 1972).

A loss is not considered fortuitous if it results from an inherent defect in the object damaged, from ordinary wear and tear, or from the intentional misconduct of the insured. Fortuitous events are accidents or casualties of the seas, unforeseen and unexpected events, and are not losses occasioned by the incursion of water into a vessel's hull owing to the defective, deteriorated or decayed condition of the hull or ordinary wear and tear. *International Ship Repair and Marine Services, Inc. v. St. Paul Fire and Marine Ins. Co.* 944 F.Supp. 886, 892 - 893 (M.D.Fla.,1996).

The Court rejects Defendants' position that the Policy exception providing cover for physical loss or damage to the yacht resulting from latent defect modifies the requirement of fortuity. The only authority Defendants cite for this curious proposition is a paraphrase of the Eleventh Circuit's refusal in *French Cuff, Ltd. v. Markel American Insurance Company, supra,* to "read out" of the Markel policy the latent defect exception. However, when the Panel's statement is read in its entirety, it is clear that it does not affect interpretation of the Centennial Policy, which does not contain an exception to the exclusion for defect in manufacture for "latent

defects". There is nothing in the Eleventh Circuit's statement that remotely suggests that Defendants' burden of establishing a fortuitous loss is under consideration by the Court, let alone "modified".

Defendants affirm that from O'Neill's perspective, as well as that of the sellers and the surveyors who inspected the yacht prior to purchase, the losses certainly were unexpected. The Court cannot accept Defendants' characterization of O'Neill's expectations. Carolina pled in the HMY litigation, supported by the unanimous opinion of the numerous experts marshaled by her Owner and ultimately vindicated by the jury's verdict, that the "Vessel was not seaworthy, unsafe and structurally unsound, and was not built according to the designer's plans" before O'Neill's purchase. In other words, *MY BRYEMERE* was a loss – a "catastrophe" - waiting to happen: ("If the yacht were to encounter 6 to 8 foot seas offshore when running at 28 to 30 knots, the structural failure would be catastrophic and potentially result in loss of vessel and life"; Carolina, First Amended Complaint in HMY litigation ¶ 69, quoting from affidavit of naval architect Matthew Smith). *MY BRYEMERE'S* loss was inevitable; a certainty, with nothing left to chance, a point made repeatedly by Carolina in the HMY litigation.

Accordingly, the Court finds that O'Neill has failed to meet his burden that the physical loss to *MY BRYEMERE* was anything other than the inevitable result of the flaws in her construction. The rule of fortuity embodies a fundamental principle of Pennsylvania public policy "not to enforce an insurance coverage contract providing coverage for a non-fortuitous loss." *USX Corp. v. Adriatic Insurance Co*. 99 F.Supp.2d 593, 629 (W.D.Pa.,2000) (citing *Koppers Co., Inc. v. Aetna Cas. & Sur. Co.,* 98 F.3d 1440, 1447 (3d Cir.1996). The loss cannot be ascribed to a fortuitous event.

## F. Bank of America's Claim under the Mortgagee's Interest Clause

The Court finds there is no controlling federal precedent defining a mortgagee's interest clause and therefore Pennsylvania law applies in this instance. As explained by the Third Circuit Court of Appeals in *Gallatin Fuels, Inc. v. Westchester Fire Ins. Co*. 244 Fed.Appx. 424, 429, 2007 WL 2274437, 4 (C.A.3 (Pa.), 2007) interpreting Pennsylvania law, insurance policies regularly have one of two sorts of mortgagee payment clauses. An ordinary loss payable clause is one under which the mortgagee is a mere appointee of the fund whose right of recovery is not greater than that of the mortgagor. Where the loss payable clause contains language stipulating

that, as to the mortgagee, the insurance shall not be invalidated by any act or neglect of the mortgagor, this creates a separate and distinct contract on the mortgagee's interest, referred to as the New York standard or union mortgage clause. *See also, World of Tires Inc. v. Am. Ins. Co.*, 360 Pa. Super. 514, 520 A.2d 1388 (1987), *allocatur denied*, 516 Pa. 623, 532 A.2d 20 (1987); *Guarantee Trust and Safe Deposit Co. v. Home Mut. Fire Ins. Co.,* 180 Pa. Super. 1, 4-5, 117 A.2d 824, 825-26 (1955). The Parties agree that the Mortgagee's Interest Clause at issue is a standard clause.  The clause in the subject Policy reads in relevant part:

> It is understood and agreed that in the interest of the Mortgagee(s) $1,976,000, shall not be impaired or invalidated by any act or omission, or neglect of the mortgagor, owner, master, agent or crew of the vessel(s) insured by this policy or by failure to comply with any warranty or condition over what the Mortgagee has no control. (*sic*.)

> All other terms, conditions and valuations remain unchanged.

Bank of America maintains that the mortgagee's interest clause on the Centennial Declarations Page is a standard clause providing the mortgagee with a right of insurance superior to the insured's.  The Bank maintains that the clause compels the insurer to provide coverage, despite any misrepresentations by O'Neill on the application for insurance, and no matter who holds title as owner of the vessel, no matter who is the named insured, and without regard to any other Policy terms and conditions affecting coverage because the policy specifically covers M/Y BRYEMERE.

Centennial argues that an independent contract between it and BOA was never created because (1) there is no privity of contract or meeting of the minds between Centennial and BOA; (2) no consideration supports the contract claimed by BOA to exist between Centennial and Carolina, the mortgagor, which is necessary to support an independent contract in favor of the mortgagee; and, (3) because BOA never accepted, but rather rejected Centennial's offer to form a valid contract of insurance.

Additionally, Centennial argues that Bank of America is subject to terms and conditions of the Policy, namely that coverage only exists for physical loss or damage which occurs during the policy period, and that the Policy excludes coverage for manufacturing and latent defects. The Court finds Centennial's assertion that BOA is, at best, that of a loss payee, subject to the same coverage defenses as the named insured, to be persuasive, and based on the rationale below, finds the Bank is not entitled to cover under the Policy.

### i. __The Mortgagee's Interest Clause__

Where a policy is issued to the owner of a vessel and a mortgagee clause is attached, the insurer is, in effect, making two contracts. First, the insurer it is agreeing to indemnify the vessel's owner for the loss of or damage to the property, and second, it is insuring the mortgagee's interest in the security for its debt. If the circumstances are such that the insurer would be liable to the owner under the policy, a payment to the mortgagee would be in relief of the mortgage debt; but if, depending on the circumstances, the insurer would not be liable to the owner, its liability to the creditor may, depending on the circumstances, remain. In the latter case, the liability to the creditor would be the same as though the company had insured the creditor's interest alone and, if it pays the creditor, it would be entitled to be subrogated to the creditor's rights against the vessel owner/debtor. *See Taylor v. Seckinger,* 184 A.2d 317, 319 (Pa. Super. 1962) (citations omitted).

While a standard mortgagee clause creates a separate, distinct and independent contract between the insurer and the mortgagee, as observed in *Gallatin Fuels*, the fact remains that the mortgagee's entitlement to recovery under the Policy is still defined by the other Policy terms and conditions. *Gallatin Fuels, Inc. v. Westchester Fire Ins. Co.*, 244 Fed. Appx. 424, 430 (3d Cir. 2007). Although a separate contract: "that does not mean that a court is free to invent terms for that separate contract. Rather, the terms of that separate contract between [insurer and loss payee] are defined in the policy." *Id.* at 432.

A mortgagee clause is not an independent contract in the sense that none of the terms of the policy apply to it. It is not in itself complete, but becomes so by reading the policy in connection with it, and the reading of the two together does not clash with the notion that the mortgagee clause creates an independent contract between the company and the mortgagee. The policy furnishes the terms of the contract between the owner and the insurer. The mortgagee clause is the contract between the insurer and the mortgagee, quite separate from the policy, yet engrafted upon it, and must be understood by reference to the policy which renders it certain and complete. *See Abbottsford Bldg. & Loan Ass'n v. William Penn Fire Ins. Co.*, 130 Pa.Super. 422, 425-427, 197 A. 504, 505 - 506 (Pa. Super. 1938).

A mortgagee clause then, being contractual in nature, and considered a separate independent contract of insurance, is subject to the defenses which are available in any action for

breach of contract save those specifically waived by the clause itself. *See* 4 Couch on Ins. ¶65:31 (2011). "Like any other contract there must be an offer, acceptance, and consideration or mutual meeting of the minds." *Lobar, Inc. v. Lycoming Masonry, Inc.*, 876 A.2d 997, 1001 n. 3 (Pa. Super. 2005) (quoting *Yarnall v. Almy*, 703 A.2d 535, 538 (Pa. Super. 1997)). Therefore, a standard mortgagee's interest clause is then only binding if there is an offer which reflects such a meeting of the minds between the insurer and the mortgagee, after it is accepted in manner that reflects that same meeting of the minds and executed.  *See* 4 Couch on Ins. ¶65:33 (2011). The consideration for the insurer's undertaking with respect to the mortgagee under the standard clause is the consideration for which the policy was itself issued to the mortgagor. *See May v. Market Ins. Co.,*  387 So.2d 1081, 1084 -1085 (La. 1980), citing *Officer v. American Eagle Fire Ins. Co.*, 175 La. 581, 143 So. 500 (1932).

Where separate and independent insurance of the mortgagee's interest exists, there must be both an insurer and insured mortgagee. *Id.* As the *May* Court put it: a standard or union mortgage clause brings the insurer and the mortgagee into *relations of privity*, to convert the mortgagee into a party to the contract of insurance, to give to the mortgagee separate and distinct protection to his interest, to create in him an interest under the policy distinct from that of the property owner and to in fact make him the assured. *Id.* (emphasis added).

The wording in the mortgagee's interest clause must reflect the same meaning as those words found in the mortgage. The Court accepts then the wording set forth in the Preferred Ship Mortgage that the "mortgagor" is Carolina Acquisition LLC, and only Carolina Acquisition LLC.  The Court also finds the sole "owner" of BRYEMERE is Carolina.  The rights of Bank of America under the mortgagee's interest clause must be analyzed accordingly.

The mortgagee's interest clause only provides that the interest of BOA shall not be invalidated by any act or omission of the mortgagor (Carolina), the owner (Carolina), the master (no master involved), an agent of the vessel (no agent of the vessel involved) or the crew (no crew involved) of the vessel. Notably, it has never been argued by Centennial that Carolina did or failed to do anything that affected BOA's interest. The mortgagee's interest clause does not provide separate coverage for BOA, it only provides that certain acts or omissions or failure to comply with any warranty or condition by the owner, mortgagor, master, agent or crew of the vessel will not invalidate BOA's interest.  Because Centennial has never made such an argument,

the mortgagee's interest clause is not at issue for purposes of determining whether Bank of America is entitled to coverage.

BOA's status then is as a loss payee under the Policy. A loss payee may only recover if the named insured may also recover. Thus, because recovery by the named insured O'Neill is barred by breach of utmost good faith, the fact that the loss did not occur within the policy period, and in light of the other policy terms and conditions, Bank of America is barred from recovery. *See Great Lakes Reinsurance (UK) PLC v. Morales*, 760 F.Supp. 2d 1315, 1327 (S.D. Fla. 2010).

### ii. No valid independent contract of insurance was formed with BOA

The cases discussing mortgagee's interest clauses do not contemplate the rather bizarre and unusual current set of facts before the Court. For one, the cases discussing the separate and distinct contract in favor of the mortgagee and the rights of the mortgagee there under appear to presume that the named insured under the Policy is the vessel owner and the named insured is also the mortgagor. *See Taylor, Abbottsford, May, supra.* Such is not the case here. There is, therefore, a dearth of authority to support the position of BOA that they may recover under a mortgagee's interest clause where the mortgagor is not a named insured under the policy and the named insured under the policy is neither the vessel owner nor the mortgagor.

Nevertheless, the mere fact that a mortgagee's interest clause is a separate and distinct contract of insurance does not support the conclusion that a valid, separate policy of insurance arose for the benefit of BOA without the requisite elements of contract formation present, which they are not.

#### a. No Consideration

"[T]he formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and consideration." *Lawrence v. Walker*, (Pa.Com.Pl. 2009), citing Restatement (Second) of Contracts §17(1) (1979). When there is lack of manifested intent or consideration, a contract does not exist. *Estate of Beck*, 489 Pa. 276, 414 A.2d 65 (1980). The consideration for issuance of a policy to the owner of the property is also the consideration for the company's promise to pay the mortgagee under the mortgage clause. *See Prudential Ins. Co. of America v. German Mut. Fire Ins. Ass'n of Lohman*, 105 S.W.2d 1001, 1008 (Mo.App. 1937); *May, supra.* It is universally accepted that a change or modification of a contract must be

supported by consideration. *J.M.P.H. Wetherell v. Sentry Reinsurance, Inc.*, 743 F.Supp. 1157, 1170 (E.D.Pa., 1990)(citations omitted).

BOA cannot recover because consideration is lacking to support a separate contract of insurance.  The consideration for Centennial's undertaking with respect to BOA under the standard clause *should be* the consideration for which the policy was itself issued to the *mortgagor*, Carolina. However, here, the policy was not issued to the mortgagor, Carolina, because Carolina is not the named insured. In other words, the consideration paid for the issuance of the policy to J. Brian O'Neill, does support the creation of a separate contract with BOA because the consideration paid only supports a contract arising in favor of BOA *if Carolina was the insured.* Hence, notwithstanding the fact than an additional premium was paid by O'Neill for the mortgagee's interest clause, consideration is lacking to support the existence of BOA's separate contract of insurance protecting its interest as a mortgagee under a mortgage in which Carolina is the mortgagor and vessel owner.

The testimony shows BOA requests and requires the policy or binder naming the mortgagor as the named insured before it proceeds to fund the loan. The BOA mortgage also clearly establishes that BOA will only fund a mortgage with vessel owner as the mortgagor. Those facts alone establish the materiality of accurately disclosing the identity of the vessel owner to the insurer. BOA's agent/broker in this transaction was Beacon Marine Credit. At the time Sharon King was attempting to finalize the procurement of insurance naming O'Neill as the insured, multiple communications were exchanged between Sharon King at Willis, Desiree Foulds for O'Neill, and Peta-Ann Blair and Melanie Jolles for BOA through Beacon Marine. The record reflects that Sharon King did not issue only one (1) binder. Instead, she issued at least **_three (3) binders_** bearing the names of different insureds, to wit: (1) DE 274-4, Exhibit "A-3", the binder issued at 5:11 p.m. from Sharon King to Desiree Foulds with the cover sheet stating "See revised Binder with the LLC name. Sorry for the error."; (2) an unknown binder, which has never been produced by O'Neill or Willis, bearing the named insured "J. Brian O'Neill" which would have logically preceded the 5:11 p.m. binder given the statement by King "revised Binder with the LLC name", (after all, there would need to be an initial binder to "revise"). In fact, King's customer activity listing  (*see* DE 285-1, Exhibit "D"; Bates Stamp "Willis 352") reflects the initial (never produced) binder was sent to Desiree Foulds at 5:07 p.m.; and finally, (3) a

third revised binder sent at 5:41 p.m. (*see* DE 285-1, Exhibit "E" bearing Bates Stamps CA-008283-CA008285 and Bank of America Bates Stamp JBO 0164 – 0165) comprised of a Willis coversheet stating "Attached is corrected binder.  I have faxed copy to Peta-Ann Blair.", which includes special conditions (not previously included) and the proper hull number as requested by Peta-Ann Blair in an e-mail to Sharon King. *See* correspondence from Blair to King dated April 19, 2007 at 5:32 p.m. *See* DE 285-1,  Exhibit "F".

The original binder sent from Sharon King to Desiree Foulds at 5:07 PM as reflected in King's customer activity listing (DE 285-1, Exhibit "D", Bates Stamp "Willis 352"), was based on the original quotation prepared by Susan Bonner in which Centennial offered to insure J. Brian O'Neill as the named insured. This initial binder was sent to Desiree Foulds, acting as agent for O'Neill, and was also sent to and rejected by Beacon Marine Credit as agent for and on behalf of BOA.  Foulds would not have rejected the original binder naming O'Neill as the insured nor would she have independently requested that O'Neill be removed as the named insured and Carolina Acquisitions LLC be listed as the named insured on the revised binder because all correspondence exchanged between King, Foulds, and Susan Bonner reflected J. Brian O'Neill as the named insured, including the Application, Emails, Email subject lines, the Policy, and the Letter of Compliance. *See* DE 109-1, Exs. "A", "E", "G", "H", "I", "J", "N, "P", and "R".  It was BOA, through its agents Peta-Ann Blair and Melanie Jolles at Beacon Marine, that requested that the initial binder sent by Sharon King be changed and re-issued with Carolina Acquisition LLC as the named insured in place of J. Brian O'Neill. This action by BOA, through its agent Beacon, rejected the quotation offer of Centennial to issue a policy naming J. Brian O'Neill as the insured and, instead, demanded instead that Centennial issue a policy naming Carolina Acquisition LLC as the named insured. BOA rejected the terms and conditions of Centennial's offer to insure and demanded different terms and conditions which were never accepted by Centennial. BOA now seeks to enforce policy terms and condition to which it never agreed to be bound and, in fact, rejected, while seeking to hold Centennial to policy terms and conditions which it never agreed to accept.

Centennial's underwriter's testified King had no authority to alter the terms of the binder to deviate from the Policy terms offered by Centennial. When Sharon King changed the named insured, she nullified any potential contract between Centennial and BOA for want of

consideration, offer and acceptance. As in the case of ordinary contracts, a contract for temporary insurance by binder must be supported by offer, acceptance and consideration. *See* 1A Couch on Ins. § 13:2 (2011). While the original 5:07 p.m. binder was in fact supported by the consideration paid for the Policy, it was rejected by BOA and the Carolina binder, with its critical different term, was not supported by consideration or accepted by Centennial. No contract between Centennial and BOA can exist on these grounds.

### b.   No meeting of the minds between the Parties

There was also no meeting of the minds between Centennial and BOA to create the separate contract of insurance with BOA as the insured.  Where separate and independent insurance of the mortgagee's interest exists, the parties to the separate contract are the insurer and the insured mortgagee. Therefore, there must be a meeting of the minds as to the identities of mortgagor vessel owner and named insured under the policy and both should be the same. In Centennial's mind at the time of contracting, Centennial understood the insured vessel owner and mortgagor to be J. Brian O'Neill. However, in the mind of BOA at the time of contracting, as required by its own mortgage and internal policies and procedures, BOA contemplated that Carolina was both the sole vessel owner, the mortgagor, and the named insured under the Policy. A meeting of the minds can only occur when both parties mutually agree to the same terms. *Frank v. Mailboxes Etc.*, 2004 WL 3092492, at *414 (Pa. Com. Pl. 2004). The major disconnect between Centennial and BOA regarding the identity of the insured vessel owner/mortgagor makes it clear the same terms were not agreed upon, there was no "meeting of the monds" and a separate contract in favor of BOA was never formed. For these reasons, there was no meeting of the minds and Centennial and BOA were never brought into a relation of contractual privity as the standard or union mortgage clause intends. *See May, supra.*

### c.   Rejection of the original binder precluded formation of a valid independent insurance contract

The moment the original unproduced 5:07 p.m. binder was rejected by BOA and requested to be revised to reflect Carolina as the named insured, Centennial's offer of insurance was rejected nullifying the separate and distinct contract of insurance in the form of the mortgagee's interest clause. Essentially, the request for revision constituted a rejection and counteroffer which was never accepted by Centennial.

In accordance with general principles of contract law, a proposal does not become a completed contract until it is accepted by the insurer on the same terms on which the offer was made. If the acceptance modifies or alters any of the terms of the proposal, it becomes a counteroffer. The applicant can also make a counteroffer by rejecting the contract offered and making a counter proposition, in which case there is no contract unless the proposition is accepted by the insurer. *See* 1A Couch on Ins. § 11:8 (2011).

Under any set of circumstances, neither offer by either party, Centennial's offer to insure O'Neill and BOA's demand for a policy naming Carolina as the named insured, was accepted by the other. When the original binder bearing O'Neill as the named insured was rejected by BOA via counteroffer, King had no authority to accept the counteroffer on behalf of Centennial and list Carolina as the named insured. No matter who requested the revision to the binder, Foulds or Beacon Marine, the original binder (initial offer) naming O'Neill as the insured was rejected by BOA and no contract with BOA or naming Carolina as the named insured was formed. The principle that the standard mortgage clause gives rise to an independent contract between the mortgagee and the insurer is, of course, subject to the qualification that no such contract arises if the mortgagee rejects the proposed terms and conditions of the policy. *See* 4 Couch on Ins. § 65:32 (2011), citing *Continental Ins. Co. v. Ferro*, 109 N.J. Eq. 374, 157 A. 558 (N.J.Ch.1931) (Mortgagee's rejection of insurance policy precludes independent contract between it and insurer; Mortgagee cannot reject fire policy and thereafter claim benefit under it for loss sustained.)

Centennial underwriter Susan Bonner testified that she was never sent the binder bearing the name Carolina as the named inured; therefore, her acceptance of the counteroffer never occurred and no separate contract between Centennial and BOA was formed. Subsequently, when the Policy was issued, by terms of the binder itself, any and all temporary binders were cancelled and replaced by the terms of the Policy issued, with J. Brian O'Neill as the named insured on the Policy.

Critical to the mortgagee clause becoming engrafted on the Policy, and thereby creating a separate independent contract of insurance in favor of BOA, was the initial binder containing the initial offer and terms of the Policy as agreed by Susan Bonner. These terms were rejected, and BOA's separate contract of mortgagee's interest insurance could not be engrafted on a Policy

that simply did not exist. No meeting of the minds between Centennial and BOA occurred, BOA rejected the terms and conditions of insurance to which Centennial was willing to be bound and coverage does not follow for BOA.

### d.  No Privity of Contract

To support its argument that BOA is entitled to recovery under the Policy, BOA casts aside the fact that Carolina, its mortgagor, was not insured on the Policy by stating: "minor discrepancies as to the named 'owner' of the subject vessel" do not cloud the fact that the "insured vessel is and always has been the *Bryemere.*" *See* DE 270, p. 3-4. As further support, BOA relies on the fact that O'Neill is the sole owner and shareholder of Carolina. *Id.* Essentially, BOA wants to disregard the separate corporate existence of Carolina in order to recover. Pennsylvania contract principals provide BOA's position cannot be sustained.

A corporation is "distinct and separate from the individual shareholders. It has a real existence with rights and liabilities as a separate legal entity." *U.S. v. Sain,* 141 F.3d 463, 474 (3d Cir. 1998), *cert. denied,* 119 U.S. 190. This is true even if a single individual owns and controls all of the corporation's stock. *Id.* at 474; *Lumax Industries, Inc. v. Aultman,* 543 Pa. 38, 669 A.2d 893 (1995)("A corporation is an independent legal entity, even where one person owns the stock"). There is a critical difference between O'Neill and Carolina that Defendants cannot ignore.

BOA's attempt to summarily dispose of Carolina's corporate structure is frowned upon by Pennsylvania Courts.

> [o]ne cannot choose to accept the benefits incident to a corporate enterprise and at the same time brush aside the corporate form when it works to (the shareholders') detriment. The advantages and disadvantages of the corporate structure should be seriously evaluated at the time such organization is contemplated and after incorporation has been selected, the shareholders cannot be heard to argue that the courts should not treat them as a corporation for some purposes and as such a corporation for other purposes, whichever suits their present economic interest.

*Kelleher v. Com.*, 704 A.2d 729, 731 (Pa.Cmwlth.1997), citing *Sams v. Redevelopment Authority,* 431 Pa. 240, 244-45, 244 A.2d 779, 781 (1968).

It is undisputed that O'Neill is the only "named insured" on the Policy [DE 109-1, Ex. "A"]; yet, Carolina is the vessel owner and mortgagor even if O'Neill signed the mortgage in his capacity as Managing Member of Carolina [DE 273-1, Ex. "G"]. This is so because O'Neill

contracted with Centennial in his individual capacity as the individual insured for the Policy, but contracted in his corporate capacity as Managing Member of Carolina for the mortgage.  *Id.; see* DE 109-1, Ex. "G".  Pursuant to Pennsylvania law, the use of an individual signature, without indication that it is being signed in a representative manner, imports a personal liability. *In re LMcD, LLC*, 405 B.R. 555, 568 (Bkrtcy.M.D.Pa.2009), citing *Watters v. DeMilio,* 390 Pa. 155, 159, 134 A.2d 671, 674 (1957); *Strauss v. Berman,* 297 Pa. 432, 435, 147 A. 85, 86 (1929); *Flexlume Corp. v. Norris,* 98 Pa.Super. 530, 532 (1929). Thus, there being no indication in the insurance policy application that O'Neill was acting on behalf of Carolina, he was acting in his personal capacity in obtaining the insurance while at the same time, his signature on the mortgage clearly establishes that Carolina was the corporate vessel owner and mortgagor, not O'Neill.

In order to somehow create the appearance of privity of contract between Centennial and BOA, where privity only exists between Centennial and O'Neill on one hand, and Carolina and BOA on the other, BOA would have the Court disregard the corporate structure with a "reverse corporate veil-piercing" theory. However, the burden of proving that the corporate veil can be disregarded is on the party who attempts to negate the existence of the separate corporate entity. *In re RBGSC Inv. Corp*., 242 B.R. 851, 858 (Bkrtcy.E.D.Pa.2000)(citations omitted)(Mere fact that defendant corporations which signed management, license and consulting, or settlement agreements were all related to each other because they shared a common corporate parent did not mean that each corporation could be considered a signatory to each agreement, in absence of specific circumstances which called for a piercing of corporate veil.)

BOA has not presented any evidence that warrants disregarding the different legal existence between O'Neill and Carolina and the Court declines to do so. Since the basis of the bargain between Centennial and BOA was premised on a clear misunderstanding, i.e, the identity of the name insured, vessel owner and mortgagor, and the mortgagee's interest clause relies on the presumption that the mortgagor *is* both the vessel owner and the named insured, no independent contract between Centennial and BOA can exist. *See In re RBGSC Inv. Corp*., 242 B.R. at 860 (Bkrtcy.E.D.Pa.2000)("The most important provisions of the contracts as written turn out to be, for purposes of this litigation, who are the parties to the contracts and the terms relating to the durations of the contracts.")

CASE NO.:  09-60551-CIV-ZLOCH

BOA also makes the argument that the property insured, BRYEMERE, is not in dispute and as such, BOA is entitled to coverage. However, the Court does not find this position to be legally sound either. Pennsylvania courts have consistently held that insurance contracts are personal contracts of indemnity that protect the insured's interest in the property, but that they are not an indemnity on the property itself. *See In re Gorman's Estate,* 321 Pa. 292, 295, 184 A. 86, 87 (1936) (an insurance policy is a personal contract that exists between the insurer and insured; the building itself is not insured); *Mutual Benefit Ins. Co. v. Goschenhoppen Mut. Ins. Co.,* 392 Pa.Super. 363, 368, 572 A.2d 1275, 1277 (1990) (a fire insurance policy is a personal contract of indemnity on the insured's interest in the property and not on the property itself); *McDivitt v. Pymatuning Mut. Fire Ins. Co.,* 303 Pa.Super. 130, 135, 449 A.2d 612, 615 (1982) (a husband who owned property as a tenant by the entireties with his wife had no interest in proceeds from insurance covering a property since the contract was a personal contract between the wife and the insurer and did not pertain directly to the insured property); s*ee also* 43 C.J.S. 489 (1978).

Consequently, in determining a third party's interest in or rights to proceeds from an insurance policy, this court must assess the parties' interest in the contract, not their interest in the property which it insures. *See In re CS Associates*, 161 B.R. 144, 147 (Bkrtcy.E.D.Pa.1993).

The subject Policy is a personal contract of indemnity. One of the three defining characteristics of a marine insurance policy is that it is "a contract of indemnity." *Certain Underwriters at Lloyds, London v. Inlet Fisheries Inc.,* 518 F.3d 645, 654-55 (9th Cir.2008) (Marine insurance is, simply, insurance against "the losses incident to the marine adventure." Marine insurance generally has three "central conceptual elements:" (1) "it is a contract of *indemnity* against loss;" (2) "the indemnity … is only triggered by an accident or fortuity;" and (3) "the "adventure' or peril insured against must be specifically *maritime* in character.")(internal citations omitted).

Therefore, because the subject Policy is a personal contract of indemnity, and because Pennsylvania law governing indemnity contracts only protects the *insured's* interest in the property, not the property itself, BOA's argument is without merit. Merely because the policy was procured by O'Neill to protect *his* interest in BRYEMERE does not mean that BOA, only in

63

privity with Carolina, can seek unfettered coverage without proving BOA possessed a valid, separate contract of insurance, which it does not.

Therefore, the Bank's entitlement to recovery under the Policy is defined by the Policy terms and conditions; much like the insured, coverage cannot be afforded to the Bank.

### iii. Bank of America is not entitled to coverage because the loss occurred outside the Policy period and the vessel was unseaworthy at the inception of the risk

The Court finds Defendants' expert David Pedrick's testimony to be contradictory to his opinions rendered in the HMY[2] litigation brought by CAROLINA ACQUISITION LLC and O'NEILL against the selling broker, and declines to allocate his opinions any weight for purposes of determining when the damage to *M/Y BRYEMERE* occurred. Specifically, Pedrick previous testified in detail that all the physical damage to the yacht caused by the structural defects occurred prior to the beginning of the Policy period in April 2007 and the pre-purchase survey of the vessel in March 2007.

The evidence shows a multitude of experts examined the vessel on behalf of CAROLINA, O'NEILL and CENTENNIAL and all agree the structural defects found by them in the yacht were manufacturing defects resulting from the builder's failure to follow design specifications. Centennial's expert, Mr. Gimpel states he is in agreement with David Pedrick's statements in the HMY litigation that the damages, including the delamination, failure of the hull tabbing, failure of the fuel tank brackets, and failure of the hull shell bottom existed prior to the purchase of the vessel in April 2007.

The Court finds the loss occurred prior to the commencement of the Policy period. The defects in the construction of *M/Y BRYEMERE* existed before O'Neill purchased the vessel and before the risk attached under the Policy at issue in this case. The structural problems observed in BRYMERE existed before April 2007 and did not suddenly occur. They happened over a long period of time and not just in the relatively few operating hours that happened after April 2007. The delamination of the hull topsides discovered in BRYEMERE in Rhode Island in July 2007 occurred and existed prior to the purchase of the vessel by Brian O'Neill and the attachment of the risk under the subject Policy in April 2007. Based on this finding, the Policy does not cover loss that occurred prior to the Policy period, and the Bank is not entitled to coverage for the loss.

---

[2] *Carolina Acquisitions, LLC v. Double Billed, LLC et al*, Case No. 07-61738 CIV-ZLOCH

CASE NO.:  09-60551-CIV-ZLOCH

Based determination above, the Court also finds the fact that the vessel was unseaworthy at the inception of the risk precludes the Bank's recovery as well.

> **iv.  Bank of America cannot recovery because the Policy specifically excludes coverage for manufacturing defects as set forth above.**

The Court has already found that, based on the Policy wording, there is no coverage for loss attributable to the various manufacturing defects created by the failure of the builder to follow the design specifications.  Because Bank of America has been deemed to be no more than a loss payee in this instance, it cannot recover any more than O'Neill in this instance. Therefore, there is no coverage afforded to the Bank for the cost of repairing or replacing the structural defects created by the failure of the builder to follow the design specifications.

## G.    DAMAGES

In the event of coverage, the Policy limits any recovery to the costs of repairs of physical damage caused by latent defects, but does not include repair or replacement of the latent defect itself. Defendants' damages claim in this case includes the costs of repairing any damage allegedly *caused by* the structural defects in BRYEMERE by reason of the builder's failure to build the vessel as provided by the design specifications. The Parties agree, however, that there is no coverage, and no right to recovery, for the cost of repairs necessary to correct those structural defects *themselves* and restore BRYEMERE to the "as built" condition intended by the designer.

Defendant's offered the testimony of their naval architect expert David Pedrick to assert there are three "latent" defects in M/Y BRYEMERE that caused the damage for which Defendants seek to recover repair costs.  The three alleged "latent" defects that purportedly caused the damage to the vessel, according to Pedrick, are: (1) the foreshortened port and starboard outboard girders; (2) the deficient fiberglass core thickness in the topsides (5/8" rather than 1 3/8"); and, (3) the water-saturated laminate of the hull bottom by the propeller's struts.

Pedrick further testified these three items caused the following resulting damage.  The defective girders allegedly caused damage to: (1) the tabbing at the forward end of each girder (the fiberglass material connecting the girders to the inside of the hull bottom); (2) minimal and shallow cracks to the outside of the hull shell under the forward end of the defective girders; and, (3) failure of the port and starboard outboard fuel tank mounting brackets. The insufficient fiberglass core also allegedly caused delamination between the port outer skin and starboard

inner skins of a section of the hull topsides core.  Finally, the water-saturated laminate purportedly compromised the internal strength of the propeller strut foundation.

Defendants claim the amount due under the Policy is $915,571.67 after application of the $47,000 deductible and the addition of $10,500 for ten days' loss of use of the yacht, but presented no expert testimony regarding the specific cost of repairs or the damages amount in general. The Court struck Defendants' damages expert Mike Taylor before trial. *See* DE 256 and 346.

Defendants offered no expert testimony or other evidence as to the specific cost of repairing only the physical damage allegedly caused by "latent defects" as opposed to the cost of repairing the defects themselves.

Centennial offered evidence from its expert Peter Gimpel that there are no consequential damage costs as repairing the manufacturing defects would altogether rectify the damage allegedly *caused by* the structural defects. The Court agrees. His conclusions are supported by testimony at trial that: the tabbing for the girders necessarily had to be re-done to replace the defective girders; the cracks to the outside of the hull shell under the forward end of the defective girders were necessarily repaired when additional fiberglass was added to the hull as part of Pedrick's original plan to reduce flexing of the bottom panels; and, the cost of removing and replacing the tanks themselves, according to Pedrick, had to be incurred to gain access to the deficient outboard girders and would have been incurred even if the brackets were not fractured.

Pedrick also conceded that repairing the delamination would have accomplished nothing as the core thickness would have still been defective and required replacement, a cost not covered by the policy.  In fact, because it would accomplish nothing, the delamination repair was never actually repaired.  In addition, Pedrick admitted that he cannot state with any certainty when the hull bottom laminate became saturated precluding recovery for any consequential damage allegedly derived from this defect as well.

Pedrick also testified that his overall goal in planning the repairs was to "meet or exceed the requirements of the American Bureau of Shipping," indicating an intention not simply to repair the yacht's damage, but to better its condition.  The Policy specifically states that it does not cover "any improvement or betterment of the yacht".  The Court finds there were no repairs

to any damage allegedly caused by the so called latent defects and, therefore, no covered damages at all.  Defendants are to recover nil.

In any case, Defendants offer no testimony regarding the apportionment of repair costs between the cost of repairing the structural defects and that of repairing any damage allegedly caused by said defects. Defendants did not present any evidence as to specific repair costs whatsoever.  As such, Defendants have failed to carry their burden of proving damages in this case and can recover nothing for this reason as well.

The plaintiff's burden on damages has been stated in various ways in admiralty cases: "to establish that the amount claimed was reasonable and that it fairly reflected the actual costs of repairing the [damaged property]," *United States v. M/V Gopher State,* 614 F.2d 1186, 1187 (8th Cir.1980); "to prove that the amount claimed to repair the damages is fair and reasonably related to actual damages incurred," *id.,* 472 F.Supp. 556, 559 (E.D.Mo.1979); to prove "the damages he has actually suffered," *The Helen Moran,* 160 F.2d at 504–05; to prove "the amount, as well as the fact, of damages," *Pizani v. M/V Cotton Blossom,* 669 F.2d 1084, 1088 (5th Cir.1982). All of these formulations include what has been called scope or extent of repairs necessary in this case.

The general rule is that actual cost of repairs must be proven. Proving "necessary repairs" is still a part of plaintiff's burden, and it may be, in particular cases, that expert testimony is required. *See George's Radio and Television Co., Inc. v. Insurance Co. of North America,* 549 F.Supp. 1014, 1016 (D.C.Md.1982).

Under Pennsylvania law, the same standard applies. In order to establish compensatory damages, the burden is upon the proponent to produce evidence which affords a reasonably fair basis for calculating the amount of loss actually sustained.  See *Kaczkowski v. Bolubasz,* 491 Pa. 561, 567, 421 A.2d 1027, 1030 (1980). Further, the loss claimed has to be substantiated by reliable evidence and with a reasonable degree of certainty. *Acchione & Canuso, Inc. v. Pa. Department of Transportation,* 501 Pa. 337, 461 A.2d 765 (1983); *Standard Pipeline Coating Company, Inc. vs. Solomon & Teslovich, Inc.,* 334 Pa. Super. 367, 496 A.2d 840 (1985); *Larry Armbruster & Sons, Inc. vs. Public School Building Authority,* 95 Pa. Comwlth. Ct. 310, 505 A.2d 395 (1986).

Because the Policy provides no right to recovery for the cost of repairs necessary to correct the alleged latent or structural defects *themselves,* the Court finds there are no

CASE NO.:  09-60551-CIV-ZLOCH

consequential damage costs as repairing the manufacturing defects would altogether rectify the damage allegedly *caused by* the structural defects. Defendants similarly cannot recovery because they have failed carry their burden on damages to establish that the amount claimed for costs was reasonable and fairly reflected the actual costs of repairing the vessel.

Accordingly, after due consideration, it is

**ORDERED AND ADJUDGED** as follows:

1. The Court finds in favor of Plaintiff AIG CENTENNIAL INSURANCE COMPANY such that no coverage exists under the subject Policy;

2. The Court finds against Defendants J. Brian O'Neill, Carolina Acquisitions LLC, and Bank of America, N.A. such that no recovery shall be had under the Policy;

3. The Court finds against Defendants J. Brian O'Neill, and Bank of America, N.A. such that judgment is entered against Defendants on their counterclaim for breach of contract against AIG CENTENNIAL INSURANCE COMPANY;

4. This Court retains jurisdiction to address any remaining concerns or issues regarding attorneys' fees and costs;

5. Final Judgment will be entered by separate Order.

**DONE AND ORDERED.**

Respectfully submitted,

   *Marcus G. Mahfood*
ANDREW W. ANDERSON (213144)
aanderson@houckanderson.com
ADRIA G. NOTARI (87272)
anotari@houckanderson.com
MARCUS G. MAHFOOD (41495)
mmahfood@houckanderson.com
HOUCK ANDERSON P.A.
200 South Biscayne Blvd., Suite 300
Miami, Florida 33131
Telephone:  (305) 372-9044
Facsimile:   (305) 372-5044
*Attorneys for Plaintiff*

CASE NO.:  09-60551-CIV-ZLOCH

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 23rd day of February, 2012, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

_____*Marcus G. Mahfood*_____
Marcus G. Mahfood

HOUCK ANDERSON, ATTORNEYS AT LAW